David Bricker (158896)
Guillaume Buell (*pro hac vice*)
**THORNTON LAW FIRM LLP**
9430 West Olympic Boulevard, Suite 400
Beverly Hills, CA 90212
Telephone: 310-282-8676
Facsimile: 310-388-5316

1 Lincoln Street, 25th Floor
Boston, Massachusetts 02111
Telephone: 617-720-1333
Facsimile: 617-720-2445
Email: dbricker@tenlaw.com
Email: gbuell@tenlaw.com

Ivy T. Ngo (249860)
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 E. Evans Avenue
Aurora, Colorado 80014
Telephone: 303-757-3300
Facsimile: 720-213-5131
Email: ngoi@fdazar.com

*Co-Lead Counsel for the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| DAVID KIPLING, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FLEX LTD., MICHAEL M. MCNAMARA, and CHRISTOPHER E. COLLIER,<br><br>Defendants. | Case No. 5:18-cv-02706-LHK-SVK<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>**DEMAND FOR JURY TRIAL** |

TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 2

II. JURISDICTION AND VENUE ........ 9

III. PARTIES ........ 10

A. Lead Plaintiff ........ 10

B. Defendants ........ 10

IV. CONTROL PERSON ALLEGATIONS ........ 11

V. SUBSTANTIVE ALLEGATIONS ........ 12

A. Flex, principally an electronics manufacturing company, attempted to diversify its customer base via a "Sketch-to-Scale" strategy to become more involved in the design and development of customers' products ........ 12

B. After signing Nike as a customer and entering the shoe manufacturing business for the first time, Flex made the Nike contract a cornerstone to its Sketch-to-Scale strategy ........ 13

C. Throughout the Class Period, Flex missed Nike's expectations by wide margins, putting the Nike project on a failing trajectory ........ 16

D. Despite the rosy public display they put on during the Class Period, Flex did not have a smooth relationship with Nike and was not meeting Nike's expectations ........ 20

E. During the Class Period, McNamara and Dennison closely monitored and managed the Nike contract, with McNamara publicly taking personal ownership ........ 22

F. Throughout the Class Period, Defendants touted to the market that the Nike project was on a steady, timely trajectory to "breakeven" or become profitable by FY 2018 ........ 23

G. Defendants partially disclosed operational and client issues related to the Nike contract, but continued to mislead the market regarding its trajectory and commercial viability ........ 28

H. Flex revealed the whole truth about the Nike project when it announced the winding down and termination of its co-manufacturing operations in Guadalajara and the departure of McNamara from the Company ........ 31

I. Defendants misled the market about Flex's internal controls over accounting as they related to customer contracts during the Class Period ........ 32

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS AND ANALYST AND MARKET REACTIONS THERETO ........ 34

A. January 26, 2017 – Press Release on Form 8-K........ 34

B. January 26, 2017 – F3Q 2017 Earnings Call ........ 35

C. January 27, 2017 – Quarterly Report on Form 10-Q ........ 36

D. February 15, 2017 – Goldman Sachs Technology and Internet Conference........ 37

E. April 27, 2017 – F4Q 2017 Earnings Call ........ 38

F. May 16, 2017 – Annual Report on Form 10-K........ 40

G. May 23, 2017 – J.P. Morgan Global Technology, Media & Telecom Conference ........ 41

H. July 27, 2017 – Press Release on Form 8-K ........ 42

I. July 27, 2017 – F1Q 2018 Earnings Call – Partial Corrective Disclosure........ 42

J. August 1, 2017 – Quarterly Report on Form 10-Q ........ 45

K. September 6, 2017 – Citi Global Technology Conference ........ 46

L. October 26, 2017 – Press Release on Form 8-K ........ 47

M. October 26, 2017 – F2Q 2018 Earnings Call ........ 48

N. October 30, 2017 – F2Q 2018 Quarterly Report on Form 10-Q........ 50

O. November 7, 2017 – RBC Capital Markets Technology, Internet, Media and Telecommunications Conference ........ 51

P. November 14, 2017 – UBS Global Technology Conference........ 52

Q. December 4, 2017 – Raymond James Technology Conference........ 53

R. December 19, 2017 – Meeting with UBS ........ 53

S. January 25, 2018 – Press Release on Form 8-K........ 54

T. January 25, 2018 – F3Q 2018 Earnings Call ........ 55

U. January 26, 2018 – F3Q 2018 Quarterly Report on Form 10-Q ........ 57

V. February 14, 2018 – Goldman Sachs Technology and Internet Conference........ 58

W. April 26, 2018 — Partial Disclosure of the Truth Regarding Nike and Acknowledgment of Accounting Issues — F4Q 2018 Earnings Call ......59

X. May 10, 2018 – Investor & Analyst Day ......64

Y. May 16, 2018 – J.P. Morgan Global Technology, Media & Communications Conference ......66

Z. July 26, 2018 – F1Q 2019 Earnings Call ......67

AA. September 5, 2018 – Citi Global Technology Conference ......68

VII. THE TRUTH IS REVEALED ......69

VIII. NO SAFE HARBOR ......71

IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ......72

A. The Individual Defendants closely monitored and had direct ownership of the Nike contract ......72

B. The Nike project was core to Flex's operations ......75

C. The timing and circumstances of Dennison and McNamara's departures support a strong inference of scienter on their part ......77

X. CLASS ACTION ALLEGATIONS ......77

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ......79

XII. LOSS CAUSATION ......80

COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ......82

COUNT II: Violation of Section 20(a) of the Exchange Act Against Individual Defendants McNamara and Collier ......84

PRAYER FOR RELIEF ......85

JURY DEMAND ......85

This lawsuit is a class action arising under the federal securities laws that is before the Court because from January 26, 2017 to October 25, 2018, Defendants Flex Ltd. ("Flex" or the "Company") and several of its most senior executives—CEO Michael McNamara, CFO Christopher Collier, President Michael Dennison, and Vice President Kevin Kessel (the "Individual Defendants," together with Flex, "Defendants")—made false and misleading statements concerning Flex's management and execution of customer contracts.

Defendants consistently assured the market that (1) the Company's internal controls over financial reporting, including those related to customer contracts, were adequate and proper, and (2) the most crucial contract in the Company's pipeline, a massive and very expensive contract with Nike to automate sneaker manufacturing, was repeatedly hitting key milestones while timely proceeding on a steady trajectory to profitability. Defendants failed to disclose or warn the market of material facts showing that the Nike contract was failing operationally and not commercially viable, instead pointing to purported accomplishments and a timely trajectory to breaking even. By October 25, 2018, Defendants fully disclosed the truth concerning Flex's management and execution of customer contracts. First, Flex admitted near the end of the Class Period to ***material weaknesses*** in its internal controls over financial reporting as they pertained to customer contracts—a fact that ***only*** came to light because a whistleblower forced Flex to disclose it. Second, Flex was so poorly executing on the Nike contract that it was ***winding down*** its Nike manufacturing operations after failing to sustainably manage the contract, having invested hundreds of millions of dollars in what was CEO McNamara's personal project.

On the last day of the Class Period, the ***same day*** the Nike project was terminated, and just months after confirming the internal control material weaknesses, McNamara abruptly retired with, as one market analyst pointedly observed, no "obvious choices for a replacement from the existing senior management." As a result of Defendants' misstatements and omissions, Flex's stock lost *half its value* during the partial and full disclosures of the truth, falling from $15.29 on January 26, 2017, to $7.09 on October 26, 2018.

Lead Plaintiff Bristol County Retirement System ("Bristol County"), individually and on behalf of a class of similarly situated persons and entities, brings this Amended Class Action

Complaint against Defendants. Lead Plaintiff's claims are brought upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Flex with the Securities and Exchange Commission; (2) reports issued by analysts covering or concerning Flex and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Flex, its business, and the Individual Defendants; (4) an investigation conducted by Bristol County's attorneys, including interviews with former Flex employees; and (5) other publicly-available information concerning Flex, its business, and the allegations contained herein. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This action is brought on behalf of a Class consisting of all purchasers of Flex's publicly traded securities, including common stock and exchange-traded options on such common stock, during the period from January 26, 2017, to October 25, 2018, inclusive (the "Class Period"), and who were damaged thereby. The following are excluded from the Class: (a) Defendants; (b) members of Defendants' immediate families; (c) any person who was an officer or director of Flex during the Class Period; (d) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (e) Flex's employee retirement and benefit plan(s), if any; and (f) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq*. (the "Exchange Act").

2. Flex is incorporated in Singapore and has corporate executive offices in San Jose, California. Flex is, and during the Class Period was, primarily in the business of providing packaged consumer electronics and industrial products for original equipment manufacturers. For financial reporting purposes, Flex uses a fiscal year that ends on March 31. The following chart sets forth the fiscal periods referenced throughout this pleading:

| Flex Fiscal Period | Calendar Period |
|---|---|
| F3Q 2017 | Oct. 1, 2016 – Dec. 31, 2016 |
| F4Q 2017 | Jan. 1, 2017 – Mar. 31, 2017 |
| FY 2017 | Apr. 1, 2016 – Mar. 31, 2017 |
| F1Q 2018 | Apr. 1, 2017 – June 30, 2017 |
| F2Q 2018 | July 1, 2017 – Sept. 29, 2017 |
| F3Q 2018 | Sept. 30, 2017 – Dec. 31, 2017 |
| F4Q 2018 | Jan. 1, 2018 – Mar. 31, 2018 |
| FY 2018 | Apr. 1, 2017 – Mar. 31, 2018 |
| F1Q 2019 | Apr. 1, 2018 – June 29, 2018 |
| F2Q 2019 | July 1, 2018 – Sept. 30, 2018 |
| F3Q 2019 | Oct. 1, 2018 – Dec. 31, 2018 |

3. In October 2015, Flex announced a partnership with Nike to enhance Nike's shoe manufacturing process, including automating and modernizing the very labor-intensive process by which Nike manufactured sneakers. The contract was monumentally important to Flex. Defendants claimed, and the market believed, that Nike would soon be one of Flex's "top ten" customer contracts. The Nike contract was part of Flex's strategic pivot at that time to what it called its "Sketch-to-Scale" strategy, which was an effort to identify new customer opportunities that involved Flex earlier and more frequently in product design, development, and manufacturing. Market analysts repeatedly expressed positive investor sentiment on the importance of what Nike meant to the Company's valuation.

4. A key aspect of Flex's "Sketch-to-Scale" contract with Nike was that it would become one of Nike's manufacturing partners—designing, building, and operating automated processes for manufacturing shoes. The fulcrum to the partnership was Flex's Nike operations in Guadalajara, Mexico: a brand-new factory designed specifically to manufacture sneakers for Nike.

**<u>January 2017 to July 2017: Nike on a steady, timely trajectory to profitability</u>**

5. From the beginning of the Class Period, Defendants repeatedly touted breakthroughs Flex was purportedly achieving on the Nike contract while also reassuring the market that this very expensive project was on a steady, timely trajectory to breakeven/profitability. On January 26, 2017, McNamara declared that "Our Sketch-to-Scale strategy remains firmly on track as reflected in our third quarter performance…." He also announced that "the innovations that [Nike is] seeing coming out of our team, that is our team, our

guys and their guys, are probably above expectation of what they anticipated . . . the results that they're seeing are above expectations."

6. The following month, on February 27, 2017, Collier confirmed that "we anticipate and see profitability being achieved" by the end of fiscal year ("FY") 2018, meaning March 2018. On May 23, 2017, Collier again stated that with the Nike contract, "this year is a year of investment, next year steps into profitability and probability."

7. The market did not learn of any issues underlying the Nike contract until Flex's July 27, 2017 quarterly earnings call with analysts when McNamara partially disclosed the truth that the contract was more expensive, driving heavier losses than previously disclosed. He explained that the "biggest driver" of Flex's investment costs into the Nike contract "is we're moving into a brand new facility" in Guadalajara Mexico. But, he assured the market that the "transition into that facility will be complete by October [2017]. So, that's really the last major implementation." He further boasted that "we have a whole roadmap of process changes that will yield results, going into the new facility, the natural learning curve and the people coming along, between all those things, we do expect it to move into a break-even situation by the end of our fiscal year."

**<u>July 2017 to April 2018: Nike still on a steady, timely trajectory to profitability and no issues pertaining to internal controls over customer contracts.</u>**

8. Collier reiterated the importance of the new Guadalajara factory to turning the Nike project towards operational success on September 6, 2017, when he noted that Flex was "moving into a customized, tailor-built facility in our Q3 [*i.e.*, the next month] that's specifically designed to optimize around the manufacturing requirements for our partner…." When asked about the March 2018 breakeven in terms of the "general trajectory" on November 7, 2017, Kessel confirmed that "what we said back in May has been very much intact."

9. By December 4, 2017, Defendants had announced that the Guadalajara factory—dubbed a "dream factory" by one market analyst, a term McNamara agreed with—had gone online in October "according to schedule." It was described as "a state-of-the-art purpose-built factory, which the complete entire solution is in the four walls and enables us to have better process flows,

material flows, production flows…. We see multiple signs of the accelerated scaling effects. We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation….” Prior to the new “dream” factory coming online, Flex was operating out of other older plants.

10. On January 25, 2018, just a few weeks away from the much-heralded March breakeven/profitability date, McNamara reiterated that it was “still our target. We still have a line of sight to that.” Collier affirmed that “there's a lot of different evidential proof points that show that our trajectory is pretty firm.” Likewise, on February 14, 2018, Kessel stated: “we haven't made any changes to our view on Nike …. Q4 is where we're focusing on breaking even as we exit the year….” In truth, Defendants knew that Nike had already veered off that trajectory.

11. At the same time that Defendants were painting a false and misleading picture about its most important customer project, throughout most of the Class Period, Defendants failed to disclose material weaknesses in Flex's internal control over financial reporting related to customer contracts. From January 2017 to April 2018, Flex, McNamara, and Collier repeatedly assured the market, investors, and the Securities Exchange Commission that Flex's financial statements were prepared in accordance with generally accepted accounting principles, and that they had designed or caused to be designed such internal control over financial reporting as to provide reasonable assurance regarding the reliability of the Company's financial reporting.

**April 2018 – October 2018: Weak Internal Controls; Nike breakeven delayed; Dennison out**

12. The truth partially emerged on April 26, 2018 when Flex disclosed (1) weaknesses in internal controls relating to the Company's customer contracts and (2) operational issues plaguing Nike. First, Flex confessed that it was investigating a whistleblower's allegation that the Company improperly accounted for certain obligations in a customer contract and certain related reserves, and that the SEC had been informed. Then, on June 14, 2018, Flex admitted that it, in fact, had material weaknesses in its internal controls over accounting for accrued customer obligations related to customer contracts.

13. Flex stunned the market with news that the Nike contract was not profitable and that certain key milestones had in fact not been accomplished. McNamara conceded that Flex did

not have the right "design content – shoe content that's designed to run on a highly automated line." But, he reassured the market that the issues were now behind the Company: "Nike has released a full set of products designed for our automation system which is now beginning to ramp in mass production." And he doubled-down on the contract's reset trajectory, confirming profitability in just two more quarters. Thus, while Defendants partially disclosed prior known issues with Flex's execution of the Nike contract, they assured the market that those issues had been addressed and that profitability was imminent.

14. A few weeks later, Dennison (who had been running the Nike project and would soon leave the Company) further conceded at Flex's May 10, 2018 Investor & Analyst Day that Flex had been missing three key things necessary to the Nike project's success: (1) "shoes designed or redesigned to work in an automation process;" (2) for Flex's "automation system to actually now convert from being completed to actually going into production;" and (3) "a material supply chain that would allow us to fill that factory and make the automation run." Nike's Chief Operating Officer, Eric Sprunk, also revealed that he and McNamara spoke "a lot" about the contract and that all along, based on its experience, Nike had told McNamara and Dennison that Flex would not be able to move as quickly as it was stating, a crucial fact that Defendants withheld from the market.

15. Even after Defendants admitted on April 26, 2018 that profitability on the Nike project would be delayed another six months and the Company was investigating its accounting relating to customer contracts, they had continued to paint the picture of a steady trajectory to breakeven on the Nike contract with capable management at the helm of its customer contracts. For example, that same day McNamara boasted to the market that a "unique automation system" had been developed with Nike and released into production on April 11. More success. And the Company showed that it was able to conclude an accounting investigation in just a couple of months without having to issue a restatement.

16. While the market was displeased with the delay on profitability and the audit investigation announced on April 26, 2018, analysts continued to be deceived. Deutsche Bank Securities Inc. wrote that evening that "the bull thesis [on Flex] has largely been anchored around

the benefits of the Nike partnership." UBS Securities LLC wrote on April 27 and May 11, 2018 that Flex's "Management overpromised in getting to breakeven with Nike" and that it was "too optimistic" about the ramp. UBS "expected management shuffling," but importantly wrote that the "hard parts" of the Nike project, "getting an automated line running and Nike designing for automation-seem to be going pretty well."

17. On May 10, 2018, McNamara reassured the market that "we have a lot of content that's been designed for that system, and we're driving a numerous amount of productivity." No mention was made of any issues relating to the Nike contract not being commercially viable. And on May 16, 2018, Kessel spoke at length about how the "overall opportunity remains unchanged" with Nike, that "this should be and can be ***easily*** a $1 billion opportunity," and that Flex was "making progress" on "solving … materials management…." McNamara reaffirmed this during Flex's July 26, 2018 earnings call, announcing—alongside his taking personal oversight of the Nike project—that "[w]e remain confident in achieving our target for profitability during the second half of fiscal 2019." As of September 5, 2018, he was still touting Nike as "a very win-win kind of relationship" with "a line of sight to productivity that'll drive this to our targets by the end of the year."

18. But that was not the case. On October 25, 2018, the truth about the Nike contract and the capability of Flex's management was fully revealed. Contrary to previously disclosed information, the Company announced that it was immediately winding down the co-manufacturing operations with Nike because they were not commercially viable, as it was later announced that Flex could not sustainably manage the contract. In addition, McNamara – who just three months earlier announced he was taking "direct ownership" of the Nike project to ensure its "operational success" – was suddenly retiring from the Company with, as one market analyst put it, no "obvious choices for a replacement from the existing senior management."

