**LABATON SUCHAROW LLP**
JAMES W. JOHNSON (*admitted pro hac vice*)
jjohnson@labaton.com
MICHAEL H. ROGERS (*admitted pro hac vice*)
mrogers@labaton.com
MARISA N. DEMATO (*admitted pro hac vice*)
mdemato@labaton.com
140 Broadway
New York, New York 10005
Tel: (212) 907-0700

*Counsel for Lead Plaintiff National Elevator*
*Industry Pension Fund and Lead Counsel for*
*the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| DAVID KIPLING, on Behalf of Himself and All Others Similarly Situated, | Case No. 5:18-cv-02706-LHK |
| Plaintiff, | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | CLASS ACTION |
| FLEX LTD., MICHAEL M. MCNAMARA, CHRISTOPHER E. COLLIER, MICHAEL C. DENNISON and KEVIN KESSEL, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ......................................................................................... 1

    A.  Background ................................................................................................. 3

    B.  Defendants Misled Investors, Telling Them that the Nike Contract Presently
        was on a Steady, Linear Trajectory to Profitability ................................... 4

    C.  Flex Moved Into Its Massive New "Dream Factory," Purportedly Custom-
        Built for Automating Mass Quantities of Nike Shoes ............................... 6

    D.  Flex Delayed Breakeven by Six Months or More But Reassured Investors .............. 7

II.  JURISDICTION AND VENUE ................................................................................... 9

III.  PARTIES ................................................................................................................... 10

    A.  Lead Plaintiff ........................................................................................... 10

    B.  Defendants................................................................................................. 10

    C.  Relevant Third Parties.............................................................................. 11

IV.  FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF
     FRAUD.................................................................................................................. 12

    A.  Flextronics Reinvents Itself as "Flex," With a New Focus on The
        Company's "Sketch-to-Scale" Business Strategy ................................... 12

    B.  Flex Touted the Nike Contract as an Important Revenue Generator Critical
        to Flex's Profitability .............................................................................. 15

    C.  Throughout the Class Period, Defendants Misled the Market About Flex's
        Ability to Manufacture the Volume of Shoes Required to Make the Nike
        Contract Profitable .................................................................................. 17

    D.  Despite Knowingly Failing to Hit the Nike Contract's Production Targets,
        Defendants Continued to Tout the Breakeven Story to Investors .......................... 21

    E.  Defendants Continued to Double-Down on Imminent Profitability Despite
        Knowing that Flex Was Failing to Meet Production Targets Due to
        Significant Manufacturing Problems ....................................................... 24

    F.  Defendants Continued to Mislead the Market Regarding the Nike Contract's
        Trajectory and Commercial Viability After Failing to Achieve Profitability .......... 29

    G.  Flex Revealed the Truth About the Manufacturing and Production Target
        Issues When it Announced that it was Cancelling the Nike Contract,
        Winding Down Operations in Guadalajara, and Defendant McNamara was
        Resigning................................................................................................ 33

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..................................... 34

VI.     THE TRUTH ABOUT THE FULL IMPACT OF THE FRAUD IS GRADUALLY
        REVEALED ........................................................................................................................... 53

VII.    LOSS CAUSATION ........................................................................................................... 56

        A.      July 27, 2017 – First Partial Disclosure/Materialization of the Risk ...................... 58

        B.      April 26, 2018 – Second Partial Disclosure/Materialization of the Risk ................ 59

        C.      October 25, 2018 – Final Disclosure/Materialization of the Risk ........................... 61

VIII.   ADDITIONAL INDICIA OF SCIENTER .................................................................... 64

        A.      The Nike Contract Was Critical To Flex's Core Operations ................................... 64

        B.      Defendants' Statements Support a Strong Inference of Scienter ........................... 65

        C.      Defendants Dennison and McNamara Were Directly in Charge of the Nike
                Contract ..................................................................................................................................... 67

        D.      The Timing and Circumstances of Defendants Dennison and McNamara's
                Departures Support a Strong Inference of Scienter .................................................. 68

IX.     CONTROL PERSON ALLEGATIONS ....................................................................... 69

X.      CLASS ACTION ALLEGATIONS .............................................................................. 70

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
        MARKET DOCTRINE ...................................................................................................... 72

XII.    NO SAFE HARBOR .......................................................................................................... 74

XIII.   CAUSES OF ACTION ....................................................................................................... 75

        COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against
        All Defendants .......................................................................................................................... 75

        COUNT II Violation of Section 20(a) of the Exchange Act Against Individual
        Defendants McNamara, Collier, Dennison, and Kessel .................................................... 76

XIV.    PRAYER FOR RELIEF ..................................................................................................... 77

XV.     JURY DEMAND .................................................................................................................. 78

Court-appointed Lead Plaintiff National Elevator Industry Pension Fund ("Lead Plaintiff" or "National Elevator" or the "Pension Fund"), individually and on behalf of all persons and entities who, during the period from January 26, 2017 to October 25, 2018, inclusive (the "Class Period"), purchased the publicly traded common stock of Flex Ltd. ("Flex" or the "Company") and were damaged thereby (the "Class").[1]  Lead Plaintiff brings this Consolidated Class Action Complaint against Defendants Flex and several of its senior executives—Chief Executive Officer Michael M. McNamara, Chief Financial Officer Christopher E. Collier, President Michael C. Dennison, and Vice President Kevin Kessel (the "Individual Defendants," and together with Flex, "Defendants").

Lead Plaintiff's claims are brought upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Flex with the Securities and Exchange Commission; (2) reports issued by analysts covering or concerning Flex and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Flex, its business, and the Individual Defendants; (4) an investigation conducted by National Elevator's attorneys, including interviews with former Flex employees; and (5) other publicly-available information concerning Flex, its business, and the allegations contained herein.  Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

I.    NATURE OF THE ACTION

1.    This securities fraud action presents a classic case of Defendants overpromising to investors the progress of a critical manufacturing project, despite facing catastrophic manufacturing problems about which they did not tell the truth until forced to do so.

---

[1] The following are excluded from the Class: (1) Defendants; (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of Flex during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) Flex's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity.

2.       In 2015, electronics manufacturer Flex entered into a game-changing shoe manufacturing contract with Nike ("Nike contract").   Indeed, while Flex had never before manufactured shoes, Defendants nevertheless promised investors that the Company's technology and automation in its custom-built shoe factory in Guadalajara, Mexico would generate a multi-billion dollar revenue stream from the Nike contract.   Not only that, to assuage investors that the contract was going as planned, Flex told investors (and investors understood) that the Company was, and would continue to achieve these tremendous revenue gains *on a steady linear trajectory* towards profitability at a point no later than end of March 2018—what Defendants touted as the "breakeven point."   Throughout the Class Period, Defendants again and again assured investors that they *presently* were on that linear trajectory to profitability, consistently telling investors that Flex's trajectory to profits "remains intact."

3.       In reality, however, Defendants knew Flex was falling woefully short of its shoe production targets due to severe and persistent manufacturing problems.   In fact, one former Flex employee has confirmed that, at best, during the peak of the Nike contract, Flex was achieving *only <u>one-third</u> of the target number of shoes <u>required</u> by the Nike contract*.   Despite this, Defendants nonetheless consistently reassured investors that they would hit the breakeven point by the end of March 2018.

4.       However, at the end of March 2018, to the surprise of investors (but not to Defendants), Flex badly missed its long-promised breakeven point.   Indeed, in connection with the announcement, Defendants shockingly admitted that from the outset of the contract, they "*had no idea how long it would actually take*" to breakeven.   In response, Flex's stock price plummeted *over 21%*.

5.       Nonetheless, despite knowing that their Nike operations were still no closer to achieving their required production targets, Defendants once again falsely reassured investors that profitability was right around the corner because their innovative automation processes were finally showing progress.

6.       That did not last long.   On October 25, 2018, Defendants finally revealed that not only was the Nike contract not profitable, but Flex was completely cancelling the Nike contract

that, less than two years earlier, the Company heralded as the source of a critical, multi-billion dollar revenue stream.  Investors acted accordingly, selling off Flex stock to the tune of a ***35% decline*** in price.

### A.    Background

7.    Flex is, and during the Class Period was, primarily in the business of providing packaged consumer electronics and industrial products for original equipment manufacturers ("OEMs") across the globe.  Traditionally, Flex focused its manufacturing and supply chain operations around electronic components.  In fact, until 2015, the Company was known as "Flextronics International."

8.    In July 2015, the Company rebranded itself as simply "Flex" with a new, expanded focus on products outside of electronics.  As part of this rebranding, Flex started heavily marketing itself under its trademarked "Sketch-to-Scale" business strategy, which purportedly allowed Flex to tailor product specifications to the Company's already established manufacturing and supply-chain operations so that Flex could make and ship the product more efficiently (and thereby, so the strategy intended, generate more profits).

9.    Fresh off this rebranding and the Company's new focus on its Sketch-to-Scale business strategy, in October 2015, Flex announced a significant new partnership with footwear giant Nike.  While Flex had no previous footwear experience whatsoever, Defendants nevertheless told investors that they could overhaul Nike's shoe manufacturing process by automating and modernizing the labor-intensive process through which Nike traditionally manufactured sneakers by hand.  The key to the success of the Nike contract was supposed to be Flex's commitment to build a brand-new, million-square-foot factory designed specifically for the automation of Nike shoe manufacturing.  Flex chose Guadalajara, Mexico as the location of this state-of-the-art facility because of its inexpensive labor and proximity to the United States, Nike's biggest and most important market.

10.    In the minds of investors and the analysts who covered the Company, the Nike contract soon became synonymous with Flex's success.  Indeed, throughout the Class Period, Flex touted the importance of the Nike contract, telling investors that Nike was intended to be one of

Flex's "**top ten**" customer contracts, accounting for billions of dollars in revenues.  In response, market analysts repeatedly expressed extremely positive sentiment regarding what the Nike contract meant to the Company's revenues and profits as a whole.

11.      For example, an analyst from RBC Capital Markets ("RBC") wrote on May 26, 2017 that based on Defendants' representations, "Nike will become 'multi-billion' revenue stream with >2x corporate margins over time."  Likewise, on April 26, 2018, a Deutsche Bank analyst also accepted what Defendants told the market, stating that the Nike contract was the most important to Flex's overall success stating that the "bull thesis" on Flex had "largely been *anchored around the benefits of the Nike partnership."*

12.      However, far from generating billions of dollars in profits, Defendants were aware from the very beginning that Flex's Nike contract would never get off the ground due to massive manufacturing problems preventing Flex from making enough shoes to make the venture profitable.

**B.      Defendants Misled Investors, Telling Them that the Nike Contract Presently was on a Steady, Linear Trajectory to Profitability**

13.      On January 26, 2017, the first day of the Class Period, Defendant McNamara confidently assured investors that the Nike contract (and Flex overall) was on a successful trajectory towards the multi-billion dollar revenues the Nike partnership promised, proclaiming that "the innovations that [Nike is] seeing coming out of our team, that is our team, our guys and their guys, *are probably above expectation of what they anticipated . . . . [T]he results that they're seeing are above expectations*," and adding that the "Sketch-to-Scale strategy" which Flex applied to all major contracts, including Nike, "*remains firmly on track* as reflected in our third quarter performance."

14.      In addition to touting the Company's results to date, Defendant McNamara also explained to investors how Flex would achieve the billions of dollars in revenue by growing its production on a steady, linear trajectory stating: "[W]e'll expect to see revenue grow pretty linearly over the next year.  Actually, I expect revenue to grow pretty linearly over the next 3 or 4 years."

15.     As a way to assure investors that Flex was achieving this steady, linear growth towards profitability, throughout the Class Period Defendants periodically assured investors that Flex was achieving the production targets (*i.e.*, making enough shoes) necessary to make the Nike contract the revenue and margin generator that investors understood it to be.    Defendants accomplished this by telling investors constantly that the Nike contract presently was on a trajectory to turn from losses to profits (*i.e.*, the breakeven point or profitability) by the end of Flex's 2018 Fiscal Year (March 31, 2018) ("FY 2018").

16.     Thus, each time Defendants reassured investors that the breakeven point "remained intact," Flex misled the market by giving the knowingly false impression that the Company had the contract on a steady, linear trajectory—*i.e.*, that Flex was manufacturing enough shoes to make the Nike contract profitable.

17.     Indeed, throughout the Class Period, Flex repeatedly reassured the market that it was achieving the volume necessary to reach breakeven at the end of FY 2018.    For example, during a February 15, 2017 Goldman Sachs investor conference, in response to a question from a Goldman Sachs analyst, Defendant Collier declared (without identifying his statement either as forward-looking or referencing any cautionary language) with respect to the Nike contract: "*[W]e anticipate <u>and see</u> profitability being achieved in Q4 next year*."

18.     Unbeknownst to investors, however, from the very start of the Nike contract, Flex was not the well-oiled manufacturing operation Defendants touted it to be, nor were they anywhere close to achieving breakeven.    In reality, Defendants **knew** Flex's Guadalajara operations were suffering from massive manufacturing and personnel problems resulting in the Company's inability to manufacture enough shoes to meet its steadily increasing (*i.e.*, toward breakeven) production targets.

19.     Specifically, **multiple** former Flex employees, referred to herein as confidential witnesses or "CWs," confirmed that Defendants **knew** the Company's Guadalajara manufacturing operation was not making enough shoes to achieve breakeven throughout the Class Period. Indeed, as discussed in more detail below, the former Flex employees explained that throughout the Class Period, Flex consistently failed to meet its production targets because of severe quality,

supply chain, and personnel issues.  Critically, one former Flex employee confirms that Defendants McNamara and Dennison visited the Guadalajara facilities on multiple occasions in 2017, attending meetings where they and others discussed Flex's inability to meet its Nike production targets, as well as proposed (yet ultimately unrealized) remedies to those substantial problems on the Nike contract.

20.     Despite these undisclosed facts, throughout the Class Period, Defendants declared at every chance they could that they presently were on a steady trajectory towards profitability. This mantra continued all the way to the Company's earnings call on April 26, 2018 (the first public statements made by Defendants after the March 31, 2018 breakeven deadline) when, contrary to their prior misleading statements, Defendants announced that they had failed to achieve breakeven.

### C.     Flex Moved Into Its Massive New "Dream Factory," Purportedly Custom-Built for Automating Mass Quantities of Nike Shoes

21.     In October 2017, Flex completed its move into the new Guadalajara, Mexico factory that it told investors was tailor-made to automate shoe manufacturing and allow Flex to manufacture enough shoes to turn the Nike contract into the multi-billion dollar revenue generator it promised.  Following the opening of the new factory, Defendants touted that the factory had gone online in October "according to schedule," and that "[w]e see multiple signs of the accelerated scaling effects.  We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation."

22.     Following the move into the new factory, Defendants doubled-down on their statements that they were steadily growing the number of shoes such that they were manufacturing on a linear trajectory to breakeven in March 2018—*now less than six months away*.  Indeed, on November 7, 2017, also without identifying any of his statements as forward-looking or referencing any cautionary language, Defendant Kessel confirmed that Flex hitting breakeven on the Nike contract was *presently on track*: "[W]hat we said back in May *has been very much intact*."

23.     Moreover, on January 25, 2018, just a few weeks away from the much-heralded March breakeven/profitability date, Defendant McNamara reiterated that breaking even on the Nike contract was "*still our target*. *We still have a line of sight to that*."  The same day, Defendant Collier affirmed that "*there's a lot of different evidential proof points that show that our trajectory is pretty firm*."  Likewise, on February 14, 2018, Defendant Kessel, without identifying any of his statements as forward-looking or referencing any cautionary language, stated: "*[W]e haven't made any changes to our view on Nike . . . .*  Q4 is where we're focusing on *breaking even* as we exit the year."

24.     However, in reality, Defendants knew that the Flex's Nike manufacturing operations were still encountering massive, fundamental production issues that were preventing the Company from manufacturing enough shoes to remain on a trajectory towards breakeven by March 2018.  Not only that, these substantial manufacturing issues continued even after Flex moved into its new, supposedly state-of-the-art facility, significantly impacting Flex's ability to make enough shoes to remain on the linear trajectory to breakeven.  Indeed, several former Flex employees confirmed that the manufacturing issues that plagued Flex in early 2017 *continued to cause Flex to miss its production targets after October 2017 when the new factory purportedly went online*.  Specifically, one former Flex employee explained that even after moving into their new facility, Flex was never able to produce more than 20,000 perfect quality sneakers per day despite the Nike contract requiring Flex to produce approximately 60,000 perfect quality sneakers per day.

D.     **Flex Delayed Breakeven by Six Months or More But Reassured Investors**

25.     The truth about Flex's manufacturing failures was partially revealed on April 26, 2018, when Flex stunned the market with news that the Company missed the breakeven point and that the Nike contract was not profitable.  In fact, when Flex failed to breakeven, Defendant McNamara admitted that Flex *knew* all along it could not be "precise" about when the Nike contract would be profitable because "*[w]e had no idea how long it would actually take*."  In response to these revelations, on April 27, 2018, Flex's stock price fell *over 21%*, or $3.61 per share, on unusually high trading volume.

26.     While Defendant McNamara knew Flex missed breakeven because of the Company's pervasive inability to meet production targets, he offered a red herring, instead attributing the miss to Flex's supposed lack of the right "design content—shoe content that's designed to run on a highly automated line."

