United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DAVID KIPLING, et al.,

              Plaintiffs,

     v.

FLEX LTD., et al.,

              Defendants.

Case No. 18-CV-02706-LHK

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE**

Re: Dkt. No. 128

Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff" or "National Elevator"), individually and on behalf of all other persons similarly situated, alleges that Defendants Flex Ltd. ("Flex"), Michael M. McNamara, Christopher E. Collier, Michael C. Dennison, and Kevin Kessel (collectively, "Defendants") violated federal securities laws. Before the Court is Defendants' motion to dismiss. ECF No. 128 ("Mot."). Having considered the parties' briefing,[1] the relevant law, and the record in this case, the Court GRANTS Defendants' motion to dismiss without prejudice.

---

[1] Both parties use footnotes excessively. In particular, Defendants frequently use nearly half of an entire page for footnotes. These footnotes enable the parties' briefs to circumvent the page limits set forth in the Civil Local Rules and detract from the parties' arguments. *See* Civ. L.R. 7-2(b) (setting forth page limits).

United States District Court
Northern District of California

## I.      BACKGROUND

### A.  Factual Background

#### 1.  The Parties

Plaintiff National Elevator is a multiemployer pension plan as defined in sections 3(2)(A) and 3(37) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(2)(A) and 1002(37).  ECF No. 125, Consolidated Class Action Complaint ("Compl.") ¶ 35.  Plaintiff "purchased Flex securities" and was allegedly damaged by Defendants' misrepresentations and omissions.  *Id.*  Plaintiff seeks to represent a class "of all persons and entities who, during the period from January 26, 2017 to October 25, 2018, inclusive (the 'Class Period'), purchased the publicly traded common stock of Flex Ltd."  *Id.* ¶ 1.

Defendant Flex is incorporated in Singapore and maintains offices in San Jose, California.  *Id.* ¶ 36.  Flex's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "FLEX."  *Id.*   Defendant Michael M. McNamara ("McNamara") served as the CEO of Flex and a member of its Board of Directors until December 31, 2018.  *Id.* 37.  Defendant Christopher E. Collier ("Collier") serves as the CFO of Flex.  *Id.* 38.  Defendant Kevin Kessel ("Kessel") serves as the Vice President of Investor Relations and Corporate Communications of Flex.  *Id.* 39.  Defendant Michael C. Dennison ("Dennison") served as the President of Flex's Consumer Technology Group ("CTG").  *Id.* 40.  Defendant Dennison's employment with Flex ended in approximately July or August 2018.  *Id.*

#### 2.  Flex's Business

Plaintiff alleges Flex is a design, engineering, manufacturing, and supply chain firm, though Plaintiff contends that Flex is and always was principally in the business of electronics manufacturing services.  *Id.* ¶¶ 47, 48.  Plaintiff alleges that Flex is divided into four business segments: Consumer Technologies Group ("CTG"), which includes consumer-related businesses in connected living, wearables, gaming, augmented and virtual reality, fashion, and mobile devices; Communications & Enterprise Compute ("CEC"), which includes Flex's telecom, networking, and server and storage business; Industrial & Emerging Industries ("IEI"), which

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

includes Flex's energy and metering, semiconductor tools and capital equipment, office solutions, household industrial and lifestyle, industrial automation and kiosks, and lighting businesses; and High Reliability Solutions ("HRS"), which includes Flex's medical, automotive and defense and aerospace businesses. *Id.* ¶ 49.

At some point in 2015, in an effort to expand its business beyond electronic manufacturing, Flex rebranded from "Flextronics International" to its current name, Flex.  *Id.* ¶ 51. Flex also embraced a strategy that Flex dubbed "Sketch-to-Scale," a term that Flex trademarked. *Id.*  Under the Sketch-to-Scale strategy, Flex provides its own in-house design engineers to customers with a view towards helping take a product idea or concept ("sketch") to a final manufactured product ("scale").  *Id.* ¶ 52.  This process purportedly allows Flex to become involved in designing and incorporating product specifications that are tailored to Flex's established manufacturing and supply chain operations which then allows Flex to manufacture and ship the product more efficiently (and ostensibly generate more profits for Flex and its customers). *Id.*

### 3.  The Nike Contract

In October 2015, Flex announced that it had entered into a contract with Nike to manufacture shoes (the "Nike contract").  *Id.* ¶ 54.  Plaintiff alleges that this effort was part of Nike's larger push to create regional manufacturing centers in order to permit Nike to more rapidly move from shoe design to sale.  *Id.*  Nike also sought to lower required inventory levels and reduce the amount of scrap produced by the manufacturing process.  *Id.*

Flex agreed to craft a state-of-the-art, custom-built factory in Guadalajara, Mexico that would more efficiently automate the production cycle for Nike shoes.  *Id.* ¶ 55.  In the meantime, before the new factory was built, Flex used existing electronics manufacturing facilities in Guadalajara to produce Nike shoes.  *Id.*  The CTG segment of Flex was tasked with managing the Nike contract.

Plaintiff alleges that on January 26, 2017, the first day of the Class Period, Defendant McNamara informed investors that Flex "expect[ed] to see revenue grow pretty linearly over the

United States District Court
Northern District of California

next year." *Id.* ¶ 64.  Plaintiff also alleges that Defendants repeatedly informed investors that the Nike contract would cross into profitability (or "break-even") by the close of fiscal year 2018, *i.e.* March 2018.[2]  *Id.*

However, Plaintiff contends that the Nike contract was in fact in disarray "due to a myriad of manufacturing issues that were materially impacting Flex's ability to manufacture enough shoes to come close to being on a trajectory to breakeven." *Id.* ¶ 69.  Plaintiff relies on five confidential witnesses ("CWs"), each of whom is alleged to have been an employee of Flex, to outline these manufacturing issues.

According to the CWs, Flex was unable to meet "production targets" contemplated by the Nike contract because, *inter alia*, (1) Flex did not have sufficient raw materials, *id.* ¶ 72, (2) Flex was forced to scrap product that did not meet Nike's standards, *id.* ¶¶ 72, 80, 83, and (3) Flex employees were trained in electronics, not shoe manufacturing, *id.* ¶ 86.  As to the first point, CW1 indicated that Flex faced "operational problems with suppliers of raw materials who were located in Asia." *Id.* ¶ 85.  According to CW1, "due to the lead time, travel time and additional time for other issues that could arise, Flex lost flexibility when raw material orders were canceled or changed." *Id.*

As to the second point, CW5 explained that Nike classified shoes produced by Flex as belonging to "A" class, "B" class, or "C" class.  *Id.* ¶ 81.  CW5 asserted that pursuant to the contract with Flex, Nike purchased "A" shoes as well as "a small percentage of B shoes to be sold at outlet stores." *Id.*  CW5 claimed that pursuant to the Nike contract, Flex was expected to manufacture 60,000 shoes a day, "most of them being 'A' quality and a few of 'B' quality, which Nike would buy for sale in discount outlets." *Id.* ¶ 82.  However, Flex "never produced more than 20,000 Class A sneakers per day." *Id.*  Flex was required to "'eat' all of the scrap (*i.e.*, 'C' quality sneakers and excess 'B' quality sneakers not bought by Nike)." *Id.*

As to the third point, CW1 indicated that "the people initially hired to work on the Nike

_____

[2] For financial reporting purposes, Flex uses a fiscal year that ends on March 31 of the relevant calendar year.  Compl. ¶ 50.

United States District Court
Northern District of California

project in Guadalajara did not have the right skills or abilities." *Id.* ¶ 86.  CW1 opined that "this impacted Flex's ability to operate the Guadalajara factory at full capacity or meet projections."  *Id.*

In July 2017, Plaintiff argues that Defendants "partially disclosed the existence of some manufacturing issues." *Id.* ¶ 88.  However, notwithstanding these issues, Defendants repeatedly predicted that the Nike contract would cross into profitability by the end of March 2018.  *Id.* ¶ 87.  Defendants asserted that preparation of the new Guadalajara factory was responsible for increased investment costs, but Defendants also indicated that the transition of operations into that new factory would permit the Nike contract to meet the March 2018 target for profitability.  *Id.* ¶¶ 89, 90.

On October 26, 2017, Defendant McNamara announced that the transition of operations related to the Nike contract into the new Guadalajara factory was "substantially complete."  *Id.* ¶ 95.  For the next few months, into January 2018, Defendants continued to maintain that the end of March 2018 represented the "target" for profitability of the Nike contract.  *Id.* ¶ 100.  However, according to Plaintiff, "the very same manufacturing issues that plagued the Nike contract from the start of the Nike contract continued to prevent Flex from hitting the production targets required to remain on the trajectory to breakeven."  *Id.* ¶ 102.

On April 26, 2018, Defendant McNamara announced that the Nike contract had not in fact reached profitability by the end of March 2018.  *Id.* ¶ 106.  However, Defendant McNamara indicated that the Nike contract would become profitable in the "near future," and set the updated break-even timeframe at some point in the second half of the 2019 fiscal year.  *Id.*  Defendant McNamara indicated that new "design content" from Nike had been needed to achieve profitability, but that "the purported design content problem was resolved."  *Id.* ¶ 111.

On July 26, 2018, Defendant McNamara informed investors that "he had 'taken direct ownership for [*sic*] our Nike operations to ensure its operational success.'"  *Id.* ¶ 116.  Shortly afterward, in August 2018, Defendant Dennison, the President of Flex's CTG segment, was hired by another company and ceased employment at Flex.  *Id.* ¶ 119.