19. The market was shocked by these revelations. Flex's stock lost $3.61 per share – over 21% – on April 26, 2018, and another $3.82 per share – 35% – on October 26, 2018:




**<u>Former Flex employees confirm Nike was in chaos</u>**

20. Former Flex employees point to a wide range of operational issues plaguing the Nike project that further confirm the falsity of Defendants' Class Period misstatements and raise a strong inference Defendants' knew their statements were false and misleading or were reckless in making them:

- On an operational level, the Guadalajara factory was unable to work at full capacity because the people hired did not have the right skills or abilities. As a former Flex Senior Director of Quality for the Nike account explained, Flex's business model for Nike was not set up appropriately because Flex hired people that had no idea how to build shoes. While Flex hired a "few people" with a footwear background, they did not last and were let go. A Flex Supervisor at its plant confirmed that 90% of the production line employees came from an electronics background, and had no experience with a soft materials production line. Everyone working on the project

knew that the automated processes wouldn't work and that the shoes needed to be made by hand.

- Flex consistently missed Nike's internal deadlines and was manufacturing shoddy products with high rejection rates. While Nike was expecting product rejection rates between one and five percent, former Flex employees described rejection rates between 20 and 50 percent with only ten percent being perfect quality "A" shoes. Flex could not complete passing quality greater than 50-65% of what came off the lines.
- Nike was "very upset" because Flex was not meeting Nike's quality standards or demand and delivery targets. Demand was not being met by Flex because it did not have enough materials on hand and it had to scrap products that did not meet quality standards. This was one of Flex's main problems—dealing with fabric and shortages. Flex was having a difficult time tracing fabric and would have to use 10-15% more fabric to account for lost materials. Nike and Flex could not determine how to resolve supply issues.
- A former Director of Supply Chain further recounted how Nike failed to offer training or provide personnel with helpful knowledge.
- Even after the new Guadalajara factory went live, Flex encountered bottlenecks that made hitting targets impossible. Furthermore, Flex encountered numerous issues with the machines in the production lines at the factory, replacing many of its machines at least monthly, and the machines on one production line in particular being modified *twenty times* over an 11-month period during the Class Period.
- McNamara and Dennison frequently visited the plant and participated in meetings with local management.

## II. JURISDICTION AND VENUE

21. These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Flex maintains offices in this Judicial District, and at least one of the Individual Defendants is employed by Flex in this Judicial District.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

25. On October 1, 2018, the Court appointed Bristol County to serve as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Bristol County is a defined-benefit contributory retirement system in Massachusetts that oversees more than $650 million in total assets. Bristol County purchased Flex securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

### B. Defendants

28. Flex is incorporated in Singapore and maintains offices in San Jose, California. Flex's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "FLEX." Flex's Quarterly Report filed on Form 10-Q with the SEC on November 2, 2018 states that 526,586,420 shares of Flex were issued and outstanding as of October 25, 2018.

29. Michael M. McNamara ("McNamara") is, and was at all relevant times, the Chief Executive Officer ("CEO") of Flex and a member of its Board of Directors. On October 25, 2018, the last day of the Class Period, Flex announced McNamara would leave the Company effective December 31, 2018.

30. Christopher E. Collier ("Collier") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Flex.

31. Kevin Kessel ("Kessel") is, and was at all relevant times, the Vice President of Investor Relations and Corporate Communications of Flex.

32. Michael "Mike" Dennison ("Dennison") was, during part of the Class Period, the President of Flex's Consumer & Technologies Group ("CTG"). Dennison's employment with Flex ended in approximately July or August 2018, after the truth about Flex's issues with the Nike project began to emerge.

33. During the Class Period, McNamara and Collier oversaw the Company's operations and finances. They were intimately knowledgeable about all aspects of Flex's financial and business operations and intimately involved in deciding which disclosures would be made by Flex. The Individual Defendants made various public statements on behalf of Flex during the Class Period, and participated in Class Period investor conferences.

## IV. CONTROL PERSON ALLEGATIONS

34. McNamara and Collier, by virtue of their high-level positions at Flex, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

35. McNamara and Collier, as senior executive officers of Flex, and McNamara as a director of Flex – a publicly held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws – each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Flex's publicly-traded common stock would be based on accurate information. McNamara and Collier each violated these requirements and obligations during the Class Period.

36. McNamara and Collier, because of their positions of control and authority as senior executive officers of Flex, and McNamara as a Flex director, were able to and did control the content of Flex's SEC filings, press releases, and other public statements issued by or on behalf of Flex during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, McNamara and Collier are responsible for the accuracy of the public statements alleged herein.

37. McNamara and Collier are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Flex common stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Flex's business, operations, and management and execution of customer contracts, and the intrinsic value of Flex's common stock and options; and caused Lead Plaintiff and members of the Class to purchase Flex common stock and options at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

38. Unless otherwise noted, all references to Flex's business and operations refer to events that occurred during the Class Period as defined herein.

### A. Flex, principally an electronics manufacturing company, attempted to diversify its customer base via a "Sketch-to-Scale" strategy to become more involved in the design and development of customers' products

39. Flex is incorporated in Singapore and is principally in the business of electronics manufacturing services. Flex publicly describes itself as a provider of "design, engineering, manufacturing, and supply chain services and solutions – from conceptual sketch to full-scale production." The Company is divided into four business segments: Communications & Enterprise Compute ("CEC"), Consumer Technologies Group ("CTG"), Industrial & Emerging Industries ("IEI"), and High Reliability Solutions ("HRS"). Within these four segments, Flex purported to be exposed to a wide range of industries and customers.

40. The CTG segment—which handled the Nike contract—focused on consumer-related businesses in connected living, wearables, gaming, augmented and virtual reality, fashion, and mobile devices; various supply chain solutions for notebook personal computers, tablets, and printers; and supply chain optimization for non-electronics products.

41. As part of its effort to diversify its customer base, Flex was trying to expand beyond its historical focus on electronics. The Company rebranded itself as Flex (it was previously known as Flextronics International, Ltd.), and pivoted its business strategy to a concept it coined as "Sketch-to-Scale." This was, as Kessel described it during the Class Period, a "change" in Flex's "strategy to … lead with design and engineering…." Flex wanted to approach customers "much earlier in the overall product cycle" so it could do more than just manufacturing for them. Sketch-to-Scale became so important to Flex that it consistently used the term to describe its operations in opening statements of quarterly filings with the SEC. At the start of the Class Period, on January 26, 2017, McNamara stated that Flex's "Sketch-to-Scale strategy is helping us drive further diversification and more strategic relationships with customers," emphasizing that "[c]atalysts for future growth that we are actively investing in include our growing Nike relationship on the back of reinventing the shoe manufacturing industry and supply chain using automation…." During the Class Period, Dennison went so far as to say that for Flex, Sketch-to-Scale was the Nike project.

### B. After signing Nike as a customer and entering the shoe manufacturing business for the first time, Flex made the Nike contract a cornerstone to its Sketch-to-Scale strategy

42. In October 2015, Flex announced that Nike had selected it to help enhance its shoe manufacturing process, with a particular emphasis on automating and modernizing the very labor-intensive process by which Nike manufactured sneakers. This was part of Nike's larger push to create regional manufacturing centers where it could respond to the marketplace with must faster supply chain velocity, getting from the design cycle of a sneaker to the sales cycle in store shelves in a much more accurate and precise way. McNamara termed it a "contract with a market leader." At the same time, Nike wanted to lower required inventory levels and end up with less scrap. The

fulcrum to this Sketch-to-Scale co-manufacturing project would become a custom-built factory in Guadalajara, Mexico where shoes could be manufactured in a more automated process. Flex was building the factory, the automation processes within it, and hiring the factory's employees. Defendants consistently told the market that this "dream" factory was key to making the Nike contract operationally successful and profitable. After the factory was activated in October 2017, Defendants boasted about the supposed vast contributions it was making to the success of the Nike project.

43. As early as February 15, 2017, Collier referred to the Nike contract as being a "meaningful foundational element for Flex" the following year. Kessel conveyed the same message to the market on May 23, 2017, stating that "with Nike, you're actually going to see that business- we believe, over time, we're going to see the margins begin to expand because we've talked about that partnership being at a higher operating margin potential as we scale it up," elaborating that "in the case of Nike, we're talking about supply chain automation, a whole host of other factors that come to bear, absolutely it's very interesting to us. And we believe that with us being able to provide that additional value, we can see higher margins." Collier similarly boasted on the same day that the Nike project is "going to be a very profitable relationship with an iconic, highly innovative partner that we anticipate a long journey with. You'll see some elevated levels of profitability which helps you think about how the CTG mix of business and its margin profile shifts." Just a few days later, RBC wrote that "[a]t scale, Nike will have a higher margin profile than FLEX's op-margins. We think Nike will become 'multi-billion' revenue stream with >2x corporate margins over time."

44. During Flex's May 10, 2018 Investor Day, in particular, Dennison emphasized just how "incredibly important" the Nike contract was to Flex's "Sketch-to-Scale" strategy:

> The value to us in getting – in being successful with this program is incredibly important. **Mike [McNamara] talks a lot about portfolio expansion and Sketch-to-Scale and platform leverage. <u>And in our mind, this is Nike – this is our Nike partnership.</u>** Our ability to expand our portfolio into the footwear business is a major objective for us. To do that, we really had to create a Sketch-to-Scale solution at scale in Mexico and beyond to drive volume.

The Nike contract was a cornerstone to Flex's "Sketch-to-Scale" strategy.

45. The market understood the importance of the Nike co-manufacturing project to Flex. For example, immediately after the Class Period began on January 27, 2017, UBS wrote that "[a] real swing factor [for Flex] could be in the traditional low margin (3%) CTG group, where Bose and Nike each could be 10% company customers within a few years, **with Nike margins eventually more like HRS's 6-9%**." Market analysts made similar comments throughout the rest of the Class Period, including Argus Research Company noting on January 31, 2017 that Flex "expects the operating margin on Nike production to be significantly higher that CTG baseline margins" over time. As a result, Nike dominated discussions relating to Flex, leading an analyst for RBC to note early in the Class Period, Nike "comes up in every discussion with Flex I think off [*sic*] late." This narrative did not change as the Class Period progressed. RBC Capital Markets issued a research note on Flex on May 10, 2017 summarizing "key points" from a presentation by Collier, noting in part that in just a few years, Nike should "sustain $1.0B[illion]+ in revenues and have HRS like margins" in the 6-9% range. Two days later, on May 12, 2017, J.P. Morgan issued a note with similar commentary, stating that "Nike will drive meaningful revenue in F[iscal] Y[ear] 18 running breakeven this year. FY19 revenues should ramp and respective operating margins should take a step up to 3.5-5% range from 2-4% range." As Citi analyst Jim Suva stated during a Q&A with McNamara and Collier during the September 6, 2017 Citi Global Technology Conference, "literally, almost every discussion I have on the phone with investors also brings up the word Nike…." And on April 26, 2018, Deutsche Bank wrote that the "bull thesis" on Flex had "largely been anchored around the benefits of the Nike partnership…."

46. But unbeknownst to the market, the Nike project was beset with problems from very early on that would ultimately force Flex to announce *the winding down of the much anticipated and touted Guadalajara factory* and *the abrupt departure of Flex's CEO* – who during the Class Period personally took *"direct ownership"* of the "Nike operations to ensure its operational success."

### C. Throughout the Class Period, Flex encountered severe operational issues and missed Nike's expectations by wide margins, putting the Nike project on a failing trajectory

47. Contrary to Defendants' rosy statements about Nike, the project was in fact in disarray. Former employees of Flex, and the Company's own admissions, confirm that throughout the Class Period, Flex struggled with serious personnel issues, an unhelpful but demanding customer in Nike, and severe operational issues.[1]

48. CW1 worked for Flex in Guadalajara from January 2017 to October 2017 as the Director of Supply Chain.[2] CW1 recalled that one of the major operational problems at the Guadalajara plant that impacted its ability to operate at full capacity was that the people hired initially to work on the Nike project did not have the right skills or abilities. CW1 also explained that Nike's projections for how many shoes Flex would manufacture in Guadalajara increased in early 2017, but by May 2017, Flex did not meet Nike's projection of 1,460,000 pairs of shoes, and the projections from Nike ***decreased*** after that point.

49. CW1 also confirmed that Flex experienced operational problems with suppliers of raw materials who were located in Asia. Due to the lead time (~six weeks), travel time (~two weeks), and cushion time for other issues that could arise (~two weeks), the Company lost flexibility and time to react when raw material orders from Asia were canceled or changed. While Flex and Nike jointly sought raw material suppliers in Mexico, Nike had not approved any Mexican suppliers for the soles or bottoms of its shoes for the injection process as of October 2017. Moreover, the Guadalajara factory could not function at full capacity or meet projections. Flex also had inventory comprised of finished goods because Flex could not ship an order – which consisted of a mix of shoe sizes and models or colors – until the entire order was filled. As a consequence, Flex had a high amount of inventory which consisted of both raw materials and finished products.

---

[1] All Confidential Witnesses are described in the feminine to protect their identity.

[2] CW1 reported to a Vice President in Guadalajara who became Plant Director; he later reported to a Senior Director.

50. CW2 was employed by Flex as a Senior Director of Quality for the Nike account from November 2016 to August 2018.[3] Based on her experience in the Quality department, CW2 explained that the way Flex's business model for Nike was set up was not appropriate because Flex hired "a bunch of people that had no idea how to build shoes," such as people from the automotive industry, electronics, and others to work on the Nike project. CW2 recalled that while Flex hired a "few people" with a footwear background, "they didn't last," only "about a year" before they were let go. Flex thought it could make anything using the same processes it had always used, and it was completely wrong. Employees with footwear experience were "basically pushed to leave," because they knew the project was a "complete fail." CW2 noted that VP of Operations Wagner Cespedes had a footwear background, but the company was forced to move him somewhere else and bring in Flavio Magalhaes, who had no background in footwear as the new VP of Operations because there was a lot of pressure from Nike and things were not happening as expected.

51. CW2 also described how, because it was "really hard" to trace the fabric (used in making the sneakers) from start to finish, Flex needed to add 10-15% more fabric to account for lost materials. CW2 emphasized that the main issue Flex was dealing with was fabric and shortages – it did not have enough materials. CW2 stated that Nike executives brainstormed many ideas with Flex to resolve the issues, but nothing worked to resolve the fabric shortages. CW2 confirmed that Flex employees did not know how to measure and manage fabrics, which was 90% of the shoe. Flex needed to add 10-15% more fabric to account for lost materials, and was short 20-30 percent of the fabric needed for manufacturing because of lost fabric. CW2 further recalled that the machines for cutting and stitching were never going to work for all the different shoe types because there are different types of fabrics used for different shoes. There was a big automation team that kept experimenting with and testing the machines, but there was so much pressure on output that there was no time to find a solution. As a result, the machines were never really used for mass production. Several workshops were held by the supply chain and engineering

[3] CW2 reported to Vice President of Operations Wagner Cespedes, then to Senior Director Victoria Valenica, and finally to Vice President of Operations Flavio Magalhaes.

teams to try to figure out what was wrong, but nothing ever came of the meetings.

52. CW3 was a Flex Supervisor who worked on Flex's Nike contract from May 2017 to April 2018.[4] CW3 started at New Product Innovation as an engineer. She began her tenure running new trials for new shoe models and later new production lines. Over the course of her tenure, she saw Flex's Nike Guadalajara plant become operational. CW3 confirms that there were about ten different shoe models being worked on, including a high priority Roshe model. CW3 stated that Flex would want 800 produced per shift, with three shifts daily, but that only 500 could be made. CW3 explained that there were three categories of "qualities" of shoes (described as "models") that would be made:

- **"A" shoes:** Perfect quality
- **"B" shoes:** Defective, but could be sold in an outlet for 80% of the full price
- **"C" shoes:** Wasted shoes that would be destroyed and shredded

CW3 stated that out of every 500 shoes that were produced, 50 were "A" shoes, 300 were "B" shoes, and 150 were "C" shoes. In CW3's opinion, Flex's directors and superintendents did not care about the quality of the shoes being manufactured, they cared more about the quantity, and this carried over to the production lines. One of the constant problems CW3 observed was Flex's high amount of favoritism in giving more responsibility to supervisors who lacked specific knowledge. CW3 also observed that the reaction of Flex leadership to problems would be to see if one production line did not do well, Flex compounded the problems by firing the production line supervisors and operators, and replacing them with new hires.

53. CW3 explained that 90% of the production line employees came from an electronics background, and had no experience with a soft materials production line. The supervisors of the production line would have a problem and not know how to fix it. CW3 confirmed that the main problem (with respect to shoe manufacturing itself) was the bottom of the shoes. The formula in the machines for injection was not correct. The bottom of the shoes would not form well as the temperature and humidity in Guadalajara was different than Asian markets,

---

[4] CW3 reported to numerous personnel during her tenure, including Babito Suna, Nicolas Peralta, Jose Basunto, and Sira Carion.

and Flex needed to change the formula for bottom injections. The problem was more common during colder weather. Flex was never able to complete passing quality greater than 50-65%, based on what CW3 saw most of the time. There was a lot of lack of control, staff would learn how to do something and then be moved, and new employees entered with no skills and a learning curve. CW3 stated that the machines Flex used would be uncalibrated during injection as well.

54. CW3 also confirmed that a main issue Flex faced was machines that would not work, which became a common occurrence near the end of her time with the Company. Machines needed to be repaired, replaced, disassembled, and assembled again and again, and entire production lines would be removed and replaced with new machines. CW3 explained that the new machines would be used for a month before Flex would fully replace them again. CW3 described one production line that was modified approximately twenty times that lead to the same quality, quantity, and results.

55. CW4 worked for Flex from December 2006 to September 2017, and was the Business Excellence Manager for the Guadalajara factory from January 2016 to September 2017.[5] In this role, she was responsible for continuous improvement activities such as improving processes in operations, reducing headcounts and waste, and the layout of machines on the floor. According to CW4, the many problems with the factory included suppliers not supplying materials and trouble with the multi-injection machine. CW4 explained that Flex was unable to get the machines to meet the necessary production requirements, coupled with Flex not having people with the correct skills or abilities to run the machines. CW4 also stated that there were issues with not meeting demand as a result of either not having materials on hand or needing to scrap product because they did not meet quality standards. CW4 stated that beginning in February 2017, Nike was scraping about 50% of the product, which decreased to about 20% by September 2017, far short of the 93 or 96% rate that Nike required. CW4 stated that Nike was "very upset" with the results because Flex was not meeting its quality standards or demand and delivery targets.

[5] CW4 reported to Plant Manager Carina Lnu.