27.     Moreover, Defendant McNamara falsely reassured the market on April 26, 2018 that the issues were now behind the Company: "Nike has released a full set of products designed for our automation system which is now beginning to ramp in mass production."  Additionally, despite being aware that Flex was failing to meet production targets as a result of the manufacturing issues, Defendant McNamara doubled-down by confirming a new breakeven/profitability target that the Company promised to hit within approximately six months—while assuring the market that any manufacturing issues were behind them.

28.     While investors expressed concerns with the delay on breakeven, analysts continued to believe in Flex's ability to produce and sell the volume of shoes necessary to meet breakeven.  For example, UBS Securities LLC ("UBS") stated shortly after the April 26, 2018 announcement that although Flex's "[m]anagement overpromised in getting to breakeven with Nike" and was "too optimistic" about the ramp, nevertheless the "hard parts" of the Nike contract, such as "getting an automated line running and Nike designing for automation[] *seem to be going pretty well*."

29.     On May 10, 2018, Defendant McNamara falsely reassured the market that "*we have a lot of content* that's been designed for that system, and *we're driving a numerous amount of productivity*."  And on May 16, 2018, Defendant Kessel, again without identifying any of his statements as forward-looking or referencing any cautionary language, spoke at length about how the "*overall opportunity [with Nike] remains unchanged*," and that "this should be and can be easily a $1 billion[-]plus opportunity."  Defendant McNamara likewise reaffirmed this during Flex's July 26, 2018 earnings call, announcing—alongside his taking "direct ownership" of the Nike contract—that "*[w]e remain confident in achieving our target for profitability during the second half of fiscal 2019*."

30.     However, on October 25, 2018, the truth about the Nike contract and the extent of the missed production targets due to the massive manufacturing problems was finally revealed. Contrary to its Class Period assertions, the Company announced that it was ***immediately winding down the manufacturing operations with Nike because they were not commercially viable***.  In addition, the Company announced that Defendant McNamara—who just three months earlier announced he was taking "direct ownership" of the Nike contract to ensure its "operational success"—was unexpectedly retiring, leaving Flex with, as one market analyst put it, no "obvious choices for a replacement."  In response to this shocking revelation, on October 26, 2018, Flex stock plummeted another $3.82 per share, ***or over 35%***, on unusually high trading volume.

## II.     JURISDICTION AND VENUE

31.     These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

32.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

33.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Flex maintains offices in this Judicial District, and at least one of the Individual Defendants is employed by Flex in this Judicial District.

34.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

III.     **PARTIES**

   A.     **Lead Plaintiff**

   35.     On September 26, 2019, the Court appointed National Elevator to serve as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Established in 1962, National Elevator is a multiemployer pension plan as defined in sections 3(2)(A) and 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1002(2)(A) and 1002(37), with approximately 27,000 active participants employed by over 600 employers throughout the United States that contribute to the Pension Fund on their employees' behalf.  The Pension Fund has assets in excess of $7.5 billion and currently provides pension benefits to approximately 17,500 retirees.  National Elevator purchased Flex securities during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

   B.     **Defendants**

   36.     Flex is incorporated in Singapore and maintains offices in San Jose, California.  Flex's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "FLEX."  Flex's Quarterly Report filed on Form 10-Q with the SEC on November 2, 2018 states that 526,586,420 shares of Flex were issued and outstanding as of October 25, 2018.

   37.     Michael M. McNamara ("McNamara") was, at all relevant times, the Chief Executive Officer ("CEO") of Flex and a member of its Board of Directors.  During the Class Period, McNamara spoke publicly and extensively about the Nike contract and its impact on Flex's business.  During the Class Period, McNamara also traveled to Guadalajara, Mexico and visited Flex's Nike manufacturing operations on multiple occasions.  Towards the end of the Class Period, McNamara told investors that he was taking "direct ownership" of the Nike contract to "ensure its operational success."  Shortly thereafter, on October 25, 2018, the last day of the Class Period, Flex announced McNamara was leaving the Company effective December 31, 2018.

   38.     Christopher E. Collier ("Collier") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Flex.  Collier was tasked with managing Flex's financial operations.

1   In his role as CFO, Defendant Collier spoke publicly and extensively about the Nike contract and

2   its impact on Flex's financial performance.

3       39.     Kevin Kessel ("Kessel") is, and was at all relevant times, the Vice President of

4   Investor Relations and Corporate Communications of Flex.   As VP of Investor Relations,

5   throughout the Class Period, Kessel was responsible for accurately disseminating information to

6   investors and analysts about Flex's business and financial operations.   During the Class Period,

7   Kessel made numerous public statements about the Nike partnership.

8       40.     Michael C. Dennison ("Dennison") was, during part of the Class Period, the

9   President of Flex's Consumer Technology Group ("CTG").   As head of the CTG segment,

10  Dennison was tasked with ensuring the success of the Nike contract.   During the Class Period,

11  Dennison traveled to Guadalajara, Mexico and visited Flex's Nike manufacturing operations on

12  multiple occasions. Dennison's employment with Flex ended in approximately July or August

13  2018, after the truth about Flex's issues with the Nike contract began to emerge. During the Class

14  Period, Dennison made numerous public statements about the Nike partnership.

15      **C.     Relevant Third Parties[2]**

16      41.     CW1 worked for Flex in Guadalajara from January 2017 to October 2017 as the

17  Director of Supply Chain.   CW1 initially reported to a Vice President in Guadalajara who became

18  Plant Director; she later reported to a Senior Director of Supply Chain.   CW1 explained that in her

19  role, she worked closely with Nike to identify local suppliers in Mexico.   CW1 also confirmed that

20  Flex experienced operational problems with suppliers that impacted Flex's ability to operate the

21  Guadalajara factory at full capacity or meet projections.

22      42.     CW2 worked for Flex from December 2006 to September 2017, and was the

23  Business Excellence Manager for the Nike factory in Guadalajara from January 2016 to

24  September 2017.   In this role, CW2 was responsible for continuous improvement activities such as

25  improving processes in operations, reducing headcounts and waste, and the layout of machines on

26  the floor.   CW2 explained that Flex was unable to get the machines to meet the necessary

27  

28  [2] All Confidential Witnesses are described in the feminine to protect their identity.

production requirements, coupled with Flex not having people with the correct skills or abilities to operate the machines.

43.     CW3 was a Human Resources Generalist in Flex's Human Resources department in Guadalajara, Mexico from April 2017 to October 2017.  CW3 reported to Senior Human Resources Manager Cristina Ibarra.  CW3 observed that the demand for employees on the Nike project was so high in the beginning that Flex was hiring people who were not qualified to work in shoe production.

44.     CW4 was a Flex Senior Director for Global Account Management from January 2013 to December 2018.  According to CW4, she was familiar with the Nike contract in Mexico since she was a Senior Director within the CTG segment.

45.     CW5 worked for Flex in Guadalajara, Mexico from November 2006 until September 2019 as a Director of Indirect Procurement (Commodity Management).  In CW5's role as a Director of Indirect Procurement, CW5 was responsible for developing indirect material sourcing and supply base strategies in China, South East Asia, and the Americas.  In addition, CW5 developed scrap and waste management strategies and worked directly on the Nike contract on scrap management at Flex's North Campus (where the Nike production facility was located).

46.     CW6 was an employee on the Nike project from 2017 until Q1 2018 in Guadalajara, Mexico.[3]

## IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD[4]

### A.     Flextronics Reinvents Itself as "Flex," With a New Focus on The Company's "Sketch-to-Scale" Business Strategy

47.     Flex was originally founded in 1969 in Silicon Valley, California.  Flex was relocated to Singapore in 1990 where it is currently incorporated; however, Flex still maintains a

---

[3] At CW6's request, Lead Plaintiff has withheld additional details of CW6's employment at Flex. While Lead Plaintiff believes that the details of CW6's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff will provide additional information, including CW6's exact position titles to the Court for an *in camera* inspection at the Court's request.

[4] Unless otherwise noted, all references to Flex's business and operations refer to events that occurred during the Class Period as defined herein.

U.S. headquarters in San Jose, California.  Flex is and always was principally in the business of electronics manufacturing services.  Currently, Flex has manufacturing operations in approximately 35 countries and more than 200,000 employees.

48.     According to its SEC filings, Flex publicly describes itself as a provider of "design, engineering, manufacturing, and supply chain services and solutions – from conceptual sketch to full-scale production."  Flex "design[s], build[s], ship[s] and service[s] complete packaged consumer and enterprise products."

49.     Flex is divided into four business segments: Consumer Technologies Group ("CTG"), which includes consumer-related businesses in connected living, wearables, gaming, augmented and virtual reality, fashion, and mobile devices; Communications & Enterprise Compute ("CEC"), which includes Flex's telecom, networking, and server and storage business; Industrial & Emerging Industries ("IEI"), which includes Flex's energy and metering, semiconductor tools and capital equipment, office solutions, household industrial and lifestyle, industrial automation and kiosks, and lighting businesses; and High Reliability Solutions ("HRS"), which includes Flex's medical, automotive and defense and aerospace businesses.  The Nike contract was handled by the CTG group.

50.     For financial reporting purposes, Flex uses a fiscal year that ends on March 31 of that calendar year.  The following chart sets forth the fiscal periods referenced throughout this pleading:

| Flex Fiscal Period | Calendar Period |
|---|---|
| Q3 2017 | Oct. 1, 2016 – Dec. 31, 2016 |
| Q4 2017 | Jan. 1, 2017 – Mar. 31, 2017 |
| FY 2017 | Apr. 1, 2016 – Mar. 31, 2017 |
| Q1 2018 | Apr. 1, 2017 – June 30, 2017 |
| Q2 2018 | July 1, 2017 – Sept. 29, 2017 |
| Q3 2018 | Sept. 30, 2017 – Dec. 31, 2017 |
| Q4 2018 | Jan. 1, 2018 – Mar. 31, 2018 |
| FY 2018 | Apr. 1, 2017 – Mar. 31, 2018 |
| Q1 2019 | Apr. 1, 2018 – June 29, 2018 |
| Q2 2019 | July 1, 2018 – Sept. 30, 2018 |
| Q3 2019 | Oct. 1, 2018 – Dec. 31, 2018 |

51.     In 2015, as part of an effort to diversify its customer base beyond simply electronics, the Company announced that it was rebranding itself, changing its name from Flextronics International to its current name "Flex."  In addition, Flex fundamentally expanded its business strategy from electronics manufacturing to a broader and more diverse strategy it called "Sketch-to-Scale"—a term the Company trademarked.  As Defendants described in their Form 10-K Annual Report for the year ending March 31, 2017: "Over the past several years, we have evolved beyond a traditional Electronics Manufacturing Services ("EMS") company, and now consider Flex to be a provider of a full range of Sketch-to-Scale services—beyond electronics manufacturing services."

52.     Under the Sketch-to-Scale strategy, Flex provides its own in-house design engineers to customers with a view towards helping take a product idea or concept ("sketch") to a final manufactured product ("scale").  This process purportedly allows Flex to become involved in designing and incorporating product specifications that are tailored to Flex's established manufacturing and supply chain operations which then allows Flex to manufacture and ship the product more efficiently (and ostensibly generate more profits for Flex and its customers).

53.     Flex's CTG segment—which handled the critical Nike contract and many of the Company's other non-electronic market customers—soon became the focus of the Company's attempted shift from traditional electronics manufacturing to broader, consumer-related businesses and implementation of the "Sketch-to-Scale" business strategy.  Indeed, the Nike contract

1   represented the ideal opportunity for Flex to demonstrate to the market **both** the value of its new

2   Sketch-to-Scale business strategy and the business *coup* of landing a large contract with a major

3   non-electronics-based customer that was the leader in its respective industry.  According to former

4   Flex corporate employees, the Nike contract was also critical to the CTG segment's success at

5   Flex.  Specifically, CW4 explained that the importance of Nike to the CTG group was significant.

B.   **Flex Touted the Nike Contract as an Important Revenue Generator Critical to Flex's Profitability**

6

7   54.   In October 2015, Flex announced that Nike had selected it to help enhance its shoe

8   manufacturing process, with a particular emphasis on automating and modernizing the very

9   labor-intensive process by which Nike manufactured shoes.  This effort was part of Nike's larger

10   push to create regional manufacturing centers where it could respond to the marketplace with

11   faster supply chain velocity, getting from the design cycle of a sneaker to the sales cycle on store

12   shelves faster and more precisely.  Nike also wanted to lower required inventory levels and end up

13   with less costly scrap which meant that Nike manufacturers had to meet exceedingly high quality

14   standards.

15   55.   In order to meet Nike's requirements, Flex agreed to build and staff a custom-built

16   factory in Guadalajara, Mexico that was supposed to automate Nike's shoe-making process which

17   largely relied on assembling the shoes by hand.  Flex consistently told the market that this

18   custom-built factory was the key to making the Nike contract operationally successful and

19   profitable and was what differentiated Flex from its competitors.  Flex had already established

20   electronics manufacturing facilities in Guadalajara.  One of those facilities was referred to as the

21   North Campus.  Prior to the opening of the new state-of-the-art factory on the North Campus, Flex

22   began using these electronics manufacturing facilities on the North Campus to make Nike shoes.

23   56.   In late 2016, at the RBC Capital Markets Conference, Defendant Dennison touted the

24   importance of the Nike contract's near-term profitability explaining that it was "really big business

25   and definitely meaningful this next year, but *we absolutely see [Nike] as one of our top customers*

26   *in the [C]ompany on a go forward basis* and a big pivot for us."  During the same conference,

27

28

1  Defendant Collier echoed Dennison stating: "I mean, it's going to be a top 10 customer in a couple

2  of years and it's a billion-dollar piece of business for us as we get out."

3       57.   During the same conference, Defendant Dennison also reassured investors that both

4  Flex and Nike were traveling to Guadalajara and closely monitoring the progress of Flex's state-

5  of-the-art manufacturing facilities that would be the key factor in allowing Flex to make enough

6  shoes to generate the massive revenues Defendants were promising investors.  Specifically,

7  Dennison stated that Mark Parker, President Chairman and CEO of Nike, and his team "were just

8  with us in Mexico less than a month ago looking at what we're doing" and that ***the Nike***

9  ***operations are "[h]ugely important to us*** because it's a whole different margin structure than

10 what we would have usually done."

11      58.   Defendant Kessel conveyed the same message to the market on May 23, 2017,

12 stating that "with Nike . . . we're going to see the margins begin to expand, because we've talked

13 about that partnership being at a higher operating margin potential as we scale it up," and "we

14 believe that ***with us being able to provide that additional value***, we can see higher margins."

15      59.   The market understood and appreciated the importance of the Nike contract to Flex

16 and responded positively to Defendants' statements about Nike and the steady revenue growth the

17 contract promised.  For example, on January 31, 2017, Argus Research Company ("Argus") noted

18 that Flex "expects the operating margin on Nike production to be significantly higher than CTG

19 baseline margins."  RBC Capital Markets ("RBC") issued a research note on Flex on May 10,

20 2017 summarizing "[k]ey points" from a presentation by Defendant Collier, noting in part that in

21 just a few years, Nike should "***sustain $1.0B[illion]+ in revenues*** and have [ ] margins" in the 6-

22 9% range.

23      60.   Two days later, on May 12, 2017, J.P. Morgan issued a note with similar

24 commentary, stating that "***Nike will drive meaningful revenue in FY18 running breakeven this***

25 ***year***.  FY19 revenues should ramp and respective operating margins should take a step up to 3.5-

26 5% range from 2-4% range."  On May 26, 2017, RBC wrote that "[a]t scale, Nike will have a

27 higher margin profile than FLEX's op-margins. We think Nike will become 'multi-billion'

28 revenue stream with >2x corporate margins over time."

61.   As Citigroup, Inc. ("Citigroup") analyst Jim Suva stated during a Q&A with Defendants McNamara and Collier during the September 6, 2017 Citi Global Technology Conference, "literally, almost every discussion I have on the phone with investors also brings up the word Nike."   And on April 26, 2018, Deutsche Bank wrote that the "bull thesis" on Flex had "largely been anchored around the benefits of the Nike partnership."   Analysts saw the Nike contract as synonymous with Flex's success.

C.   **Throughout the Class Period, Defendants Misled the Market About Flex's Ability to Manufacture the Volume of Shoes Required to Make the Nike Contract Profitable**

62.   Because of the importance of the Nike contract to the Company's financial success, analysts regularly asked about the progress of the Nike contract and the new start-of-the-art facility in Guadalajara, Mexico.   In addition to regularly boasting about the manufacturing progress Defendants were purportedly seeing at Flex's Nike operations, Defendants also periodically reassured investors that they were achieving the volume and production targets (*i.e.*, making enough shoes) necessary to make the Nike contract the revenue and margin boon that investors understood it to be.   Indeed, despite *knowing* all along that Flex was not close to hitting its required production targets during the Class Period, Defendants kept investors believing in the Nike story by consistently telling investors that the Nike contract was on a steady trajectory to turn from losses to profitability (*i.e.*, the breakeven point) by the end of FY 2018 (March 31, 2018).

63.   As the example of a breakeven analysis below demonstrates, the breakeven point represents the point at which the manufacturer is *making and selling enough shoes to cover total costs* (fixed costs + variable costs).   Thus, in the case of the Nike contract, in order to breakeven, Flex **had to be able to make <u>and sell</u> enough quality shoes** to Nike to cover the costs associated with the Company's Nike shoe manufacturing operations.