On October 25, 2018, Flex announced the winding down of operations related to the Nike

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

contract effective December 31, 2018, because "[i]n recent weeks, [] it became clear that the Company [*i.e.*, Flex] would be unable to reach a commercially viable solution" as to the Nike contract.  *Id.* ¶ 120.  On that same day, Flex also announced the retirement of Defendant McNamara.  *Id.*  Plaintiff alleges that this news caused Flex's stock price to drop 35% in one day.  *Id.*

### 4.  The False or Misleading Statements

Plaintiff alleges that over the course of the foregoing events, between January 26, 2017 and July 26, 2018, Defendants made twenty-four false or misleading statements.  The Court reproduces in the table below the specific statements that Plaintiff alleges to be false or misleading (hereinafter, the "Challenged Statements"):[3]

| No. | Speaker(s) / Date / Medium | False and Misleading Statement(s) or Omissions |
|---|---|---|
| 1 | McNamara / January 26, 2017 / Press Release | "***Our Sketch-to-Scale strategy remains firmly on track*** as reflected in our third quarter performance . . . ." |
| 2 | McNamara / January 26, 2017 / Earnings Call | Defendant McNamara elaborated further by touting the early successes in the Flex-Nike partnership which supported why Flex's expectations were unchanged, including that "the innovations that [Nike is] seeing coming out of our team, that is our team, our guys and their guys, ***are probably above expectation of what they anticipated. . . . [T]he results that they're seeing are above expectations***." |
| 3 | Collier / January 26, 2017 / Earnings Call | When asked whether Flex could give "an update about the timeline" for the Flex-Nike partnership and when Flex expected "to see losses turn into breakevens," Defendant Collier responded that "as it relates to the profitability, we said all along, this is going to be a multiyear process and we're in an investment cycle right now.  ***We cross into profits in the last quarter, next year, in Q4 of fiscal 2018***." |
| 4 | Flex / February 2017 / Investor Presentation | "In 18 months, 20 inventions on the factory floor[.] Fastest new Nike ramp, 150 days from start to first ship[.] ***On track to have meaningful revenue in FY18***." |

---

[3] The statements highlighted in bold and italics represent the statements that Plaintiff alleges were knowingly and materially false and misleading and/or failed to disclose material information of which Defendants were aware or were reckless in not knowing.  ECF No. 125-1 ("App'x A") at 1 n.1.

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

| 5 | Collier / February 15, 2017 / Goldman Sachs Conference | When asked if he could confirm that the Company would crossover from investment to "profitability in the March calendar '18 quarter," Defendant Collier replied: "***Yes, correct. . . . [W]e anticipate and see profitability being achieved in Q4 next year and then sustaining that going forward.***" And while acknowledging that there would be an incremental level of cost associated with the Nike ramp, he reiterated that Flex has "***a clear line of sight and conviction around hitting profitability and sustaining profitability from that point forward . . . .***" |
|---|---|---|
| 6 | McNamara / April 27, 2017 / Earnings Call | Defendant McNamara boasted to investors that Flex was "accelerating our investments in Nike ***on the back of early automation successes***, a strong customer collaboration and broad-based opportunities." |
| 7 | McNamara / April 27, 2017 / Earnings Call | ***"We're starting to get early successes around some of the design engagements that we're having [with Nike] about reinventing how design actually occurs, some of the new technologies of the shoes, and even into the automation projects that we're seeing."*** |
| 8 | Collier / April 27, 2017 / Earnings Call | Defendant Collier reiterated that Flex was on track with the ramp of the Nike project, noting that they were "***completely aligned with the production curve . . . .***" |
| 9 | Dennison / May 10, 2017 / Investor Day | In discussing the status of the project: "[W]e've got real commits. ***We have to drive significant volume, which we're doing today.*** This has been a great solution for us, a great story for us. It continues to be a great story for us. We're going to continue to focus on this. We are committed to our numbers this year. So we're going to be at meaningful revenue in FY '18, and ***we will be at breakeven or better by the end of the year*** as we've said before." |
| 10 | McNamara / July 27, 2017 / Press Release | "***Our Sketch-to-Scale strategy remains firmly on track*** as reflected in our first quarter results . . . ." |
| 11 | McNamara / July 27, 2017 / Earnings Call | "***[O]ur expectation is always in the fiscal year we would cross-over into break-even. We still believe that's the right target and objective where we see the business heading.***" |
| 12 | Collier / September 6, 2017 / Citi Conference | When asked to confirm that the end of fiscal year 2018 is the "time line . . . for turning past loss-making to breakeven, profitable exiting at that quarter," Defendant Collier responded "***[e]xactly.***" He went on to state that: "We're moving into a customized, tailor-built facility in our Q3 that's specifically designed to optimize around the manufacturing requirements for our partner, and ***we anticipate, as we exit this year, being at a breakeven, which allows us to see some real good accretion into EPS into fiscal '19 and beyond.***" |
| 13 | Kessel / November 7, 2017 / RBC Conference | When asked "how confident we remain with the goals for March breakeven," Defendant Kessel responded, "[a]dmittedly, we did have some struggles initially in terms of Q1, in terms of the initial stages of ramping up and dealing with multiple styles of shoes before we've actually put in place the factory that we've talked about that is now as of end of [] October online. ***But in terms of the general*** |

7

| | | |
|---|---|---|
| | | *trajectory, I think we still remain very confident about the fact that we're going to be improving both performance and scaling as time goes on here . . . . [W]e still look at what we said back in May has been very much intact.*" |
| 14 | Kessel / November 14, 2017 / UBS Conference | In response to a question from an analyst about the status of the Nike project, Defendant Kessel stated: "So, we had our Investor and Analyst Day back in May and we presented a timeline back then that kind of talks about how we see Nike over the next two years to three years evolving for us. And I think at this stage, *it remains very much intact.*" |
| 15 | Collier / December 4, 2017 / Raymond James Conference | When asked by an analyst whether the move into the new Guadalajara factory was directly associated with Flex's trajectory to breaking even on the Nike project, Defendant Collier stated: "We're well on our way, we're 30 days plus into the new operation. *We see multiple signs of the accelerated scaling effects.* We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation. We've been deploying further lean manufacturing principles and *you're going to see a natural progression up as we scale that further with the target of exiting this year at breakeven.*" |
| 16 | McNamara / January 25, 2018 / Earnings Call | Defendant McNamara spoke about the impact that moving into the Guadalajara factory was having, and how it was driving the breakeven trajectory that was just a few months away now: "*This move improved efficiency and helped reduce operating losses in line with expectations. Our objectives of moving this project towards the breakeven level exiting our Q4 remains unchanged.*" |
| 17 | McNamara / January 25, 2018 / Earnings Call | When asked: "[i]s that essentially still on track? And then, as you think about calendar 2018, just remind us how do you think about revenue and perhaps some margin contribution from the Nike ramp," Defendant McNamara responded: "*Yes*. Kind of how we've been expecting this ramp to mature is that we hope to crossover into breakeven by the end of the year. *That's still our target. We still have a line of sight to that. . . .* So, these are the margin profiles that we expect, that we're driving to, that *we have a line of sight to*, and I think we will achieve." |
| 18 | Kessel / February 14, 2018 / Goldman Sachs Conference | In response to a question from a Goldman analyst regarding the March 2018 breakeven date, Defendant Kessel reiterated that Flex would breakeven on the Nike project in just a few weeks:<br><br>"*Yes, Yes*. So we haven't made any changes to our view on Nike, and really the most important thing for us is getting that business to breakeven. That's been something we've been discussing at length this entire fiscal year. Q1, for us, was kind of the peak period of investment, if you will, the biggest period of absorbing losses. Every quarter since then we've seen improvement in terms of revenue and loss shrinking. We, obviously, just finishedQ3, where again we saw |

United States District Court
Northern District of California

| | | |
|---|---|---|
| | | a further reduction in loss, further increase in revenue, and *Q4 is where we're focusing on breaking even as we exit the year.*" |
| 19 | McNamara / April 26, 2018 / Earnings Call | Rather than admit to investors that the Nike project had failed to hit breakeven because it was not on track to profitability, Defendant McNamara attributed the failure to breakeven solely on the previous lack of design content:<br><br>"The key to Nike is to have design content – shoe content that's designed to run on a highly automated line. The highly automated line that's turned on, the content has been developed, and it just needs to ramp. *So this is the key thing we need. We don't need any more optimizations of a factory. We have good factory flow. We just need the right content to run*. . . . [Y]ou have to have design content. That design content has to run on fully automated lines. We turned those fully automated lines on. They're running really well. We'll ramp up those fully automated lines over the course of the year and get to volume. *And this is what we need to get to profitability: the right shoe with the right automation system*. . . ." |
| 20 | McNamara / April 26, 2018 / Earnings Call | Defendant McNamara portrayed the issue as a past, not current problem. He reassured investors that because Nike had now provided design content, Flex was on track to achieve profitability going forward: "Most importantly, Nike has released a full set of products designed for our automation system, *which is now beginning to ramp in mass production*." |
| 21 | McNamara / May 10, 2018 / Investor Day | "*We now believe we have a way of operating that will move it to second half profitability*. So this is the – we're moving to this is the target we're trying to achieve. We've got a lot of automation that we're driving, . . . we'll begin to ramp that through the course of the year, we have a lot of content that's been designed for that system, and we're driving a numerous amount of productivity and yield items that reach all different aspects because it's a really complex problem." |
| 22 | Kessel / May 16, 2018 / J.P. Morgan Conference | In response to a question regarding the profitability of the Nike project, Defendant Kessel told investors that *"[t]he overall opportunity remains unchanged for Flex meaning that over time this should be and can be easily a $1 billion[-]plus opportunity. . . . As we go into this fiscal year, it will improve dramatically, so we talked about significant year-over-year growth, again, getting into profitability at some point in the second half of the year*." |
| 23 | McNamara / July 26, 2018 / Earnings Call | "At our Nike business, we expect to significantly increase revenue over the remainder of the year. . . . *We remain confident in achieving our target for profitability during the second half of fiscal 2019*." |
| 24 | McNamara / July 26, 2018 / Earnings Call | When asked whether the Nike project was "tracking as you had expected or are they tracking slower or faster," Defendant McNamara responded: "*I think . . . it's tracking exactly to where we thought probably 3 months ago, so we're going to have significant* |

9

United States District Court
Northern District of California

|  |  | *revenue growth this year, and we're continuing to expand productivity. We expect margins to move to profitability in the second half of the year.*" |

### B. Procedural History

On May 8, 2018, a group of Flex shareholders filed suit against Defendants Flex, Collier, and McNamara.  ECF No. 1.  On October 1, 2018, the Court then appointed Plaintiff Bristol County Retirement System ("Bristol") as lead plaintiff in the instant case.  ECF No. 37.  On November 8, 2018, Bristol filed an amended complaint that substantially altered the class allegations against Flex.  ECF No. 42.  In light of this fact, the Court vacated the appointment of lead counsel in order to re-open the appointment process.  ECF No. 74.  On September 26, 2019, the Court then appointed Plaintiff National Elevator as lead plaintiff.  ECF No. 111.