56. CW5 worked for Flex from 2007 to June 2018, most recently as a Vice President in Flex's San Jose, California offices. CW5 has years of experience in manufacturing and the systems that go along with it. CW5 visited Guadalajara in late 2016 and again in the March/April 2017 time frame where she saw a lot of red flags, including process problems and dysfunction within the teams – there were "too many chiefs to try to get anything done." CW5 confirmed that Flex lacked barcodes to track parts of the processes. For example, when CW5 visited in March/April 2017, just before a visit by McNamara, Flex had moved a warehouse location and did not know where its inventory was, creating a chaotic situation. CW5 stated that the Guadalajara factory went live in August/September 2017 and confirmed that there were issues with material loss, machines not functioning properly, and problems meeting demand. Once the new facility was built and equipment was in it, CW5 heard about bottlenecks that made hitting Flex's targets difficult and the ramp slow, and that Flex was having a hard time recovering money from Flex.

57. CW6 was a Human Resources Generalist in Flex's Human Resources department in Guadalajara, Mexico from April 2017 to October 2017.[6] CW6 was separated from the Company because after production went down, Flex did not need as many employees. According to CW6, the demand for employees on the Nike project was so high in the beginning that Flex was hiring people who were not qualified to work in shoe production. CW6 also recalled that there was a lot of "rejected product" coming off the production line during quality inspections; there was always more rejected product than Nike expected. CW6 stated that something was "way off" and it was not what Nike expected or was used to.

**D. Despite the rosy public display they put on during the Class Period, Flex did not have a smooth relationship with Nike and was not meeting Nike's expectations**

58. With regard to the operational issues Flex encountered, CW1 stated that Nike was not helpful as it did not offer training or provide personnel with knowledge who could assist in Guadalajara. CW4 stated Nike was just "very upset" with the results because Flex was not meeting its quality standards or demand and delivery targets.

[6] CW6 reported to Senior Human Resources Manager Cristina Ibarra.

59. On Flex's part, as CW2 described, the volume and demand (from Nike) changed dramatically over time and Flex would have goals every month that it was not meeting, noting "we were short every time." CW2 went on to say that Nike was demanding deliveries which they expected and it was "very open and obvious" that Nike was not happy. Additionally, CW2 said there were "so many people coming in" from Flex corporate that something was not right.

60. That Flex recklessly disregarded Nike's experience in shoe manufacturing is confirmed by their own statements during and after the Class Period. For example, when Dennison was onstage with Nike's COO Sprunk during Flex's May 2018 Investor Day, it emerged from their colloquies that Flex and Nike's leaders regularly spoke, and that Nike had told Flex that the process would take longer than Flex was saying:

> **Dennison:** And I remember, Mike [McNamara] and I and others were sitting with you and said, close this one, factory out and let you … rent some … stuff and get it done.
>
> **Sprunk:** Oh yeah.
>
> **Dennison:** And we're going to move fast. We got to be moving fast.
>
> **Sprunk:** Yeah, I remember those discussions.
>
> **Dennison:** And you said, no, this is a decades kind of things, **and it will take you a while.** […] We didn't believe you then. We didn't believe you.
>
> [pages omitted]
>
> **Dennison:** So talk to us about your commitment to the partnership and to the objective of what we're trying to go do. And the level of commitments kind of in your workforce, but also in your investment. Because, I have to say, cost us both money to get there.
>
> […]
>
> **Sprunk**: We talk about this a lot. Mike and I spent a lot of time on that. And our teams do too. We are investing right alongside of Flex and we are doing that for the same reason you're doing it, because we believe that there is an unbelievable payoff….
>
> [pages omitted]
>
> **Sprunk:** … You've come a long ways up the ramp curve. I know you guys like to work at a much higher pace that – which we would love, but we also come from a 50 years of reality and for us, when I see the slide, I said, someone wants to see the slide, you showed. I think at Flex that feels like gee, that's taking a long time. At Nike, you're on the path to becoming a footwear manufacturer.

> **Dennison:** You had mentioned to me this morning, or maybe last week that timeline that you actually had originally thought about relative to getting to a certain amount of productivity and a certain amount of scale that we're actually kind of on track to that timeline, **it was our timeline that we were off track…** [ellipses in original]
>
> **Sprunk:** Correct.
>
> **Dennison:** In achieving that.
>
> **Sprunk:** Yeah, and…[ellipses in original]
>
> **Dennison:** Oops.

Shortly after this exchange, Dennison was no longer with Flex.

61. The rift between Flex and Nike continued even *after* the Class Period. While Flex stated that the companies had "mutually" decided to terminate the co-manufacturing operations, Macquarie Research wrote on October 29, 2018 that Nike unilaterally ended things because Flex was unable to commercially scale the effort at a faster rate: "We caught up with Nike following the news that FLEX will wind down its footwear manufacturing facility in Guadalajara, Mexico …. Nike ultimately ended the partnership as FLEX was not able to commercially scale the effort at a faster rate."

**E. Defendants closely monitored and managed the Nike contract, with McNamara publicly taking personal ownership**

62. CW4 attended daily meetings at Flex to discuss solutions to problems. The meetings were held at 9:00 a.m. and were attended by Magalhaes, Carina, and other material, engineering, operations, and business excellence managers. CW4 stated that Dennison also attended the meetings when he was in Guadalajara. According to CW4, one of the main problems, as exemplified by these meetings, was that there were too many leaders involved; everyone had a different solution to the problems, and no one could come together on a solution.

63. CW3 observed visits by McNamara to the plant. CW3 was provided one-week's notice in advance of such visits. CW3 recalled approximately seven visits by McNamara during her 11-month tenure; directors would tell McNamara the route, provide a tour, explain along the tour, and take McNamara to meetings to discuss the process, machines, and development. CW6 recalled Dennison coming to Guadalajara specifically for a site visit even towards the end of her tenure with the Company, in approximately May or June 2017.

64. CW2 confirmed that McNamara was in Guadalajara every other month and "knew what was going on." A colleague had told CW2 that "this is the first project that I've seen Mike [McNamara] in my 20 years of working here." Starting around June 2018, CW5 recalled McNamara flying down to Guadalajara every week or two, and had previously been involved in 2017 when he was making trips to Guadalajara with VP of Operations Flavio Magalhaes.

**F. Throughout the Class Period, Defendants touted to the market that the Nike project was on a steady, timely trajectory to "breakeven" or become profitable by the close of FY 2018**

65. Notwithstanding Flex's inability to sustainably manage the Nike contract, Defendants painted a false and misleading picture of it throughout the Class Period. On the first day of the Class Period, during Flex's January 26, 2017 earnings call, Collier confirmed that the Nike project would breakeven, *i.e.*, become profitable, by the close of FY 2018 (March 2018). In addition, earlier that day, Flex published a press release quoting McNamara as stating that Flex's Sketch-to-Scale strategy "remains firmly on track…." McNamara also stated that "the innovations that [Nike was] seeing coming out of our team, that is our team, our guys and their guys, are probably above expectation of what they anticipated … the results that they're seeing are above expectations."

66. During a February 15, 2017 Goldman Sachs conference, in response to a question from a Goldman Sachs analyst, Collier declared that "we anticipate and see profitability being achieved in that Q4 next year and we're sustaining that going forward" and that there was a "clear line of sight in conviction around hidden profitability – sustaining profitability from that point forward…."

67. During Flex's April 27, 2017, quarterly earnings call, McNamara stated that "A great example of entirely new industries that have better economics and long-term profit potentials is seen with our Nike partnership.… We are accelerating our investments in Nike on the back of early automation successes, a strong customer collaboration and broad-based opportunities." McNamara specifically noted successes that Flex was having – without reference to any issues – in the design and automation processes: "We're starting to get early successes around some of the design engagements that we're having [with Nike] about reinventing how design actually occurs,

some of the new technologies of the shoes, and even into the automation projects that we're seeing." McNamara also confirmed: "We have new technologies. We have automation. We have to re-optimize the supply chain for the new locations. We're taking and making improvements all the way back to the – or changes back to the design process, all the way back into Nike."

68. Two weeks later, on May 23, 2017, while speaking at the JP Morgan Technology, Media & Telecom Conference, Collier again stated that with respect to Nike, "this year is a year of investment, next year steps into profitability and probability." Based on Defendants' "recent comments," RBC understood "a larger (or quicker) Nike ramp vs. initial expectations" by July 24, 2017. As RBC wrote that day, "[w]e think Nike ramps are occurring faster than Street expectations for a Dec/March quarter contribution" – meaning contributions *prior to* the end of FY 2018.

69. Shortly thereafter, during Flex's July 27, 2017 Earnings Call, McNamara declared: "We are making steady progress and completely reinventing shoe manufacturing by developing new automation technologies and integrating into our partner's designed processes." He further noted that "the quarter underneath the Nike investments is very healthy and moving forward at a nice clip and very consistent with our expectation." McNamara confirmed that breakeven by March 2018 "is always" the expectation, explaining that it is "the right target and objective": "So, let me start with break-even. So our expectation is always in the fiscal year we would cross-over into break-even. We still believe that's the right target and objective and where we see the business heading. So we're not on a calendar year forecast and I think we've been pretty consistent about if I think about all the things that were said over the past quarters." That same day, in a press release announcing its quarterly results, Flex quoted McNamara as saying that "Flex's 'Sketch-to-Scale strategy remains firmly on track….'"

70. However, in a partial disclosure of Flex's difficulties with Nike, Flex also attempted to "reset" expectations concerning just how costly the Nike project was. Collier stated that Flex experienced "elevated levels of costs to support our strategic partnership with Nike" and conceded that "[w]hat you're seeing now is a reset, if you will, that we acknowledged the June quarter's elevated levels" of Nike costs.

71. Following up on the elevated Nike costs, an analyst asked what remaining investments Flex needed to make for the Nike project, and when the peak investments would occur. McNamara responded that "the biggest driver of that whole investment is we're moving into a brand new facility and transition in that facility will be complete by October. So, that's really the last major implementation." He also emphasized that "we have a whole roadmap of process changes that will yield results, going into the new facility, the natural learning curve and the people coming along, between all those things, we do expect it to move into a break-even situation by the end of our fiscal year."

72. The market bought both the partial corrective disclosure regarding the elevated Nike costs and Defendants' reassurances that Flex's profitability trajectory was still intact. For instance, RBC wrote on July 27, 2017, that Defendants' partial disclosure "provide[d] a dose of reality that this ramp isn't seamless and without challenges" but it did not "alter[ ] the long-term view on FLEX." And on July 28, 2017, UBS wrote:

> **The learning curve is proving more difficult**, and at a higher cost than expected. **As the new facility ramps late this year**, material flow, automation, and localization of the supply chain should improve. **<u>Flex is adamant that the difficulties do not affect its return expectations over time</u>**.

73. Having "reset" the market's expectations, Defendants continued to paint the Nike contract and co-manufacturing operations as a well-oiled machine. The most important aspect of which was Flex's transition into a custom-designed factory for Nike in Guadalajara, Mexico.

74. The factory, which began to at least partially operate by August or September 2017, was the fulcrum on which the Nike contract's success would turn. During a September 2017 Citi conference, Collier was asked whether the breakeven trajectory was still for the end of FY 2018. Collier confirmed it was: "Exactly …. We're moving into a customized, tailor-built facility in our Q3 that's specifically designed to optimize around the manufacturing requirements for our partner, and we anticipate, as we exit this year, being at a breakeven, which allows us to see some real good accretion into EPS into fiscal '19 and beyond." UBS wrote a few days later that "breakeven is still planned for March" and reflected Defendants' comments about how important the Mexico factory would be: "The 'dream factory' should be running in October."

75. On October 26, 2017, McNamara stated in a press release that the second quarter's results "strongly indicate Flex's top-line growth, structural portfolio evolution, and capital return all remain on track…." Later that day, during Flex's F2Q 2018 earnings call, McNamara confirmed that the transition into the Guadalajara factory was "substantially complete" and represented a major step forward: "I mean to move into a factory that size you don't do it all in one month. So, we've been moving in over the last couple of months. We're substantially complete at this point. We'll be complete by the end of the month. And that's going on track. So, pretty much the timing is right. We're obviously excited about it. **You called it the dream factory, I like the way you describe that.** But as we move toward the end of that factory, we're just very pleased because the opportunity to optimize workflows and lay everything out instead of splitting around a bunch of different factories is really going to be extremely advance – a big advantage for us going forward."

76. When asked about the degree of automation in the Guadalajara factory, McNamara parried his response: "it's hard to put an exact number on it. Different processes and different shoes are going to have different degrees of automation and it really depends on the mix. So, we continue to innovate around a number of different processes. That continues to go very, very well." Collier also stated that everything was proceeding without a hitch with respect to the new factory: "this quarter reflected our continued investment in the development of new automation and process technologies to support our strategic long-term partnership with Nike. We are pleased that our transition into the new state-of-the-art and purpose-built factory is on track to be completed by the end of this month."

77. With the "dream factory" now part of the equation, Defendants continued to tout the Nike contract's steady trajectory to timely profitability. When asked on November 7, 2017 about how the Nike project had performed to-date, Kessel *admitted* that there had been "struggles initially in terms of Q1 [2018], in terms of the initial stages of ramping up and dealing with multiple styles of shoes before we've actually put in place the factory that we've talked about" – confirming that Defendants' earlier statements during the first quarter of 2018 (*i.e.*, April to June 2017) about the Nike contract were false and misleading by omission. However, Kessel quickly

pivoted to reassuring investors by talking about the Guadalajara factory: "***we've actually put in place the factory that we've talked about that is now as of end of the October online***. ***But in terms of the general trajectory, I think we still remain very confident about the fact that we're going to be improving both performance and scaling as time goes on here***…." When again asked just a week later to give a summary of where Flex was with Nike and whether there had been any changes, Kessel answered in relevant part that Flex was now "scaling up production" and that "[w]e talked about moving into our new facility that we built, which has went online [*sic*] at the end of October, so that went on according to schedule."

78. Collier doubled down on the Guadalajara factory while speaking at the December 4, 2017 Raymond James Technology Conference, proclaiming that "we've moved into a state-of-the art purpose-built factory, which the complete entire solution is in the four walls and enables us to have better process flows, materials flows, production flows…." He further elaborated:

> And we're well on our way, we're 30 days-plus into the new operation. ***We see multiple signs of the accelerated scaling effects. We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation.*** We've been deploying further lean manufacturing principles and ***you're going to see a natural progression up as we scale that further with the target of exiting this year at breakeven***.

79. On December 19, 2017, after meeting with "senior executives" of Flex, UBS published a note indicating that there was "increased confidence that the Nike plant is on track" as Flex management was "much more confident than six months ago when challenges were encountered. Local supply chain, labor management, and process flows are coming together" with "noticeable" improvements.

80. Flex maintained the same story on January 25, 2018, with McNamara stating that a "sequential improvement in operating profits reflected reduced from [*sic*] our strategic partnership with Nike as its transition to a new manufacturing facility during the third quarter aided in driving operational improvements…. This move improved efficiency and helped reduce operating losses in line with expectations. Our objectives of moving this project towards the breakeven level exiting our [fiscal] Q4 remains unchanged."

81. On February 14, 2018, Kessel was still reaffirming that trajectory, telling an analyst at the Goldman Sachs Technology and Internet Conference that "we haven't made any changes to our view on Nike" and that "Q4 is where we're focusing on breaking even as we exit the year…." (By Q4, Kessel was referring to the close of the 2018 fiscal year, which at that point was just *weeks away*.)

82. On April 24, 2018, Macquarie Research ("Macquarie") published a report indicating that Flex had not changed its tune: "The company continues to make progress with its Nike business. We believe the company has been working with Nike designers, encouraging them to design for the new manufacturing and that this effort has been successful. With the Nike designers on board, we believe a big hurdle towards profitability has been overcome."

**G. Defendants partially disclosed operational and client issues related to the Nike contract, but continued to mislead the market regarding its trajectory and commercial viability**

83. But Flex did not—because it could not—breakeven on the Nike contract by the end of FY 2018. As Flex admitted during its F4Q 2018 earnings call on April 26, 2018, the trajectory Defendants had been publicly trumpeting was not the case. The operational problems plaguing the Nike contract and Flex's contract execution and management failures were partially disclosed. First, McNamara announced that the long-trumpeted trajectory of breaking even by the end of March 2018 had not materialized. Flex needed two more quarters to breakeven, to the second half of FY 2019. McNamara made two additional crucial partial disclosures. *First*, he admitted that Flex *knew* it could not be "precise" about when the Nike contract would be profitable, despite its string of Class Period statements to the contrary: "We had no idea how long it would actually take because we were reinventing shoes and that's a category that we never gone after before." [*Sic*] Yet at the same time, McNamara claimed he was still "confident that [Flex's] accomplishments will enable us to significantly improve our fiscal 2019" with profitability during the second half of the fiscal year.

84. Second, McNamara admitted that Flex was missing design content from Nike that could run on the automated lines – but also reassured the market that everything else was now in place: "**The key to Nike is to have design content – shoe content that's designed to run on a**

**highly automated line.** The highly automated line is turned on, the content has been developed and it just needs to ramp. So this is the key thing we need…. **We just need the right content to run**.” Doubling down in response to an analyst’s question about “whether or not the company has identified the steps that it needs to take to get Nike to profitability…,” McNamara reiterated that “design content” “is the key thing we need. We don’t need any more optimizations of a factory. We have a good factory flow. We just need the right content to run.” McNamara assured the market that the problem was resolved: “Most importantly, Nike ***has*** released a full set of products designed for our automation system ***which is now beginning to ramp in mass production***.”

85. McNamara also disclosed that the automation process at the Guadalajara factory just went online a few weeks earlier—on April 11, 2018. This crucial fact had been omitted from Defendants’ prior statements heralding that the new factory was online in October 2017 and pivoting the Nike project toward profitability. Defendants omitted to tell the market *for six months* that while the factory was operational, the crucial automation processes were not even in place yet.