64.   Critically, Defendants also assured investors that Flex would hit the breakeven point by growing its production volume in a steady linear fashion.  Specifically, on January 26, 2017, the first day of the Class Period, Defendant McNamara told the market on an earnings call that the Company expected to grow revenues (*i.e.*, the number of shoes Flex was making and selling) in a linear fashion:  "So what we will expect to do is we'll actually see revenue—we'll expect to see revenue grow pretty linearly over the next year. Actually, I expect revenue to grow pretty linearly over the next 3 or 4 years."  In other words, Defendants falsely told investors that Flex was not going to go from making zero shoes to suddenly making enough shoes to breakeven.  Rather, Flex falsely assured investors that it was steadily increasing the number of shoes (and revenues) it was making, on a stable, linear path towards the breakeven point (specifically in March 2018).

65.   Accordingly, each time Defendants reassured investors that the breakeven date "remained intact," Flex misled the market about its ***current state of affairs*** by giving the false impression that the Company ***presently*** had the project growing on the linear trajectory that would result in the contract being profitable by March 2018.  Indeed, throughout the Class Period, Defendants consistently confirmed the Company's path to profitability despite ***knowing*** at each

point along the way that Flex was falling woefully short of the production targets *required to remain* on a present trajectory that headed towards breakeven.

66.   On January 26, 2017, the first day of the Class Period, Flex published a press release quoting Defendant McNamara as touting the Company's performance and progress on the Nike contract stating that Flex's Sketch-to-Scale strategy "*remains firmly on track*." McNamara also stated on an earnings call the same day that "*the innovations that [Nike was] seeing coming out of our team, that is our team, our guys and their guys, are probably above expectation of what they anticipated . . . . [T]he results that they're seeing are above expectations*."

67.   During the same earnings call, Defendant Collier confirmed that the Nike contract would breakeven, by the close of FY 2018 (March 2018).  In response to a question from an analyst for Citigroup that asked whether Flex could give "an update about the timeline" for the Nike contract and when Flex expected "to see losses turn to breakevens,"  Defendant Collier responded that "as it relates to the profitability, . . . *[w]e cross into profits in the last quarter next year in Q4 of fiscal 2018*."

68.   A few weeks later, during a February 15, 2017 Goldman Sachs Technology and Internet Conference, in response to a question from a Goldman Sachs analyst, without identifying any of his statements as forward-looking or referencing any cautionary language, Defendant Collier declared with respect to the Nike contract: "*[W]e anticipate and see profitability being achieved in Q4 next year and then sustaining that going forward*," and that there was a "*clear line of sight and conviction around hitting profitability and sustaining profitability from that point forward* . . . ."

69.   In reality, contrary to Defendants' statements about the successes of the Nike contract and the Company's confident trajectory to breakeven, the project was in fact in disarray due to a myriad of manufacturing issues that were materially impacting Flex's ability to manufacture enough shoes to come close to being on a trajectory to breakeven.  Indeed, former employees of Flex confirm that throughout the Class Period, Defendants knew Flex was consistently missing the production targets that were required to breakeven.

70. For example, CW5 stated that everyone at Flex was aware of the manufacturing issues with the Nike contract and that everyone knew at Flex, down to the factory workers, that they were never going to breakeven with the Nike contract.

71. According to CW4, the Nike contract was behind plan from the get-go, and throughout the entire program Flex corporate knew that they were having execution issues with their Nike manufacturing operations in Mexico. CW4 stated that Flex was experiencing operational issues in the factory in terms of quality and quantity output. CW4 explained that Flex had issues in its Guadalajara factory and was unable to build the shoes to what it had indicated and promised to execute on what Nike had required. CW4 also indicated that Flex continued to have significant issues with efficiencies throughout the Nike contract and that the established plan was not meeting its intended output goals.

72. CW2 confirmed that there were issues with not meeting demand as a result of either not having materials on hand or needing to scrap product because they did not meet quality standards. CW2 also stated that Nike was "very upset" with the results because Flex was not meeting its quality standards or demand and delivery targets. CW2 confirmed that she participated in daily meetings to discuss solutions. The meetings were held at 9:00 a.m. and attended by VP of Operations, Flavio Magalhaes, as well as other material, engineering, operations, and business excellence managers. CW2 stated that Defendant Dennison attended these meetings when he was in Guadalajara. Likewise, CW3 also recalled that Defendant Dennison came to the Guadalajara factory in May or June 2017 for a site visit and for meetings with Nike.

73. Other CWs corroborated Flex's inability to meet production targets. For example, CW5 stated that Flex was unable to meet the inventory levels per the agreement with Nike. CW1 also explained that Nike's projections for how many shoes Flex would manufacture in Guadalajara increased significantly in early 2017 and were essentially doubling each month. CW1 specifically recalled that by May 2017, Flex did not meet Nike's projections.

74. Moreover, and critically, Defendants **were aware** of these rampant failures to meet production targets. CW4 stated that throughout the entire program, Flex corporate leaders knew

that they were having execution issues with their Nike operations in Mexico.  According to CW6, Flex used weekly production metrics, meaning the number of shoes manufactured each day.  CW6 confirmed that in 2016 and 2017, the metrics were not critical but in mid-2017 the Company began to see the metrics were not being met and meetings were held with executives to discuss and remedy this.  CW6 confirmed that Defendants McNamara and Dennison were present at the meetings.  CW3 added that the Flex executives including Dennison visited Guadalajara at least two times during her tenure.

75.     When asked about executives from San Jose, California having knowledge of these reports or attending meetings in Guadalajara on the Nike contract, CW5 stated that CEO Michael McNamara visited Guadalajara more frequently for the Nike contract than for any other contract during CW5's fourteen-year tenure at the Company.  Specifically, CW5 stated that McNamara visited Guadalajara at least four times a year and met with VP of Operations Gabriel Macias and then his replacement Flavio Magalhaes.

**D.     Despite Knowingly Failing to Hit the Nike Contract's Production Targets, Defendants Continued to Tout the Breakeven Story to Investors**

76.     As the Nike contract progressed, Flex consistently maintained that it was on the trajectory to breakeven despite announcing certain "accelerated" investments in the Company's Guadalajara manufacturing operations in mid-2017.  Instead of revealing that the accelerated investments were related to the severe manufacturing issues, Flex misleadingly told the market that the Company was investing in the Nike contract earlier than expected because the automation of shoe manufacturing was going very well.  For example, during Flex's April 27, 2017 earnings call, Defendant McNamara stated that "[a] great example of entirely new industries that have better economics and long-term profit potentials is seen with our Nike partnership. . . . . *We are accelerating our investments in Nike on the back of early automation successes*."

77.     Defendant McNamara specifically noted successes that Flex was having—without reference to any of the negative developments he and the other Defendants knew were dogging the Guadalajara factory—in the design and automation processes: "We're *starting to get early successes around some of the design engagements that we're having [with Nike]* about

reinventing how design actually occurs, some of the new technologies of the shoes, and even into the automation projects that we're seeing."

78.    Investors credited Defendants' claims that the Nike contract was on the trajectory to breakeven and was going to be profitable and start contributing to Flex's quarterly profits earlier than expected.   In a July 24, 2017 analyst report, RBC stated that based on these "recent comments," they were expecting "a larger (or quicker) Nike ramp vs. initial expectations" and "think Nike ramps are occurring faster than Street expectations for a Dec/March quarter contribution"—meaning contributions prior to the end of FY 2018.

79.    However, far from "a larger (or quicker) Nike ramp," Flex's Nike operations continued to suffer from the catastrophic manufacturing issues resulting in Flex's failure to make enough shoes to hit the production targets required to make the Nike venture profitable. Specifically, Flex's Guadalajara facilities suffered from a number of fatal issues which prevented Flex from making enough shoes to remain on a trajectory to breakeven.

80.    According to several former Flex employees, the primary problem preventing Flex from manufacturing enough shoes to be profitable was the Company's inability to manufacture shoes that met Nike's quality standards (the remainder of which would have to be scrapped or sold at a steep discount thereby negatively impacting Flex's profitability). According to CW5, there were many issues and problems plaguing the Nike contract but the largest concerned scrap materials.

81.    According to CW5, Flex's manufacturing issues created a significant amount of scrap, which she described as footwear that did not meet Nike's manufacturing standard.   CW5 explained that there were three categories of qualities of the shoes that Flex manufactured.   "A" shoes were of perfect quality that were sold to Nike.   "B" quality shoes were defective, but Nike could buy a small percentage of B shoes to be sold at outlet stores. "C" shoes, however, were defective and had to be scrapped.   CW5 observed that footwear inventory that was inspected and rated a "B" or "C" class was supposed to be scrapped following certain protocols to ensure that no defective footwear was sold.

82.   According to CW5, Flex was producing more scrap than class "A" inventory. Specifically, CW5 stated that per the Nike agreement, Flex was expected to produce approximately 60,000 pairs of sneakers per day, most of them being "A" quality and a few of "B" quality, which Nike would buy for sale in discount outlets.   CW5 stated that Flex **never produced more than 20,000 Class A sneakers per day**.   According to CW5, Flex had to "eat" all of the scrap (*i.e.*, "C" quality sneakers and excess "B" quality sneakers not bought by Nike).

83.   Likewise, CW6 stated that in 2017, Flex noticed issues in quality and production. According to CW6, the quality parameters Nike set were very high, so the rejection rate was also high.   Specifically, CW6 stated that Flex's quality yield was low and thus Flex was not meeting the weekly production demand.   CW6 recalled that in mid-2017, there were bi-monthly visits from people at Nike along with McNamara and other executives who would meet with several of the engineers at the Guadalajara factory.

84.   CW2 stated that beginning in February 2017, Nike was scrapping about 50% of the product, which was far short of the 93% or 96% acceptance rate that Nike required.   CW3 also recalled that there were a lot of "rejected products" coming off the production line during quality inspections; there were always more rejected products than Nike expected.   CW3 stated that something was "way off" and it was not what Nike expected or was used to.   Specifically, according to CW3, Flex was experiencing 2.5 times the rejections that were expected from Nike (*i.e.*, if Nike was expecting 2%, Flex was experiencing a 5% rejection rate).

85.   In addition to Flex's inability to meet Nike's quality standards, Flex was also unable to acquire raw materials from Asia fast enough to manufacture the volume of shoes required—especially given the number of scrap shoes Flex was producing.   CW6 explained that materials for Nike products were not requested on time and certain materials needed to complete a production push were missing and would take weeks to arrive.   Specifically, CW6 stated that this was a big problem in mid-2017 when the production lines were increased from one-to-two to six-to-seven lines.   CW6 stated that Flex had to spend time expediting materials from Asia from suppliers recommended by Nike. According to CW6, Flex looked for local producers since it was more expensive to import from China, but local cloth was not the proper quality.   CW1 also confirmed

1  that Flex experienced operational problems with suppliers of raw materials who were located in

2  Asia.  CW1 stated that, due to the lead time, travel time and additional time for other issues that

3  could arise, Flex lost flexibility when raw material orders were canceled or changed.

4       86.   Finally, Flex's employees working on the Nike contract primarily came from

5  electronics backgrounds and were not trained to work on shoe manufacturing.  CW5 confirmed

6  that both VP of Operations, Gabriel Macias and his replacement Flavio Magalhaes, who were in

7  charge of Flex's Nike operations, came from predominantly electronics backgrounds.  This issue

8  flowed down to everyone who worked on the Nike contract.  According to CW3, the demand for

9  employees on the Nike project was so high in the beginning that Flex was hiring people who were

10  not qualified to work in shoe production.  Likewise, CW1 detailed that the people initially hired to

11  work on the Nike project in Guadalajara did not have the right skills or abilities.  Critically, CW1

12  stated that this impacted Flex's ability to operate the Guadalajara factory at full capacity or meet

13  projections.

14       E.    **Defendants Continued to Double-Down on Imminent Profitability Despite
          Knowing that Flex Was Failing to Meet Production Targets Due to Significant
15          Manufacturing Problems**

16       87.   Despite Defendants' awareness that they were consistently failing to achieve their

17  production targets due to the extensive manufacturing issues, Flex continued to falsely portray the

18  Nike contract as a great success that was on a trajectory to become profitable by the end of the

19  fiscal year.  During Flex's July 27, 2017 earnings call, Defendant McNamara declared: "We are

20  making steady progress and completely reinventing shoe manufacturing by developing new

21  automation technologies and integrating [it] into our partner's designed processes."  He further

22  noted that "the quarter underneath the Nike investments is very healthy and moving forward at a

23  nice clip and very consistent with our expectation."  Finally, as investors had come to expect,

24  McNamara confirmed that breakeven by March 2018 "is always" the expectation, explaining that

25  it is "the right target and objective": "So, let me start with break-even.  So our expectation is

26  always in the fiscal year we would cross-over into break-even. ***We still believe that's the right***

27  ***target and objective and where we see the business heading*** . . . .  I think we've been pretty

28  consistent about if I think about all the things that were said over the past quarters."

88.   However, in addition to reassuring investors, during the same earnings call, McNamara also partially disclosed the existence of some manufacturing issues, while not disclosing the full extent or impact thereof.  Indeed, Defendants had to provide an explanation for why the CTG segment's reported revenues and margins were significantly lower than market expectations.  Defendant McNamara explained:

> As far as citing the losses, I think the way—we can't give out any kind of specific margin and loss by customer. I think the way to think about it is CTG has a certain margin range that ran in last year. The core CTG continues to run in about that range, around just slightly below the midpoint of the range. And as you know, we posted our CTG results with Nike included, which is 1.2% this quarter, so it kind of gives you an idea of the amount of money we're spending. I don't want to go into specifics of what that's going to look like, but we expect heavy investment over the next 2 quarters.

89.   Following up on the "elevated" Nike costs and what it meant for Flex's trajectory to breakeven, an analyst asked what remaining investments Flex needed to make for the Nike contract, and when the peak investments would occur.  Despite knowing that the Company was not making enough shoes to support the revenues and margins investors expected as of that date, Defendant McNamara misleadingly attributed the additional costs to moving into the new state-of-the-art Guadalajara facility, stating that "***the biggest driver of that whole investment is we're moving into a brand new facility and transition in that facility will be complete by October. So, that's really the last major implementation***."

90.   Defendants also emphasized that the additional investments would serve as the catalyst that would propel the Company to profitability on the trajectory Defendants had promised all along. Defendant McNamara stated: "[W]e have a whole roadmap of process changes that will yield results, going into the new facility, the natural learning curve and the people coming along, between all those things, we do expect it to move into a break-even situation by the end of our fiscal year."

91.   These statements were not completely true, however.  Indeed, Defendants omitted that the true explanation for the miss was attributable to the fact that they were not producing the volume of shoes of the required quality necessary to support the revenues and margins that investors understood Flex to be making based on the steadily linear trajectory towards breakeven.

92.   The market fully digested both the partial corrective disclosure regarding the elevated Nike costs and Defendants' reassurances that Flex's profitability trajectory was still intact.  For instance, RBC wrote in a July 27, 2017 analyst report that Defendants' partial disclosure "provide[d] a dose of reality that this ramp isn't seamless and without challenges" but it ***did not "alter[ ] the long-term view on FLEX*.**"  Likewise, on July 28, 2017, UBS published an analyst report stating "[t]he learning curve is proving more difficult and at a higher cost than expected" but that "***Flex is adamant that the difficulties do not affect its return expectations over time***."  Having assuaged investors' concerns about the trajectory of the Nike contract, Defendants continued to falsely paint the Nike contract and manufacturing operations as a well-oiled machine.

93.   The new factory, which began at least partially to operate by August or September 2017, was now purported to be the lynchpin of the Nike contract's success.  During a September 6, 2017 Citi conference, Defendant Collier was specifically asked whether the Company was still on a trajectory to hit breakeven by March 2018.  In response, without identifying his statements as forward looking or referencing any cautionary statements, Defendant Collier stated with respect to the Nike contract and breakeven:

> ***Exactly*** . . . .  We're moving into a customized, tailor-built facility in our Q3 that's specifically designed to optimize around the manufacturing requirements for our partner, and ***we anticipate, as we exit this year, being at a breakeven***, which allows us to see some real good accretion into EPS into fiscal '19 and beyond.

94.   In response, an analyst from UBS wrote on September 12, 2017 that "breakeven still is planned for March" and reflected Defendants' comments about how important the Mexico factory would be: "The 'dream factory' should be running in October."

95.   On October 26, 2017, during Flex's Q2 2018 earnings call, Defendant McNamara confirmed that the transition into the Guadalajara factory was "substantially complete" and represented a major step forward: "I mean to move into a factory that size you don't do it all in one month. So, we've been moving in over the last couple of months.  ***We're substantially complete at this point.  We'll be complete by the end of the month. And that's going on track***." Defendant Collier also stated that everything was proceeding as planned with respect to the new

factory: "We are pleased that our transition into the new state-of-the-art and purpose-built factory is on track to be completed by the end of this month."