On November 8, 2019, Plaintiff filed the operative Consolidated Class Action Complaint (the "complaint").  Compl.  On December 4, 2019, Defendants filed a motion to dismiss the complaint.  ECF No. 128 ("Mot.").  On December 23, 209, Plaintiff filed an opposition.  ECF No. 130 ("Opp'n").  On January 9, 2019, Defendants filed a reply.  ECF No. 131 ("Reply").

### C. Request for Judicial Notice or Incorporation by Reference

As an initial matter, Defendants offer twenty-three exhibits that Defendants argue are subject to the Court's consideration pursuant to the doctrines of judicial notice and incorporation by reference.  ECF No. 129.  Plaintiff only opposes Defendants' request to the extent "Defendants offer Exhibits 1–23 for the truth of the matter asserted therein."  Opp'n at 2 n.3.

The Ninth Circuit recently provided guidance on the applicability of the doctrines of judicial notice and incorporation by reference in securities cases at the motion to dismiss stage.  In *Khoja v. Orexigen Therapeutics*, 899 F.3d 988 (9th Cir. 2018), the Ninth Circuit "note[d] a concerning pattern in securities cases like this one: exploiting [judicial notice and incorporation by reference] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage."  *Id.* at 998.  The Ninth Circuit explained that "Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage."  *Id.*  However, the risk of improper premature

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

1    dismissal "is especially significant in SEC fraud matters, where there is already a heightened

2    pleading standard, and the defendants possess materials to which the plaintiffs do not yet have

3    access." *Id.*

4           Defendants request that the Court take judicial notice or apply the doctrine of incorporation

5    by reference to two categories of documents: (1) transcripts from earnings calls, investor and

6    analyst conferences, and related presentations; and (2) SEC filings such as Forms 10-K, 10-Q, and

7    8-K.  ECF No. 129.  Defendants offer these documents "for the purpose of demonstrating what

8    Flex and/or its employees said to the market," and "for the purpose of providing the Court with the

9    full unabridged statements cited by Plaintiff and accompanying context regarding these

10   statements." *Id.*

11          All of the foregoing documents are public documents "the accuracy of which is not

12   reasonably subject to dispute."  *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL

13   4076437, at *1 (N.D. Cal. Aug. 27, 2018); *see Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2

14   (9th Cir. 2006) (noting that SEC filings are subject to judicial notice); *Waterford Twp. Police v.*

15   *Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018) (granting judicial notice as to

16   presentation that was "publicly available to reasonable investors at the time the defendant made

17   the allegedly false statements" (internal quotation marks omitted)).  Accordingly, the Court

18   GRANTS Defendants' request for judicial notice.  "The Court considers [these documents] in

19   evaluating the motion to dismiss for the sole purpose of determining what representations

20   [Defendants] made to the market.  The Court is not taking notice of the *truth* of any of the facts

21   asserted."  *Wochos*, 2018 WL 4076437, at *2 (emphasis in original).

22   **II.     LEGAL STANDARD**

23          **A.  Motion to Dismiss**

24          Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

25   action for failure to state a claim upon which relief may be granted.  Because Plaintiff brought the

26   instant claims in a federal securities fraud action, Plaintiff is not subject to the notice pleading

27   standards under Federal Rule of Civil Procedure 8(a)(2), which require litigants to provide "a short

28
Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

1    and plain statement of the claim showing that the pleader is entitled to relief."  Instead, Plaintiff

2    must "meet the higher, [more] exacting pleading standards of Federal Rule of Civil Procedure 9(b)

3    and the Private Securities Litigation Reform Act (PSLRA)."  *Or. Pub. Emp. Ret. Fund v. Apollo*

4    *Group Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014).

5            Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must

6    state with particularity the circumstances constituting fraud or mistake."  Plaintiffs must include

7    "an account of the time, place, and specific content of the false representations" at issue.  *Swartz v.*

8    *KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).  Rule 9(b)'s

9    particularity requirement "applies to all elements of a securities fraud action."  *Apollo Group*, 774

10   F.3d at 605.  The "PSLRA imposes additional specific pleading requirements, including requiring

11   plaintiffs to state with particularity both the facts constituting the alleged violation and the facts

12   evidencing scienter."  *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir.

13   2012).  In order to properly allege falsity, "a securities fraud complaint must . . . specify each

14   statement alleged to have been misleading, [and] the reason or reasons why the statement is

15   misleading."  *Id.* (internal quotation marks and alteration omitted).  In addition, in order to

16   "adequately plead scienter under the PSLRA, the complaint must state with particularity facts

17   giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.*

18   (internal quotation marks omitted).

19           For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations

20   in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving

21   party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

22   Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because

23   they are cast in the form of factual allegations.'"  *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir.

24   2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere "conclusory

25   allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."

26   *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).  Furthermore, "'a plaintiff may plead

27   [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . .

28

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

1    claim." *Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*,

2    60 F.3d 1234, 1239 (7th Cir. 1995)).

3    **B.  Leave to Amend**

4    Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely

5    granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate

6    decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d

7    1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted).

8    Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the

9    opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith.

10   *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III.   DISCUSSION

12   Plaintiff alleges two causes of action: (1) violation of § 10(b) of the Exchange Act and

13   Rule 10b-5 against all Defendants, and (2) violation of § 20(a) of the Exchange Act against

14   Defendants McNamara, Collier, Dennison, and Kessel.  Compl. at 75–76.  The Court addresses

15   each cause of action in turn.

16   **A.  Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

17   "To plead a claim under section 10(b) and Rule 10b-5, Plaintiff must allege: (1) a material

18   misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or

19   omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

20   causation." *Apollo Group*, 774 F.3d at 603.

21   Here, Defendants argue that Plaintiff fails to plead any material misrepresentation or

22   omission.  Specifically, Defendants claim that many of the alleged misrepresentations are

23   protected by the PSLRA's "Safe Harbor" Provision; many of the statements are nonactionable

24   statements of corporate optimism; and that Plaintiff fails to plead falsity with respect to any of the

25   alleged misrepresentations.  Mot. at 7–20.  Defendants also claim that Plaintiff fails to plead a

26   strong inference of scienter.  *Id.* at 20–24.  The Court considers these arguments in turn.

27   **1.  PSLRA Safe Harbor**

United States District Court
Northern District of California

28
13
Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

The Court begins with Defendants' PSLRA safe harbor arguments.  Under the PSLRA's "Safe Harbor" Provision, 15 U.S.C. § 78u-5(c)(1), forward-looking statements are not actionable if either (1) the statements are identified as such and accompanied by meaningful cautionary statements; or (2) the plaintiff does not prove that the statement was made with "actual knowledge . . . that the statement was false or misleading."  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (alteration omitted); *see also McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1060 (N.D. Cal. 2019) ("[I]f a forward-looking statement is not identified as a forward-looking statement or is unaccompanied by meaningful cautionary statements, then the statement is actionable only if the plaintiff proves that the forward-looking statement 'was made with actual knowledge . . . that the statement was false or misleading.'").

As an initial matter, the Court must determine which alleged misstatements attributed to Defendants are accurately characterized as forward-looking statements and therefore potentially subject to the PSLRA safe harbor.  Defendants contend that "[a]t least statements 3, 4, 5, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23, and 24 are protected forward-looking statements." Mot. at 8 n.4.  Plaintiff disagrees.  According to Plaintiff, all of these statements instead comprise "statements relating to the current status of a Company's operations."  Opp'n at 13 (emphasis in original).

The Court agrees that statements 3, 4, 5, 11, 12, 13, 14, 17, 18, 21, 22, 23, and 24 are forward-looking and hence possibly subject to the PSLRA safe harbor.  Under Ninth Circuit law, a forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues."  *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (internal quotation marks omitted).  Statements 3, 4, 5, 11, 12, 13, 14, 17, 18, 21, 22, 23, and 24 concern "financial projections" and the "future economic performance" of Flex and thus are forward-looking.