86. The market again bought Defendants’ two-way story. RBC noted that “while disappointing we think this is ultimately a positive.” RBC ultimately thought long-term the Nike project could be a profitability boon, and that since the challenges were a “byproduct of growing pains,” it had a “reasonably attractive” “risk/reward.” This duality demonstrates how despite being let down, market participants were still lulled into a false sense of security by Defendants’ continuing misstatements. UBS wrote that “**Flex missed on its most articulated goal**—that Nike would be breakeven exiting March. Instead, breakeven is pushed out about six months and that is not certain…. **Management overpromised in getting to breakeven with Nike**. The production line was turned on April 11, later than anticipated. It sounds like it was **both Flex being late in getting the line running and Nike needing to provide shoes designed for the automated process.**” Further, UBS “**expect[s] management shuffling** with IEI’s Doug Britt taking over CEC and part of CTG….” A couple weeks later, UBS wrote on May 7, 2018, that it “**didn’t expect the six-month delay in breakeven with Nike** that took the stock lower” but that the “decline [in Flex’s stock] seems an overreaction given that the relationship will play out over a decade and Nike remains committed. **More likely the problem is company credibility. The March line in**

**the sand had been reaffirmed** even after the May delay last year. Moreover, our sense is that investors view EMS names as having a checkered history with recurring execution problems. Our sense is that the delay mostly is due to establishing a local supply chain to procure fabric and yarn. **The hard parts—getting an automated line running and Nike designing for automation—seem to be going pretty well**. Flex is getting Nike's help in procuring fabric, which seems fixable."

87. During Flex's May 2018 Investor Day, Dennison provided further color on the delay and tacitly admitted what Flex needed to breakeven: (1) "shoes designed or redesigned to work in an automation process"; (2) for Flex's "automation system to actually now convert from being completed to actually going into production"; and (3) "a material supply chain that would allow us to fill that factory and make the automation run."

88. But Dennison reassured the market that all those problems were in the past: "***we have a way of operating that will move it to second half profitability***…. We've got a lot of automation that we're driving, we actually mentioned that we have an end-to-end automation system that actually went live on April 11, we'll begin to ramp that through the course of the year, ***we have a lot of content that's been designed for that system, and we're driving a numerous amount of productivity*** and yield items that reach all different aspects because it's a really complex problem. So, we kind of view this as we now need to move to our ramp phase and we need to move to an optimization phase." Shortly thereafter, Dennison was gone.

89. With the April 26 reset baked into the market, on May 16, 2018 Kessel noted that while the "biggest" issue Flex was still working on was "materials management… we are making progress on it. We have Nike's support and help and the supply base as well" and Flex "continue to make inroads with our automation system and subsequently have that fully approved for mass production as of mid-April." Kessel further assured that the Nike contract was "getting into profitability at some point in the second half of the [2019] year."

90. During Flex's July 26, 2018 earnings call, McNamara announced that he had "taken direct ownership for our Nike operations to ensure its operational success." Dennison appeared gone, quietly separated from Flex just a short time after admitting to recklessly ignoring

Nike's guidance.[7] McNamara reassured the market that even though "we've kind of reset expectations" about the Nike contract's trajectory, "it's tracking exactly to where we thought … three months ago." He pointed to significant revenue growth, expanding productivity, and profitable margins all being "right on schedule to where we thought we would be three months ago." And just before the end of the Class Period, on September 5, 2018, McNamara boasted that Flex "went into our new [Nike] factory in October [2017] that enabled us to really drive to an efficient footprint or a footprint-efficient capability," that "it's a very win-win kind of a relationship," and that "[w]e have a line of sight to productivity that'll drive this to our targets by the end of the year…."

### H. Flex revealed the whole truth about the Nike project when it announced the winding down and termination of its co-manufacturing operations in Guadalajara and the departure of McNamara from the Company

91. But the truth then fully emerged. After the markets closed on October 25, 2018, Flex announced the winding down and termination of its co-manufacturing operations because the Nike contract was not commercially viable:

> The Company has worked hard with NIKE to make the footwear manufacturing operations in Mexico technically and commercially successful. In recent weeks, however, it became clear that the Company would be unable to reach a commercially viable solution. Accordingly, Flex and NIKE have mutually agreed to wind down the footwear manufacturing operations in Guadalajara by December 31, 2018.

92. This was the first time Defendants disclosed that the Nike operations were not "commercially successful" despite the raft of issues plaguing the project throughout the Class Period. During this call, McNamara suspiciously did not answer analyst questions, even one directed directly to him, and only spoke at the top of the call regarding his departure.

93. In addition, Flex announced the abrupt—and completely unanticipated—retirement of McNamara, who just a few months earlier had taken "direct ownership for our Nike operations to ensure its operational success."

[7] Fox Factory Holding Corporation indicated on August 7, 2018 that it had hired Dennison.

94. The news stunned the market and caused Flex's stock to plummet 35% in a single day on unusually high trading. On November 13, 2018, RBC met with Kessel at RBC's TIMT conference. RBC published a "key takeaway" confirming that the Nike contract was canceled because Flex could not agree with Nike on how sustainably manage it from a profit standpoint: "While FLEX was making improvements in that business, they were unable to reach an agreement on how to sustainably manage it from a profit standpoint. As a result, FLEX and Nike mutually agreed to wind down the footwear manufacturing operations in Guadalajara, Mexico."

### I. Defendants misled the market about Flex's internal controls over accounting as they related to customer contracts during the Class Period

95. Flex's management and execution failures of customer contracts extended to customer contracts more generally. Throughout the majority of the Class Period, Defendants misled the market about the adequacy and strength of Flex's internal controls over accounting as they related to customer contracts. Through April 26, 2018, McNamara and Collier repeatedly certified that Flex had adequate internal controls over financial reporting, including that they have "***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…."

96. McNamara and Collier also certified that each quarterly report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report…."

97. In addition, McNamara and Collier consistently stated in Flex's quarterly reports filed with the SEC that "[t]he accompanying unaudited condensed consolidated financial statements have been ***prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP")*** for interim financial information and in accordance with the requirements of Rule 10-01 of Regulation S-X."

98. On April 26, 2018, however, Flex admitted that a whistleblower had forced the Company's Audit Committee, with the assistance of outside counsel, to investigate alleged improper accounting for obligations in a customer contract and certain related reserves and report the issue to the SEC:

> the Audit Committee of the Company's Board of Directors, with the assistance of independent outside counsel, is undertaking an independent investigation of allegations made by an employee including that the Company improperly accounted for obligations in a customer contract and certain related reserves. The independent outside counsel also notified the San Francisco office of the Securities and Exchange Commission of the allegations and that it will report the findings of the independent investigation upon its conclusion.

99. The issue was serious enough to cause Flex to delay the filing of its annual report on Form 10-K with the SEC. On May 30, 2018, Flex filed a *Notification of Late Filing* on Form 12b-25, notifying the SEC and the public that "[a]s a result of the Independent Investigation, the Company is evaluating the effectiveness of its internal controls. As a result of these developments, the Company is unable, without unreasonable effort or expense, to file the 2018 10-K within the prescribed due date of May 30, 2018."

100. On June 14, 2018, Flex finally filed its Form 10-K and confirmed the whistleblower's allegations. In announcing that the investigation was complete, the Company *admitted* to ***material*** weaknesses in its internal controls and did not limit the issues to any one customer:

> [T]he Company's Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2018, the Company's disclosure controls and procedures were not effective, as a result of the material weaknesses further described below, in ensuring that information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934, as amended, is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.
>
> […]
>
> Our management concluded that, as of the end of the period covered in this report, material weaknesses existed in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies,

> in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. These deficiencies resulted in a reasonable possibility that a material misstatement in our financial statements will not be prevented or detected on a timely basis and aggregated to material weaknesses in our internal control over financial reporting relating to the accounting for customer contractual obligations and aspects of our control environment and monitoring activities.
>
> We determined that there was insufficient documentation of, and ineffective design of controls over, the accounting for accrued customer obligations related to customer contracts. Factors contributing to this included insufficient training of site and segment operational and accounting personnel, and inadequate monitoring, including contract compliance, to ensure the components of internal control were present and functioning properly. In addition, the control environment was ineffective in ensuring that executive management's expectations of adherence to the Company's policies and standards of conduct were followed at all levels of the Company and in ensuring that any deviations therefrom were identified and corrected in a timely manner.
>
> As a result of these material weaknesses, our management has concluded that we did not maintain effective internal control over financial reporting as of March 31, 2018.

101. Just a few months later, in connection with the full disclosure of the truth regarding the Nike contract, McNamara announced his sudden retirement with no clear internal succession plan in place.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS AND ANALYST AND MARKET REACTIONS

102. The Class Period starts on January 26, 2017, and runs through October 25, 2018. Defendants' statements that are ***bold and italicized*** are alleged to be false and misleading. Additional statements that are **bold** but <u>not</u> italicized are for emphasis only.

### A. January 26, 2017 – Press Release on Form 8-K

103. On January 26, 2017, Flex published a press release announcing its financial results for the quarter ending December 31, 2016. The press release quotes McNamara with regard to the Company's *Sketch-to-Scale* strategy, which was anchored around the Nike project: "**Our Sketch-to-Scale strategy *remains firmly on track*** as reflected in our third quarter performance…."

104. This statement was false and misleading because the Nike project, which was key to Flex's Sketch-to-Scale strategy, was not on track as it was already being plagued by material

operational issues and increased costs that were not publicly disclosed. *See supra* ¶¶48-60, 83-84, 87, 91-94.

**B. January 26, 2017 – F3Q 2017 Earnings Call**

105. After the markets closed on January 26, 2017, Flex held a conference call with analysts to discuss the recent quarter. McNamara, Collier, and Kessel participated in this call. During the call, an analyst for Citigroup Global Markets, Inc. ("Citigroup") asked whether Flex could give "an update about the timeline" for the Flex-Nike partnership and when Flex expected "to see losses turning to breakevens." Collier responded hat "***[t]here's really no change*** in our expectations since what we lined up last May at our Investor Day. . . . We continue to get greater visibility with where we're moving with it. . . . ***We cross into profits in the last quarter next year in Q4 of fiscal 2018***."

106. This statement was false and misleading because the Nike project, which was key to Flex's Sketch-to-Scale strategy, was not on track as it was already being plagued by material operational issues and increased costs that were not publicly disclosed. *See supra* ¶¶48-60, 83-84, 87, 91-94.

107. Defendant McNamara elaborated further on the same question by touting the early successes in the Flex-Nike partnership which supported why Flex's expectations were unchanged, including that "***the innovations that [Nike is] seeing coming out of our team, that is our team, our guys and their guys, are probably above expectation of what they anticipated*** . . . ***the results that they're seeing are above expectations***."

108. This statement was false and misleading because Flex was operating below Nike's expectations and Nike was not happy with Flex's results. Flex was missing Nike's expectations with respect to the quality and quantity of the products being produced, such that Flex's results were "way off" what Nike expected or was used to from its manufacturing partners. *See supra* ¶¶48-60, 83-84, 87, 91-94.

109. The market reacted positively to Defendants' statements. Later that evening, RBC issued a report stating that it "expect[s] Nike program at volume to be $1B[illion] + revenues (2 years away) and generate op-margins of 8-10%." It also noted that the "Nike and Bose [a different

project] ramps are on track with expectations."

110. Deutsche also published a note on January 27, 2017 titled "Solid execution overcomes delays in solar biz," writing that "[w]e remain impressed with Flex's progress with its sketch-to-scale capabilities and mgmt reconfirmed that its programs with Nike and Bose remain on track, with both expected to be top 10 customers when fully ramped."

111. Similarly, UBS issued a January 26, 2017 note headlined "Flex Leading the Re-Rating of EMS as Customer Diversification Kicks In," remarking that Nike "could be [a] 10% company customer[ ] within a few years, with Nike margins eventually more like HRS's 6-9%."

112. On January 27, 2017, J.P. Morgan observed "mixed" results from the quarter but that the "long-term story remains intact." (original in sentence caps). J.P. Morgan mirrored other analysts' take that "Bose and Nike remain on track to generate material revenues in FY18/19 respectively and with scale should buoy overall operating margins."

113. As a result of Defendants' statements, Flex's stock rose 4.64% the next day, closing at $16.00 a share.

**C. January 27, 2017 – Quarterly Report on Form 10-Q**

114. On January 27, 2017, Flex filed its Quarterly Report on Form 10-Q. McNamara and Collier stated with regard to the report's contents: "The accompanying unaudited condensed consolidated financial statements have been ***prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP")*** for interim financial information and in accordance with the requirements of Rule 10-01 of Regulation S-X." McNamara and Collier certified that they had "***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…." McNamara and Collier also certified that each report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report…."

115. These statements regarding Flex's compliance with GAAP and the strength of its internal controls were false and misleading because, as Flex admitted on April 26, 2018, an employee whistleblower had accused the Company of improperly accounting for obligations in a customer contract and certain related reserves which was not only reported to the SEC, but was being independently investigated by the Company's Audit Committee with outside counsel. Furthermore, on June 14, 2018, Flex admitted in a filing with the SEC that it had identified material weaknesses in its internal controls for customer contracts as of March 31, 2018. Since these admissions regarding the Company's internal controls came not long after the whistleblower allegations were publicly announced, it may be reasonably inferred that the internal controls were also lacking for an extended prior to March 31, 2018. *Supra* ¶¶98-100.

**D. February 15, 2017 – Goldman Sachs Technology and Internet Conference**

116. On February 15, 2017, Flex participated in the Goldman Sachs Technology and Internet Conference. Collier and Douglas Britt, Flex's President of Industrial & Emerging Industries, spoke on behalf of Flex. Collier and Britt did not identify any of their statements as a forward-looking statement pursuant to the PSLRA or accompany them with cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

117. A Goldman analyst asked Collier if he could confirm that "the crossover from what today is an investment level for the company to . . . profitability in the March calendar 2018 quarter as when that becomes a profitable business." Collier replied, "***Yeah, correct*** . . . I mean, right now, we're really innovating the process. . . . ***we*** anticipate and ***see profitability being achieved in that Q4 next year and we're sustaining that going forward***." The analyst followed up seeking clarity regarding whether "[b]etween today and when that business becomes profitable in March calendar quarter 2018, [there would be] a step backward in profitability before it goes forward." While acknowledging that "there'd be an incremental level of cost associated with it," Defendant Collier claimed that "there's nothing that is alarming to us or its not contemplated in how we've set margin structures for both the CTG business or broadly Flex. It will be elevated. It should happen to you when you are making those levels of investment, but [we have a] ***clear line of sight in conviction around hidden profitability – sustaining profitability from that point***

***forward*** and again creating a real, meaningful foundational element for Flex."

118. Collier's statements were false and misleading because the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike, none of which was publicly disclosed and all of which were derailing the Nike project's purported profitability trajectory. *See supra* ¶¶48-60, 83-84, 87, 91-94.

**E. April 27, 2017 – F4Q 2017 Earnings Call**

119. After the markets closed on April 27, 2017, Flex held a conference call with analysts to discuss the recent quarter ("April 2017 Earnings Call"). McNamara, Collier, and Kessel participated in this call on behalf of Flex.

120. McNamara boasted at the start of the call that "this strategic partnership continues to work very well with both companies fully committed to success, both this year and over the next decade. ***We are accelerating our investments in Nike on the back of early automation successes, a strong customer collaboration*** and broad-based opportunities." He further detailed later during the call that "***We're starting to get early successes around some of the design engagements that we're having [with Nike] about reinventing how design actually occurs, some of the new technologies of the shoes, and even into the automation projects that we're seeing***."

121. These statements were false and misleading because the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike, none of which was publicly disclosed and all of which were derailing the Nike project's purported profitability trajectory. Furthermore, McNamara's statements regarding "early automation successes" and "early successes around some of the design engagements" were false and misleading because Flex did not have a supply chain in place to efficiently manufacture shoes, an automation system that could go into production, or the design content from Nike necessary to run on automated production lines, including a fully functional automated system that was not in place until April 11, 2018. Furthermore, Flex was "struggling" with the Nike contract during this period. *See supra* ¶¶48-60, 77, 83-84, 87, 91-94.

122. Collier similarly stated with regard to the Flex-Nike partnership, "***We're completely aligned with the production curve*** and we're continuing to manage that relationship as

we go forward. . . .”This statement was false and misleading because the project was beset with operational issues and Flex was operating below Nike’s expectations and Nike was not happy with Flex’s results. Flex was consistently missing Nike’s expectations with respect to the quality and quantity of the products being produced, such that Flex’s results were “way off” what Nike expected or was used to from its manufacturing partners. Nike was in fact very upset with Flex regarding the high rejection rate of product coming off the lines, which contributed to Flex’s failure to meet demand and delivery targets. *See supra* ¶¶48-60, 83-84, 87, 91-94. Furthermore, Flex was “struggling” with the Nike contract during this period. *Supra* ¶77.

123. During the call, an analyst for RBC asked: “is the revenue trajectory and your expectations on revenues starting to inflect? Is that happening a little bit earlier with Nike?” McNamara dissuaded the analyst’s impression that breakeven would happen earlier, provided details as to why breakeven was on track for F4Q 2018:

> ***We have new technologies. We have automation.*** We have to re-optimize the supply chain for the new locations. ***We’re taking and making improvements all the way back to the – or changes back to the design process, all the way back into Nike***. . . . we continue to be hopeful that ***despite the incremental operating investments that we’ll do over the next couple of quarters, that by the time we get into Q4, we’ll cross over into profits***.

124. These statements were false and misleading because the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike, none of which was publicly disclosed and all of which were derailing the Nike project’s purported profitability trajectory. Flex did not have a supply chain in place to efficiently manufacture shoes, an automation system that could go into production, or the design content from Nike necessary to run on automated production lines, including a fully functional automated system that was not in place until April 11, 2018. *See supra* ¶¶48-60, 83-84, 87, 91-94. Furthermore, Flex was “struggling” with the Nike contract during this period. *Supra* ¶77.

125. The market was pleased with Defendants’ comments. RBC wrote on April 27, 2017 that Flex “continues to execute rather well,” despite an uptick in investments related to Nike and other programs hurting earnings in the short term, and that the investments (including Nike) “are

all prudent and should result in a more profitable [F]lex in" the second half of FY 2018. Then on April 28, 2017, J.P. Morgan wrote that Flex "is accelerating design innovations with Nike" and that "[u]nderpinning our growing enthusiasm for this story is the probability that the Nike partnership will be material and will be significantly margin-accretive…." The same day, Craig-Hallum Capital Group LLC ("Craig-Hallum") wrote that it believes Flex "has a significant opportunity for revenue to pick up with Nike beginning in the Q3 to Q4 time frame [*i.e.*, October 2017 to March 2018] and for the Nike business to be profitable in FY19." Deutsche also viewed Defendants' comments positively, writing that Flex "continues to execute well and the sketch-to-scale model appears to be gaining momentum."