96.    With the "dream factory" now up and running, Defendants continued to tout the Nike contract's steady trajectory to timely profitability despite being well aware that the Company was presently well behind the production targets it needed to be at to achieve breakeven.  When asked on November 7, 2017 about how the Nike contract had performed to-date, Defendant Kessel, without identifying his statements as forward looking or referencing any cautionary statements, reassured investors by hyping the new Guadalajara factory: "[W]e've actually put in place the factory that we've talked about that is now as of end of the October online.  *But in terms of the general trajectory, I think we still remain very confident about the fact that we're going to be improving both performance and scaling as time goes on here . . . .  [W]e still look at what we said back in May has been very much intact.*"

97.    When again asked just a week later to give a summary of where Flex was with Nike and whether there had been any changes, Defendant Kessel, again without identifying his statements as forward looking or referencing any cautionary statements, answered: "So, we had our Investor and Analyst Day back in May and we presented a timeline back then that kind of talks about how we see Nike over the next two years to three years evolving for us.  And I think at this stage, *it remains very much intact*."

98.    Defendant Collier doubled-down on the Guadalajara factory while speaking at the December 4, 2017 Raymond James Technology Conference, proclaiming, without identifying his statements as forward looking or referencing any cautionary statements: "[W]e've moved into a state-of-the-art purpose-built factory, which the complete entire solution is in the four walls and enables us to have better process flows, materials flows, production flows."  He further elaborated:

> And we're well on our way, we're 30 days-plus into the new operation. *We see multiple signs of the accelerated scaling effects.* We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation. We've been deploying further lean manufacturing principles and *you're going to see a natural progression up as we scale that further with the target of exiting this year at breakeven*.

99.   On December 19, 2017, after meeting with "senior executives" of Flex, UBS published a report indicating that there was "*increased confidence that the Nike plant is on track*" as Flex management was "*much more confident than six months ago when challenges were encountered."*

100.  Flex maintained the same story on January 25, 2018, with Defendant Collier, who *knew* the project was an abject failure to that point, stating on an earnings call that a "sequential improvement in operating profits reflected reduced [losses] from our strategic partnership with Nike as its transition to a new manufacturing facility during the third quarter aided in driving operational improvements."   On the same call, Defendant McNamara stated: "*This move improved efficiency and helped reduce operating losses in line with expectations.   Our objectives of moving this project towards the breakeven level exiting our [fiscal] Q4 remains unchanged*."  Defendant McNamara reiterated that it was "still our target.  We still have a line of sight to that."  Defendant Collier likewise affirmed that "there's a lot of different evidential proof points that show that our trajectory is pretty firm."

101.  On April 24, 2018, a securities analyst from Macquarie Research ("Macquarie") published a report indicating that Flex had not changed its tune: "The [C]ompany continues to make progress with its Nike business.  We believe the [C]ompany has been working with the Nike designers, encouraging them to design for the new manufacturing process and that *this effort has been successful*."

102.  However, unbeknownst to the market, Flex's severe manufacturing issues and inability to meet production targets had not been remedied by the opening of the new "dream factory."  In fact, former Flex employees confirmed that the very same manufacturing issues that plagued the Nike contract from the start of the Nike contract continued to prevent Flex from hitting the production targets required to remain on the trajectory to breakeven.

103.  For example, CW5 confirmed that these manufacturing issues lasted from the beginning of the Nike project until the day it ended, and that the manufacturing issues and problems continued after Flex's new factory came online.  Specifically, CW5 stated that even after moving into its new facility in the North Campus, Flex was never able to produce more than

20,000 Class A sneakers per day (despite the Nike contract requiring Flex to produce approximately 60,000 of mostly "A" quality sneakers). CW6 also confirmed that the same manufacturing problems persisted after the new plant was opened in October 2017. Specifically, CW6 stated there were only two lines of production, but with the completion of a new building on the campus, this grew to six or seven lines. CW6 confirmed however, that even with the new lines Flex was not achieving its production metrics.

104. CW6 specifically recalled Defendants McNamara and Dennison attending meetings in 2017 where problems with production were discussed. CW6 also explained that materials for Nike products were not requested on time and certain materials needed to complete a production push were missing and would take weeks to arrive. CW6 specifically stated that this was a big problem in mid-2017 when the production lines were increased from one-to-two to six-to-seven lines. Likewise, CW4 stated that throughout the entire program Flex corporate knew the Company was having execution issues with their operations with Nike in Mexico. CW4 stated that they were known by Defendant Dennison.

105. Ultimately, despite Defendants' misstatements to the contrary, these continued manufacturing issues and missed production targets caused Flex to miss the breakeven date, and, shortly thereafter, forced Flex to unexpectedly cancel the Nike contract. The Company's stock price plummeted, resulting in the abrupt departure of Flex's CEO Defendant McNamara and the President of the CTG segment Defendant Dennison—both of whom closely oversaw and took responsibility for the Nike contract. CW4 stated that she believes the decision to end the Nike contract happened one to two months before the Company's announcement on October 25, 2018 (the day Flex announced the winding down of the Nike partnership).

### F. Defendants Continued to Mislead the Market Regarding the Nike Contract's Trajectory and Commercial Viability After Failing to Achieve Profitability

106. The operational problems plaguing the Nike contract and Flex's inability to manufacture enough shoes for breakeven were partially disclosed on April 26, 2018, when Flex announced that it did not—because it could not—breakeven on the Nike contract by the end of FY 2018. During its FY 2018 earnings call on April 26, 2018, Flex admitted that the trajectory

Defendants had been publicly touting to the market was not based in reality.  During the call, however, Defendant McNamara then doubled-down, telling investors that the Nike contract would become profitable in the near-future, but Flex needed approximately two additional quarters (six months) for it to do so and setting the new (now broader) breakeven timeframe for some time in the second half of FY 2019.

107.  During the earnings call, Defendant McNamara made two crucial disclosures.  First, he admitted that Flex **_knew_** it could not be "precise" about when the Nike contract would be profitable, despite Defendants' string of Class Period statements to the contrary: "**_We had no idea how long it would actually take_** **_because we were reinventing shoes and that's a category that we['ve] never gone after before_**."  At the same time, McNamara claimed he was still "**_confident that [Flex's] accomplishments will enable us to significantly improve our fiscal 2019. . . [with] profitability during the second half of fiscal 2019_**."

108.  Second, Defendant McNamara told investors that the purported reason Flex did not achieve profitability was missing "design content" from Nike that could run on the automated lines at the new Guadalajara factory.  In other words, Defendants did not disclose to the market that the Company had and still was experiencing significant manufacturing issues resulting in the Company's inability to make **_enough_** shoes to breakeven.  Instead, they told the market that the problem was simply because they didn't have the right **_kind of_** shoes to make in their brand-new and fully operational "dream factory" in Guadalajara.

109.  While Defendants knew all along that they failed to breakeven because of the manufacturing issues and their inability to meet production targets, during the earnings call, Defendants explained that the lack of design content was the key issue with Flex failing to achieve breakeven: "The key to Nike is to have design content – shoe content that's designed to run on a highly automated line.  The highly automated line is turned on, the content has been developed and it just needs to ramp.  So this is the key thing we need . . . .  We just need the right content to run."

110.  Similarly, in response to an analyst's question about "whether or not the company has identified the steps that it needs to take to get Nike to profitability," Defendant McNamara

reiterated that "design content . . . is the key thing we need. We don't need any more optimizations of a factory. *We have a good factory flow*. We just need the right content to run."

111. Critically, Defendant McNamara assured the market that the purported design content problem was resolved even though he knew that was not the issue that caused the Nike contract's failure to breakeven: "Most importantly, Nike *has released* a full set of products designed for our automation system *which is now beginning to ramp in mass production*." McNamara also inexplicably stated that the key automation system at the Guadalajara factory just went online a few weeks earlier—on April 11, 2018:

> Flex and Nike remain extremely committed to our strategic partnership. For example, during fiscal 2018 we made a few very important breakthroughs . . . [including] a *unique automation system together with our partner which was released to production two weeks [ago] on April 11. This new system is designed to deliver even greater productivity gains, yield improvement and enhanced quality.* Most importantly, Nike has released a full set of products designed for our automation system which is now beginning to ramp in mass production. We are confident that these accomplishments will enable us to significantly improve our fiscal 2019 and position us for greatly reduced losses in the first half of 2019. We are targeting profitability during the second half of fiscal 2019.

112. This crucial fact, if true, had been entirely omitted from Defendants' prior statements heralding that the new factory went online in October 2017—the sole reason Defendants gave at the time for why they were still confident in achieving breakeven by the end of FY 2018. Accordingly, Defendants failed to tell the market *for six months* that while the factory was operational, the crucial automation processes were purportedly not even in place yet.

113. The market once again accepted Defendants' two-way story. One RBC analyst report noted on April 26, 2018 that "while disappointing we think this is ultimately a positive." A UBS analyst wrote the next day that "Flex missed on its most articulated goal—that Nike would be breakeven exiting March. Instead, breakeven is pushed out about six months and that is not certain. . . . Management overpromised in getting to breakeven with Nike. The production line was turned on April 11, later than anticipated. It sounds like it was *both Flex being late in getting the line running and Nike needing to provide shoes designed for the automated process*."

Shortly thereafter, on May 7, 2018, UBS issued an analyst report stating that it "didn't expect the six-month delay in breakeven with Nike that took the stock lower."

114. Despite knowing the real reason why Flex badly missed its "most articulated goal" of breakeven—namely Flex's failure to achieve production targets due to manufacturing issues—during Flex's May 10, 2018 Investor & Analyst Day, Defendant McNamara reassured the market that all of those problems were in the past: "*[W]e have a way of operating that will move it to second half profitability*. . . . We've got a lot of automation that we're driving, we actually mentioned that we have an end-to-end automation system that actually went live on April 11, we'll begin to ramp that through the course of the year, *we have a lot of content that's been designed for that system, and we're driving a numerous amount of productivity* and yield items that reach all different aspects because it's a really complex problem. So, we kind of view this as we now need to move to our ramp phase and we need to move to an optimization phase." At the same time, Defendant Dennison reiterated that the Nike contract was "*critically important* for [Flex] to be successful."

115. Likewise, on May 16, 2018, Defendant Kessel stated that the "biggest" issue at Flex was "continu[ing] to make inroads with our automation system and subsequently *have that fully approved for mass production as of mid-April*." Defendant Kessel further assured investors, without identifying his statements as forward looking or referencing any cautionary statements, that the Nike contract was "*getting into profitability at some point in the second half of [2019]*."

116. During Flex's July 26, 2018 earnings call, Defendant McNamara announced that he had "*taken direct ownership for our Nike operations to ensure its operational success*." Defendant McNamara reassured the market that even though "we've kind of reset expectations" about the Nike contract's trajectory, "*it's tracking exactly to where we thought . . . three months ago*." Specifically, he pointed to revenue growth, expanding productivity, and profitable margins all being "*right on schedule to where we thought we would be three months ago*."

117. However, contrary to Defendants' statements, the Nike contract was not tracking to exactly where Flex thought three months ago or right on schedule. As Flex's newly articulated breakeven date approached, Defendants were still experiencing the manufacturing problems and

1  inability to hit production targets thereby rendering their statements about being on a trajectory to

2  achieve breakeven in the second half of 2019 false and misleading when made.

3      118.  Surprisingly, around this time, Defendant Dennison, the President of CTG and the

4  executive tasked with managing the Nike contract up to that point, appeared to no longer be in

5  charge of the CTG segment or the Nike contract, with Defendant McNamara taking direct

6  ownership.  On August 7, 2018 Fox Factory Holding Corporation indicated on that it had hired

7  Defendant Dennison as President of its Powered Vehicles Group effective August 29, 2018.

8      119.  Just before the end of the Class Period, on September 5, 2018 during a Citi Global

9  Technology conference, Defendant McNamara boasted that Flex "went into our new [Nike]

10 factory in October [2017] that enabled us to really drive to an efficient footprint or a footprint-

11 efficient capability," that "it's a very win-win kind of a relationship," and that "*[w]e have a line of*

12 *sight to productivity that'll drive this to our targets by the end of the year*."  As the market would

13 soon find out, like the rest of Defendants' Class Period statements about being on a trajectory to

14 breakeven, this statement had no basis in truth.

15      **G.    Flex Revealed the Truth About the Manufacturing and Production Target
            Issues When it Announced that it was Cancelling the Nike Contract, Winding
16            Down Operations in Guadalajara, and Defendant McNamara was Resigning**

17      120.  After the markets closed on October 25, 2018, Flex shockingly announced the

18 winding down and termination of its manufacturing operations because the Nike contract was not

19 commercially viable:

20          The Company has worked hard with NIKE to make the footwear
            manufacturing operations in Mexico technically and commercially
21          successful. In recent weeks, however, *it became clear that the
            Company would be unable to reach a commercially viable*
22          *solution. Accordingly, Flex and NIKE have mutually agreed to*
            *wind-down the footwear manufacturing operations in Guadalajara*
23          *by December 31, 2018*.

24      121.  This was the first time Defendants disclosed that the Nike operations were not

25 "commercially viable" despite the myriad issues plaguing the project throughout the Class Period.

26 Flex also announced the abrupt—and completely unanticipated—retirement of Defendant

27 McNamara, who just a few months earlier had taken "direct ownership for our Nike operations to

28 ensure its operational success."  During the October 25, 2018 earnings call, Defendant McNamara,

who had taken personal responsibility over the project in July, did not answer any analyst questions, including one addressed specifically to him.

122. The news stunned the market and caused Flex's stock to plummet ***35% in a single day*** on unusually high trading volume.  On October 29, 2018, J.P. Morgan published an analyst report on Flex stating:

> ***Mostly investors are appalled at how quickly the NIKE partnership went south given that FLEX CEO [sic] was touting its strategic importance and positive momentum at the analyst day in May 2018***.  His retirement might yield a sense of relief but several investors are uneasy about the leadership vacuum and they are looking for the next shoe to drop.

123. Similarly, a November 13, 2018 analyst report from RBC confirmed from a conversation with Defendant Kessel on the same day that Flex was unable to manage the Nike contract: "While FLEX was making improvements in [the Nike contract], they were unable to reach an agreement on how to sustainably manage it from a profit standpoint."

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

124. Lead Plaintiff alleges that the statements highlighted in bold and italics[5] within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of Flex's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

125. Throughout the Class Period, Defendants made a series of misrepresentations concerning the status and profitability of the Nike contract, in which they misled investors concerning the contract's ability to breakeven at the end of FY 2018 and subsequently, following the failure to breakeven, that the contract would get to profitability in the second half of FY 2019, while intentionally omitting crucial details about the problems the Company was experiencing at the Guadalajara factory and that the project was not on the linear track to profitability.

---

[5] *See also* Appendix to Consolidated Class Action Complaint filed herewith.

**Misstatements 1-2:**

126. On January 26, 2017, Flex issued a press release (the "January 26, 2017 Press Release") in which it announced its third-quarter financial results.  The press release quoted Defendant McNamara with regard to the Company's Sketch-to-Scale strategy, of which Nike was "critically important": "***Our Sketch-to-Scale strategy remains firmly on track*** as reflected in our third quarter performance . . . ."

127. Then, after the markets closed on January 26, 2017, Flex held an earnings call discussing the third-quarter 2017 financial results (the "January 26, 2017 Earnings Call").  During that call, Defendant McNamara elaborated further by touting the early successes in the Flex-Nike partnership which supported why Flex's expectations were unchanged, including that "the innovations that [Nike is] seeing coming out of our team, that is our team, our guys and their guys, ***are probably above expectation of what they anticipated. . . . [T]he results that they're seeing are above expectations***."

128. Defendant McNamara's statements in the January 26, 2017 Press Release that Flex's Sketch-to-Scale strategy remained currently on track based on the Company's third-quarter performance and in the January 26, 2017 Earnings Call that Flex was producing results that were above Nike's expectations materially misled investors because Defendants knew and failed to disclose or deliberately disregarded that these statements were untrue.  Importantly, the success of Defendants' Sketch-to-Scale strategy hinged on the ultimate profitability of the Nike contract, which was a "great example" of Flex's new strategy and the one that was "critically important for [Flex] to be successful."  As investors and analysts understood, when Defendant McNamara stated that the Company's Sketch-to-Scale strategy remained on track, he was referring to the Nike contract and its ability to breakeven and, ultimately, to achieve profitability in order to make it a "top ten" customer contract for the Company going forward.  For example, according to a Deutsche Bank analyst report on April 26, 2018, the Nike contract was the most important contract to Flex's overall success, stating that the "bull thesis" on Flex had "largely been anchored around the benefits of the Nike partnership."

1    129.  However, unbeknownst to investors, from the very start of the Nike contract it was

2    plagued by manufacturing and personnel issues resulting in the Company's inability to

3    manufacture enough shoes to meet its steadily increasing production targets, which were

4    preventing Flex from making enough shoes to achieve breakeven.  Instead, as alleged elsewhere

5    herein, the contract was experiencing a myriad of manufacturing issues that were materially

6    impacting Flex's ability to manufacture enough shoes to even come close to being on a trajectory

7    to breakeven.

8    130.  According to former Company employees, *see* ¶¶ 70-75, 80-86, Flex was consistently

9    missing the production targets that were required to breakeven.  The Nike contract was behind

10   plan *from the get-go*, and was experiencing operational issues in the factory in terms of quality

11   and quantity output.  The Company was therefore unable to build the shoes to what they had

12   indicated and promised to execute on what Nike had required.  Flex continued to have significant

13   issues with efficiencies *throughout the Nike contract* and the established plan was not meeting its

14   intended output goals, including the demand and delivery targets set by Nike, thus the Nike

15   contract and consequently Flex's Sketch-to-Scale strategy was not "firmly on track."