Specifically, statements 3, 4, 5, 11, 12, 13, 14, 17, 18, 21, 22, 23, and 24 address the Nike

United States District Court
Northern District of California

contract's projected profitability.  For example, Statement 3 consists of Defendant Collier's statement that "[w]e cross into profits in the last quarter, next year, in Q4 of fiscal 2018."  ECF No. 125-1 ("App'x A") at 2 (emphasis and internal quotation marks omitted).  Similarly, statement 5 consists of Defendant Collier's statement that "[w]e anticipate and see profitability being achieved in Q4 next year and then sustaining that going forward. . . .  Flex has a clear line of sight and conviction around hitting profitability and sustaining profitability from that point forward . . . ."  *Id.* at 3 (emphasis and internal quotation marks omitted)).  Statements of this nature represent paradigmatic forward-looking statements under the PSLRA.  *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face."); *see also, e.g.*, App'x A at 6 (Statement 12: "[W]e anticipate, as we exit this year, being at a breakeven, which allows us to see some real good accretion into EPS into fiscal '19 and beyond." (emphasis omitted)); *id.* at 11 (Statement 21: "We now believe we have a way of operating that will move it to second half profitability." (emphasis and internal quotation marks omitted)); *id.* at 12 (Statement 22: "[t]he overall opportunity remains unchanged for Flex meaning that over time this should be and can be easily a $1 billion[-]plus opportunity. . . .  As we go into this fiscal year, it will improve dramatically, so we talked about significant year-over-year growth, again, getting into profitability at some point in the second half of the year." (emphasis and internal quotation marks omitted)); *id.* (Statement 23: "We remain confident in achieving our target for profitability during the second half of fiscal 2019." (emphasis and internal quotation marks omitted)).

Nonetheless, Plaintiff asserts that Statements 4, 9, 11, 13, and 18 "and other similar statements" that Plaintiff does not specify are not forward-looking because they contain "*present tense* statements."  Opp'n at 13–14; *see* App'x A at 2 (Statement 4: "On track to have meaningful revenue in FY18"); *id.* at 6 (Statement 11: "[O]ur expectation is always in the fiscal year we would cross-over into break-even.  We still believe that's the right target . . . ."); *id.* at 7 (Statement 13: "[W]e still look at what we said back in May has been very much intact."); *id.* at 10

1    (Statement 18: "Q4 is where we're focusing on breaking even as we exit the year.").  Plaintiff is

2    incorrect in this argument.

3            The mere fact that a forward-looking statement contains present-tense prefatory language

4    does not remove it from the potential scope of the PSLRA safe harbor.  *See, e.g.*, *Intuitive*

5    *Surgical, Inc.*, 759 F.3d at 1058 (finding "we continue to expect dVP procedures to grow

6    approximately 40%" forward-looking); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809 (N.D.

7    Cal. 2019) (finding "[w]e believe [GDPR impacts on ads] will be relatively minor" forward-

8    looking); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1123

9    (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (similar "we believe" statement

10   forward-looking).  Indeed, as other courts have noted, every projection depends to some extent

11   "on the current state of affairs."  *Wochos v. Tesla, Inc.*, No. 17-cv-05828-CRB, 2018 WL

12   4076437, at *5 (N.D. Cal. Aug. 27, 2018).  If the Court accepted Plaintiff's argument that present

13   tense language were enough, "the distinction between present statements and forward-looking

14   statements would collapse." *Id.* (rejecting argument that company "on track" to meet projection

15   was not forward-looking).

16           Statements 9, 15, and 16 are different.  Indeed, statements 9, 15, and 16 contain forward-

17   looking portions and non-forward-looking portions.  They therefore constitute "mixed

18   statements."  For instance, in statement 9, Plaintiff points to the fact that Defendant Dennison

19   stated that "[w]e have to drive significant volume, which we're doing today," and that therefore

20   "we will be at breakeven or better by the end of the year as we've said before."  App'x A at 5.

21   The former portion of the statement is not protected by the safe harbor because it constitutes a

22   claim that Flex was "driv[ing] significant volume" at the time the statement was made.  The latter

23   statement, however, is forward-looking and potentially subject to the safe harbor.  The same is true

24   for statements 15 and 16.  *Id.* at 8 (Statement 15: "We see multiple signs of the accelerated scaling

25   effects," and "[Y]ou're going to see a natural progression up as we scale that further with the

26   target of exiting this year at breakeven"); *id.* (Statement 16: "This move improved efficiency and

27   helped reduce operating losses in line with expectations," and "Our objectives of moving this

28

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

project towards the breakeven level exiting our Q4 remains unchanged.").  The Ninth Circuit has instructed that "where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA."  *In re Quality Sys., Inc. Secs. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).  Hence, the non-forward-looking portions of statements 9, 15, and 16 are not protected by the PSLRA safe harbor.

Finally, Defendants contend that statement 19 is forward-looking.  Mot. at 8 n.4.  The Court disagrees.  Statement 19 constitutes a statement about Flex's then-contemporaneous needs in order to achieve success with the Nike contract:  "So this is the key thing we need.  We don't need any more optimizations of a factory.  We have good factory flow. We just need the right content to run . . . .  And this is what we need to get to profitability: the right shoe with the right automation system."  App'x A at 10.  Hence, statement 19 is a non-forward-looking statement.

In sum, the Court concludes that statements 3, 4, 5, 11, 12, 13, 14, 17, 18, 21, 22, 23, and 24 are forward-looking statements.  Portions of statements 9, 15, and 16 are also forward-looking. These statements are therefore subject to the PSLRA's safe harbor if the statements are accompanied by meaningful cautionary language.  The Court proceeds to consider that question.

### a.  Meaningful Cautionary Language

Defendants argue that statements 3, 4, 9, 11, 16, 17, 21, 23, and 24 were identified as forward-looking and accompanied by meaningful cautionary language when they were made. Mot. at 8.  Thus, according to Defendants, these statements are protected by the PSLRA safe harbor.  *Id.*  Plaintiff, on the other hand, contends that none of the foregoing statements was accompanied by meaningful cautionary language.  Opp'n at 14–15

The Court agrees with Defendants.  Statements 3, 4, 9, 11, 16, 17, 21, 23, and 24 were all made in the context of earnings calls and investor presentations.  App'x A at 2, 8–9, 10–13. Specifically, statements 3, 11, 16, 17, 23 and 24 were made on earnings calls, at the outset of which Defendants declared, "Today's call . . . contains forward-looking statements, which are based on current expectations and assumptions that are subject to risks and uncertainties, and

17

United States District Court
Northern District of California

United States District Court
Northern District of California

actual results could materially differ. Such information is subject to change and we undertake no obligation to update these forward-looking statements.  For a discussion of the risks and uncertainties, see our most recent filings with the Securities and Exchange Commission, including our current annual and quarterly reports." *E.g.*, ECF No. 128-2 (Jan. 2016 earnings call transcript). Similarly, statements 4, 9, and 21 were made in the course of investor presentations preceded by similar declarations.  *E.g.*, ECF No. 128-6 (May 10, 2017 Investor Day transcript) at 4 ("This meeting and these presentations contain forward-looking statements, which are based on current expectations and assumptions that are subject to risks and uncertainties, and actual results could materially differ.  Such information is subject to change and we undertake no obligation to update these forward-looking statements.  For a discussion of the risks and uncertainties, see our most recent filings with the SEC, including our current annual and quarterly reports.").

The referenced SEC filings in turn contain cautionary language regarding the risks and uncertainties that could cause Flex's results to differ materially from those in the forward-looking statements.  The SEC filings specifically noted that "[w]e may not have sufficient capacity at any given time to meet our customers' demands," "[o]ur customers may cancel their orders, change production quantities or locations, or delay production . . . .  We generally do not obtain firm, long-term purchase commitments from our customers," Flex may be subject to "difficulties in staffing and geographic labor shortages," and "[w]e may not be able to reduce costs, incorporate changes in costs into the selling prices of our products, or increase operating efficiencies as we ramp production of our products, which would adversely affect our margins and our results of operations."  *E.g.*, ECF No. 128-19 at 14, 16, 17.

These operational difficulties are of the same nature as the ones that Plaintiff alleges rendered the forward-looking statements false.  As discussed, Plaintiff specifically alleges that Defendants suffered from "significant issues with efficiencies throughout the Nike contract," "Flex's quality yield was low and thus Flex was not meeting the weekly production demand," "Flex was [] unable to acquire raw materials from Asia fast enough to manufacture the volume of shoes required," and "Flex's employees working on the Nike contract primarily came from

18

electronics backgrounds and were not trained to work on shoe manufacturing." Compl. ¶¶ 71, 83, 85, 86. Plaintiff nevertheless asserts that the cautionary language is inadequate because the language does not specifically "mention[] the concept of breakeven, the Nike contract," or "the possibility that poor quality, lack of materials, and personnel issues would result in [Flex's] failure to achieve breakeven and the cancellation of the critical Nike contract." Opp'n at 15. Plaintiff overstates the cautionary language requirement.

As an initial matter, although the SEC filings in the instant case do not use the phrase "breakeven," the filings clearly state that "[w]e may not be able to reduce costs, incorporate changes in costs into the selling prices of our products, or increase operating efficiencies as we ramp production of our products, which would adversely affect our margins and our results of operations." ECF No. 128-19 at 16. This language encompasses Flex's potential inability to achieve profitability as to a particular product—in other words, to "break-even." Further, *In re Cutera Securities Litigation*, 610 F.3d 1103 (9th Cir. 2010), is instructive. In *In re Cutera*, the defendant allegedly failed to disclose the poor performance of a sales initiative in which junior sales representatives were tasked with selling a low-priced laser. *Id.* at 1107. The Ninth Circuit held that the statement that "factors like Cutera's 'ability to continue increasing sales performance worldwide' could cause variance in the results" was sufficient to constitute meaningful cautionary language. *Id.* The Ninth Circuit did not require that the defendant specifically mention the sales initiative or product at issue. Here, too, Ninth Circuit law imposes no requirement that cautionary language specifically refer to the Nike contract or use the phrase "break-even."