**F. May 16, 2017 – Annual Report on Form 10-K**

126. On May 16, 2017, Flex filed its Annual Report on Form 10-K. McNamara and Collier stated with regard to the report's contents: "The accompanying unaudited condensed consolidated financial statements have been ***prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP")*** for interim financial information and in accordance with the requirements of Rule 10-01 of Regulation S-X." McNamara and Collier certified that they had "***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…." McNamara and Collier also certified that each report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report…."

127. These statements regarding Flex's compliance with GAAP and the strength of its internal controls were false and misleading because, as Flex admitted on April 26, 2018, an employee whistleblower had accused the Company of improperly accounting for obligations in a customer contract and certain related reserves which was not only reported to the SEC, but was being independently investigated by the Company's Audit Committee with outside counsel.

Furthermore, on June 14, 2018, Flex admitted in a filing with the SEC that it had identified material weaknesses in its internal controls for customer contracts as of March 31, 2018. Since these admissions regarding the Company's internal controls came not long after the whistleblower allegations were publicly announced, it may be reasonably inferred that the internal controls were also lacking for an extended prior to March 31, 2018. *Supra* ¶¶98-100

**G. May 23, 2017 – J.P. Morgan Global Technology, Media & Telecom Conference**

128. On May 23, 2017, Flex participated in the J.P. Morgan Global Technology, Media & Telecom Conference. Collier and Kessel spoke at this event. Collier and Kessel did not identify any of their statements as a forward-looking statement pursuant to the PSLRA or accompany them with any cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

129. During the conference, a J.P. Morgan analyst followed up with Collier regarding his prior statement that Nike "will be a material revenue contributor as soon as 2018. Is that correct?" Collier did not delve into "what level of revenue profitability" the Flex-Nike relationship would yield, but confirmed that "what we did define was a phased journey. This is going to be measured in decades. And as you think through that, we defined each of those steps where this year is a year of investment, ***next year steps into profitability and probability***..."[8] He added that "***You'll see some elevated levels of profitability which helps you think about how the CTG mix of business and its margin profile shifts***….."

130. These statements were false and misleading because the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike. Flex did not have a supply chain in place to efficiently manufacture shoes, an automation system that could go into production, or the design content from Nike necessary to run on automated production lines, including a fully functional automated system that was not in place until April 11, 2018. *See supra* ¶¶48-60, 83-84, 87, 91-94. Furthermore, Flex was "struggling" with the Nike contract during this period. *Supra* ¶77.

[8] Ellipses in original.

**H. July 27, 2017 – Press Release on Form 8-K**

131. On July 27, 2017, Flex published a press release on Form 8-K with the SEC announcing its results for the quarter ending June 30, 2017. The release quotes McNamara as stating that Flex's "***Sketch-to-Scale strategy remains firmly on track*** as reflected in our first quarter results which were within guidance ranges …. While Fiscal 2018 is an investment year, we continue to evolve our portfolio and enter and create new markets that will generate meaningful value and expand the Company's total available market."

132. This statement was false and misleading because the Nike project, key to Flex's Sketch-to-Scale strategy, was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike, none of which was publicly disclosed and all of which were derailing the Nike project's purported profitability trajectory. Flex did not have a supply chain in place to efficiently manufacture shoes, an automation system that could go into production, or the design content from Nike necessary to run on automated production lines, including a fully functional automated system that was not in place until April 11, 2018. *See supra* ¶¶48-60, 83-84, 87, 91-94. Furthermore, Flex was "struggling" with the Nike contract during the just-completed quarter. *Supra* ¶77.

**I. July 27, 2017 – F1Q 2018 Earnings Call – Partial Corrective Disclosure**

133. After the markets closed on July 27, 2017, Flex held a conference call to discuss the recent quarter's results. McNamara, Collier, and Kessel participated in this call. During the call, McNamara continued to assure investors that Flex was on track to break even and achieve profitability by the end of FY 2018. He boasted that "***[w]e are making steady progress*** and completely reinventing shoe manufacturing by developing new automation technologies ***and integrating into our partner's designed processes***…."

134. These statements were false and misleading because the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike that were not publicly disclosed, but all of which were derailing the Nike project's purported profitability trajectory. In addition, Flex did not have design content from Nike that could work in the new automated lines, and the full automation process did

not go live until April 11, 2018. *See supra* ¶¶48-60, 83-84, 87, 91-94. Furthermore, Flex was "struggling" with the Nike contract during the just-completed quarter. *Supra* ¶77.

135. Following up on Defendants' statements at prior conferences and earnings calls, an analyst for UBS specifically noted during the F1Q Earnings Call:

> [Y[ou had said previously that you expected to be near break-even by the end of the calendar year. It sounds like that might not be the case. And if so, when do you expect to be at break-even? Second, can you size at all the investments you're making with Nike or at least give us a sense maybe when the peak investments occurs? And third, your ability to predict the cost, I guess, is two quarters now that's been higher than you expected. How much confidence do you have that this isn't going to continue for the next couple of quarters…

Defendant McNamara responded by again declaring that, "So our expectation is always ***in the fiscal year we would cross-over into break-even***. We still believe ***that's the right target and objective and where we see the business heading***." While he did not "want to go into specifics" of what Flex was investing in for Nike, he noted that "the biggest driver of that whole investment is we're moving into a brand new facility ***and transition in that facility will be complete by October. So, that's really the last major implementation***."

136. These statements were false and misleading because the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike that were not publicly disclosed, but all of which were derailing the Nike project's purported profitability trajectory. Moreover, the transition into the Guadalajara factory was not the last major implementation for the Nike project because the automation system would not go live until April 11, 2018. *See supra* ¶¶48-60, 83-84, 87, 91-94. Furthermore, Flex was "struggling" with the Nike contract during the just-completed quarter. *Supra* ¶77.

137. Defendants partially disclosed difficulties in the Nike project, as demonstrated by the increased spending requirements. Collier admitted that Flex "saw elevated levels of costs to support our strategic partnership with Nike," and conceded in response to question from an analyst concerning costs that "[w]hat you're seeing now is a reset, if you will, that we acknowledged the June quarter's elevated levels" of Nike costs.

138. The market was surprised, but still bought into Defendants' story. An analyst with Raymond James & Associates Inc. ("Raymond James") asked "is there an aspect here of some cost due to missteps in ramp." McNamara did not provide a direct response, evasively saying "I don't know really how to answer that" before launching into a long answer about granularities relating to the Nike contract.

139. Deutsche wrote the next day, July 28, 2017, that it still viewed Nike as a plus, even though Defendants' disclosures took some of the shine off the Nike gloss: "Given the bull case on FLEX revolves around the growth and margin benefits of the Nike deal, we believe many investors will want to see mgmt. deliver on improving margins as we move into [the second half of FY 2018]…. While well-telegraphed, the investments (especially Nike) were meaningfully higher than expectations and resulted in" lower margins for the CTG group. "While mgmt expects the Nike program to breakeven by FYE-18, the next two quarters are expected to reflect similarly elevated levels of spend."

140. UBS was also optimistic, reporting that while "higher Nike investments could likely cause a decline in operating income this year[,] … Flex still expects to be breakeven exiting June and remains confident in the long-term benefits." It also noted that Flex acknowledged that the "learning curve is proving more difficult and at a higher cost than expected." But, reflecting Defendants' statements regarding the profitability trajectory being on track, UBS noted that "[a]s the new facility [in Guadalajara] ramps late this year, material flow, automation, and localization of the supply chain should improve. **Flex is adamant that the difficulties do not affect its return expectations over time**."

141. J.P. Morgan too noted on July 28, 2017 that there was a "near-term margin drag from the investment into the NIKE operations," but that "long-term investors should take advantage of the dip [in Flex's stock price] to build positions…." It acknowledged the "margin decline in the CTG segment, which was pressured by ramping expense associated with the NIKE business (which understandably became the focus of the subsequent analyst questions)" and McNamara's description of the "on-ramp as 'complex." But it also acknowledged Defendants' continued depiction of the Nike project as being on track – Flex "confidently expects the NIKE

business to be at break-even by F1Q19" – and concluded that "investors will see a pay-back from the NIKE investment in FY 19," *i.e.*, beginning in April 2018.

142. As a result of Defendants' statements on July 27, 2017, Flex's stock dropped nearly 5% the next day, falling $0.80 to close at $16.29, on unusually high trading volume of over 12 million shares.

**J. August 1, 2017 – F1Q 2018 Quarterly Report on Form 10-Q**

143. On August 1, 2017, Flex filed its Quarterly Report on Form 10-Q. McNamara and Collier stated with regard to the report's contents: "The accompanying unaudited condensed consolidated financial statements have been ***prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP")*** for interim financial information and in accordance with the requirements of Rule 10-01 of Regulation S-X." McNamara and Collier certified that they had "***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…." McNamara and Collier also certified that each report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report…."

144. These statements regarding Flex's compliance with GAAP and the strength of its internal controls were false and misleading because, as Flex admitted on April 26, 2018, a whistleblower had accused the Company of improperly accounting for obligations in a customer contract and certain related reserves which was not only reported to the SEC, but was being independently investigated by the Company's Audit Committee with outside counsel. Furthermore, on June 14, 2018, Flex admitted in a filing with the SEC that it had identified material weaknesses in its internal controls for customer contracts as of March 31, 2018. Since these admissions regarding the Company's internal controls came not long after the whistleblower allegations were publicly announced, it may be reasonably inferred that the internal controls were

also lacking for an extended prior to March 31, 2018. *Supra* ¶¶98-100.

**K. September 6, 2017 – Citi Global Technology Conference**

145. Flex participated in the September 2017 Citi Conference. McNamara and Collier attended and spoke at the conference. McNamara and Collier did not identify any of their statements as a forward-looking statement pursuant to the PSLRA or accompany them with any cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

146. During the conference, Collier noted that "***we're perfectly aligned as a company and aligned with our partner*** that this is the right journey that we're on it and that it's going to garner the right level of return for the company as well as put us in a position as a highly protected revenue stream."

147. This statement was false and misleading because Flex was operating below Nike's expectations and Nike was not happy with Flex's results. Flex was consistently missing Nike's expectations with respect to the quality and quantity of the products being produced, such that Flex's results were "way off" what Nike expected or was used to from its manufacturing partners. *See supra* ¶¶48-60, 83-84, 87, 91-94.

148. In response to a question from an audience member, McNamara reiterated Collier's statement regarding Flex's supposed alignment with Nike:

> **Unidentified Participant**: what's the difference with the Nike investment in relationship versus many years ago when you entered the notebook market where you also saw huge revenue opportunity in a new segment and then you ultimately -- you had to pull out of that because it wasn't very profitable? Just kind of what are the differences? I mean, I know you're promising much higher profitability, but I'm just trying to understand what lessons you may have learned.
>
> […]
>
> **Collier**: ….We're embarking on this initiative, strategic initiative ***with our partner collaboratively aligned, both making the levels of investment necessary*** for this strategic initiative to be successful on both sides.

149. This statement was false and misleading because Flex was operating below Nike's expectations and Nike was not happy with Flex's results. Flex was consistently missing Nike's expectations with respect to the quality and quantity of the products being produced, such that

Flex's results were "way off" what Nike expected or was used to from its manufacturing partners. Moreover, Nike was not providing the design content necessary to run on automated production lines or offering training or personnel with knowledge who could assist with Flex' operational issues. *See supra* ¶¶48-60, 83-84, 87, 91-94. And just as was the case with the notebook market the participant asked about, the Nike contract was not commercially viable and would be wound down because Flex was not sustainably managing the contract. *Supra* ¶77.

150. Collier was also asked by Citi analyst Jim Suva about the profitability of the Nike project:

> **Jim Suva:** And I've been telling the people the time line is exiting fiscal '18, which is exiting the March quarter of '18 for turning past loss-making to breakeven, profitable exiting that quarter. Is that the time line you're looking at?
>
> **Collier:** ***Exactly***. So we talked about that on our call just in July. So our anticipation is that we're going to continue to transition this year. ***We're moving into a customized, tailor-built facility in our Q3 that's specifically designed to optimize around the manufacturing requirements for our partner, and we anticipate, as we exit this year, being at a breakeven, which allows us to see some real good accretion into EPS into fiscal '19 and beyond***.

151. This statement was false and misleading because the Nike project was not on track as it was already being plagued by material operational issues and increased costs that were not publicly disclosed but were derailing the Nike project's purported profitability trajectory. Moreover, the transition into the Guadalajara factory was not the fulcrum on which the Nike contract's success would turn as the automation system that could go into production would not go live until April 11, 2018. *See supra* ¶¶48-60, 83-84, 87, 91-94.

152. In a research note after meeting Flex "senior management" including Dennison and McNamara, published on September 12, 2017, UBS picked up on Defendants' continued misinformation, and noted that "[t]he upfront Nike investment has been greater than expected, but **breakeven is still planned for March**…. **The 'dream factory' should be running in October**."

**L. October 26, 2017 – Press Release on Form 8-K**

153. On October 26, 2017, Flex published a press release on Form 8-K with the SEC, announcing its results for the recent quarter. The press release quotes McNamara as stating that "[o]ur **results this quarter *strongly indicate Flex's top-line growth, structural portfolio***

***evolution,*** and capital return all ***remain on track***….”

154. This statement was false and misleading because the Nike project, which was key to Flex’s Sketch-to-Scale strategy, was not on track as it was already being plagued by material operational issues and increased costs that were not publicly disclosed. *See supra* ¶¶48-60, 83-84, 87, 91-94.

**M. October 26, 2017 – F2Q 2018 Earnings Call**

155. After the markets closed on October 26, 2017, Flex held a conference call with analysts to discuss the recent quarter. McNamara, Collier, and Kessel were present during and spoke on this call.

156. Collier made the following statement regarding Flex’s transition into the new “dream factory” in Mexico:

> … this quarter reflected our continued investment in the development of new automation and process technologies to support our strategic long-term partnership with Nike. We are pleased that ***our transition into the new state-of-the-art and purpose-built factory is on track to be completed by the end of this month.***

157. This statement was false and misleading because the transition to the Guadalajara factory was not yet near completion nor the solution: the automation system that could go into production would not even get put into place until April 11, 2018, and Flex was still plagued by operational issues such as lacking design content from Nike that could run in the new factory, preventing it from rendering the Nike contract profitable. *See supra* ¶¶48-60, 83-84, 87, 91-94.

158. Later in that same call, Steven Milunovich of UBS asked McNamara to elaborate on what moving into the Guadalajara factory signified for Flex:

> **Milunovich:** First of all, on Nike, if you could be any more specific in terms of where we are moving into the dream factory. I think you said you would begin in October, it sounds like that’s happening. At what point do you have – I don’t know – the majority of the ramp done basically, maybe talk about how you’re making shoes in the other plant and moving it over. Sounds like you’re on track for kind of breakeven in March. And do you plan to get to your goal of 75% automation? ….
>
> **McNamara:** I mean to move into a factory that size you don’t do it all in one month. So, we’ve been moving in over the last couple of months. ***We’re substantially complete at this point***. We’ll be complete by the end of the month.

> ***And that's going on track.*** So, pretty much the timing is right. We're obviously excited about it. **You called it the dream factory, I like the way you describe that.** But as we move toward the end of that factory, we're just very pleased because ***the opportunity to optimize workflows and lay everything out instead of splitting around a bunch of different factories is really going to be extremely advance – a big advantage for us going forward***. As far as the degree of automation, are you specifically asking, Steve, about the degree of automation in that factory?
>
> **Milunovich**: Yes.
>
> **McNamara:** So, it's hard to put an exact number on it. Different processes and different shoes are going to have different degrees of automation and it really depends on the mix. ***So, we continue to innovate around a number of different processes. That continues to go very, very well.*** But it really depends on the mix in that. So, I think it's hard to really quantify the 75% number. ***So, I can't either confirm or deny the 75%.***

159. McNamara's statements were false and misleading because the October 2017 transition to the Guadalajara factory was not yet complete nor the ultimate solution: the automation system that could go into production would not even get put into place until April 11, 2018, and Flex was still plagued by operational issues such as lacking design content from Nike that could run in the new factory, and the contract was not commercially viable. *See supra* ¶¶48-60, 83-84, 87, 91-94.

160. The market continued to be deceived by Defendants' misstatements. For example, in a research note published on October 27, 2017, Craig-Hallum, a market maker for Flex, noted:

> Transition into new state-of-the-art facility for Nike partnership on track to be completed by the end of October. Exiting FY18 (Mar [2018]) the company expects its Nike business to break even and exiting FY19 for Nike to be a top 10 revenue customer ….

161. Other market analysts reacted similarly. J.P. Morgan published a note the same day as Craig-Hallum, stating the "with the new Nike-dedicated facility going live in November, we should see scale drive margin expansion in the CTG segment for several years." Deutsche also published a research note that day, stating that "Mgmt reiterated expectations that the Nike program, an area of heavy investment within CTG … will not break even until F4Q-18…." UBS too wrote that "Flex appears to be inventing new manufacturing processes to make customized shoes with short lead times." These market commentaries confirm that the market was misled as to

Flex's significant difficulties in putting in place processes that could manufacture shoes at a pace that would make the Nike project profitable for Flex.

162. Just a few days later, on November 1, 2017, Argus updated its report on Flex and stated in relevant part that "… with Flex better managing Nike costs [and an unrelated factor], we look for CTG margins to recover back into the target range in the coming quarters."

**N. October 30, 2017 – F2Q 2018 Quarterly Report on Form 10-Q**

163. On October 30, 2017, Flex issued its quarterly report on Form 10-Q for the second quarter of FY 2018. McNamara and Collier stated that as to the report's contents: "The accompanying unaudited condensed consolidated financial statements have been ***prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP")*** for interim financial information and in accordance with the requirements of Rule 10-01 of Regulation S-X." McNamara and Collier certified that they have "***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…." McNamara and Collier also certified that each report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report…."

164. These statements regarding Flex's compliance with GAAP and the strength of its internal controls were false and misleading because, as Flex admitted on April 26, 2018, a whistleblower had accused the Company of improperly accounting for obligations in a customer contract and certain related reserves which was not only reported to the SEC, but was being independently investigated by the the Company's Audit Committee with outside counsel. Furthermore, on June 14, 2018, Flex admitted in a filing with the SEC that it had identified material weaknesses in its internal controls for customer contracts as of March 31, 2018. Since these admissions regarding the Company's internal controls came not long after the whistleblower

allegations were publicly announced, it may be reasonably inferred that the internal controls were also lacking for an extended prior to March 31, 2018. *Supra* ¶¶98-100.