16   **Misstatement 3:**

17   131.  Also during the January 26, 2017 Earnings Call, Citigroup analyst asked whether

18   Flex could give "an update about the timeline" for the Flex-Nike partnership and when Flex

19   expected "to see losses turn into breakevens."  Defendant Collier responded that "as it relates to

20   the profitability, we said all along, this is going to be a multiyear process and we're in an

21   investment cycle right now.  *We cross into profits in the last quarter, next year, in Q4 of fiscal*

22   *2018*."

23   132.  Defendant Collier's statement on the January 26, 2017 Earnings Call asserting that

24   the Nike contract would cross into profits at the close of the 2018 fiscal year materially misled

25   investors because Defendants failed to disclose that they already knew that the Nike contract was

26   experiencing a myriad of manufacturing issues that were materially impacting Flex's ability to

27   manufacture enough shoes and therefore would not be able to breakeven in March 2018.

28

133.   According to former Company employees, *see* ¶¶ 70-75, 80-86, Flex was consistently missing the production targets that were required to breakeven.  The Nike contract was behind plan *from the get-go*, and was experiencing operational issues in the factory in terms of quality and quantity output.  Thus, the Company was unable to build the shoes to what they had indicated and promised to execute on what Nike had required.  Flex continued to have significant issues with efficiencies *throughout the Nike contract* and the established plan was not meeting its intended output goals, including the demand and delivery targets set by Nike.

134.   Importantly, as Defendant McNamara later admitted, Flex *knew* throughout the Class Period that it could not be "precise" about when the Nike contract would be profitable: "*We had no idea how long it would actually take because we were reinventing shoes and that's a category that we['ve] never gone after before*."   Thus, Defendant Collier's assertion on January 26, 2017 that the Nike contract was at that time in a position to cross over into profits in March 2018 was materially false when made because Defendants failed to disclose that they had no knowledge of the timeline needed to achieve breakeven on the Nike contract.

135.   The market reacted positively to Defendants' statements.  Later that evening, RBC issued a report stating that it "expect[s] Nike program at volume to be $1B[illion] + revenues (2 years away) and generate op-margins of 8-10%."  It also noted that the Nike ramp was "on track with expectations."

136.   The next day, on January 27, 2017, UBS issued a report headlined, "Flex Leading the Re-Rating of EMS as Customer Diversification Kicks In," remarking that Nike "could be [a] 10% company customer[ ] within a few years," which would turn the CTG segment "from a weakness into a strength."

137.   Deutsche Bank also wrote on January 26, 2017 that "[w]e remain impressed with Flex's progress with its sketch-to-scale capability and mgmt reconfirmed that it's program[] with Nike . . . remain[s] on track," and that Nike was expected to be a top 10 customer "when fully ramped."

138. Similarly, J.P. Morgan observed on January 27, 2017 that despite "mixed" results from the quarter, the "[l]ong-[t]erm [s]tory [r]emains [i]ntact" because Nike "remain[s] on track to generate material revenues" in FY 2018.

**Misstatement 4:**

139. In February 2017, Defendants created a presentation for investors ("February 2017 Investor Presentation") in which they touted the success of the Nike contract and its status, noting: "In 18 months, 20 inventions on the factory floor[.]  Fastest new Nike ramp, 150 days from start to first ship[.]  *On track to have meaningful revenue in FY18*."

140.  This statement in the February 2017 Investor Presentation that the Nike contract was on track to have meaningful revenue in fiscal year 2018 materially misled investors because Defendants knew and failed to disclose or deliberately disregarded that this statement was untrue. Importantly, analysts understood that "meaningful revenue" on the Nike contract was equivalent to the breakeven point, where losses would cross into profits.  For example, as J.P. Morgan observed on January 27, 2017 following Defendants' statements that the Nike contract would cross into profits in fiscal year 2018, Nike "remains on track to generate *material revenues*" in FY 2018.

141.  However, unbeknownst to investors, from the very start of the Nike contract it was plagued by manufacturing and personnel issues resulting in the Company's inability to manufacture enough shoes to meet its steadily increasing production targets, which were preventing Flex from making enough shoes to achieve breakeven.  Instead, as alleged elsewhere herein, the contract was experiencing a myriad of manufacturing issues that were materially impacting Flex's ability to manufacture enough shoes to even come close to being on a trajectory to breakeven.

142.  According to former Company employees, *see* ¶¶ 70-75, 80-86, Flex was consistently missing the production targets that were required to breakeven.  The Nike contract was behind plan *from the get-go*, and was experiencing operational issues in the factory in terms of quality and quantity output.  Thus, the Company was unable to build the shoes to what they had indicated and promised to execute on what Nike had required.  Flex continued to have significant issues

with efficiencies ***throughout the Nike contract*** and the established plan was not meeting its intended output goals, including the demand and delivery targets set by Nike.

143. Importantly, as Defendant McNamara later admitted, Flex *knew* throughout the Class Period that it could not be "precise" about when the Nike contract would be profitable: "***We had no idea how long it would actually take because we were reinventing shoes and that's a category that we['ve] never gone after before***."  Thus, the Company's assertion in February 2017 that the Nike contract was on track for meaningful revenue—*i.e.*, breakeven—was also materially false when made because Defendants failed to disclose that they had no knowledge of the timeline needed to achieve breakeven on the Nike contract.

**Misstatement 5:**

144. On February 15, 2017, Flex participated in the Goldman Sachs Technology and Internet Conference ("February 15, 2017 Goldman Sachs Conference").  Defendant Collier and Douglas Britt, Flex's President of Industrial & Emerging Industries, spoke on behalf of Flex. Neither identified any of their statements as forward-looking pursuant to the PSLRA or accompanied them with cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1).

145. When asked by an analyst if he could confirm that the Company would crossover from investment to "profitability in the March calendar '18 quarter," Defendant Collier replied: "***Yes, correct. . . . [W]e anticipate and see profitability being achieved in Q4 next year and then sustaining that going forward***."  And while acknowledging that there would be an incremental level of cost associated with the Nike ramp, he reiterated that Flex has "***a clear line of sight and conviction around hitting profitability and sustaining profitability from that point forward*** . . . ."

146. Defendant Collier's statements at the February 15, 2017 Goldman Sachs Conference that the Nike contract would be profitable at the end of FY 2018 and that the Company currently had a line of sight to hitting that target and maintaining profitability from that point forward were knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

**Misstatements 6-7:**

147.  After the markets closed on April 27, 2017, Flex held an earnings call discussing the fourth-quarter 2017 financial results (the "April 27, 2017 Earnings Call").  During the call, Defendant McNamara boasted to investors that Flex was "accelerating our investments in Nike *on the back of early automation successes*, a strong customer collaboration and broad-based opportunities."

148. Later on that call, Defendant McNamara further stated that: "*We're starting to get early successes around some of the design engagements that we're having [with Nike] about reinventing how design actually occurs, some of the new technologies of the shoes, and even into the automation projects that we're seeing.*"

149.  These statements by Defendant McNamara on the April 27, 2017 Earnings Call that Flex was experiencing early successes on the Nike contract materially misled investors because Defendants failed to disclose that they already knew that the Nike contract was experiencing a myriad of manufacturing issues that were materially impacting Flex's ability to manufacture shoes and therefore that the Company was not experiencing any automation successes on the contract.

150.  According to former Company employees, *see* ¶¶ 70-75, 80-86, Flex was consistently having issues with meeting demand as a result of either not having sufficient materials on hand or needing to scrap product because they did not meet quality standards.  In fact, a significant percentage of the shoes produced by Defendants were ultimately considered unusable scrap material.  Flex was not meeting the weekly production demand, and Nike was "very upset" with the results because Flex was not meeting its quality standards or demand and delivery targets.  Importantly, Flex continued to have significant issues with efficiencies *throughout the Nike contract* and the established plan was not meeting its intended output goals.  In fact, by May 2017 Flex did not meet Nike's projections, and the projections from Nike decreased after that point.  Accordingly, at the end of April 2017, when these statements were made, Defendants were not experiencing any successes on the Nike contract or its automation processes.

**Misstatement 8:**

151.  On the same April 27, 2017 Earnings Call, Defendant Collier reiterated that Flex was on track with the ramp of the Nike contract, noting that they were "***completely aligned with the production curve*** . . . ."

152.  Defendant Collier's statement on the April 27, 2017 Earnings Call that the Nike contract was aligned with the production curve was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

153.  The market was pleased with Defendants' comments.  On April 28, 2017, J.P. Morgan wrote that Flex "is accelerating design innovations with Nike" and that "[u]nderpinning our growing enthusiasm for this story is the probability that the Nike partnership will be material and will be significantly margin-accretive . . . ."  The same day, Craig-Hallum Capital Group LLC ("Craig-Hallum") wrote that it believes Flex "has a significant opportunity for revenue to pick up with Nike beginning in the Q3 to Q4 time frame [*i.e.*, October 2017 to March 2018] and for the Nike business to be profitable in FY19."

**Misstatement 9:**

154.  On May 10, 2017, Flex hosted its annual Investor & Analyst Day ("May 2017 Investor Day"), during which Defendant Dennison spoke extensively about the Nike contract.  In discussing the status of the project, Dennison stated that: "[W]e've got real commits.  ***We have to drive significant volume, which we're doing today***.  This has been a great solution for us, a great story for us.  It continues to be a great story for us.  We're going to continue to focus on this.  We are committed to our numbers this year.  So we're going to be at meaningful revenue in FY '18, and we ***will be at breakeven or better by the end of the year*** as we've said before."

155.  Defendant Dennison's statement at the May 2017 Investor Day that the Nike contract was currently driving significant volume and would be at breakeven by the end of FY 2018 was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

156.  Indeed, analysts covering the Company were duped and credited Flex's statements, and were unaware that the Nike contract was not on track to breakeven in FY 2018.  For example,

on May 11, 2017, UBS reported that the Nike contract provides "a long term multi-billion relationship that leverages Flex's global manufacturing footprint and automation capabilities" and was "expected to generate 6-9% operating margin." J.P. Morgan echoed these sentiments on May 12, 2017, noting that the Company was positioned for an "operating margin uplift in the CTG sector driven by ramp in Nike-related revenues in FY19/20." Acknowledging that while "[m]argins will take a slight breather in FY18 as investments ramp," J.P. Morgan continued that "bookings-backed line of sight instills confidence in management to achieve long-term targets."

**Misstatement 10:**

157. On July 27, 2017, Flex issued a press release (the "July 27, 2017 Press Release") in which it announced its first-quarter financial results. The press release quoted Defendant McNamara with regard to the Company's Sketch-to-Scale strategy, of which Nike was "critically important": "*Our Sketch-to-Scale strategy remains firmly on track* as reflected in our first quarter results . . . ."

158. Defendant McNamara's statement in the July 27, 2017 Press Release that Flex's Sketch-to-Scale strategy remained currently on track based on the Company's first-quarter performance was knowingly false and materially misled investors for the same reasons set forth in paragraphs 128-130, herein.

**Misstatement 11:**

159. After the markets closed on July 27, 2017, Flex held an earnings call discussing the first-quarter 2018 financial results (the "July 27, 2017 Earnings Call"). During that call, Defendants partially disclosed for the first time that the Nike contract was more expensive than expected, driving heavier losses than previously expected. Still, Defendant McNamara continued to assure investors that Flex was on track to breakeven and achieve profitability by the end of FY 2018. Following up on Defendants' statements at prior conferences and earnings calls, an analyst for UBS pointedly asked Defendant McNamara: "[Y]ou had said previously that you expected to be near break-even by the end of the calendar year. It sounds like that might not be the case. And if so, when do you expect to be at break-even?" Defendant McNamara responded by reassuring analysts and investors that "*our expectation is always in the fiscal year we would cross-over into*

*break-even.  We still believe that's the right target and objective where we see the business heading*."

160.  Defendant McNamara's statement on the July 27, 2017 Earnings Call that the Nike contract was making progress and would breakeven at the end of the fiscal year, notwithstanding the increased costs, was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

161.  The market was surprised, but still bought into Defendants' story.  An analyst with Raymond James & Associates ("Raymond James") asked "is there an aspect here of some cost due to missteps in ramp?"  Defendant McNamara responded evasively that he "d[idn't] really know how to answer that" before launching into a long answer about granularities relating to the Nike contract.

162.  Deutsche Bank wrote the next day, July 28, 2017, that it still viewed Nike as a plus, even though Defendants' disclosure took some of the shine off the Nike gloss: "Given the bull case on FLEX revolves around the growth and margin benefits of the Nike deal, we believe many investors will want to see mgmt deliver on improving margins as we move into [the second half of FY 2018]."

163.  UBS was also optimistic, reporting on the same day that while "higher Nike investments could likely cause a decline in operating income this year[,] . . . Flex still expects to be breakeven exiting June and remains confident in the long-term benefits."  It also noted that Flex acknowledged that the "learning curve is proving more difficult and at a higher cost than expected."  But, reflecting on Defendants' statements regarding the profitability trajectory being on track, UBS noted that "[a]s the new facility ramps late this year, material flow, automation, and localization of the supply chain should improve.  Flex is adamant that the difficulties do not affect its return expectations over time."

164.  J.P. Morgan too noted on July 28, 2017 that there was a "near-term margin drag from the investment into the NIKE operations," but that "long-term investors should take advantage of the dip [in Flex's stock price] to build positions . . . ."  It acknowledged the "margin decline in the CTG segment, which was pressured by ramping expense associated with the NIKE business

(which understandably became the focus of the subsequent analyst questions)" and Defendant McNamara's description of the "on-ramp as 'complex.'"  But it also acknowledged Defendants' continued depiction of the Nike contract as being on track – Flex "confidently expects the NIKE business to be at break-even by F1Q19" – and concluded that "investors will see a pay-back from the NIKE investment in FY19," *i.e.*, beginning in April 2018.

**Misstatement 12:**

165.  On September 6, 2017, Flex participated in the Citi Global Technology Conference ("September 6, 2017 Citi Conference").  Defendants McNamara and Collier attended and spoke on behalf of Flex.  Neither identified any of their statements as forward-looking pursuant to the PSLRA or accompanied them with cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1).

166.  When asked to confirm that the end of fiscal year 2018 is the "time line . . . for turning past loss-making to breakeven, profitable exiting at that quarter," Defendant Collier responded "*[e]xactly*."  He went on to state that: "We're moving into a customized, tailor-built facility in our Q3 that's specifically designed to optimize around the manufacturing requirements for our partner, and *we anticipate, as we exit this year, being at a breakeven, which allows us to see some real good accretion into EPS into fiscal '19 and beyond*."

167.  Defendant Collier's statement at the September 6, 2017 Citi Conference that the Nike contract was still on track to achieve breakeven and hit profitability at the end of fiscal year 2018 was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

**Misstatement 13:**

168.  On November 7, 2017, Flex participated in the RBC Capital Markets Technology, Internet, Media and Telecommunications Conference ("November 7, 2017 RBC Conference").  Defendant Kessel and Douglas Britt, Flex's President of Industrial & Emerging Industries, attended and spoke on behalf of Flex.  Neither identified any of their statements as forward-looking pursuant to the PSLRA or accompanied them with cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1).

169. Defendant Kessel reiterated Defendant McNamara's admissions during the July 27, 2017 Earnings Call that during the first quarter of fiscal year 2018—April 2017 through June 2017—Flex was struggling with the ramp of the Nike contract, but reiterated McNamara's assurance to investors that the Nike contract remained on track to breakeven at the close of fiscal year 2018.

170. However, when asked "how confident we remain with the goals for March breakeven," Defendant Kessel responded, "[a]dmittedly, we did have some struggles initially in terms of Q1, in terms of the initial stages of ramping up and dealing with multiple styles of shoes before we've actually put in place the factory that we've talked about that is now as of end of [] October online.  ***But in terms of the general trajectory, I think we still remain very confident about the fact that we're going to be improving both performance and scaling as time goes on here . . . . [W]e still look at what we said back in May has been very much intact***."

171. Defendant Kessel's statement at the November 7, 2017 RBC Conference that Flex's statements from the May 2017 Investor Day—that the Nike contract would be at breakeven by the end of FY 2018—was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134, 140-143 herein.

172. The market continued to be misled by the Defendants' statements that they were on track to breakeven in March 2018.  As RBC stated in a note that it published later that day, a "[k]ey takeaway[]" from the RBC Conference emphasized that "FLEX remains confident about the Nike business which is a multi-decade opportunity. . . .  Despite initial struggles related to scaling multiple SKUs, which resulted in higher than expected investments, FLEX is optimistic about the Nike opportunity."

**Misstatement 14:**

173. On November 14, 2017, Flex participated in the UBS Global Technology Conference ("November 14, 2017 UBS Conference").   Defendant Kessel and Paul Humphries, Flex's President of High Reliability Solutions, attended and spoke on behalf of Flex.  Neither identified any of their statements as forward-looking pursuant to the PSLRA or accompanied them with cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1).