Plaintiff makes two arguments that the PSLRA safe harbor nevertheless does not apply to the foregoing statements. First, Plaintiff claims that because "Plaintiff has alleged particularized facts showing that Defendants had 'actual knowledge' that the statements were materially false or misleading when made," the safe harbor cannot apply. Opp'n at 16. The Ninth Circuit has squarely foreclosed this argument. *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d at 1113 ("[T]he logical reading of the [PSLRA] is simply to take it as written—subsections (A) and (B) and their subpoints each offer safe harbors for different categories of forward-looking statements. The

19

United States District Court
Northern District of California

defendants' state of mind is not relevant to subsection (A)."). Second, Plaintiff contends that because the foregoing statements allegedly "omitted facts . . . regarding Flex's failure to meet shoe production targets due to severe operational problems," the statements are also not subject to the PSLRA safe harbor. Opp'n at 16. Plaintiff misconstrues the cited authority. The PSLRA safe harbor may not apply when a plaintiff challenges an omission of historical fact. In such a case, the challenged "omission is not 'a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items,' 15 U.S.C. § 78u-5(i)(1)(A), but rather a contemporaneous fact." *Prodanova v. H.C. Wainwright & Co., LLC*, No. LA CV17-07926 JAK (ASx), 2018 WL 8017791, at *13 (C.D. Cal. Dec. 11, 2018). Here, as discussed, the challenged statements are projections made by Defendants about the Nike contract's future profitability; that is, Defendants' claims that the Nike contract would become profitable by March 2018 or the second half of fiscal year 2019. These statements are subject to the PSLRA safe harbor. *See Intuitive Surgical*, 759 F.3d at 1058 ("The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face.").

The Court thus concludes that the foregoing cautionary language is sufficient. Hence, statements 3, 4, 11, 17, 21, 23, and 24 are subject to the PSLRA safe harbor. The same is true for the forward-looking portions of statements 9 and 16. The Court therefore GRANTS Defendants' motion to dismiss to the extent Plaintiff's claim under section 10(b) and Rule 10b-5 concerns statements 3, 4, 11, 17, 21, 23, 24, and the forward-looking portions of statements 9 and 16. The Court now turns to Defendants' argument that many of the Challenged Statements are nonactionable statements of corporate optimism.

### 2. Nonactionable Statements of Corporate Optimism

Defendants further argue that many of the allegedly false or misleading statements are not actionable because they are mere statements of corporate optimism. Indeed, according to Defendants, "[a]t least Statements 1, 2, 4, 6, 7, 8, 9, 10, 13, 15, 16, 19, and 20 are nonactionable puffery." Mot. at 10 n.7. Plaintiff responds that many of these statements were "verifiably false

20

1   when made" by Defendants.  Opp'n at 17.

2          In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of

3   'mere puffing' are not actionable material misrepresentations under federal securities laws"

4   because no reasonable investor would rely on such statements.  *In re Impac Mortg. Holdings, Inc.*,

5   554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*,

6   352 F.3d 367, 379 (9th Cir. 2003)); *In re Cutera*, 610 F.3d at 1111 ("[P]rofessional investors, and

7   most amateur investors as well, know how to devalue the optimism of corporate executives.").

8   This is because "[w]hen valuing corporations, . . . investors do not rely on vague statements of

9   optimism like 'good,' 'well-regarded,' or other feel good monikers."  *Id.*; *see also In re iPass, Inc.*

10  *Sec. Litig.*, 2006 WL 496046, at *4 (N.D. Cal. Feb. 28, 2006) (generalized statements of optimism

11  are not actionable because they are "'not capable of objective verification,'" and "'lack[] a

12  standard against which a reasonable investor could expect them to be pegged.'" (quoting

13  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

14         Thus, for example, a district court in this district has held the following statements to be

15  nonactionable statements of corporate optimism: "[w]e are very pleased with the learning from our

16  pilot launch," "so far we're getting really great feedback," and "we are very pleased with our

17  progress to date."  *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036–37 (N.D. Cal. 2012).

18  Likewise, "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales

19  gains,' and '10% to 30% growth rate over the next several years'" have been held to constitute

20  mere puffery.  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087

21  (N.D. Cal. 2005); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868–89 (N.D.

22  Cal. 2004) ("[R]un-of-the-mill" statements such as "business remained 'strong'" are not actionable

23  under § 10(b)); *In re LeapFrog*, 527 F. Supp. 2d at 1050 (vague statements such as "[t]his is going

24  to be a very big second half for us" were not actionable under § 10(b)); *City of Royal Oak Ret. Sys.*

25  *v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statements that "[b]oth

26  Verizon and AT&T are strong partners," company has "strong demand metrics and good

27  momentum" and "our demand indicators are strong, our product portfolio is robust" are

28

21

United States District Court
Northern District of California

nonactionable statements of corporate optimism).  "The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions."  *Stearns v. Select Comfort Retail Corp.*, No. 08-CV-02746 JF, 2009 WL 1635931, at *11 (N.D. Cal. June 5, 2009).

Here, the Court finds that statements 1, 2, 9, and 10 are nonactionable statements of corporate optimism.  Statements 1 and 10 both consist of statements that Flex's "Sketch-to-Scale strategy remains firmly on track."  App'x A at 1, 5.  However, the complaint specifically alleges that the "Sketch-to-Scale" strategy is "a broad[] and [] diverse strategy" that extends beyond Flex's Nike contract.  Compl. ¶ 51.  The concept of an amorphous "strategy" being "on track" is inherently subjective.  Hence, statements 1 and 10 are nonactionable statements of corporate optimism.  *See Stearns*, 2009 WL 1635931, at *11 (explaining that "vague, highly subjective claims" amount to nonactionable corporate optimism).

With respect to statement 2, Plaintiff challenges Defendant McNamara's statement that "the innovations that [Nike is] seeing coming out of our team, that is our team, our guys and their guys, are probably above expectation of what they anticipated. . . . [T]he results that they're seeing are above expectations."  App'x A at 1.  The proposition that unspecified "innovations" by Flex were "above [Nike's] expectations" is also the kind of feel-good corporate speak that is not actionable.  *See, e.g.*, *Wozniak*, 850 F. Supp. 2d at 1036–37 (explaining that assertions such as "so far we're getting really great feedback" are nonactionable corporate optimism).

The same is true as to statement 9.  Indeed, to the extent that statement 9 is not forward-looking, the statement amounts to the vague claim that Flex was "driv[ing] significant volume" in relation to the Nike contract.  App'x A at 5; *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d at 1087 (noting that "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years'" have been held to constitute mere puffery).  Statements 1, 2, 9, and 10 are tantamount to the kind of "feel-good" language that is not actionable under federal securities law.

Accordingly, the Court finds statements 1, 2, 9, and 10 to be nonactionable statements of

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

1    corporate optimism.  Thus, the Court GRANTS Defendants' motion to dismiss to the extent

2    Plaintiff's claim under section 10(b) and Rule 10b-5 challenges statements 1, 2, 9, and 10.  The

3    Court now proceeds to consider Defendants' arguments concerning falsity.

### 3. Falsity

5        To assert a claim under the PSLRA, the plaintiff must plead with particularity, *inter alia*,

6    the element of falsity.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

7    "The PSLRA has exacting requirements for pleading 'falsity.'"  *Metzler Inv. GMBH v. Corinthian*

8    *Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  To satisfy these "exacting requirements," a

9    plaintiff must plead "specific facts indicating why" the statements at issue were false.  *Id.*;

10   *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege

11   specific facts that show" how statements were false); *see also In re Stratosphere Corp. Sec. Litig.*,

12   1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide

13   "evidentiary facts contemporary to the alleged false or misleading statements from which this

14   court can make inferences permissible under Rule 9(b)").  Moreover, to be actionable, a statement

15   must be false "at [the] time by the people who made them."  *Larkin*, 253 F.3d at 430.  "The fact

16   that [a] prediction proves to be wrong in hindsight does not render the statement untrue when

17   made."  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

18       First, Defendants assert that the accounts provided by Plaintiff's confidential witnesses

19   "lack the requisite specificity, reliability, and personal knowledge.  Further, none of the accounts

20   are inconsistent with any of Defendants' statements" about the Nike contract's profitability.  Mot.

21   at 16 (emphasis omitted).  Second, Defendants claim that Plaintiff "fails to allege particularized

22   facts showing that any of Defendants' other statements were false."  *Id.* at 17–18.  The Court

23   addresses these arguments in turn

### a.  Confidential Witnesses and Profitability Projections

25       Plaintiff's allegations that the challenged statements are false depend on information

26   provided by six confidential witnesses.  Specifically, Plaintiff claims that "[a]ccording to [the six]

27   former Company employees, . . . Flex was consistently missing the production targets that were

28
Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

1    required to breakeven." *E.g.*, Compl. ¶¶ 130, 133, 142, 150; *see also, e.g.*, *id.* at ¶ 152 (alleging

2    that statement 8 was false "for the same reasons set forth in paragraphs 132–134 herein"); *id.* at ¶

3    152 (alleging that statement 10 was false "for the same reasons set forth in paragraphs 128–130

4    herein"); *id.* at ¶ 171 (alleging that statement 13 was false "for the same reasons set forth in

5    paragraphs 132–134, 140–143 herein").

6        "[A] complaint relying on statements from confidential witnesses must pass two hurdles to

7    satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. "First, the confidential

8    witnesses . . . must be described with sufficient particularity to establish their reliability and

9    personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses

10   with sufficient reliability and personal knowledge must themselves be indicative of" falsity. *Id.*

11   The Court addresses the two *Zucco* prongs in turn.

12         **i.** ***Zucco* Prong One**

13       As to the first prong, for a confidential witness's allegation to be credited at the pleading

14   stage, the confidential witness must be described "with sufficient particularity to support the

15   probability that a person in the position occupied by the source would possess the information

16   alleged." *Id.* (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)); *Inchen Huang*

17   *v. Higgins*, No. 17-CV-04830-JST, 2019 WL 1245136, at *6 (N.D. Cal. Mar. 18, 2019) ("Second,

18   the [former employees'] statements must 'themselves be indicative of' the elements in question;

19   here, falsity . . . ."). To determine whether a confidential witness has the requisite knowledge,

20   courts look to the "level of detail provided by the confidential sources, the corroborative nature of

21   the other facts alleged (including from other sources), the coherence and plausibility of the

22   allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco*, 552

23   F.3d at 995 (quoting *Daou*, 411 F.3d at 1015).

24       Defendants challenge each of the six CWs on the grounds that "Plaintiff fails to establish

25   the reliability and personal knowledge of the CWs." Mot. at 12. Accordingly, the Court first

26   considers whether the CWs are described in the complaint with "sufficient particularity to

27   establish their reliability and personal knowledge." *Zucco*, 552 F.3d at 995. As an initial matter,

28

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

1    the complaint provides no information about the identity of CW6 beyond the fact that CW6 "was

2    an employee on the Nike project from 2017 until Q1 2018 in Guadalajara, Mexico." Compl. ¶ 46.