**O. November 7, 2017 – RBC Capital Markets Technology, Internet, Media and Telecommunications Conference**

165. On November 7, 2017, Flex participated in the RBC Capital Markets Technology, Internet, Media and Telecommunications Conference. Kessel and Douglas Britt, Flex's President-Industrial & Emerging Industries spoke at the conference. Kessel did not identify any of his statements as forward-looking pursuant to the PSLRA or accompany them with any cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

166. Kessel admitted at this conference that in the first quarter of FY 2018, the April to June 2017 time period, Flex was struggling with its ramp of the Nike project and with dealing with multiple styles of shoes to manufacture.

167. Kessel spoke about Flex's then-current trajectory toward breakeven and the impact the Guadalajara factory was having on the Nike project's performance:

> **Unidentified Speaker**: Kevin, it's …hard to have a discussion [about] Flex, about [*sic*, without] talking about Nike. Maybe just it was brought up on the call after a month, but just in your perspective in kind of what's the goalpost, the timelines to watch for on the Nike ramp so. But as you go forward, **how do you guys think it's done so far and how confident we remain with the goals for March breakeven** and the revenue targets you guys have broadly talked about?
>
> **Kessel**: …. Admittedly, **we did have some struggles initially in terms of Q1, in terms of the initial stages of ramping up and dealing with multiple styles of shoes** before ***we've actually put in place the factory that we've talked about that is now as of end of the October online***. ***But in terms of the general trajectory, I think we still remain very confident about the fact that we're going to be improving both performance and scaling as time goes on here***…. [W]e still look at ***what we said back in May has been very much intact***.

168. This statement was false and misleading because the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike that were not publicly disclosed. Moreover, simply getting the Guadalajara factory online was not the fulcrum on which the Nike contract's success would turn as the automation system that could go into production would not go live until April 11, 2018, and Flex

was still plagued by operational issues such as lacking design content from Nike that could run in the new factory. *See supra* ¶¶48-60, 83-84, 87, 91-94.

169. RBC published a note later that day with a "Key takeaway" emphasizing that "[d]espite initial struggles related to scaling multiple SKUs, which resulted in higher than expected investments, FLEX is optimistic about the Nike opportunity."

**P. November 14, 2017 – UBS Global Technology Conference**

170. On November 14, 2017, Flex participated in the UBS Global Technology Conference. Kessel and Paul Humphries, Flex's President-High Reliability Solutions spoke at the conference. Kessel did not identify any of his statements as a forward-looking statement pursuant to the PSLRA or accompany them with cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

171. In response to a question from UBS's Steven Milunovich, Kessel spoke about the Nike project's trajectory to profitability and the impact of the Guadalajara factory going online and its readiness to manufacture shoes for Nike:

> **Milunovich**: There's always lots of interest in the Nike relationship. Maybe you can kind of give us a summary of where you are and if there's been any recent changes there?
>
> **Kessel:** So, we had our Investor and Analyst Day back in May and we presented a timeline back then that kind of talks about how we see Nike over the next two years to three years evolving for us. And I think at this stage, ***it remains very much intact***. This year, we said, was very much the invest-and-create year, fiscal 2018 for us, right, very much fiscal year end. So, we're just, right now, at the very beginning stages of scaling up production. **We talked about moving into our new facility that we built, *which has went [sic] online at the end of October, so that went on according to schedule*.** Next year, we talked about it being a rapid ramp phase for us; next year, again, fiscal 2019 for us. And the following year, more of a scaled expansion

172. This statement was false and misleading because the transition to the Guadalajara factory was not yet complete nor the solution: the automation system that could go into production would not even get put into place until April 11, 2018, and Flex was still plagued by operational issues such as lacking design content from Nike that could run in the new factory. *See supra* ¶¶48-60, 83-84, 87, 91-94.

**Q. December 4, 2017 – Raymond James Technology Conference**

173. On December 4, 2017, Flex participated in the Raymond James Technology Conference. Collier spoke on behalf of Flex at this conference. Collier did not identify any of his statements as a forward-looking statement pursuant to the PSLRA or accompany them with any cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

174. At this conference, Raymond James analyst Adam Tindle asked Collier to comment on the apparent direct link between the Guadalajara factory coming online and Flex's trajectory to breaking even on the Nike project:

> **Tindle:** And more recently, you've been transitioning into a purpose-built 1 million square foot facility for Nike. Talk about what has changed as a result of this and tie this into the goal of reaching breakeven with the Nike relationship exiting the fiscal year?
>
> **Collier:** …. We are operating a disparate multi-facility structure …. And so, now as you mentioned, ***we've moved into a state-of-the art purpose-built factory, which the complete entire solution is in the four walls and enables us to have better process flows, materials flows, production flows***.
>
> And we're well on our way, we're 30 days-plus into the new operation. ***We see multiple signs of the accelerated scaling effects. We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation.*** We've been deploying further lean manufacturing principles and ***you're going to see a natural progression up as we scale that further with the target of exiting this year at breakeven***.

175. Collier's statement was false and misleading because the transition to the Guadalajara factory was not yet complete nor the solution: the automation system that could go into production would not even get put into place until April 11, 2018, and Flex was still plagued by operational issues such as lacking design content from Nike that could run in the new factory. *See supra* ¶¶48-60, 83-84, 87, 91-94.

**R. December 19, 2017 – Meeting with UBS**

176. On or about December 19, 2017, Flex "senior executives" met with UBS. Among the "takeaways" from Flex at the meeting was "***increased confidence that the Nike plant is on track***." This statement by Flex was false and misleading because the transition to the Guadalajara factory not yet complete nor the solution: the automation system that could go into production

would not even get put into place until April 11, 2018, and Flex was still plagued by operational issues such as lacking design content from Nike that could run in the new factory. *See supra* ¶¶48-60, 83-84, 87, 91-94.

177. Flex gave UBS the sense that its management was "much more confident than six months ago when challenges were encountered. ***Local supply chain, labor management, and process flows are coming together.***" UBS reported that Flex indicated improvements in these three areas were "***noticeable***" and that "customized shoes out of the plant can be delivered in seven days vs[.] seven weeks previously." This statement was false and misleading because improvements in supply chain, labor management and process flows, if any, were meaningless in the face of operational issues such as lacking design content from Nike that could run in the Guadalajara factory. *See supra* ¶¶48-60, 83-84, 87, 91-94.

178. Flex also indicated that the Nike plant would "***breakeven around March***," *i.e.*, the end of FY 2018. This statement was false and misleading because the transition to the Guadalajara plant was not yet complete nor the solution: the automation system that could go into production would not even get put into place until April 11, 2018, and Flex was still plagued by operational issues such as lacking design content from Nike that could run in the new factory. *See supra* ¶¶48-60, 83-84, 87, 91-94.

179. In a research note published on January 11, 2018, UBS again referenced its meeting with Flex executives and "sensed increased management confidence in the Nike ramp…."

**S. January 25, 2018 – Press Release on Form 8-K**

180. On January 25, 2018, Flex published a press release on Form 8-K with the SEC, announcing its results for the recent quarter. The press release quotes McNamara as stating that "[o]ur third quarter displayed continued revenue growth acceleration ***and the advancement of our portfolio evolution***…."

181. This statement was false and misleading because the Nike project, which was key to Flex's Sketch-to-Scale strategy, was not advancing on track as it was already being plagued by material operational issues. *See supra* ¶¶48-60, 83-84, 87, 91-94.

**T. January 25, 2018 – F3Q 2018 Earnings Call**

182. After the markets closed on January 25, 2018, Flex held a conference call with analysts to discuss the recent quarter. McNamara, Collier, and Kessel were present during and spoke on this call.

183. McNamara spoke about the impact moving into the Guadalajara factory was having, and how it was driving the breakeven trajectory that was just a few months away now:

> The sequential improvement in operating profits reflected reduced [*sic*] from our strategic partnership with Nike ***as its transition to a new manufacturing facility during the third quarter aided in driving operational improvements***.
>
> […]
>
> The strategic partnership with Nike was further enhanced with the successful move into our new manufacturing facility during the third quarter. ***This move improved efficiency and helped reduce operating losses in line with expectations. Our objectives of moving this project towards the breakeven level exiting our Q4 remains unchanged.***

184. These statements were false and misleading because the transition to the Guadalajara factory was not yet complete nor the solution: the automation system that could go into production did not even get put into place until April 11, 2018, and Flex was still plagued by operational issues such as lacking design content from Nike that could run in the new factory, preventing it from rendering the Nike contract profitable. Moreover, the Nike project was not on track as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike that were not publicly disclosed. *See supra* ¶¶48-60, 83-84, 87, 91-94.

185. McNamara also discussed the state of Flex's relationship with Nike vis-à-vis the shoe collaboration:

> …***the continued development of our long-term strategic partnership with Nike contributed to a new foundational layer of revenue for Flex***, although in the near term, it depressed our margin due to high levels of investment costs and under-absorbed overhead costs.

186. This statement was false and misleading because Flex was operating below Nike's expectations and Nike was not happy with Flex's results. Flex was consistently missing Nike's

expectations with respect to the quality and quantity of the products being produced, such that Flex's results were "way off" what Nike expected or was used to from its manufacturing partners. *See supra* ¶¶48-60, 83-84, 87, 91-94.

187. McNamara and Collier also spoke about the Nike contract's trajectory:

> **Daryanani**: … just maybe talk about the Nike ramp, and in the past, you've talked about this confidence around achieving breakeven by the March quarter. Is that essentially still on track? And then, as you think about calendar 2018, just remind us how do you think about revenue and perhaps some margin contribution from the Nike ramp.
>
> **McNamara:** Yeah. Kind of how we've been expecting this ramp to mature is that we hope to crossover into breakeven by the end of the year. ***That's still our target. We still have a line of sight to that.*** We actually thought at calendar year 2019, we get halfway to our margin targets or I think what we said before was we'd have CTG levels that is actually continues to be what we can see with calendar year 2020 ramping into or going into more like HRS kind of margin. So, these are the margin profiles that we expect, that we're driving to, that ***we have a line of sight to***, and I think we will achieve.

188. These statements were false and misleading because the Nike project was not on track to breakeven at the end of FY 2018 as it was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike, none of which was publicly disclosed. *See supra* ¶¶48-60, 83-84, 87, 91-94.

189. In *Key Quarterly Takeaways* published the next day, Craig-Hallum noted the "**Nike partnership remains on track to be breakeven exiting FY 18.** Flex began operation of its new facility with Nike during the [third fiscal] quarter [Oct. 1 to Dec. 31, 2017] and the company reiterated they remain on track to have the partnership ramped to break even exiting this fiscal year."[9]

190. Also on January 26, 2018, Macquarie summarized that Flex had announced that while the "Nike business continues to ramp slower than expected as both manufacturing and business processes continue to evolve between the two partners…[, t]he company continues to expect it will see the Nike business at break-even levels as we exit Q4. When Nike kicks in it

[9] Emphasis in original.

should both bolster growth and profitability." Specifically, Macquarie noted that during the quarter, Flex "moved the Nike operations into a new plant in Mexico which is helping improve profitability." While the Nike project was "ramping with volumes lower than expected," Macquarie reiterated that "Management noted that they have consolidated operations from three facilities to just one[,] which is helping efficiencies."

191. UBS published a note on January 26, 2018 indicating that it understood the partial disclosure regarding ramp issues, but was not fully aware of the massive issues actually taking place behind the scenes, noting that the "Nike [project] is on track for breakeven exiting March. Although the shoe revenue ramp is slower, the opportunity appears <u>larger</u>."[10]

**U. January 26, 2018 – F3Q 2018 Quarterly Report on Form 10-Q**

192. On January 26, 2018, Flex issued its quarterly report on Form 10-Q for the third quarter of FY 2018. The report was signed by Collier and McNamara, both of whom also stated that as to the report's contents: "The accompanying unaudited condensed consolidated financial statements have been ***prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP")*** for interim financial information and in accordance with the requirements of Rule 10-01 of Regulation S-X." McNamara and Collier certified that they had "***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…." McNamara and Collier also certified that each report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report…."

193. These statements regarding Flex's compliance with GAAP and the strength of its internal controls were false and misleading because, as Flex admitted on April 26, 2018, a

[10] Emphasis added.

whistleblower had accused the Company of improperly accounting for obligations in a customer contract and certain related reserves which was not only reported to the SEC, but was being independently investigated by the Company's Audit Committee with outside counsel. Furthermore, on June 14, 2018, Flex admitted in a filing with the SEC that it had identified material weaknesses in its internal controls for customer contracts as of March 31, 2018. Since these admissions regarding the Company's internal controls came not long after the whistleblower allegations were publicly announced, it may be reasonably inferred that the internal controls were also lacking for an extended prior to March 31, 2018. *Supra* ¶¶98-100.

**V. February 14, 2018 – Goldman Sachs Technology and Internet Conference**

194. Flex participated in the February 2018 Goldman Sachs Technology and Internet Conference. Kessel spoke on behalf of Flex at this conference. He did not identify any of his statements as forward-looking pursuant to the PSLRA or accompany them with any cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

195. In response to a question from a Goldman analyst, Kessel reiterated that Flex would breakeven on the Nike project in just a few weeks:

> **Delaney**: I wanted to talk about Nike, a popular topic amongst investors. Nike's revenue contribution for Flex this year came in towards the lower end of Flex's plan. But Flex reiterated a breakeven profit plan exiting this March quarter. I'm wondering is it reasonable for us to expect that Nike is a top 10 customer in fiscal 2019 with CTG plus margins, $1 billion of revenue in 2020 and beyond with HRS-like margins as had been articulated at the Analyst Day.
>
> **Kessel**: Yeah. ***So we haven't made any changes to our view on Nike***, and really the most important thing for us is getting that business to breakeven. That's been something we've been discussing at length this entire fiscal year. Q1, for us, was kind of the peak period of investment, if you will, the biggest period of absorbing losses. Every quarter since then we've seen improvement in terms of revenue and loss shrinking. We, obviously, just finished Q3, where again we saw a further reduction in loss, further increase in revenue, and ***Q4 is where we're focusing on breaking even as we exit the year***….

196. This statement was false and misleading because the Nike project was not on track and was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike that were not publicly disclosed. *See supra* ¶¶48-60, 83-84, 87, 91-94.

197. On April 24, 2018, just a few days before the truth was more fully revealed, Macquarie published a note on Flex previewing the April 26, 2018 earnings call. Macquarie's comments reflect how the market did not understand that the breakeven trajectory had been shattered and that the Nike project was experiencing severe issues: "The company continues to make progress with its Nike business. We believe the company has been working with the Nike designers, encouraging them to design for the new manufacturing process **and that this effort has been successful.** With the Nike designers on board, **we believe a big hurdle towards profitability has been overcome**…."

**W. April 26, 2018 — Partial Disclosure of the Truth Regarding Nike and Acknowledgment of Accounting Issues — F4Q 2018 Earnings Call**

198. After the markets closed on April 26, 2018, Flex issued a press release announcing that

> the Audit Committee of the Company's Board of Directors, with the assistance of independent outside counsel, is undertaking an independent investigation of allegations made by an employee including that the Company improperly accounted for obligations in a customer contract and certain related reserves. The independent outside counsel also notified the San Francisco office of the Securities and Exchange Commission of the allegations and that it will report the findings of the independent investigation upon its conclusion.

199. Flex elaborated that

> the Company is not aware of any issues under investigation that will materially affect the fourth quarter or fiscal year results, but the investigation is ongoing. The Company has also not yet determined whether the issues will impact previously reported periods and, if so, whether that impact will be material. The historic, fourth quarter, and fiscal year results disclosed in this release do not reflect the impact, if any, from the issues under investigation.

200. Later that day, Flex held its quarterly earnings conference call with analysts to discuss the recent quarter's results. McNamara, Collier, and Kessel participated in the call. Kessel noted at the beginning of the call that with respect to Flex's accounting issues, no further comments would be made:

> The Audit Committee is working diligently to complete the investigation with expedience and beyond what is provided in the press release. And this is very important; as this is an ongoing legal matter, we will not be able to provide any more information or answer any questions on this issue today.

201. Having set aside any further discussion of the accounting issues, Nike was the focus of much of the call because McNamara also partially disclosed some of the ongoing issues that had been plaguing the Nike project during the Class Period. First, during his introductory comments, McNamara disclosed that the Nike project had, in fact, failed to breakeven exiting the fourth quarter of FY 2018 (*i.e.*, the end of March 2018). Indeed, the Nike project would not breakeven for at least another two quarters, as McNamara further disclosed that Flex was "targeting profitability during the second half of fiscal 2019," *i.e.*, between October 2019 and March 2020 — thus up to a *full year* later than the March 2018 trajectory Flex was supposedly steadily tracking to as recently as just a few weeks earlier.

202. McNamara admitted in response to an analyst's question that Defendants knew during the Class Period that it could not be "precise" about the Nike contract's profitability trajectory, rendering their prior statements to that effect false and misleading when they were made.

203. McNamara blamed the miss in part on not having gotten shoe content designed for automation from Nike: "**The key to Nike is to have design content – shoe content that's designed to run on a highly automated line.** The highly automated line is turned on, the content has been developed and it just needs to ramp. So this is the key thing we need…. **We just need the right content to run.**" But, even in partially disclosing this issue, McNamara continued to mislead the market by indicating that it had been resolved: "Most importantly, Nike ***has*** released a full set of products designed for our automation system ***which is now beginning to ramp in mass production***."

204. This statement was false and misleading because the Nike project was not on track and was already being plagued by material operational issues, increased costs, and a dysfunctional relationship with Nike that were not publicly disclosed. McNamara also failed to disclose that the Nike contract was not yet commercially viable. *See supra* ¶¶48-60, 91-94.

205. While McNamara blamed the failure to breakeven on not having the automated processes fully running until very recently in the new "dream" factory, he portrayed the issue as a past, not current, problem: "our automation system took maybe a little bit of time because not only do you have to actually invent the automation, but then you have to go back and invent the products that need to on the automation and then you actually have to find the whole market standpoint for those new products." While McNamara conceded that the automation processes ***just went online on April 11***, a few weeks earlier, he touted it as an "important breakthrough" that the Company had "made" (past tense) in its collaboration with Nike:

> For example, during fiscal 2018, **we made** a few very important breakthroughs such as moving into our new factory in Q3 and further optimizing in Q4, which has allowed us to realize productivity improvements of over 40%. Ramping and delivering NIKEiD volumes successfully from our factories at substantially reduce lead times and, **importantly, co-developing a unique automation system together with our partner which was released to production two weeks on April 11**. This new system is designed to deliver even greater productivity gains, skill improvement and enhanced equality.