174. In response to a question from an analyst about the status of the Nike contract, Defendant Kessel stated: "So, we had our Investor and Analyst Day back in May and we presented a timeline back then that kind of talks about how we see Nike over the next two years to three years evolving for us.  And I think at this stage, *it remains very much intact*."

175. Defendant Kessel's statement at the November 14, 2017 UBS Conference that Flex's statements from the May 2017 Investor Day—that the Nike contract would be at breakeven by the end of FY 2018—was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134, 140-143 herein.

**Misstatement 15:**

176. On December 4, 2017, Flex participated in the Raymond James Technology Conference ("December 4, 2017 Raymond James Conference").  Defendant Collier and Chris Obey, Flex's President of Automotive, attended and spoke on behalf of Flex.  Neither identified any of their statements as forward-looking pursuant to the PSLRA or accompanied them with cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1).

177. When asked by an analyst whether the move into the new Guadalajara factory was directly associated with Flex's trajectory to breaking even on the Nike contract, Defendant Collier stated: "We're well on our way, we're 30 days-plus into the new operation.  *We see multiple signs of the accelerated scaling effects*.  We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation.  We've been deploying further lean manufacturing principles and *you're going to see a natural progression up as we scale that further with the target of exiting this year at breakeven*."

178. Defendant Collier's statement at the December 4, 2017 Raymond James Conference that the move into the new Guadalajara factory had accelerated production and that it would allow the Nike contract to exit the fiscal year at breakeven was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134, 149-150 herein.

**Misstatements 16-17:**

179. After the markets closed on January 25, 2018, Flex held an earnings call discussing the third-quarter 2018 financial results (the "January 25, 2018 Earnings Call").  During that call,

Defendant McNamara spoke about the impact that moving into the Guadalajara factory was having, and how it was driving the breakeven trajectory that was just a few months away now: "*This move improved efficiency and helped reduce operating losses in line with expectations. Our objectives of moving this project towards the breakeven level exiting our Q4 remains unchanged*."

180. Defendant McNamara's statement on the January 25, 2018 Earnings Call that the move to the new Guadalajara factory was reducing operating expenses and keeping the Nike contract on track to breakeven by the end of FY 2018 was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

181. Later, an analyst questioned Defendant McNamara about the Nike ramp and Defendants' confidence in achieving breakeven by the March quarter, posing the question, "[i]s that essentially still on track?  And then, as you think about calendar 2018, just remind us how do you think about revenue and perhaps some margin contribution from the Nike ramp."

182. Defendant McNamara responded: "*Yes*.   Kind of how we've been expecting this ramp to mature is that we hope to crossover into breakeven by the end of the year.  *That's still our target.  We still have a line of sight to that*. . . .  So, these are the margin profiles that we expect, that we're driving to, that *we have a line of sight to*, and I think we will achieve."

183. Defendant McNamara's statement on the January 25, 2018 Earnings Call that the Nike contract was on track to breakeven by the end of FY 2018 and that Flex had a line of sight to that breakeven target was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

184. In *Key Quarterly Takeaways* published the next day, Craig-Hallum noted that the "Nike partnership remains on track to breakeven exiting FY18.  Flex began operation of its new facility with Nike during the [third fiscal] quarter [September 30, 2017 to December 31, 2017] and the [C]ompany reiterated they remain on track to have the partnership ramped to break even exiting the fiscal year."

185. Macquarie echoed these sentiments on January 26, 2018, noting that while the "Nike business continues to ramp slower than expected as both manufacturing and business processes

continue to evolve between the two partners. . . [, t]he company continues to expect it will see the Nike business at break-even levels as we exit Q4.  When Nike kicks in it should both bolster growth and profitability."  Specifically, Macquarie noted that during the quarter, Flex "moved the Nike operations into a new plant in Mexico, which is helping improve profitability."  While the Nike contract was "ramping with volumes lower than expected," Macquarie reiterated that "[m]anagement noted that they have consolidated operations from three facilities to just one[,] which is helping efficiencies."

186.  UBS also published a report on the same date indicating that while it understood the partial disclosure regarding ramp issues in July 27, 2017, it was unaware that the Nike contract was not on track to breakeven in March 2018, stating that they were "willing to look past near-term challenges given . . . that the Sketch-to-Scale strategy is working.  Nike [contract] is on track for breakeven exiting March.  Although the shoe revenue ramp is slower, the opportunity appears larger."

**Misstatement 18:**

187. On February 14, 2018, Flex participated in the Goldman Sachs Technology and Internet Conference ("February 14, 2018 Goldman Sachs Conference").  Defendant Kessel and Douglas Britt, Flex's President of Industrial & Emerging Industries, attended and spoke on behalf of Flex.  Neither identified any of their statements as forward-looking pursuant to the PSLRA or accompanied them with cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1).

188. In response to a question from a Goldman analyst regarding the March 2018 breakeven date, Defendant Kessel reiterated that Flex would breakeven on the Nike contract in just a few weeks:

> ***Yes, Yes. So we haven't made any changes to our view on Nike***, and really the most important thing for us is getting that business to breakeven.  That's been something we've been discussing at length this entire fiscal year.  Q1, for us, was kind of the peak period of investment, if you will, the biggest period of absorbing losses.  Every quarter since then we've seen improvement in terms of revenue and loss shrinking.  We, obviously, just finished Q3, where again we saw a further reduction in loss, further increase in revenue, and ***Q4 is where we're focusing on breaking even as we exit the year***.

189.  Defendant Kessel's statement at the February 14, 2018 Goldman Sachs Conference that the Nike contract was on track to breakeven by the end of FY 2018 was knowingly false and materially misled investors for the same reasons set forth in paragraphs 132-134 herein.

**Misstatements 19-20:**

190.  After the markets closed on April 26, 2018, Flex held an earnings call discussing the fourth-quarter 2018 financial results (the "April 26, 2018 Earnings Call").  During that call, Defendants partially disclosed for the first time that the Nike contract had, despite consistent reassurance over the previous year, failed to breakeven exiting the fourth quarter of FY 2018 (*i.e.*, the end of March 2018).  Indeed, Defendants disclosed that the Nike contract would not breakeven for at least another two quarters, as Defendant McNamara further disclosed that Flex was "targeting profitability during the second half of fiscal 2019," *i.e.*, between October 2018 and March 2019—up to a full year later than the March 2018 trajectory for the Nike ramp that Flex was purportedly tracking as recently as just a few weeks earlier.

191.  Yet, rather than admit to investors that the Nike contract had failed to hit breakeven because it was not on track to profitability, Defendant McNamara attributed the failure to breakeven solely on the previous lack of design content:

> The key to Nike is to have design content – shoe content that's designed to run on a highly automated line.  The highly automated line that's turned on, the content has been developed, and it just needs to ramp.  ***So this is the key thing we need.  We don't need any more optimizations of a factory.  We have good factory flow. We just need the right content to run***. . . .  [Y]ou have to have design content.  That design content has to run on fully automated lines.  We turned those fully automated lines on.  They're running really well.  We'll ramp up those fully automated lines over the course of the year and get to volume.  ***And this is what we need to get to profitability: the right shoe with the right  automation system***. . . .

192.  Defendant McNamara's statement on the April 26, 2018 Earnings Call that the only reason Flex had failed to breakeven on the Nike contract by end of fiscal year 2018 was because of the lack of design content from Nike materially misled investors because Defendants omitted to inform investors that this was not the only reason—or even the main reason—why Defendants had failed to breakeven on the Nike contract.  This statement also materially misled investors because

1  Defendants failed to disclose that they had knowledge of additional issues with the Nike contract

2  that would prevent it from attaining profitability and becoming commercially viable.

3      193.  Instead, the Nike contract had failed to breakeven because, according to former

4  Company employees, *see* ¶¶ 70-75, 80-86, it was plagued by manufacturing and personnel issues

5  resulting in the Company's inability to manufacture enough shoes to meet its steadily increasing

6  production targets.  Instead, as alleged elsewhere herein, the project was experiencing a myriad of

7  manufacturing issues that were materially impacting Flex's ability to manufacture enough shoes to

8  breakeven.  In fact, the Company was unable to build the shoes to what they had indicated and

9  promised to execute on what Nike had required.  Flex continued to have significant issues with

10  efficiencies ***throughout the Nike contract*** and the established plan was not meeting its intended

11  output goals throughout, including the demand and delivery targets set by Nike, leading to its

12  ultimate failure to breakeven in March 2018.  Defendant McNamara's statement that the right

13  design content would allow the project to get to profitability was also materially misleading for

14  these same reasons.

15      194.  At the same time, Defendant McNamara portrayed the issue as a past, not current

16  problem.  He reassured investors that because Nike had now provided design content, the Nike

17  contract was on track to achieve profitability going forward: "Most importantly, Nike has released

18  a full set of products designed for our automation system, ***which is now beginning to ramp in***

19  ***mass production***."

20      195.  Defendant McNamara's statement on the April 26, 2018 Earnings Call that because

21  Nike had now provided design content, the Nike contract was beginning to ramp in production in a

22  way that would ultimately lead to profitability materially misled investors because Defendants

23  knew and failed to disclose or deliberately disregarded that Flex's severe manufacturing issues and

24  inability to meet production targets had not been remedied following the contract's failure to

25  breakeven in March 2018 and therefore the contract was not actually on the trajectory to

26  profitability.

27      196.  According to former Company employees, *see* ¶¶ 70-75, 80-86, 103-105, the

28  manufacturing issues that Flex was experiencing with the Nike contract lasted from when the

1  contract began until the day it ended.  Indeed, even once Defendants moved the contract into the

2  new factory in Guadalajara, Flex was not achieving its production metrics and thus was not able to

3  achieve profitability on the contract, as Defendants claimed.

4        197. The market was surprised by Flex's disclosures.  That evening, Deutsche Bank

5  published a report on Flex titled *F4Q-18 results: step up in investments derail near-term*

6  *profitability* noting: "Impressive growth and profitability in FLEX's IEI and HRS segments were

7  overshadowed by disclosure that the Nike deal is still unprofitable, and is not expected to break-

8  even until F3Q-19," despite the fact that "[t]he bull thesis [on Flex] has largely been anchored

9  around the benefits of the Nike partnership and FLEX's ability to earn at least $1.80 [per share] in

10  FY-20."  Deutsche Bank further acknowledged that "[w]hile [management] expects Nike-related

11  losses to narrow linearly over the next six months, the program is not expected to be profitable

12  until F3Q-19 when production volumes ramp up."

13        198. However, the market again bought Defendants' story.  Despite expressing some

14  dismay at Flex's failure to hit its profitability timeline, RBC noted that "while disappointing we

15  think this is ultimately a positive."  RBC ultimately thought that in the long-term the Nike contract

16  could be a profitability boon, and that since the challenges were a "byproduct of growing pains," it

17  had a "reasonably attractive" "risk/reward."  Thus, despite the let down over the failure to

18  breakeven, market participants were still lulled into a false sense of security by Defendants'

19  continuing misstatements.

20        199. On April 27, 2018, UBS wrote that "Flex missed on its most articulated goal—that

21  Nike would be breakeven exiting March.  Instead, breakeven is pushed out about six months . . . .

22  It sounds like it was both Flex being late in getting the line running and Nike needing to provide

23  shoes designed for the automated process."  As UBS further noted a few days later, on May 7,

24  2018, "[t]he hard parts—getting an automated line running and Nike designing for automation—

25  seem to be going pretty well."

26  **Misstatement 21:**

27        200. On May 10, 2018, Flex hosted its annual Investor & Analyst Day ("May 2018

28  Investor Day"), during which Defendant McNamara spoke about the Nike contract and how Flex

now had the automation and the content designed for automation necessary to render the contract profitable in just five months, *i.e.*, the end of the second fiscal quarter of 2019:

> ***We now believe we have a way of operating that will move it to second half profitability***. So this is the – we're moving to this is the target we're trying to achieve.  We've got a lot of automation that we're driving, . . . we'll begin to ramp that through the course of the year, we have a lot of content that's been designed for that system, and we're driving a numerous amount of productivity and yield items that reach all different aspects because it's a really complex problem.

201.  Defendant McNamara's statement at the May 2018 Investor Day that because Nike had now provided design content, the Nike contract was on track to hit profitability in the second half of fiscal year 2019 was knowingly false and materially misled investors for the same reasons set forth in paragraphs 195-196 herein.

**Misstatement 22:**

202.  On May 16, 2018, Flex participated in the J.P. Morgan Global Technology, Media, and Communications Conference ("May 16, 2018 J.P. Morgan Conference").  Defendant Kessel and Paul Humphries, Flex's President for High Reliability Solutions, attended and spoke on behalf of Flex.  Neither identified any of their statements as forward-looking pursuant to the PSLRA or accompanied them with cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1).

203.  During the conference, in response to a question regarding the profitability of the Nike contract, Defendant Kessel told investors that "*[t]he overall opportunity remains unchanged for Flex meaning that over time this should be and can be easily a $1 billion[-]plus opportunity. . . . As we go into this fiscal year, it will improve dramatically, so we talked about significant year-over-year growth, again, getting into profitability at some point in the second half of the year.*"

204.  Defendant Kessel's statement at the May 16, 2018 J.P. Morgan Conference that the overall opportunity for Nike to represent a $1 billion opportunity for Flex and that the Nike contract would get into profitability in the second half of fiscal year 2019 was knowingly false and materially misled investors for the same reasons set forth in paragraphs 195-196 herein.

**Misstatements 23-24:**

205.  After the markets closed on July 26, 2018, Flex held an earnings call discussing the first-quarter 2019 financial results (the "July 26, 2018 Earnings Call").   During that call, Defendant McNamara spoke about the profitability of the Nike contract, stating: "At our Nike business, we expect to significantly increase revenue over the remainder of the year. . . . *We remain confident in achieving our target for profitability during the second half of fiscal 2019*." Further, to reassure investors that this was the case, Defendant McNamara noted that in order to achieve profitability he had personally "taken direct ownership for [the] Nike operations to ensure its operational success."

206.  In response to a question from an analyst regarding whether the Nike contract was "tracking as you had expected or are they tracking slower or faster," Defendant McNamara responded: "*I think . . . it's tracking exactly to where we thought probably 3 months ago, so we're going to have significant revenue growth this year, and we're continuing to expand productivity.  We expect margins to move to profitability in the second half of the year*."

207.   Defendant McNamara's statements on the July 26, 2018 Earnings Call that the Nike contract would get into profitability in the second half of fiscal year 2019 were knowingly false and materially misled investors for the same reasons set forth in paragraphs 195-196 herein.

208.  As Deutsche Bank wrote in a report published later that day, it was "encouraged to hear that the productivity and losses associated with the Nike program (in CTG) are improving, with the partnership on track to reach profitability by F3Q-19."   RBC also wrote that day that the Nike "ramp[ ] remain[s] on track and management reiterated expectations for break-even in [the second half of FY 2019]."

## VI.    THE TRUTH ABOUT THE FULL IMPACT OF THE FRAUD IS GRADUALLY REVEALED

209.  As set forth in Section IV.E-G, *supra*, the full extent of Defendants' fraud was gradually revealed through the disclosure of new information about Flex's manufacturing issues and the impact they were having on the Company's ability to make enough shoes to generate a profit on the Nike contract.  On July 27, 2017, for the first time, Defendants partially revealed that

they were having difficulties in the execution of the Nike contract when they disclosed that the contract was driving heavier losses than previously expected.  In response, Flex's stock price fell $0.80 per share, or 4.7 percent, to close at $16.29 per share on July 28, 2017, on unusually high trading volume of over 12 million shares.

210. However, the Company's stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that the Nike contract was not on track to profitability.  Instead, Flex misleadingly informed investors that the "biggest driver" of Flex's increased costs were attributable only to "moving into a brand new facility" in Guadalajara, Mexico, and reassured the market that the losses would come to an end at that point because the "transition into that facility will be complete by October [2017]."

211.  Flex further assuaged investors' concerns about the production ramp and profitability of the contract by March 2018 by stating that it had "a whole roadmap of process changes that will yield results, going into the new facility, the natural learning curve and the people coming along, between all those things, we do expect it to move into a break-even situation by the end of our fiscal year."  Accordingly, investors understood that the Company was still on the trajectory to achieve breakeven at the end of FY 2018.

212.  The market responded to Defendants' reassurances accordingly.  For instance, RBC wrote in a July 27, 2017 analyst report that Defendants' partial disclosure "provide[d] a dose of reality that this ramp isn't seamless and without challenges" but it did not "alter[ ] the long-term view on FLEX."  Likewise, on July 28, 2017 UBS published an analyst report stating "Flex is adamant that the difficulties do not affect its return expectations over time.

213.  On April 26, 2018, after the close of trading, the truth about the extent of the manufacturing issues was partially disclosed when Flex announced that the Nike contract had failed to breakeven exiting the fourth quarter of fiscal year 2018 despite its statements to the contrary throughout the Class Period—and as recently as just a few weeks prior—and that profitability on the Nike contract would be delayed for approximately six months.  This news caused Flex's stock price to fall $3.61 per share, or *21.7 percent*, to close at $13.03 per share on April 27, 2018, on unusually high trading volume of more than 35 million shares.