3    At a bare minimum, the Ninth Circuit requires that the complaint describe the confidential

4    witnesses with a "large degree of specificity," including the witnesses' job description and also his

5    or her "responsibilities." *See Daou*, 411 F.3d at 1016.

6         Plaintiff seeks to overcome this deficiency by noting that "Plaintiff will provide additional

7    information, including CW6's exact position titles[,] to the Court for an *in camera* inspection at

8    the Court's request." Compl. ¶ 46 n.3. The Court is sympathetic to Plaintiff's desire to preserve

9    CW6's anonymity. However, the PSLRA imposes *pleading requirements*. *See Zucco*, 552 F.3d at

10   995 ("[A] complaint relying on statements from confidential witnesses must pass two hurdles to

11   satisfy the PSLRA pleading requirements."). Plaintiff may not sidestep these requirements by

12   providing the necessary details to the Court *in camera*. *See In re Dot Hill Sys. Corp. Sec. Litig.*,

13   594 F. Supp. 2d 1150, 1162 (S.D. Cal. 2008) ("The Court has found no precedent in the law of

14   federal securities fraud allowing *in camera* review of details about confidential witnesses (as

15   plaintiffs propose) instead of pleading those details within the complaint."). The Court thus

16   cannot consider the statements of CW6, because the complaint fails to describe CW6 with

17   sufficient particularity to "establish [her] reliability and personal knowledge." *Zucco*, 552 F.3d at

18   995.

19        By contrast, Plaintiff provides some details about the other five CWs. As to CW3 and

20   CW4, however, the complaint provides only the relevant job titles, with no accompanying

21   description of what those titles entailed. Specifically, the complaint provides only that CW3 "was

22   a Human Resources Generalist in Flex's Human Resources department in Guadalajara, Mexico

23   from April 2017 to October 2017," and CW4 "was a Flex Senior Director for Global Account

24   Management from January 2013 to December 2018." Compl. ¶¶ 43–44. Thus, with respect to

25   CW3 and CW4, "the complaint is lacking important details about the CWs' employment

26   information, including 'his or her job description and responsibilities,' or duties." *McGovney v.*

27   *Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019) (quoting *Zucco*, 552 F.3d

28

25

at 996).  As discussed, at a bare minimum, the Ninth Circuit requires that the complaint describe the confidential witnesses with a "large degree of specificity," including not just the witnesses' job description, but also his or her "responsibilities."  *See Daou*, 411 F.3d at 1016.  This lack of specificity renders statements by CW3 and CW4 unreliable under *Daou*.  *See, e.g.*, *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) (affirming district court's finding that the complaint failed to allege with requisite particularity the responsibilities of the CWs and facts supporting an inference that the CWs had personal knowledge of relevant information).

The lack of specificity as to CW3 and CW4 is particularly significant in light of the assertions CW3 and CW4 make in the complaint.  Specifically, in the complaint, CW3 makes numerous production-related claims, such as the claim that "Flex was experiencing 2.5 times the rejections that were expected from Nike (i.e., if Nike was expecting 2%, Flex was experiencing a 5% rejection rate)."  Compl. ¶ 84.  Similarly, CW4 describes various factory-related "execution issues" and "operational issues" in connection with the Nike contract.  *Id.* ¶ 71.  However, CW3 is alleged to have been a "Human Resource Generalist," and CW4 is alleged to have been an account manager.  *Id.* ¶¶ 43–44.  It is unclear how CW3 and CW4 would have firsthand knowledge of operational issues in Flex's factories given their alleged roles.  A lack of allegations concerning personal knowledge therefore renders the statements of CW3 and CW4 unreliable.  *See, e.g.*, *Applestein*, 861 F. Supp. 2d at 1037 ("Even if Plaintiffs had provided more complete descriptions of the confidential witnesses, the statements are still unreliable.  First, Plaintiffs fail to adequately allege that the confidential witnesses were in a position to have the knowledge they profess.  Plaintiffs do not state that any of the confidential witnesses were connected to Organica's work for Medivation; for example, the TAC does not explain what a Senior Technology Engineer does and why someone in that position would have knowledge about the Dimebon pills produced for the Phase 2 study."); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955 (D. Ariz. 2007) ("The Court notes that the SAC does generally describe the CWs job titles; however, the SAC fails to allege facts showing how the CWs possess the information attributed to them, that the CWs were involved in Amkor's forecasting process or that the CWs were in a position to possess knowledge

26

United States District Court
Northern District of California

about the forecasting process.").

By contrast, as to CW1, CW2, and CW5, the complaint provides specific job titles and discusses roles and responsibilities.  As to CW1, the complaint alleges that "CW1 worked for Flex in Guadalajara from January 2017 to October 2017 as the Director of Supply Chain," and that "in her role, [CW1] worked closely with Nike to identify local suppliers in Mexico."  Compl. ¶ 41. As to CW2, the complaint alleges that CW2 "was the Business Excellence Manager for the Nike factory in Guadalajara from January 2016 to September 2017.  In this role, CW2 was responsible for continuous improvement activities such as improving processes in operations, reducing headcounts and waste, and the layout of machines on the floor."  *Id.* ¶ 42.  Finally, as to CW5, "CW5 worked for Flex in Guadalajara, Mexico from November 2006 until September 2019 as a Director of Indirect Procurement (Commodity Management).  In CW5's role as a Director of Indirect Procurement, CW5 was responsible for developing indirect material sourcing and supply base strategies in China, South East Asia, and the Americas.  In addition, CW5 developed scrap and waste management strategies and worked directly on the Nike contract on scrap management at Flex's North Campus (where the Nike production facility was located)."  *Id.* ¶ 45.

Defendants broadly argue that the assertions of CW1, CW2, and CW5 should be discounted because Plaintiff alleged "no basis for personal knowledge" as to the assertions. Defendants' argument is true to some extent.  For instance, CW1 alleges that "the people initially hired to work on the Nike project in Guadalajara did not have the right skills or abilities."  *Id.* ¶ 86. It is not clear how CW1, whose role seemingly only entailed "identify[ing] local suppliers in Mexico," could speak to employment-related difficulties such as whether employees of Flex had "the right skills or abilities" for factory work of the kind required.  *Id.* ¶ 41.

However, in light of Plaintiff's descriptions of the roles performed by CW1, CW2, and CW5, the Court may infer that CW1, CW2, and CW5 possessed firsthand knowledge as to the bulk of the statements alleged in the complaint that are attributed to them.  For instance, CW1 described "problems with suppliers of raw materials who were located in Asia," which aligns with the complaint's description of CW1 as "Director of Supply Chain" for Flex in Guadalajara.  *Id.* ¶¶

27

United States District Court
Northern District of California

41, 85.  Similarly, the complaint recounts CW5's claims that "manufacturing issues created a significant amount of scrap, which she described as footwear that did not meet Nike's manufacturing standard."  *Id.* ¶ 81.  This aligns with the complaint's allegation that "CW5 developed scrap and waste management strategies and worked directly on the Nike contract on scrap management at Flex's North Campus."  *Id.* ¶ 45.

Accordingly, for the instant motion, the Court concludes that Plaintiff satisfies the first prong of the *Zucco* framework as to CW1, CW2, and CW5.  The Court therefore proceeds to consider the second prong of the framework: whether the statements attributed to CW1, CW2, and CW5 are "themselves [] indicative of" falsity.

### ii.  *Zucco* Prong Two

As to the second prong, Defendants contend that "the CW accounts, even if credited, are not indicative of falsity."  Reply at 8.  Plaintiff, on the other hand, responds that "the CWs confirmed and corroborated that Flex was consistently missing the production targets that were required to breakeven at the end of FY2018 and at the second half of FY2019," which rendered the Challenged Statements false.  Opp'n at 21.  The Court agrees with Defendants.

As an initial matter, and as Defendants note, most of the Challenged Statements consist of "Defendants' projections of future profitability or break-even."  Mot. at 16.  Specifically, statements 3, 5, 9, 11, 12, 13, 14, 15, 16, 17, 18, 21, 22, 23, and 24 comprise Defendants' projections of the Nike contract's future profitability.  For instance, statement 3 consists of Defendant McNamara's statement that with respect to the Nike operation, "We cross into profits in the last quarter, next year, in Q4 of fiscal 2018."  App'x A at 2.  Statement 5 consists of Defendant Collier's statement that with respect to the Nike operation, Flex "anticipate[d] and [saw] profitability being achieved in Q4 next year and then sustaining that going forward," and that Flex had "a clear line of sight and conviction around hitting profitability and sustaining profitability from that point forward."  *Id.* at 3.  The other Challenged Statements listed above follow this same format.  *See, e.g.*, App'x A at 12 (Statement 23: "We remain confident in achieving our target for profitability during the second half of fiscal 2019.").