206. McNamara reassured the market "that ***these accomplishments will enable us to significantly improve our fiscal 2019 and position us for greatly reduced losses in the first half of 2019***. We are targeting profitability during the second half of fiscal 2019."

207. This statement was false and misleading because regardless of Defendants' accomplishments to-date, the Nike contract was encountering severe operational issues and Flex and Nike still did not have a commercially viable solution for the contract. *See supra* ¶¶48-60, 91-94.

208. McNamara was also asked by a Goldman analyst if Flex had identified what it needed to get Nike to profitability:

> **Delaney:** … I was wondering if you can be a bit more explicit about whether or not the company has identified the steps that it needs to take to get Nike to profitability. It sounded like revenue volume was one of the things that needs to take place based on your earlier comments. But if you could be more specific is there's an exact level of revenue you need to achieve and is there other things on productivity and cost that need to take place, and have you identified those or is there still work that needs to be done figure to out what needs happen to fix that?

> **McNamara: The key to Nike is to have design content – shoe content that's designed to run on a highly automated line**. The highly automated line is turned on, the content has been developed and it just needs to ramp. ***So this is the key thing we need. We don't need any more optimizations of a factory. We have a good factor flow. We just need the right content to run.*** …. [Y]ou have to have design content, that design content has to run on fully automated lines. **We turned those fully automated lines on. *They're running really well*.** We'll ramp up those fully automated lines over the course of the year and get to volume. ***And this is what we need to get to profitability: the right shoe with the right automation system and this is our way of getting out of it.***
>
> So it's a very, very discreet, specific activity that we're undergoing, all with the help and support of our customer who has been in this with us for quite some period of time. And what we'll see as that ramps is we'll expect to see the losses dissipate and move. It's disappointing that we're talking about this still, but it's actually complicated, that's why we kind of started off two years ago saying think about this in a decade. **<u>We had no idea how long it would actually take because we were reinventing shoes and that's a category that we never gone after before.</u>** But that's the very specific activity that we need to move to profitability. And we think it's going to happen over the course of these next few quarters.

209. These statements were false and misleading because the Guadalajara factory, even with automation, was not enough to achieve profitability and Flex was encountering severe operational issues. In addition, Defendants failed to disclose that the Nike project was yet not commercially viable and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

210. McNamara also touted the fact that Nike and Flex had *already* developed a "***mutually beneficial relationship***," which suggested that the project was commercially viable: "Let's just say that ***we believe we've developed a mutually beneficial relationship***. It's a relationship that we continue to work on and develop and adjusting changes we need to…."

211. This statement was false and misleading because Defendants failed to disclose that the Nike project was not yet commercially viable and Flex could not sustainably manage the contract in a profitable way. Furthermore, McNamara failed to disclose that Flex was operating below Nike's expectations and Nike was not happy with Flex's results. Flex was consistently missing Nike's expectations with respect to the quality and quantity of the products being produced, such that Flex's results were "way off" what Nike expected or was used to from its manufacturing partners. *See supra* ¶¶48-60, 91-94.

212. The market was surprised by Flex's disclosures. That evening, Deutsche Bank published a report on Flex titled *F4Q-18 results: step up in investments derail near-term profitability* noting: "Impressive growth and profitability in FLEX's IEI and HRS segments were **overshadowed by disclosure that the Nike deal is still unprofitable, and is not expected to break-even until F3Q-19.**" Notably, Deutsche acknowledged that "[t]he **bull thesis [on Flex] has largely been anchored around the benefits of the Nike partnership** and FLEX's ability to earn at least $1.80 [per share] in FY-20." Based on both the Nike news and the announcement of the independent investigation into the allegations of accounting misconduct, Deutsche said it now "expect[s] shares and valuation to remained pressured well into FY-19." Deutsche did acknowledge that "[w]hile mgmt expects Nike-related losses to narrow linearly over the next six months, the program is not expected to be profitable until F3Q-19 when production volumes ramp up…."

213. RBC also expressed dismay at the news in a report titled "**Tangled Shoelaces**" on April 26, 2018 that "FLEX reported a rather disappointing print/guide with operating margins declining in a severe manner … despite strong sales growth. **Effectively, FLEX capitulated on NKE ramps and profitability timeline** — while disappointing we think this is ultimately a positive." RBC ultimately thought long-term the Nike project could be a profitability boon, and that since the challenges were a "byproduct of growing pains," it had a "reasonably attractive" "risk/reward." This duality demonstrates how despite being let down, market participants were still lulled into a false sense of security by Defendants' continuing misstatements.

214. On April 27, 2018, UBS wrote that "**Flex missed on its most articulated goal**— that Nike would be breakeven exiting March. Instead, breakeven is pushed out about six months and that is not certain…. **<u>Management overpromised in getting to breakeven with Nike</u>**. The production line was turned on April 11, later than anticipated. It sounds like it was **both Flex being late in getting the line running and Nike needing to provide shoes designed for the automated process.**" UBS further noted that it "**<u>expect[s] management shuffling</u>** with IEI's Doug Britt taking over CEC and part of CTG." UBS ultimately downgraded its valuation of Flex: "We previously thought Flex should trade at a premium to systems peers due to stronger earnings

growth. We now think it should trade in parity…."

215. J.P. Morgan was similarly disappointed, noting in a research note published before the markets opened on April 27, 2018 that it was "reducing estimates, lowering our price target[,] and removing FLEX from the Focus List owing to disappointing F4Q results and guidance, **and a longer time-line to achieving profitability and leverage from the ramping NIKE business**." In addition, J.P. Morgan noted that Flex had "engaged outside counsel to perform an investigation into allegations of improper accounting relating to a customer contract…."

216. On this news, Flex's share price fell $3.61 per share the next day, or more than 21%, on unusually high trading volume of more than 35 million shares, to close at $13.03 per share on April 27, 2018.

217. On May 2, 2018, just a few days later, Argus published a note attributing the decline in Flex's stock in part to the Nike problems: "FLEX shares sold off sharply as EPS hit the bottom of the guidance range, reflecting investments in new business opportunities and the steep learning curve in the Nike partnership."

218. UBS wrote a follow-up note on May 7, 2018 reflecting an understanding that the automation and design issues were behind Flex:

> **We didn't expect the six-month delay in breakeven with Nike** that took the stock lower. The decline seems an overreaction given that the relationship will play out over a decade and Nike remains committed. **More likely the problem is company credibility. The March line in the sand had been reaffirmed** even after the May delay last year. Moreover, our sense is that investors view EMS names as having a checkered history with recurring execution problems. Our sense is that the delay mostly is due to establishing a local supply chain to procure fabric and yarn. **The hard parts—getting an automated line running and Nike designing for automation—seem to be going pretty well**. Flex is getting Nike's help in procuring fabric, which seems fixable.

## X. May 10, 2018 – Investor & Analyst Day

219. On May 10, 2018, Flex hosted its annual Investor & Analyst Day. McNamara, Collier, Dennison, and Kessel spoke at this event.

220. Both McNamara and Dennison spoke at length about Nike. At the top of his comments, Dennison acknowledged the importance of the Nike project to Flex investors, noting

that the Company intentionally made Nike the first topic of discussion: "We talked about when we should talk about Nike today and I think we decided it was fairly important to many of you and therefore we put it right up front."

221. McNamara, in his introductory comments, noted that Flex now had the automation and the content designed for automation necessary to render the project profitable in just *five months*, *i.e.*, the end of the second fiscal quarter of 2019:

> We now believe ***we have a way of operating that will move it to second half profitability***. So this is the – we're moving to this is the target we're trying to achieve. We've got a lot of automation that we're driving, we actually mentioned that we have an end-to-end automation system that actually went live on April 11, we'll begin to ramp that through the course of the year, we have a lot of content that's been designed for that system, and we're driving a numerous amount of productivity and yield items that reach all different aspects because it's a really complex problem. So, we kind of view this as we now need to move to our ramp phase and we need to move to an optimization phase.

222. This statement was false and misleading because the Nike project, even with the Guadalajara factory now activated and operating with automated systems, was not yet commercially viable, was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

223. Dennison noted that Flex and Nike had "unlocked" working together on designing shoes for automation: "

> One of the things that we think has been ***a huge unlock in the relationship in probably the last nine months is the proximity, the relationship, the way that we work with your design and category teams, the people that are really helping us figure out what's the best shoe for that automation solution***.

224. This statement was false and misleading because Nike was not happy with Flex's progress and thus Flex was operating beneath Nike's expectations. Flex was consistently missing Nike's expectations with respect to the quality of the products being made, such that Flex's performance was "way off" what Nike expected or was used to from its manufacturing partners. Moreover, regardless of what had been "unlocked" in the Flex and Nike partnership to-date, the contract was still not commercially viable and would ultimately result in the Guadalajara factory being wound down because Nike and Flex could not even agree how to sustainably manage the

contract in a profitable way. *See supra* ¶¶48-60, 91-94.

225. The next day, UBS published a report on Flex writing that a "takeaway" from the May 2018 Investor Day was "it's clear that Flex was too optimistic about ramping shoe production…." UBS also commented on how Nike itself knew Flex's public statements were not on the right trajectory:

> It became clear, though, that *Nike thought it would be a difficult learning curve while Flex was more optimistic*. When Sprunk mentioned the different expectations, Flex's Mike *Dennison's response of "oops" was our highlight of the day***.** Flex missed breakeven in March due to a lack of fabric. *The seemingly more difficult tasks of building an automated line and Nike designing for automation appear to be about 70% complete.*

### Y. May 16, 2018 – J.P. Morgan Global Technology, Media & Communications Conference

226. On May 16, 2018, Flex participated in the J.P. Morgan Global Technology, Media, and Communications Conference. Kessel and Paul Humphries, President for High Reliability Solutions, participated on behalf of Flex. Kessel and Humphries did not identify any of their statements as a forward-looking statement pursuant to the PSLRA or accompany them with any cautionary language pursuant to 15 U.S.C. §78u-5(c)(1).

227. During the conference, Kessel was asked about the status of the Nike project and how it is "moving forward" by Paul Coster, a J.P. Morgan analyst. In his response, Kessel maintained that while Flex missed the prior "breakeven" point of March 2018, it would breakeven and become profitable by the second half of FY 2019, and that "***we're optimistic that we're moving in the right direction and that things are improving***." In response to a question regarding what problem Flex was solving for Nike, Kessel similarly stated, that Flex was "***making progress***" on "***solving … materials management***" and that "***we see the overall situation improving***."

228. These statements were false and misleading because Kessel failed to disclose that the Nike project was not yet commercially viable, Flex was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

229. Kessel also noted, in response to a different question, that "[t]he ***overall opportunity remains unchanged for Flex meaning that over time this should be and can be easily a $1 billion plus opportunity…. As we go into this fiscal year, it will improve dramatically, so we talked about significant year-over-year growth, again, getting into profitability at some point in the second half of the year***."

230. This statement was false and misleading because Kessel failed to disclose that the Nike project was not yet commercially viable, Flex was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

**Z. July 26, 2018 – F1Q 2019 Earnings Call**

231. After the markets closed on July 26, 2018, Flex held a conference call with analysts to discuss the recent quarter's results. McNamara, Collier, and Kessel participated in the call on behalf of the Company.

232. In his introductory remarks, Collier discussed CTG's contribution to Flex's revenues, including the improved profitability trajectory Nike was on:

> Our underperformance to target reflects the underlying mix shift, ramping of new programs and sustaining losses from our strategic partnership with Nike, ***although we continue to make improvements in tracked profitability in the second half of this year***. We expect for CTG to expand its adjusted operating margin and move into our targeted margin range later this fiscal year, as our new programs' manufacturing volumes increase and our utilization rates and overhead absorption improves, ***and we benefit from the profitability improvement of Nike***.

233. These two statements were false and misleading because Kessel failed to disclose that the Nike project was not yet commercially viable, Flex was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

234. McNamara made similar comments regarding the trajectory of the Nike project:

> At our Nike business, we expect to significantly increase revenue over the remainder of the year. The manufacturing system is rapidly improving productivity, our [*sic*] is accelerating and our losses are improving. ***We remain confident in achieving our target for profitability during the second half of fiscal 2019***. <u>To this end, I've firstly taken direct ownership for our Nike operations to ensure its operational success</u>.

235. This statement was false and misleading because Kessel failed to disclose that the Nike project was not yet commercially viable, Flex was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

236. McNamara further elaborated on the Nike trajectory in response to a question from a Bank of America analyst who asked if the Nike project was "tracking as you had expected or are they tracking slower or faster?" McNamara responded:

> As far as Nike, … ***it's tracking exactly to where we thought*** … ***three months ago***. So, we're going to have significant revenue growth this year. We're continuing to expand productivity. We expect margins to move to profitability in the second half of the year. So, I would say ***we're like right on schedule to where we thought we would be three months ago***.

237. This statement was false and misleading because Kessel failed to disclose that the Nike project was not yet commercially viable, Flex was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

238. Deutsche wrote in a note published later that day that it was "encouraged to hear the productivity and losses associated with the Nike program (in CTG) are improving, with the partnership on track to reach profitability by F3Q-19." RBC also wrote that day that the Nike "ramps remain on track and management reiterated expectations for break-even in H2:18."

**AA. September 5, 2018 – Citi Global Technology Conference**

239. McNamara also discussed the status of Flex's business relationship with Nike at the September 2018 Citi Conference:

> ***So it's a very win-win kind of relationship*** if you think about it. Our job in the relationship is to drive productivity and get our regional manufacturing center to be productive. And I think Nike needs to figure out how they then take a regional manufacturing capability and leverage it into the marketplace and get value out of it that increases their revenue, is more responsive to customers and can drive their own margins. **So it's an interesting combination and we continue to work on it very aggressively**.

240. This statement was false and misleading because Kessel failed to disclose that the Nike project was not yet commercially viable, Flex was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

241. McNamara also discussed the state of the trajectory the Nike contract was on, while noting in passing that Flex was working on the long term business model, and that profitability and efficiency were on track:

> So … we're losing a little bit less per quarter which is kind of hard to sit up here and say, but we're losing little bit less each quarter. ***We have a line of sight to productivity that'll drive this to our targets by the end of the year***. We're very aggressively running it. And we have a pretty good team. ***So I actually think we deliver by the end of the year a very efficient regional capability***.

242. This statement was false and misleading because Kessel failed to disclose that the Nike project was not yet commercially viable, Flex was encountering severe operational issues, and Flex could not sustainably manage the contract in a profitable way. *See supra* ¶¶48-60, 91-94.

## VII. THE TRUTH IS REVEALED

243. After the markets closed on October 25, 2018, Flex issued a press release announcing a complete reversal of what Defendants had been touting all along: the co-manufacturing operations in Guadalajara were being wound down because the Company was "**unable to reach a commercially viable solution**" for the project. The press release went on to explain that as a result, "**Flex and NIKE have mutually agreed to wind-down the footwear manufacturing operations** in Guadalajara by December 31, 2018."

244. At the same time, Flex also announced the abrupt—and completely unanticipated—retirement of McNamara, who just a few months earlier had "taken direct ownership for our Nike operations to ensure its operational success." In a conference call with analysts later that day, McNamara stated "now is the time for me to step back and allow new leadership to continue improving on what we have built."

245. During the same conference call, Collier admitted:

> Regarding NIKE, we have worked hard with NIKE to make our footwear operation in Mexico technically and commercially successful. In recent weeks, however, it became clear that **we are unable to reach a commercial and viable solution with NIKE and have mutually agreed to wind down our NIKE footwear manufacturing operation in Guadalajara by December 31, 2018**. We are finalizing the terms and details of the wind-down and we are striving to retain many of our affected employees and to repurpose our facility.

246. The market was stunned. Reuters wrote on October 26, 2018 in an article headlined "*BUZZ-Flex plummets as Nike partnership ends, CEO retires*" that Flex's stock "plunged … after announcing end to Nike Inc partnership, retirement of CEO." The Motley Fool published an article titled "*Why Shares of Flex Ltd. are Plummeting Today"* which noted that "[s]hares of **Flex Ltd.** (NASDAQ: FLEX) plunged on Friday after the electronics manufacturing services provider reported mixed second-quarter results. The company missed analysts' estimate for revenue, announced an end to a partnership with **Nike**, disclosed that its CEO was retiring at the end of the year, and provided guidance that was below expectations." And in a research note published on October 26, 2018, Macquarie wrote that the "Nike strategic partnership [was] cancelled" and that McNamara was retiring. Importantly, Macquarie recognized the sudden nature of this announcement, noting that "[t]here do not seem to be any obvious choices for a replacement from the existing senior management team."

247. In response to this full disclosure of the truth, Flex's stock plummeted 35% on October 26, 2018, freefalling $3.82 to close at $7.09 a share, after closing at $10.91 the previous day. The stock fell another 2.12% on October 29, dropping $0.15 to close at $6.94. Unusually high trading volume occurred on these days, with more than 70 million shares trading on October 26 and over 31 million on October 29.

248. MarketRealist.com wrote on October 29, 2018 that Flex's shares dropped on October 26 because "Flex missed analyst revenue estimates, it also announced that its partnership with Nike (NKE) has ended. Further, the company's CEO, Mike McNamara, plans to retire by the end of this year."

249. An October 29, 2018 Audit Analytics report discussed McNamara's departure alongside its discussion of the prior disclosure of internal controls issues, and how his departure could be an indication of more severe issues within the Company: "The unexpected departure of a chief executive officer or chief financial officer may be a sign of a significant problem within a company. The issues may be severe if the departure is accompanied by 'tone at the top' language, which may indicate improper management conduct and signal negative business developments."

250. That same day, J.P. Morgan published a report on Flex noting that "[m]ostly investors are appalled at how quickly the NIKE partnership went south given that FLEX CEO [*sic*] was touting its strategic importance and positive momentum at the analyst day in May 2018. His retirement might yield a sense of relief but several investors are uneasy about the leadership vacuum and they are looking for the next shoe to drop."

251. RBC confirmed from a conversation with Kessel on November 13, 2018 that Flex was unable to manage the Nike project: "While FLEX was making improvements in [the Nike contract], they were unable to reach an agreement on how to sustainably manage it from a profit standpoint…."

## VIII. NO SAFE HARBOR

252. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

253. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection – at least with respect to the part of the statement that refers to the present.

254. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

255. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Flex was not on a timely trajectory to having the Nike contract become profitable and that Flex was encountering material roadblocks to having the Nike contract become profitable or commercially viable.

256. Defendants are also liable for false or misleading statements that may be construed as forward-looking because at the time each of those purportedly forward-looking statements were made, the particular speaker knew that the particular statement was false, or by reason of what the speaker failed to note, was materially false or misleading, or that each such statement was authorized or approved by a Flex executive officer who actually knew that each statement was false or misleading when made.

## IX. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

### A. The Individual Defendants closely monitored and had direct ownership of the Nike contract

257. Throughout the Class Period, Defendants knew, or were reckless in not knowing based on the material facts available to them, that their statements regarding Flex's timeline for its Nike ramp-up, its trajectory for breaking even on the Nike business by the end of FY 2018, and the strength of its internal controls were materially false or misleading. The Flex-Nike business relationship was created, managed, and maintained at the top levels of both companies. Further, Flex and Nike executives and their teams worked intimately together, regularly keeping each other well-informed of expectations, timelines, and the status and/or progress of the ramp-up. And Flex's CEO and CFO, Defendants McNamara and Collier, certified that they designed, or caused the design of, the internal controls over financial reporting to provide assurance as to the reliability of the Company's financial reporting.

258. Not only did the Nike contract emanate from the executive C-suite level since its inception, but as the project grew, McNamara and Dennison discussed the contract "a lot" with Nike executives. McNamara and Dennison regularly visited the Nike operations during the Class Period.

259. During Flex's January 27, 2017 earnings call, Collier assured investors that they not only had visibility into the Nike project, but that they "continue[d] to get greater visibility with where [they were] moving with [Nike]," and as far as McNamara was concerned, "we'll see [Nike] in a top 10 position on the overall Flex business" by FY 2019. McNamara further touted how "we've been able to build not only results in terms of innovating of how manufacturing is done, but the amount of teamwork we've been able to develop with their guys and collectively finding solution together is really, really high."

260. During Flex's July 2017 Earnings Call, Collier again noted that they "continue[d] to have line of sight to" several areas, including the "commissioning or a qualification to the design process" [with Nike] "that we anticipate moving throughout the year and improving on those." McNamara also indicated that they knew what they were doing with regard to Nike, referencing their "methodical portfolio management" and "deliberate[] increase[ in] our investments in new transformational business opportunities, including Nike. This strategic partnership, which, measured in decades, remains a very important long-term margin revenue and TAM [Total Available Market] expansion opportunity for us." McNamara reiterated the same point during Flex's October 26, 2017 earnings call: "This further underscores the strategic nature of our partnership, one that will be measured in decades. This partnership is an important long-term revenue, margin and TAM expansion opportunity for Flex." McNamara even appeared to joke about Collier's knowledge of and tolerance for the upfront investment into Nike at the September 2017 Citi Conference, "…we're actually talking about volume manufacturing. So once you do that, you have to make an investment upfront. Any new facilities, new operations, new people, you have to make an investment upfront, and those investments put a little bit of a drain on the P&L, which my friend here, Chris [Collier], says is okay to do as long as it's only this year."

261. Based on Defendants' statements, analysts following the Company understood and reported on how close the Flex-Nike relationship was throughout the Class Period – particularly the executives of both companies. For instance, as early as May 22, 2017, investors understood that Flex and Nike were "Engaging at the C Suite" based on comments by Collier and Kessel at the J.P. Morgan Global, Technology, Media and Communications Conference which were reflected in the report: "Customer product discussions are now occurring at the C suite level driving stickier, higher-margin business and opportunities for Flex's design engineers to engage early on."

262. At the December 4, 2017 Raymond James Technology Conference, Collier confirmed that Flex "had a great calibration with [Nike's] senior leadership, their executive team. It was an executive led – and this goes back to a strategically led engagement where our C-suite was engaged with theirs to identify what that vision is to look like and the underlying business model and financial return model that was associated with it was very attractive for us." Then, at the February 2018 Goldman Sachs Conference, Kessel described the importance of hitting breakeven as "something that [Flex and Nike have] been discussing at length this entire fiscal year." The constant communication and unified engagement between Flex and Nike top-down meant that Flex was informed of and updated on Nike's expectations and timelines for growth, reaching breakeven, and, eventually, becoming profitable.

263. Dennison and Sprunk appeared to be on the same page about how closely Flex and Nike had been working together at Flex's May 2018 Investor Day. Dennison detailed how "[o]ne of the things that we think has been a huge unlock in the relationship in probably the last nine months is the proximity, the relationship, the way that we work with [Nike's] design and category teams, the people that are really helping us figure out what's the best shoe for that automation solution." And when Sprunk commented that Nike's people were "in your factory, they're working with your teams," Dennison responded that "[t]hey're living with us." Sprunk further noted that Flex and Nike had reached a point in their relationship where "you're getting a lot more visitors, you're getting a lot more engineering help, a lot more development help. You're taking to the category teams, they're in." At the close of their conversation, Dennison declared that "[w]e

love this relationship. This partnership is unlike any other partnership we have at Flex and a testament is that you're here with me in a difficult period to explain kind of the future and the benefits and the value of this business.". This concerted effort between C-suite individuals at Flex and Nike trickled down to all levels of employees working on the joint project, allowing Defendants intimate access to the progress of the project throughout the Class Period.

264. Thus, after telling investors that the Flex-Nike project was simply "off" by six months on April 26, 2018, Defendants continued to tout the strength of and closeness of their partnership with Nike. Analysts like Macquarie who attended the May 2018 Investor Day specifically reported on such statements as: "Both the Company's CEO and the head of the Consumer group reiterated their strong commitment to making the Nike deal work. Eric Sprunk, Nike's COO, was on hand to discuss the partnerships and the two organizations clearly have a strong relationship."

265. By July 2018, McNamara was directly managing the Flex-Nike project, which he continued to tout as being on track to breakeven by the end of FY 2019 during the July 2018 Earnings Call, "We remain confident in achieving our target for profitability during the second half of fiscal 2019. To this end, I've firstly taken direct ownership for our Nike operations to ensure its operational success." The market took note and gave credence to his statements, as reflected in analyst reports by JPMorgan – "Even NIKE business, now reporting directly to the CEO, should go margin neutral by fiscal year-end" – and RBC – "Nike Ramp: Importantly, CEO Mike McNamara has undertaken direct oversight of the Nike project. The company is making steady progress and reiterated its goal to achieve breakeven in second half of the year."

**B. The Nike project was core to Flex's operations**

266. The Nike project was so important to Flex that its C-suite executives, particularly Defendants Dennison, McNamara, and Collier, intimately collaborated with Nike's senior leadership throughout the Class Period to discuss critical facts relating to the project from the vision, business model, and financial return model for the project to the designs for the shoes to be

manufactured.[11] Indeed, by July 2018, McNamara had taken direct ownership of the Nike operations.

267. Even though Nike was not one of Flex's top 10 customers during the Class Period, Defendants were telling the investing public that Nike would be by FY 2019 during earnings calls like the one on July 27, 2017. During that earnings call as well as others, Defendants consistently described the Nike project as a "transformational business opportunit[y]" and as a "strategic partnership" which would last decades and provide long-term margin revenue and TAM expansion opportunity.

268. That the Nike project was one of Flex's core operations during the Class Period is further demonstrated by analysts' constant focus on the progress and profitability of the Nike project up until Defendants disclosed that Flex was exiting the project.

269. In the face of analysts' focus on Nike, the Individual Defendants stayed abreast of issues and successes relating to the project. For example, during the November 2017 RBC Conference, in response to an analyst question about how the Nike project had performed to-date, Kessel conceded that "Admittedly, we did have some struggles initially in terms of Q1 [2018], in terms of the initial stages of ramping up and dealing with multiple styles of shoes before we've actually put in place the factory that we've talked about that is now as of end of the October online." The Individual Defendants thus had knowledge of facts critical to the Nike project, including specific information from the initial stages of ramping up.

270. Since key executives at Flex like Dennison, McNamara, Collier, and Kessel had knowledge of critical facts related to the progress, timing and profitability of the Nike project, such knowledge may be imputed to Flex.

---

[11] *See, e.g.*, December 2017 Raymond James Conference (Flex "had a ***great calibration with [Nike's] senior leadership, their executive team***. It was an ***executive led*** – and this goes back to a ***strategically led engagement where our C-suite was engaged with theirs*** to identify what that vision is to look like and the underlying business model and financial return model that was associated with it was very attractive for us."); May 22, 2017 *J.P. Morgan TMT Conference Takeaways – Alert* ("***Customer product discussions are now occurring at the C suite level*** driving stickier, higher-margin business and opportunities for Flex's design engineers to engage early on.").

### C. The timing and circumstances of Dennison and McNamara's departures support a strong inference of scienter on their part

271. Throughout most of the Class Period, Dennison was Flex's face for the Nike project. But his quiet and unannounced separation from the Company in the summary of 2018, followed by the abrupt, public announcement from McNamara that the latter was taking "direct ownership" of the Nike project to ensure its "operational success," raises a strong inference of scienter. Dennison had been with the Company for over 19 years and had risen through the ranks to be its Chief Marketing Officer, yet there was no announcement about his leaving the Company on good terms or having retired voluntarily. On August 7, 2018, Fox Factory Holding Corporation announced Dennison was joining it as an executive in its powered vehicles group.

272. McNamara's departure raises just as strong an inference of scienter. McNamara departed the Company very suddenly – and just three months after taking "direct ownership" of the Nike project to ensure its "operational success" – on the *same day* the Company announced the co-manufacturing operations with Nike had been terminated. There was no succession plan in place, and as one market analyst noted, *see supra* ¶246, there was no obvious in-house choice to replace him. McNamara had spent more than two decades with Flex and had given no public indicia that he would retire; rather the opposite given his July 2018 takeover of the Nike project.

## X. CLASS ACTION ALLEGATIONS

273. This is a class action on behalf of the following:

> All purchasers of Flex's publicly traded securities, including common stock and exchange-traded options on such common stock, during the period from January 26, 2017 to October 25, 2018, inclusive, and who were damaged thereby. The following are excluded from the Class: (a) Defendants; (b) members of Defendants' immediate families; (c) any person who was an officer or director of Flex during the Class Period; (d) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (e) Flex's employee retirement and benefit plan(s), if any; and (f) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

274. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, according to its quarterly and annual reports filed with the SEC, Flex had between approximately 526 million and 535 million shares of common stock

outstanding and actively traded on the NASDAQ with the ticker symbol "FLEX." While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Flex or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

275. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

276. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

277. Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

- Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;
- Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;
- Whether, and to what extent, the market price of Flex common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;
- Whether Defendants acted with the requisite level of scienter;
- Whether McNamara and Collier were controlling persons of Flex;
- Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United*

*States*, 406 U.S. 128 (1972), or both; and

- Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

278. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

279. Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

- Flex's common stock was actively traded on the NASDAQ, and informationally efficient market, throughout the Class Period.
- Flex's common stock traded at high weekly volumes during the Class Period.
- As a regulated issuer, Flex filed periodic public reports with the SEC.
- Flex regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and in filings with the SEC, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.
- The market reacted promptly to public information disseminated by Flex.
- Flex securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. These firms included, but are not necessarily limited to, the following: RBC, UBS, J.P. Morgan, Goldman, Deutsche,

Craig-Hallum, Raymond James, Argus, Macquarie, Bank of America, Cross Research LLC, Citigroup, and Needham & Company.

- There were market makers for Flex's common stock during the Class Period, including but not limited to J.P. Morgan, UBS, Craig-Hallum, Deutsche, and RBC.

280. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Flex's common stock.

281. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Flex's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

282. In the alternative, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

## XII. LOSS CAUSATION

283. During the Class Period, as detailed herein, Defendants engaged in a scheme and wrongful course of business that was designed to and did artificially inflate Flex's stock price, whose misconduct operated as a fraud and deceit on Class Period purchasers of the Company's common stock. Defendants did this by making materially false and misleading statements and omissions regarding Flex's progress in ramping up its Nike business, the strength of its internal controls, and its ability to hit breakeven by the end of FY 2018 as set forth *supra*. When the false and misleading nature of Defendants' statements were disclosed on July 27, 2017, and April 26, 2018, the Company's stock price materially declined from $17.09 to $16.29 per share by the close of trading on July 28, 2017 and $16.64 to $13.03 per share by the close of trading on April 27, 2018 as the artificial inflation partially dissipated each time. Then, when the complete truth about Defendants' statements regarding the Nike contract was revealed after the markets closed on October 25, 2018, the Company's stock price dropped from $10.91 to $7.09 by the close of trading on October 26, 2018 as the artificial inflation fully dissipated. As a result of their

purchases of Flex common stock during the Class Period at prices artificially inflated by Defendants' false and misleading statements, Lead Plaintiff and other Class members suffered significant damages.

284. The market for Flex common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 4,073,534 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Flex's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased or otherwise acquired Flex common stock relying upon the integrity of the market relating to Flex common stock and suffered economic losses as a result thereof.

285. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' misrepresentations artificially inflating Flex's stock price and the subsequent significant decline in the value of Flex common stock when the truth was revealed after the markets closed on July 27, 2017, April 26, 2018, and October 25, 2018.

286. The declines in Flex's common stock price on July 28, 2017, April 27, 2018, and October 26, 2018 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the markets closed on July 27, 2017, April 26, 2018, and October 25, 2018. The timing and magnitude of Flex's stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct. Indeed, as illustrated in the chart below, on the same day that Flex's common stock share price closed down over 35%, the Standard & Poor's 500 Index and Dow Jones Industrial Index decreased 1.83% and 1.19%, respectively. Moreover, there was no news about Flex, other than the disclosures in the July 27, 2017 press release or conference call, the April 26, 2018 press release or conference call, and the October 25, 2018 press release or earnings call that could fully explain the Company's stock price declines on July 28, 2017, April 27, 2018, and October 26, 2018.




## COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

287. Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

288. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

289. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as

alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Flex common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Flex common stock and options on such common stock at artificially inflated prices.

290. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

291. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Flex common stock and exchange traded options on such common stock during the Class Period.

292. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Flex common stock and exchange traded options on such common stock, Lead Plaintiff and other members of the Class purchased Flex common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Flex common stock and options at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Flex common stock declined precipitously and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Flex common stock and options at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

293. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against Individual Defendants McNamara and Collier**

294. Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

295. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants McNamara and Collier. At this time, Lead Plaintiff excludes defendants Kessel and Dennison because it does not have information sufficient for it to believe that either was a controlling person of Flex during the Class Period. Lead Plaintiff reserves the right to further amend this pleading should it discovery facts sufficient to establish that Kessel or Dennison was a controlling person of Flex during the Class Period.

296. Defendants McNamara and Collier had control over Flex and made the material false and misleading statements and omissions on behalf of Flex within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and share ownership, as alleged above, Defendants McNamara and Collier had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends, were false and misleading. Defendants McNamara and Collier were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

297. In particular, Defendants McNamara and Collier had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

298. By reason of such wrongful conduct, Defendants McNamara and Collier are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants McNamara's and Collier's wrongful conduct, Lead Plaintiff and the other members of the Class

suffered damages in connection with their purchases of the Company's shares during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiff Bristol County Retirement System as a class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Thornton Law Firm LLP and Franklin D. Azar & Associates, P.C. as co-Class Counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated Section 10(b) and Rule 10b-5 thereunder of the Exchange Act by reason of the acts and omissions alleged herein;

C. Declaring and determining that Defendants McNamara and Collier violated Section 20(a) of the Exchange Act by reason of the acts and omissions alleged herein;

D. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

E. Awarding Lead Plaintiff Bristol County Retirement System and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

F. Granting all other and further relief as the Court deems just and proper.

**JURY DEMAND**

Lead Plaintiff Bristol County Retirement System demands a trial by jury.

Dated: November 28, 2018

**THORNTON LAW FIRM LLP**

By: *s/ Guillaume Buell*
Guillaume Buell (*Pro Hac Vice*)
1 Lincoln Street, 25th Floor
Boston, MA 02110
Telephone: 617-720-1333
Facsimile: 617-720-2445
Email: gbuell@tenlaw.com

David Bricker (158896)
9430 West Olympic Boulevard, Suite 400
Beverly Hills, CA 90212
Telephone: 310-282-8676
Facsimile: 310-388-5316
Email: dbricker@tenlaw.com

Ivy T. Ngo (249860)
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 E. Evans Avenue
Aurora, CO 80014
Telephone: 303-757-3300
Facsimile: 303-759-5203
Email: ngoi@fdazar.com

*Co-Lead Counsel for the Proposed Class and Counsel for Lead Plaintiff Bristol County Retirement System*

## CERTIFICATE OF SERVICE

I, Guillaume Buell, am not a party to this case and am over the age of 18. I certify that on November 28, 2018, I served true and correct copies of this *Amended Class Action Complaint* on all parties by filing the document electronically using the Court's CM/ECF website, which electronically served the document on all parties registered to receive such notices in the foregoing service list, set forth below. No parties have requested manual service.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 28, 2018 at Boston, Massachusetts.

/s/ *Guillaume Buell*
Guillaume Buell

Charles Henry Linehan clinehan@glancylaw.com, charles-linehan-8383@ecf.pacerpro.com

David Bricker dbricker@tenlaw.com

Ex Kano S. Sams , II esams@glancylaw.com, ex-kano-sams-8208@ecf.pacerpro.com

Guillaume Buell gbuell@tenlaw.com

Ivy T Ngo ngoi@fdazar.com, footec@fdazar.com

Laurence M. Rosen lrosen@rosenlegal.com, larry.rosen@earthlink.net

Lesley F. Portnoy LPortnoy@glancylaw.com, info@glancylaw.com, lesley-portnoy-3007@ecf.pacerpro.com

Lionel Z. Glancy info@glancylaw.com, lglancy@glancylaw.com

Nicole Marie Ryan nicole.ryan@sidley.com, dgiusti@sidley.com, ldonohue@sidley.com, nicole-ryan-5866@ecf.pacerpro.com, sfdocket@sidley.com, sfefilingnotice@sidley.com, tberninzoni@sidley.com

Robert Vincent Prongay rprongay@glancylaw.com, info@glancylaw.com, robert-prongay-0232@ecf.pacerpro.com

Sara B. Brody sbrody@sidley.com, ddelarocha@sidley.com, sara-brody-9555@ecf.pacerpro.com, sfdocket@sidley.com