214. However, Flex's stock price again remained artificially inflated as Defendants continued to reassure investors that the Company remained on steady trajectory to profitability on the Nike contract in the second half of FY 2019.   Instead, Defendants blamed the failure to breakeven only on the lack of "design content" provided by Nike, claiming Nike had now released a full set of products and the Company would ramp up production over the course of the next year to get to profitability.   Defendants made no mention of the fact that the Nike contract was not on the linear trajectory to profitability as a result of the significant manufacturing issues facing the Company's Guadalajara operations throughout the Class Period.

215. Analysts fully absorbed Defendants' disclosure and their reassurances that Flex was still on the trajectory to achieve profitability by the second half of FY 2019.   For example, one RBC analyst report noted that "while disappointing we think this is ultimately a positive."   A UBS analyst wrote that "Flex missed on its most articulated goal—that Nike would be breakeven exiting March. Instead, breakeven is pushed out about six months and that is not certain. . . . Management overpromised in getting to breakeven with Nike. The production line was turned on April 11, later than anticipated. It sounds like it was both Flex being late in getting the line running and Nike needing to provide shoes designed for the automated process."

216. On October 25, 2018, the full impact of Flex's manufacturing failures was fully disclosed when Flex announced the wind-down of the Guadalajara plant and the cancellation of the Nike contract because the Company was "unable to reach a commercially viable solution" for the project—a complete reversal of what Defendants had been touting throughout the Class Period.   At the same time, Defendants also announced the unexpected retirement of McNamara, who just a few months earlier announced that he was taking "direct ownership for [the] Nike operations to ensure its operational success."

217.   In a conference call with analysts later that day, Defendant McNamara stated "now is the time for me to step back and allow new leadership to continue improving on what we have built."

218.   During the same conference call, Defendant Collier admitted:

> Regarding NIKE, we have worked hard with NIKE to make our footwear operation in Mexico technically and commercially

1
2
3
4

> successful. In recent weeks, however, it became clear that we are unable to reach a commercial and viable solution with NIKE and have mutually agreed to wind down our NIKE footwear manufacturing operation in Guadalajara by December 31, 2018. We are finalizing the terms and details of the wind-down and we are striving to retain many of our affected employees and to repurpose our facility.

5   219.  The market reacted swiftly.  News outlet Reuters, published an article on October 26,

6   2018 headlined "*BUZZ-Flex plummets as Nike partnership ends, CEO retires*" explaining that

7   Flex's stock "plunged . . . after announcing end to Nike Inc partnership, retirement of CEO."

8   Similarly, in an analyst report published on October 26, 2018, Macquarie wrote that the "Nike

9   strategic partnership [was] cancelled" and that Defendant McNamara was retiring. Importantly,

10  Macquarie recognized the sudden nature of this announcement, noting that "[t]here do not seem to

11  be any obvious choices for a replacement from the existing senior management team."

12  220.  On October 29, 2018, J.P. Morgan published a report on Flex noting that "[m]ostly

13  investors are appalled at how quickly the NIKE partnership went south given that FLEX CEO

14  [*sic*] was touting its strategic importance and positive momentum at the analyst day in May 2018.

15  His retirement might yield a sense of relief but several investors are uneasy about the leadership

16  vacuum and they are looking for the next shoe to drop."  Likewise, RBC confirmed from a

17  conversation with Kessel on November 13, 2018 that Flex was unable to manage the Nike

18  contract: "While FLEX was making improvements in [the Nike contract], they were unable to

19  reach an agreement on how to sustainably manage it from a profit standpoint. "

20  221.  In response to this news, the price of Flex stock plummeted by $3.82 per share, or

21  *more than 35%,* to close at $7.09 per share on October 26, 2018, on unusually high trading

22  volume of more than 70 million shares.  Flex stock fell another 2.12% on the next trading day,

23  Monday, October 29, dropping $0.15 to close at $6.94, again on unusually high trading volume of

24  over 31 million shares.

25  **VII.   LOSS CAUSATION**

26  222. During the Class Period, as detailed herein, Defendants engaged in a course of

27  conduct that artificially inflated or artificially maintained the price of Flex's common stock and

28  operated as a fraud or deceit on Class Period purchasers of Flex common stock by failing to

disclose and misrepresenting Flex's progress in ramping up the Company's Nike business, the manufacturing issues that the Company was experiencing which were preventing it from meeting its production targets, and the Company's inability to hit breakeven by the end of FY 2018, as detailed herein.

223. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Flex common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Flex stock at the artificially inflated prices at which it traded during the Class Period.

224. The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between July 27, 2017 and October 25, 2018. During this corrective disclosure period, Flex's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Flex's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 25, 2018 that the full truth was known to the market, such that there was no longer any artificial inflation in Flex's stock price attributable to the fraud.

225. The declines in Flex's stock price during the corrective disclosure period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

226. As a result of their purchases of Flex common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Flex common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $19.71 per share on January 18, 2018.

227. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Flex's business and prospects. As the truth about the Company and the extent of the fraud were revealed to the market, the price of Flex common stock fell significantly.

1   These declines removed the inflation from the price of Flex common stock, causing real economic

2   loss to investors who had purchased Flex common stock during the Class Period.

3       **A.      July 27, 2017 – First Partial Disclosure/Materialization of the Risk**

4       228.  On July 27, 2017, the relevant truth and foreseeable risks concealed by Defendants'

5   misconduct and their false representations and omissions during the Class Period were revealed

6   and/or partially materialized after the close of trading, in connection with Flex's release of its

7   financial results for the first quarter of FY 2018.  On that date, Defendants partially revealed that

8   they were having difficulties in the execution of the Nike contract when they disclosed that the

9   contract was more expensive than expected, driving heavier losses than previously expected.

10      229.  Defendant Collier revealed that Flex had seen "elevated levels of costs to support our

11  strategic partnership with Nike" which were "higher than anticipated and had an effect of

12  pressuring our profitability to the low end of our guidance ranges."

13      230.  Defendant McNamara provided more explanation of why the CTG segment's

14  reported revenues and margins were significantly lower than market expectations, noting that

15  "[f]iscal 2018 continues to be the investment increase phase in this business, with significant

16  losses" which "will likely persist throughout the year, as we operationalize our processes and

17  expand capacity to position ourselves to scale up revenue over the coming quarters and move into

18  profitability in fiscal 2019."  He further revealed that "we posted our CTG results with Nike

19  included, which is 4.2% this quarter, so it kind of gives you an idea of the amount of money we're

20  spending.  I don't want to go into specifics of what that's going to look like, but we expect heavy

21  investment over the next two quarters."

22      231.  The July 27, 2017 disclosure that Flex was seeing greater losses on the Nike contract

23  than the market had been previously been made aware of was a foreseeable consequence of, and

24  within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning

25  the manufacturing issues that were plaguing the Nike contract and preventing it from meeting its

26  production targets, which would render the entire project not commercially viable.  Moreover, the

27  July 27, 2017 disclosure revealed new information that Defendants' misstatements, omissions and

28  fraudulent course of conduct previously concealed and/or obscured from the market.  This

disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the trajectory and status of the Nike contract, including that the Nike contract was completely aligned with the production curve and that it was on track to breakeven by the end of FY 2018.

232. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Flex common stock declined by $0.80 per share, or 4.7 percent, to close at $16.29 per share on July 28, 2017, on unusually high trading volume of over 12 million shares.

233. However, despite this partial disclosure of adverse news which removed some of the artificial inflation in Flex's stock price, its stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded that the Nike contract was not on the linear track to profitability. Instead, Flex informed investors that the "biggest driver" of Flex's increased costs were attributable *only* to "moving into a brand new facility" in Guadalajara, Mexico, and reassured the market that the losses would come to an end at that point because the "transition into that facility will be complete by October [2017]." Flex further assuaged investors about the production ramp and profitability of the contract by March 2018 by stating that it had "a whole roadmap of process changes that will yield results, going into the new facility, the natural learning curve and the people coming along, between all those things, we do expect it to move into a break-even situation by the end of our fiscal year."

**B.     April 26, 2018 – Second Partial Disclosure/Materialization of the Risk**

234. On April 26, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized after the close of trading, in connection with Flex's release of its financial results for the fourth quarter of FY 2018. On that date, the Company disclosed that the Nike contract had failed to breakeven exiting the fourth quarter of FY 2018 despite its statements to the contrary throughout the Class Period—and as recently as just a few weeks prior—and that profitability on the Nike contract would be delayed for up to an additional year. During the FY 2018 earnings call on April 26, 2018, Flex admitted that the trajectory Defendants

1   had been publicly touting to the market was not based in reality.   Defendant McNamara

2   announced that the target of breaking even by the end of March 2018 had not been met.

3        235.   The April 26, 2018 disclosure that the Nike contract did not achieve breakeven at the

4   end of FY 2018 was a foreseeable consequence of, and within the zone of risk concealed by, the

5   Defendants' misrepresentations and omissions concerning the manufacturing issues that were

6   plaguing the Nike contract and preventing it from meeting its production targets, which would

7   render the entire project not commercially viable.   Moreover, the April 26, 2018 disclosure

8   revealed new information that Defendants' misstatements, omissions and fraudulent course of

9   conduct previously concealed and/or obscured from the market.   This disclosure partially (but

10  incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior

11  misstatements and omissions surrounding the trajectory and status of the Nike contract, including

12  Defendants' consistent statements that the Nike contract was on track to breakeven by the end of

13  FY 2018.

14       236. As a direct and proximate result of this partial corrective disclosure and/or

15  materialization of foreseeable risks concealed by Defendants' fraud, the price of Flex common

16  stock declined by $3.61 per share, or 21.7 percent, to close at $13.03 per share on April 27, 2018,

17  on unusually high trading volume of more than 35 million shares.

18       237.   Analysts attributed the 21.7% decline in Flex's stock to the revelation that the Nike

19  contract had failed to breakeven.   For example, Deutsche Bank published a report on Flex titled

20  *F4Q-18 results: step up in investments derail near-term profitability* noting: "Impressive growth

21  and profitability in FLEX's IEI and HRS segments were overshadowed by disclosure that the Nike

22  deal is still unprofitable, and is not expected to break-even until F3Q-19," despite the fact that

23  "[t]he bull thesis [on Flex] has largely been anchored around the benefits of the Nike partnership

24  and FLEX's ability to earn at least $1.80 [per share] in FY-20."   Deutsche Bank further

25  acknowledged that "[w]hile mgmt expects Nike-related losses to narrow linearly over the next six

26  months, the program is not expected to be profitable until F3Q-19 when production volumes ramp

27  up."

28

238.  However, despite this partial disclosure of adverse news which removed some of the artificial inflation in Flex's stock price, its stock price remained artificially inflated after this announcement as Defendants continued to paint the picture of a steady trajectory to profitability on the Nike contract, reassuring the market that they would be profitable in the second half of fiscal year 2019.  Instead, Defendants blamed the failure to breakeven only on the lack of "design content" provided by Nike that could run on the automated lines at the new Guadalajara factory, claiming Nike had now released a full set of products and the Company was beginning to ramp up production over the course of the next year to get to profitability.  Defendants made no mention of the fact that the Company had and still was experiencing significant manufacturing issues resulting in the Company's inability to make enough shoes to breakeven.

### C.      October 25, 2018 – Final Disclosure/Materialization of the Risk

239. On October 25, 2018, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized.  On that date, Defendants disclosed that the Company was immediately winding down the manufacturing operations with Nike because the Company was "unable to reach a commercially viable solution" for the project—a complete reversal of what Defendants had been touting throughout the Class Period.  At the same time, Defendants also announced the abrupt—and completely unanticipated—retirement of Defendant McNamara, who just a few months earlier announced that he was taking "direct ownership for [the] Nike operations to ensure its operational success."

240.  The October 25, 2018 disclosures that the Nike contract was being cancelled because it was not a "commercially viable solution" and that Defendant McNamara was retiring were foreseeable consequences of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions concerning the manufacturing issues that were plaguing the Nike contract and preventing it from meeting its production targets.  Moreover, the October 25, 2018 disclosures revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior

misstatements and omissions surrounding the trajectory and status of the Nike contract, including Defendants' consistent statements since the failure of the contract to breakeven in March 2018 that the opportunity for Flex remained unchanged and that the contract would get into profitability in the second half of fiscal year 2019.

241.  On this shocking news, the price of Flex stock fell precipitously by $3.82 per share, or more than 35%, to close at $7.09 per share on October 26, 2018, on unusually high trading volume of more than 70 million shares.  Flex stock fell another 2.12% on Monday, October 29, dropping $0.15 to close at $6.94, on unusually high trading volume of over 31 million shares. Analysts directly connected the stock price decline to the disclosure of the winding down and ultimate cancellation of the Nike contract, and the resignation of Defendant McNamara as CEO. On October 29, 2018, J.P. Morgan published a report on Flex stating:

> ***Mostly investors are appalled at how quickly the NIKE partnership went south given that FLEX CEO [sic] was touting its strategic importance and positive momentum at the analyst day in May 2018.***  His retirement might yield a sense of relief but several investors are uneasy about the leadership vacuum and they are looking for the next shoe to drop.

242. Similarly, a November 13, 2018 analyst report from RBC confirmed from a conversation with Defendant Kessel on the same day that Flex was unable to manage the Nike contract: "While FLEX was making improvements in [the Nike contract], they were unable to reach an agreement on how to sustainably manage it from a profit standpoint."

243.  Each decline in the price of Flex common stock, as detailed above, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Flex common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

244.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of

Flex common stock and the subsequent significant decline in the value of Flex common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

245. The market for Flex common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 4,075,100 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Flex's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased Flex common stock relying upon the integrity of the market relating to Flex common stock and suffered economic losses as a result thereof.

246. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' misrepresentations artificially inflating Flex's stock price and the subsequent significant decline in the value of Flex common stock when the truth was revealed after the markets closed on July 27, 2017, April 26, 2018, and October 25, 2018.

247. The declines in Flex's common stock price on July 28, 2017, April 27, 2018, and October 26, 2018 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the markets closed on July 27, 2017, April 26, 2018, and October 25, 2018.  The timing and magnitude of Flex's stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct. Indeed, on the same day that Flex's common stock share price closed down over 35%, the Standard & Poor's 500 Index and Dow Jones Industrial Index decreased 1.73% and 1.19%, respectively.  Moreover, there was no news about Flex, other than the disclosures in the July 27, 2017 press release and earnings call, the April 26, 2018 press release and earnings call, and the October 25, 2018 press release and earnings call that could fully explain the Company's stock price declines on July 28, 2017, April 27, 2018, and October 26, 2018.

## VIII.   ADDITIONAL INDICIA OF SCIENTER

248.  Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Flex's and the Individual Defendants' materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts:

### A.      The Nike Contract Was Critical To Flex's Core Operations

249.  *First*, the Individual Defendants' knowledge of the status of the Nike contract and its profitability can be inferred because these facts were critical to Flex's core operations.  In fact, the Nike contract was so important to Flex that its executives, particularly Defendants Dennison, McNamara, and Collier, intimately collaborated with Nike's senior leadership throughout the Class Period to discuss critical facts relating to the contract from the vision, business model, and financial return model for the contract to the designs for the shoes to be manufactured.

250.  Notably, both before and throughout the Class Period, the Individual Defendants touted the importance of the Nike contract to Flex's business model and future success.  As early as November 10, 2016, Defendant Dennison noted that the Nike contract was "[h]ugely important" to Flex, and that the Company "see[s] it as one of our top customers in the Company on a go forward basis."  Defendant Collier echoed these sentiments, noting that the Nike contract was "[r]eally changing the complexity of [t]his business and the complexion of Flex in total," such that "it's going to be a top 10 customer in a couple of years, and it's a $1 billion piece of business" for them going forward.

251.  Defendants continued to emphasize the importance of the Nike contract to Flex's business going forward with Defendant Collier stating during a February 15, 2017 conference that Nike was "a real cornerstone, a real foundational element for Flex in the future."  And during an earnings call on July 27, 2017, Defendant McNamara described the Nike contract as a

"transformational business opportunit[y]" and a "strategic partnership" which would last for decades.

252. Even after the Company disclosed that it had failed to breakeven as it had consistently promised investors, Defendants continued to trumpet the partnership with Nike and the importance of the Nike contract to Flex.  As Defendant McNamara told investors during Flex's May 10, 2018 Investor Day, "Nike is obviously a really, really big deal for us."  Defendant Dennison echoed this, stating that the Nike contract was an "almost limitless revenue growth opportunity" that was "critically important for [Flex] to be successful" and for Flex's "long-term importance."

253. That the Nike contract was one of Flex's core operations during the Class Period is further demonstrated by analysts' constant focus on the progress and profitability of the Nike contract up until Defendants disclosed that Flex was exiting the project.  As one analyst noted during a conference on September 6, 2017, "literally, almost every discussion I have on the phone with investors also brings up the word Nike."

254. Thus, knowledge of the status and profitability of the Nike contract—a partnership that was a "critically important" and "foundational element for Flex"—can therefore be imputed to the Individual Defendants.

**B.**     **Defendants' Statements Support a Strong Inference of Scienter**

255. *Second*, as discussed above, Defendants spoke at length during the Class Period about the Company's ability to "*be at breakeven or better by the end of the [fiscal] year*," and, subsequently, after the Company's failure to achieve breakeven by that date, its ability to "*achiev[e] our target for profitability during the second half of fiscal 2019*."