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

The statements of CW1, CW2, and CW5 are not "themselves [] indicative of" falsity as to profitability projections of this nature.  Indeed, only one of the CWs directly addresses the profitability of the Nike contract: CW5.  According to CW5, "everyone knew at Flex, down to the factory workers, that they were never going to breakeven with the Nike contract."  Compl. ¶ 50.  This statement is both conclusory and implausible.  It is highly unlikely that everyone at Flex, down to the factory workers, was familiar enough with Flex's financial arrangement with Nike to conclude that Flex was "never going to breakeven with the Nike contract."  *Id.*  CW5's conclusory statement about the knowledge of everyone at Flex falls well short of meeting the "exacting requirements for pleading 'falsity'" imposed by the PSLRA.  *Metzler*, 540 F.3d at 1070; *see also Veal v. LendingClub Corp.*, 23 F. Supp. 3d 785, 815 (holding that a confidential witness's "vague and conclusory references" as to the knowledge of third parties does not satisfy the PSLRA).

All other statements made by CW1, CW2, and CW5 concern alleged operational difficulties that Flex experienced.  However, these statements are not necessarily indicative of the falsity of the Defendants' profitability projections.  The Court addresses the relevant statements in turn.

First, the complaint contains several statements by CW1.  CW1 indicated "that Nike's projections for how many shoes Flex would manufacture in Guadalajara increased significantly in early 2017 and were essentially doubling each month."  Compl. ¶ 73.  "CW1 specifically recalled that by May 2017, Flex did not meet Nike's projections."  *Id.*  According to the complaint, "CW1 also confirmed that Flex experienced operational problems with suppliers of raw materials who were located in Asia.  CW1 stated that, due to the lead time, travel time and additional time for other issues that could arise, Flex lost flexibility when raw material orders were canceled or changed."  Compl. ¶ 85.  These statements are not indicative of the falsity of Defendants' profitability projections.  The first statement appears to concern "Nike's projections" as to the *number of shoes* that Flex would produce, not Defendants' projection as to *profitability* of Flex's Nike operation.  Moreover, the complaint elsewhere alleges that "the projections from Nike decreased after" May 2017, which contradicts CW1's statement that Nike's projections "were

United States District Court
Northern District of California

essentially doubling each month."  Compl. ¶¶ 73, 150.  CW1's second statement describes an

operational difficulty that Flex encountered with no reference to a timeframe.  The existence of an

operational difficulty of this nature at some point during the Nike contract is not indicative of the

falsity of Defendants' profitability projections.  *See Golub v. Gigamon Inc.*, No. 17-CV-06653-

WHO, 2019 WL 4168948, at *4 (N.D. Cal. Sept. 3, 2019) ("Golub has failed to show objective

falsity with particularized facts that 'directly contradict' or are 'necessarily inconsistent with' the

Updated Case C Projections.").

Second, the complaint contains statements by CW2.  CW2 indicated that "there were

issues with not meeting demand as a result of either not having materials on hand or needing to

scrap product because they [*i.e.*, the product] did not meet quality standards."  Compl. ¶ 72.  The

complaint thus alleges that "that Nike was 'very upset' with the results because Flex was not

meeting its quality standards or demand and delivery targets."  *Id.*  "CW2 [also] stated that

beginning in February 2017, Nike was scrapping about 50% of the product, which was far short of

the 93% or 96% acceptance rate that Nike required."  *Id.* ¶ 84.  CW2's statements concern Flex's

apparent difficulty in meeting Nike's standards.  As with CW1's statements, the fact that Flex fell

short of Nike's expectations does not mean that Defendants' own profitability projections were

false.  Moreover, CW2's allegations lack specificity in time.  CW2 indicated that Flex experienced

a high scrap rate "beginning in February 2017," but CW2 did not specify whether this problem

continued into the future and, if so, for how long.

Third, and finally, the complaint contains statements by CW5.  Specifically, "CW5 stated

that Flex was unable to meet the inventory levels per the agreement with Nike."  Compl. ¶ 73.

The significance of "the inventory levels," and their significance as to "the agreement with Nike"

is entirely unelaborated.  Thus, this statement is not indicative of the falsity of Defendants'

profitability projections.  As with CW2, CW5 makes more detailed allegations about Flex's scrap

product.  According to CW5, Nike classified shoes produced by Flex as belonging to "A" class,

"B" class, or "C" class.  *Id.* ¶ 81.  CW5 asserted that pursuant to the contract with Flex, Nike

purchased "A" shoes as well as "a small percentage of B shoes to be sold at outlet stores."  *Id.*

30

United States District Court
Northern District of California

United States District Court
Northern District of California

1    CW5 claimed that at some point in the relationship between Nike and Flex, pursuant to the Nike

2    contract, "Flex was expected to produce 60,000 shoes" each day, "most of them being 'A' quality

3    and a few of 'B' quality, which Nike would buy for sale in discount outlets." *Id.* ¶ 82. However,

4    Flex "never produced more than 20,000 Class A sneakers per day." *Id.* These statements are also

5    not indicative of the falsity of Defendants' profitability projections. CW5 does not specify the

6    point in time by which Nike began to expect Flex to produce 60,000 shoes. Further, noticeably

7    absent from CW5's statement is any indication as to the number or classification of the other

8    shoes produced by Flex, and whether those shoes were still purchased by Nike, to the extent that

9    they comprised acceptable "B" class shoes.

10       At most, and taken in the light most favorable to Plaintiff, the statements of CW1, CW2,

11   and CW5 indicate that Flex produced a lower number of high-quality shoes pursuant to the Nike

12   contract than Nike had expected. However, as Defendants point out, the number of shoes that

13   Flex produced only served as one variable that affected when the Nike contract would reach

14   profitability for Flex. The profitability projections also necessarily depended on the price that

15   Nike paid Flex for shoes across the relevant period, which may have varied as Flex expanded

16   production lines and produced new Nike designs, as well as the costs Flex bore for shoe

17   production, which may have also varied as Flex changed facilities and increased scale. Mot. at 17.

18   The CWs and the complaint are utterly silent as to these other determinants of the Nike contract's

19   profitability for Flex.

20       Plaintiff seeks to sidestep this deficiency. First, Plaintiff repeatedly asserts that "the CWs

21   confirmed and corroborated that Flex was consistently missing the production targets *that were*

22   *required to breakeven*." Opp'n at 21 (emphasis added); Compl. ¶ 82. However, the CWs never

23   tied the production targets they discussed with Flex's ability to achieve profitability as to the Nike

24   contract. *Id.* Instead, as discussed, the sole reference by the CWs to the Nike contract's

25   profitability was CW5's conclusory statement that "everyone knew at Flex, down to the factory

26   workers, that they were never going to breakeven with the Nike contract." Compl. ¶ 50. Second,

27   Plaintiff provides an "example of a breakeven analysis" in which Plaintiff makes arbitrary

28

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

assumptions as to the costs Flex bore under the Nike contract for seemingly illustrative purposes. *Id.* ¶ 63.  Plaintiff does not allege that these assumptions actually apply in the instant case.  Indeed, in Plaintiff's example, Plaintiff assumes that Flex's variable costs are linear notwithstanding the fact that Flex moved into a new factory that Flex said was "specifically designed to optimize around the manufacturing requirements for our partner," and the fact that Flex increased production scale in the middle of the relevant period.  *Id.* ¶ 93.  There is simply no indication in the complaint that the profitability of the Nike contract for Flex fit Plaintiff's hypothetical model.  In any amended complaint, *see infra*, Plaintiff is thus advised to more clearly tie the allegations of the CWs to Flex's ability to achieve *profitability* as to the Nike contract.

In short, the Court concludes that the statements of CW1, CW2, and CW5 are not indicative of falsity as to statements 3, 5, 9, 11, 12, 13, 14, 15, 16, 17, 18, 21, 22, 23, and 24, each of which constitutes a profitability projection concerning the Nike contract.  Accordingly, the statements of CW1, CW2, and CW5 do not survive the PSLRA pleading standard as to the falsity of these alleged misrepresentations.  In opposition to Defendants' motion to dismiss, Plaintiff points to no other allegations in the complaint that "demonstrate the falsity" of these alleged misstatements.  Opp'n at 18.  Accordingly, the Court GRANTS Defendants' motion to dismiss to the extent Plaintiff's claim under section 10(b) and Rule 10b-5 challenges statements 3, 5, 9, 11, 12, 13, 14, 15, 16, 17, 18, 21, 22, 23, and 24.

### b.  Other Alleged False or Misleading Statements

As to the remaining alleged false or misleading statements, Defendants similarly assert that Plaintiff fails to plead falsity with sufficient particularity under the PSLRA.  Specifically, Defendants argue that Plaintiff fails to adequately allege that statements 6, 7, 8, 19, and 20 are false.  Mot. at 17–20.  Plaintiff responds that the complaint sufficiently pleads falsity as to these alleged misrepresentations.  Opp'n at 23–24.  The Court agrees with Defendants.

The Court addresses each remaining misrepresentation in turn.  First, as to statements 6 and 7, Defendant McNamara stated on April 27, 2017, during an earnings call, that Flex was accelerating investments in Nike "on the back of early automation successes."  App'x A at 3

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

United States District Court
Northern District of California

(Statement 6).  Defendant McNamara also stated on that same call that Flex was "starting to get early successes around some of the design engagements that we're having [with Nike] about reinventing how design actually occurs, some of the new technologies of the shoes, and even into the automation projects that we're seeing."  *Id.* at 4 (Statement 7).  Plaintiff does not provide particularized allegations as to the falsity of these statements.  According to Plaintiff, by April 2017, "Defendants were not experiencing any successes on the Nike contract or its automation process."  Compl. ¶ 150.  However, the mere existence of operational problems does not mean that Defendants could not simultaneously experience any "early successes."  Plaintiff's conclusory allegation to the contrary is insufficiently particularized.