256. These false and misleading statements, and others like it, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing about the manufacturing problems at the Guadalajara factory and Flex's consistent failure to meet production targets necessary to achieve breakeven and ultimately render the Nike contract commercially viable.  Accordingly, Defendants breached their duty under the federal securities

laws by speaking on these topics and failing to fully disclose all relevant material information while doing so.

257. During the Class Period, each of the Defendants unambiguously assured investors that the Nike contract would hit breakeven by the end of FY 2018, yet none of them relayed to investors that the Nike contract was actually experiencing significant manufacturing issues that were making it impossible to meet production targets and ultimately achieve breakeven and profitability on the contract.  For example, on May 10, 2017, Flex hosted the May 2017 Investor Day.  During that conference, Defendant Dennison spoke at length about the Nike contract, stating that Flex "*will be at breakeven or better by the end of the year* as we've said before."  Likewise, during the September 6, 2017 Citi Conference, Defendant Collier stated that "*we anticipate, as we exit this year, being at a breakeven, which allows us to see some real good accretion into EPS into fiscal '19 and beyond*."

258. During the January 25, 2018 Earnings Call, Defendant McNamara spoke about the impact that moving into the Guadalajara factory was having and how it was driving the breakeven trajectory that was just a few months away: "*This move improved efficiency and helped reduce operating losses in line with expectations.  Our objectives of moving this project towards the breakeven level exiting our Q4 remains unchanged.*"  And at the February 14, 2018 Goldman Sachs Conference, Defendant Kessel continued to inform the market of the Company's ability to breakeven on the Nike contract, stating in response to an analyst question that "*we haven't made any changes to our view on Nike*, and really the most important thing for us is getting that business to breakeven . . . . *Q4 is where we're focusing on breaking even as we exit the year*."

259. Even after failing to achieve breakeven in fiscal year 2018, Defendant McNamara continued to assure investors that "*We remain confident achieving our target for profitability during the second half of fiscal 2019*."

260. By repeatedly insisting first, that the Nike contract was on the linear track to profitability and would breakeven by the close of fiscal year 2018 and later, that it would attain profitability in the second half of fiscal year 2019, Defendants either: (1) knew that the Company was experiencing significant manufacturing issues on the Nike contract which were preventing it

from meeting the production targets that were necessary to ultimately breakeven and then achieve profitability; or (2) were reckless in not knowing or investigating that this was the case. Under either scenario, there is a strong inference that Defendants made these statements with scienter.

### C. Defendants Dennison and McNamara Were Directly in Charge of the Nike Contract

261. *Third*, Defendants Dennison and McNamara were directly in charge of the Nike business throughout the Class Period and thus had intimate knowledge of, or were reckless in not knowing, the expectations, timelines, and the status and/or progress of the ramp-up.

262. In this regard, Defendants McNamara and Dennison regularly visited the Nike operations in Guadalajara, Mexico during the Class Period. As CW6 stated, the Company used weekly production metrics for the manufactured shoes. When the Company began to see that these metrics were not being met in 2017, McNamara and Dennison would visit the Guadalajara factory on a bi-monthly basis and attend meetings with several of the engineers to discuss these production problems and attempt to remedy them. CW5 confirmed that McNamara traveled to the factory for meetings regarding the Nike contract. Similarly, CW2 participated in daily meetings to discuss Flex's production issues on the Nike project, which Dennison would attend when he was in Guadalajara.

263. Defendant Dennison, in particular, worked intimately with Nike throughout much of the Class Period, appearing as the face of the Nike contract at Flex's May 2017 Investor Day, and with Nike's CEO Eric Sprunk at Flex's May 2018 Analyst & Investor Day. During the May 2018 Investor Day, shortly after Flex announced its failure to breakeven in March 2018, Defendant Dennison explained his close relationship with Nike and with Sprunk specifically, stating that "[w]e love this relationship. This partnership is unlike any other partnership we have at Flex and a testament is that you're [Sprunk] here with me in a difficult period to explain kind of the future and the benefits and value of this business."

264. Then, shortly after Defendant Dennison's abrupt departure from the Company in the summer of 2018, Defendant McNamara announced to investors that he had personally "taken direct ownership for [Flex's] Nike operations to ensure its operational success." In that position of

"direct ownership" over the Nike contract, Defendant McNamara knew, or was reckless in not knowing the status of the Nike contract, including Flex's timeline for its Nike ramp-up, its trajectory for breaking even on the Nike business by the end of FY 2018, and its ultimate profitability.

**D.      The Timing and Circumstances of Defendants Dennison and McNamara's Departures Support a Strong Inference of Scienter**

265.   *Fourth*, the timing and circumstances of the resignations of Defendants McNamara and Dennison, key executives involved in the Nike contract during the Class Period, is highly suspicious.   That these resignations are temporally connected to disclosures of the Company's fraud further supports that inference.

266.   Throughout most of the Class Period, Defendant Dennison, as President of Flex's CTG group, was the leader of the Nike contract at Flex who represented the project at both of Flex's Investor Day Conferences during the Class Period.   But shortly after the Company's admission on April 26, 2018 that it had failed to hit breakeven at the end of FY 2018, as it had consistently promised investors throughout the Class Period, Defendant Dennison surreptitiously resigned from the Company, without any warning or public announcement and explanation. Given Dennison's heavy involvement in and control over the Nike contract, the timing and circumstances of his departure after over 20 years with the Company supports a strong inference of scienter.

267.   Defendant McNamara's sudden and unannounced departure after more than two decades with Flex similarly raises a strong inference of scienter.   McNamara, who had only three months earlier announced that he was taking "direct ownership" of the Nike contract to ensure its "operational success," suddenly resigned from the Company *on the same day* that the Company disclosed that the Nike partnership that Flex had trumpeted to investors as being critically important to the Company was abruptly terminated.   He had previously given no public indicia that he would retire, the Company had no succession plan in place, and as one market analyst noted, *see supra* ¶ 219, there did "not seem to be any obvious choices for a replacement from the existing senior management team."

268. On December 24, 2018, Flex published a Form 8-K with the SEC, detailing Defendant McNamara's resignation from the Company and stating: (1) that he would not be eligible for any further quarterly or annual bonuses; (2) that any unvested deferred compensation would be forfeited; and (3) that he had agreed to provide Flex with a "general release."

269. As disclosed in Flex's July 5, 2018 Proxy Statement, such quarter or annual bonus payments "are based entirely on achievement of financial performance objections," which metrics include revenue growth targets, adjusted operating targets, return on invested capital targets, and adjusted earnings per share targets.  Bonuses are set at a percentage of the base salary, based on the executive's level of responsibility, with quarterly bonuses ranging from 0% of a base salary to a maximum of 200% and annual bonuses ranging from 0% of the base salary to a maximum of 300%.

270. That McNamara was foreclosed from receiving any further bonuses is particularly surprising given that Flex's revenue gains during FY 2019 demonstrate that he had likely surpassed the "revenue growth targets" metric that he had achieved the prior year, and for which he had been awarded an annual bonus of $2,232,217.

271. The Company's decision to not award any bonus to Defendant McNamara, despite the higher revenue growth achieved under McNamara's leadership in FY 2019, and in conjunction with his abrupt resignation on the immediate heels of the failure of the Nike contract, even further supports an interference of scienter.

## IX.    CONTROL PERSON ALLEGATIONS

272. Defendants McNamara, Collier, Dennison, and Kessel, by virtue of their high-level positions at Flex, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

273. Defendants McNamara, Collier, Dennison, and Kessel, as senior executive officers of Flex, and McNamara as a director of Flex – a publicly held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws – each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Flex's publicly-traded common stock would be based on accurate information. Defendants McNamara and Collier each violated these requirements and obligations during the Class Period.

27. Defendants McNamara, Collier, Dennison, and Kessel, because of their positions of control and authority as senior executive officers of Flex, and McNamara as a Flex director, were able to and did control the content of Flex's SEC filings, press releases, and other public statements issued by or on behalf of Flex during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants McNamara and Collier are responsible for the accuracy of the public statements alleged herein.

274. Defendants McNamara, Collier, Dennison, and Kessel are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Flex common stock by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Flex's business, operations, and management and execution of customer contracts, and the intrinsic value of Flex's common stock; and caused Lead Plaintiff and members of the Class to purchase Flex common stock at artificially inflated prices.

## X.   CLASS ACTION ALLEGATIONS

275. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased the publicly traded common stock of Flex during the Class Period and were damaged thereby. Excluded from the

Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Flex during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Flex's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

276. The members of the Class are so numerous that joinder of all members is impracticable. According to its quarterly and annual reports filed with the SEC, during the Class Period, Flex had approximately 526 million to 535 million shares of common stock outstanding and was actively traded on the NASDAQ under the ticker symbol "FLEX." While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Flex and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

277. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

278. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

279. Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a)     Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

1       (b)     Whether the statements Defendants made to the investing public during the

2  Class Period contained material misrepresentations or omitted to state material information;

3       (c)     Whether, and to what extent, the market price of Flex common stock was

4  artificially inflated during the Class Period because of the material misstatements alleged herein;

5       (d)     Whether Defendants acted with the requisite level of scienter;

6       (e)     Whether Defendants McNamara, Collier, Dennison, and Kessel were

7  controlling persons of Flex; and,

8       (f)     Whether the members of the Class have sustained damages as a result of the

9  conduct complained of herein, and if so, the proper measure of such damages.

10     280. A class action is superior to all other available methods for the fair and efficient

11  adjudication of this controversy because, among other things, joinder of all members of the Class

12  is impracticable.  Furthermore, as the damages suffered by individual Class members may be

13  relatively small, the expense and burden of individual litigation make it impossible for members of

14  the Class to individually redress the wrongs done to them. There will be no difficulty in the

15  management of this action as a class action.

16  **XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
MARKET DOCTRINE**

17

18     281. To the extent that Lead Plaintiff alleges that Defendants made affirmative

19  misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-

    on-the-market doctrine in that, among other things:

20

21       (a)     Defendants made public misrepresentations or failed to disclose material

    facts during the Class Period;

22

23       (b)     the omissions and misrepresentations were material;

24       (c)     the Company's securities traded in an efficient market;

25       (d)     the misrepresentations alleged would tend to induce a reasonable investor to

    misjudge the value of the Company's securities;

26

27

28

1      (e)     Lead Plaintiff and other members of the Class purchased Flex's securities

2 between the time Defendants misrepresented or failed to disclose material facts and the time the

3 true facts were disclosed, without knowledge of the misrepresented or omitted facts;

4      (f)     Flex stock met the requirements for listing and were listed and actively

5 traded on the NASDAQ, a highly efficient and automated market;

6      (g)     As a regulated issuer, Flex filed periodic public reports with the SEC and

7 the NASDAQ;

8      (h)     Flex regularly communicated with public investors via established market

9 communication mechanisms, including regular dissemination of press releases on the national

10 circuits of major newswire services and other wide-ranging public disclosures, such as

11 communications with the financial press and other similar reporting services;

12      (i)     Flex was followed by numerous securities analysts employed by major

13 brokerage firms including, but not limited to, RBC, UBS, J.P. Morgan, Goldman, Deutsche Bank,

14 Craig-Hallum, Raymond James, Argus, Macquarie, Bank of America, Cross Research LLC,

15 Citigroup, and Needham & Company, all of which wrote reports that were distributed to the sales

16 force and certain customers of their respective brokerage firm(s) and that were publicly available

17 and entered the public marketplace; and

18      (j)     There were market makers for Flex's common stock during the Class

19 Period, including but not limited to J.P. Morgan, UBS, Craig-Hallum, Deutsche Bank, and RBC.

20    282. As a result of the foregoing, the market for Flex's securities promptly digested

21 current information regarding Flex from publicly available sources and reflected such information

22 in Flex's securities price(s).  Under these circumstances, all persons and entities who purchased

23 Flex's common stock during the Class Period suffered similar injuries through their purchase of

24 Flex at artificially inflated prices and thus, the presumption of reliance applies.

25    283. The material misrepresentations and omissions alleged herein would tend to induce a

26 reasonable investor to misjudge the value of Flex's common stock.

27    284. Without knowledge of the misrepresented or omitted material facts alleged herein,

28 Lead Plaintiff and other members of the Class purchased shares of Flex's common stock between

1  the time Defendants misrepresented or failed to disclose material facts and the time the true facts
2  were disclosed.

3      285.  To the extent that the Defendants concealed or improperly failed to disclose material
4  facts with respect to Flex's business, Lead Plaintiff is entitled to a presumption of reliance in
5  accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

6  **XII.   NO SAFE HARBOR**

7      286.  The statutory safe harbor provided by the PSLRA for forward-looking statements
8  under certain circumstances does not apply to any of the materially false and misleading
9  statements alleged in this pleading.  First, many of the statements alleged to be false and
10 misleading relate to historical facts or existing conditions.  Second, to the extent any of the
11 allegedly false and misleading statements may be characterized as forward-looking, they were not
12 adequately identified as "forward-looking" statements when made.  Third, any purported forward-
13 looking statements were not accompanied by meaningful cautionary language because the risks
14 that Defendants warned of had already come to pass.

15     287.  To the extent any statements alleged to be false and misleading may be construed to
16 discuss future intent, they are mixed statements of present or historical facts and future intent and
17 are not entitled to PSLRA safe-harbor protection – at least with respect to the part of the statement
18 that refers to the present.

19     288.  In addition, the PSLRA imposes an additional burden on oral forward-looking
20 statements, requiring Defendants to include a cautionary statement that the particular oral
21 statement is a forward-looking statement, and that "actual results might differ materially from
22 those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants
23 failed to both identify certain oral statements as forward-looking and include the cautionary
24 language required by the PSLRA.

25     289. Furthermore, Defendants did not accompany their statements with meaningful
26 cautionary language identifying important factors that could cause actual results to differ
27 materially from any results projected.  To the extent Defendants included any cautionary language,
28 that language was not meaningful because any potential risks identified by Defendants had already

passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Flex was not on a timely trajectory to having the Nike contract become profitable and that Flex was encountering material roadblocks to having the Nike contract become profitable or commercially viable.

290.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Flex who knew that the statement was false when made.

## XIII.   CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

291.  Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

292.  This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

293.  As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading, and carried out a plan, scheme and course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Flex common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Flex common stock at artificially inflated prices.

294. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

295. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Flex common stock during the Class Period.

296. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Flex common stock, Lead Plaintiff and other members of the Class purchased Flex common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Flex common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Flex common stock declined precipitously and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Flex common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

297. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against Individual Defendants McNamara, Collier, Dennison, and Kessel**

298. Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

1     299. This Count is asserted pursuant to Section 20(a) of the Exchange Act against

2 Defendants McNamara, Collier, Dennison, and Kessel.  Defendants McNamara, Collier,

3 Dennison, and Kessel had control over Flex and made the material false and misleading statements

4 and omissions on behalf of Flex within the meaning of Section 20(a) of the Exchange Act as

5 alleged herein. By virtue of their executive positions, as alleged above, Defendants McNamara,

6 Collier, Dennison, and Kessel had the power to influence and control and did, directly or

7 indirectly, influence and control the decision-making of the Company, including the content and

8 dissemination of the various statements which Lead Plaintiff contends were false and misleading.

9 Defendants McNamara, Collier, Dennison, and Kessel were provided with or had unlimited access

10 to the Company's internal reports, press releases, public filings, and other statements alleged by

11 Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the

12 ability to prevent the issuance of the statements or cause them to be corrected.

13     300. In particular, Defendants McNamara, Collier, Dennison, and Kessel had direct

14 involvement in and responsibility over the day-to-day operations of the Company and, therefore,

15 are presumed to have had the power to control or influence the particular transactions giving rise

16 to the securities violations as alleged herein.

17     301.  By reason of such wrongful conduct, Defendants McNamara, Collier, Dennison, and

18 Kessel are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result

19 of Defendants McNamara, Collier, Dennison, and Kessel's wrongful conduct, Lead Plaintiff and

20 the other members of the Class suffered damages in connection with their purchases of the

21 Company's shares during the Class Period.

22 **XIV.   PRAYER FOR RELIEF**

23     WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

24     A.     Determining that this action is a proper class action, and certifying Lead Plaintiff as

25 a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

26     B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class

27 members against all Defendants, jointly and severally, for all damages sustained as a result of

28 Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1       C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred

2   in this action, including counsel fees and expert fees; and

3       D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

4   Court.

5   **XV.    JURY DEMAND**

6       Lead Plaintiff demands a trial by jury.

Dated: November 8, 2019

**LABATON SUCHAROW LLP**

By: */s/ James W. Johnson*

JAMES W. JOHNSON (*admitted pro hac vice*)
jjohnson@labaton.com
MICHAEL H. ROGERS (*admitted pro hac* vice)
mrogers@labaton.com
MARISA N. DEMATO (*admitted pro hac vice*)
mdemato@labaton.com
140 Broadway
New York, New York 10005
Tel: (212) 907-0700

*Counsel for Lead Plaintiff National Elevator
Industry Pension Fund and Lead Counsel for
the Proposed Class*

1

## PROOF OF SERVICE

2          I hereby certify that on November 8, 2019, a copy of the foregoing was filed electronically.

3    Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

4    filing system as indicated on the Notice of Electronic Filing.   Parties may access this filing

5    through the Court's CM/ECF System.  No parties have requested manual service.

6

7                                          /s/ *Michael H. Rogers*

8                                          Michael H. Rogers

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28