Second, as to statement 8, Defendant Collier stated on April 27, 2017, during an earnings call, that "[t]he relationship with Nike . . . continue[s] to be strong.  It's probably deeper than it was at any other stage right now.  We're completely aligned with the production curve and we're continuing to manage that relationship as we go forward."  ECF No. 128-5 at 11.  Again, Plaintiff merely relies on the alleged operational problems described by the CWs as evidence of this statement's falsity.  However, CW1 stated that Plaintiff only failed to meet Nike's projections "by May 2017," seemingly in the month following the delivery of statement 8.  Compl. ¶ 150.  Further, CW2's statement that Nike "was 'very upset' with" Flex's output is not tied to any particular timing.  *Id.* ¶ 72.  These statements therefore do not render statement 8 false.  Accordingly, Plaintiff fails to plead falsity as to statement 8 with sufficient particularity.

Third, and finally, as to statements 19 and 20, Defendant McNamara stated on April 26, 2018, during an earnings call, that different design content from Nike comprised "the key thing we need.  We don't need any more optimizations of a factory.  We have good factory flow.  We just need the right content to run. . . .  And this is what we need to get to profitability: the right shoe with the right automation system."  App'x A at 10 (Statement 19).  Defendant McNamara also stated that "Nike has released a full set of products designed for our automation system, which is now beginning to ramp in mass production."  *Id.* at 11 (Statement 20).  Plaintiff misrepresents the nature of these statements.  According to Plaintiff, Defendant McNamara stated that "the only

33

United States District Court
Northern District of California

1     reason for Flex's failure to breakeven was a lack of 'design content.'"  Opp'n at 23.  Defendant

2     McNamara did not go so far.  Instead, Defendant McNamara only said that "the key thing" Flex

3     needed as of April 26, 2018, was new design content from Nike.  This is plainly distinct from

4     saying that new design content was the only thing Flex needed to achieve profitability as to the

5     Nike contract.  Plaintiff provides no particularized allegations to the contrary.  Moreover, Plaintiff

6     provides no evidence that the aforementioned Nike products were not "beginning to ramp in mass

7     production" as of April 26, 2018.  On the contrary, at that time, the complaint alleges that the new

8     Guadalajara factory had opened and Flex's lines of production for Nike allegedly increased in

9     number.  Compl. ¶ 103.

10         In short, the Court concludes that Plaintiff fails to plead the falsity of statements 6, 7, 8, 19,

11    and 20 with sufficient particularity under the PSLRA.  Accordingly, the Court GRANTS

12    Defendants' motion to dismiss to the extent Plaintiff's claim under section 10(b) and Rule 10b-5

13    challenges statements 6, 7, 8, 19, and 20.

14         **4.  Conclusion and Leave to Amend**

15         The Court now summarizes the foregoing rulings.  As to the applicability of the PSLRA

16    safe harbor, the Court concludes that statements 3, 4, 5, 11, 12, 13, 14, 17, 18, 21, 22, 23, and 24

17    are forward-looking and hence possibly subject to the PSLRA safe harbor.  Portions of statements

18    9, 15, and 16 are also forward-looking.  Moreover, statements 3, 4, 11, 17, 21, 23, and 24 are

19    indeed subject to the PSLRA safe harbor because they were accompanied by meaningful

20    cautionary language at the time they were made.  The same is true for the forward-looking

21    portions of statements 9 and 16.  The Court further concludes that statements 1, 2, 9, and 10

22    constitute nonactionable statements of corporate optimism.

23         As to falsity, the Court concludes that the CWs' assertions do not adequately allege the

24    falsity of statements 3, 5, 9, 11, 12, 13, 14, 15, 16, 17, 18, 21, 22, 23, and 24.  The Court further

25    concludes that Plaintiff also does not allege falsity with sufficient particularity under the PSLRA

26    as to statements 6, 7, 8, 19, and 20.

27         For the foregoing reasons, the Court concludes that Plaintiff has failed to adequately allege

28

United States District Court
Northern District of California

34

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

that any of the Challenged Statements are false or misleading under the PSLRA.  Because granting

Plaintiff an additional opportunity to amend the complaint would not be futile, cause undue delay,

or unduly prejudice Defendants, and because Plaintiff has not acted in bad faith, the Court grants

leave to amend.  *See Leadsinger, Inc.*, 512 F.3d at 532.  Upon amendment, Plaintiff must provide

more details and clearly tie the operational difficulties that the CWs discuss to the profitability of

the Nike contract.  The Court now briefly addresses scienter.

### 5. Scienter

Although the Court grants Defendants' motion to dismiss because none of the allegedly

false or misleading statements are actionable, in anticipation of an amended complaint, the Court

briefly addresses Defendants' argument about scienter.

In order to survive a motion to dismiss, Plaintiff's complaint must also create a strong

inference of scienter.  *See* 15 U.S.C. § 78u–4(b)(2) ("[The complaint must] state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind.").

With respect to the strong inference requirement, the Ninth Circuit has stated that "[a] strong

inference of scienter must be more than merely plausible or reasonable—it must be cogent and at

least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747

F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345*

*Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).  As to the meaning of

"scienter," the Ninth Circuit has held that a plaintiff's complaint must show that "the defendants

made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*,

552 F.3d at 990–91 (internal quotation marks omitted).  "[F]acts showing mere recklessness or a

motive to commit fraud and [the] opportunity to do so" are insufficient. *Id.*  "To meet this

pleading requirement, the complaint must contain allegations of specific contemporaneous

statements or conditions that demonstrate the intentional or the deliberately reckless false or

misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432 (internal quotation

marks and citation omitted).  When an omission is at issue, "the plaintiff must plead a highly

unreasonable omission, involving not merely simple, or even inexcusable negligence, but an

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

1    extreme departure from the standards of ordinary care, and which presents a danger of misleading

2    buyers or sellers that is either known to the defendant or is so obvious that the actor must have

3    been aware of it." *Zucco*, 552 F.3d at 991 (internal quotation marks omitted).

4         In the Ninth Circuit, courts must determine first "whether any of the plaintiff's allegations,

5    standing alone, [are] sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec.*

6    *Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). If none is sufficient alone, the court must "then

7    consider the allegations holistically to determine whether they create a strong inference of scienter

8    taken together." *Id.* Under this holistic determination, scienter is adequately pleaded if "all of the

9    facts alleged, taken collectively, give rise to a strong inference of scienter." *Intuitive Surgical*, 759

10   F.3d at 1061–62.

11        Here, Plaintiff argues that they have adequately pled scienter through (1) the CW

12   allegations; (2) the core operations doctrine; (3) the alleged misstatements themselves; (4)

13   Defendants McNamara and Dennison's responsibilities in connection to the Nike contract; (5)

14   Defendants McNamara and Dennison's resignations; and (6) alleged post-Class Period

15   admissions. Opp'n at 7–11. Defendants argue, by contrast, that none of these factors support a

16   strong inference of scienter. Instead, Defendants claim that multiple factors weigh against a strong

17   inference of scienter: (1) Plaintiff does not allege any improper stock sales; (2) Defendants

18   consistently disclosed operational difficulties; and (3) Defendants made significant investments of

19   time and money into the Nike contract.

20        The Court need not consider all of the parties' arguments because the Court found all of

21   the statements non-actionable above. However, the Court nevertheless provides a few comments

22   as to scienter.

23        First, as explained above, numerous CW statements currently lack reliability because

24   Plaintiff has not provided enough information about the responsibilities of CW3, CW4, and CW6.

25   *See* III.A.3.a. Therefore, to the extent Plaintiff's allegations of scienter are based on these CWs'

26   statements, more information as to the CWs must be pled. Second, the Court concluded that

27   statements 3, 4, 5, 11, 12, 13, 14, 17, 18, 21, 22, 23, and 24 as well as portions of statements 9, 15,

28

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE

and 16 are forward-looking.  Thus, to the extent these statements are not accompanied by meaningful cautionary language, Plaintiff must plead "actual knowledge . . . that the statement was false or misleading."  *In re Cutera*, 610 F.3d at 1112 (alteration omitted).  Third, Defendants contend that "the dismissal as to Mr. Collier and Mr. Kessel should be with prejudice" because Plaintiff does not address scienter with respect to these Defendants.  Reply at 15 n.21.  The Court disagrees.  Plaintiff discusses the conduct of Defendants generally, presumably including Defendants Collier and Kessel.  In any event, because the Court did not reach the issue of scienter in the instant Order, dismissal without leave to amend is inappropriate.

### B.  Violation of Section 20(a) of the Exchange Act

Congress has established liability in § 20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws.  15 U.S.C. § 78t(a).  To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law"; and (2) "that the defendant exercised actual power or control over the primary violator."  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Because Plaintiff has failed to plead a primary securities law violation, Plaintiff has also failed to plead a violation of Section 20(a).  *See In re Cutera*, 610 F.3d at 1113 n. 6.  Accordingly, Defendants' motion to dismiss Plaintiff's claim under Sections 20(a) is also GRANTED.  Because granting Plaintiff an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice Defendants, and Plaintiff has not acted in bad faith, the Court grants leave to amend.  *See Leadsinger, Inc.*, 512 F.3d at 532.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's complaint in its entirety is GRANTED without prejudice.  Should Plaintiff choose to file an amended complaint, Plaintiff must do so within 30 days of this Order.  Failure to do so, or failure to cure the deficiencies addressed in this Order, will result in dismissal of Plaintiff's claims with prejudice.  Plaintiff may not add new claims or parties without leave of the Court.  As an exhibit to the amended complaint, Plaintiff shall file a redlined version of the amended complaint that identifies

United States District Court
Northern District of California

all amendments.

**IT IS SO ORDERED.**

Dated: May 29, 2020

LUCY H. KOH
United States District Judge

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE