UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAVID KIPLING, et al.,<br><br>             Plaintiffs,<br><br>        v.<br><br>FLEX LTD., et al.,<br><br>             Defendants. | Case No. 18-CV-02706-LHK<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE**<br><br>Re: Dkt. No. 128 |

Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff" or "National Elevator"), individually and on behalf of all other persons similarly situated, alleges that Defendants Flex Ltd. ("Flex"), Michael M. McNamara, Christopher E. Collier, Michael C. Dennison, and Kevin Kessel (collectively, "Defendants") violated federal securities laws. Before the Court is Defendants' motion to dismiss the amended consolidated class action complaint. ECF No. 141 ("Mot." or "motion to dismiss"). Having considered the parties' briefing, the relevant law, and the record in this case, the Court GRANTS Defendants' motion to dismiss with prejudice.

//

//

//

United States District Court
Northern District of California

## I.      BACKGROUND

### A.   Factual Background

#### 1.   The Parties

Plaintiff National Elevator is a multiemployer pension plan as defined in sections 3(2)(A) and 3(37) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(2)(A) and 1002(37). Am. Consolidated Class Action Compl. ¶ 35, ECF No. 140 ("AC" or "Amended Complaint"). Plaintiff purchased Flex securities and was allegedly damaged by Defendants' misrepresentations and omissions. *Id.* Plaintiff seeks to represent a class "of all persons and entities who, during the period from January 26, 2017 to October 25, 2018, inclusive (the 'Class Period'), purchased the publicly traded common stock of Flex Ltd." *Id.* at 1.

Defendant Flex is incorporated in Singapore and maintains offices in San Jose, California. *Id.* ¶ 36. Flex's common stock trades on the NASDAQ Stock Market under the ticker symbol "FLEX." *Id.* Defendant Michael M. McNamara ("McNamara") served as the CEO of Flex and a member of its Board of Directors until December 31, 2018. *Id.* ¶ 37. Defendant Christopher E. Collier ("Collier") serves as the CFO of Flex. *Id.* ¶ 38.[1] Defendant Kevin Kessel ("Kessel") serves as the Vice President of Investor Relations and Corporate Communications of Flex. *Id.* ¶ 39. Defendant Michael C. Dennison ("Dennison") served as the President of Flex's Consumer Technology Group ("CTG"). *Id.* ¶ 40. Defendant Dennison's employment with Flex ended in approximately July or August 2018. *Id.*

#### 2.   Flex's Business

Plaintiff alleges Flex is a design, engineering, manufacturing, and supply chain firm, though Plaintiff contends that Flex is and always was principally in the business of electronics manufacturing services. *Id.* ¶¶ 48, 49. Plaintiff alleges that Flex is divided into four business segments: Consumer Technologies Group ("CTG"), which includes consumer-related businesses

---

[1] After Plaintiff filed the Amended Complaint, Defendant Collier resigned as CFO of Flex effective September 1, 2020. *See* Business Wire, *Flex Announces Chief Financial Officer Transition* (Aug. 7, 2020), https://www.businesswire.com/news/home/20200807005463/en/.

United States District Court
Northern District of California

in connected living, wearables, gaming, augmented and virtual reality, fashion, and mobile devices; Communications & Enterprise Compute ("CEC"), which includes Flex's telecom, networking, and server and storage business; Industrial & Emerging Industries ("IEI"), which includes Flex's energy and metering, semiconductor tools and capital equipment, office solutions, household industrial and lifestyle, industrial automation and kiosks, and lighting businesses; and High Reliability Solutions ("HRS"), which includes Flex's medical, automotive and defense and aerospace businesses. *Id.* ¶ 50.

At some point in 2015, in an effort to expand its business beyond electronic manufacturing, Flex rebranded from "Flextronics International" to its current name, Flex. *Id.* ¶ 52. Flex also embraced a strategy that Flex dubbed "Sketch-to-Scale," a term that Flex trademarked. *Id.* Under the Sketch-to-Scale strategy, Flex provides its own in-house design engineers to customers with a view towards helping take a product idea or concept ("sketch") to a final manufactured product ("scale"). *Id.* ¶ 53. This process purportedly allows Flex to become involved in designing and incorporating product specifications that are tailored to Flex's established manufacturing and supply chain operations which then allows Flex to manufacture and ship the product more efficiently (and ostensibly generate more profits for Flex and its customers). *Id.*

### 3. The Nike Contract

In October 2015, Flex announced that it had entered into a contract with Nike to manufacture shoes (the "Nike contract"). *Id.* ¶ 56. Plaintiff alleges that this effort was part of Nike's larger push to create regional manufacturing centers in order to permit Nike to more rapidly move from shoe design to sale. *Id.* Nike also sought to lower required inventory levels and reduce the amount of scrap produced by the manufacturing process. *Id.*

Flex agreed to craft a state-of-the-art, custom-built factory in Guadalajara, Mexico that would more efficiently automate the production cycle for Nike shoes. *Id.* ¶ 57. In the meantime, before the new factory was built, Flex used existing electronics manufacturing facilities in Guadalajara to produce Nike shoes. *Id.* The CTG segment of Flex was tasked with managing the Nike contract.

Plaintiff alleges that on January 26, 2017, the first day of the Class Period, Defendant McNamara informed investors that Flex "expect[ed] to see revenue grow pretty linearly over the next year." *Id.* ¶ 66. Plaintiff also alleges that Defendants repeatedly informed investors that the Nike contract would cross into profitability (or "break-even") by the close of fiscal year 2018, *i.e.* March 2018.[2] *Id.*

However, Plaintiff contends that the Nike contract was in fact in disarray "due to a myriad of manufacturing issues that were materially impacting Flex's ability to manufacture enough shoes to come close to being on a trajectory to breakeven." *Id.* ¶ 70. Plaintiff relies on seven confidential witnesses ("CWs"), each of whom is alleged to have been an employee of Flex, to outline these manufacturing issues.

According to the CWs, Flex was unable to meet "production targets" contemplated by the Nike contract because, among other things: (1) the shoes that Flex manufactured had a higher return rate than projected, *id.* ¶ 75; (2) Flex did not have sufficient raw materials, *id.* ¶ 87; (3) Flex was forced to scrap product that did not meet Nike's standards, *id.* ¶¶ 74, 82, 85; and (4) Flex employees were trained in electronics, not shoe manufacturing, *id.* ¶ 88.

As to the first point, CW3 stated that colleagues "in engineering and other departments" told her that "Nike had planned to accept 5% returns but in reality Flex was generating 15–20% returns." *Id.* ¶ 75. CW3 herself did not see this missed forecast. Nor does CW3 specify when she heard about the missed forecast from colleagues. Rather, CW3 left Flex a year before the class period ended. *See id.* ¶ 43 (stating that CW3 ended her position in October 2017).

As to the second point, CW1 indicated that Flex faced "operational problems with suppliers of raw materials who were located in Asia." *Id.* ¶ 87. According to CW1, "due to the lead time, travel time and additional time for other issues that could arise, Flex lost flexibility when raw material orders were canceled or changed." *Id.*

---

[2] For financial reporting purposes, Flex uses a fiscal year that ends on March 31 of the relevant calendar year. AC ¶ 51.

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

As to the third point, CW5 explained that Nike classified shoes produced by Flex as belonging to "A" class, "B" class, or "C" class. *Id.* ¶ 83. CW5 asserted that pursuant to the contract with Flex, Nike purchased "A" shoes as well as "a small percentage of B shoes to be sold at outlet stores." *Id.* CW5 claimed that pursuant to the Nike contract, Flex was expected to manufacture 60,000 shoes a day, "most of them being 'A' quality and a few of 'B' quality, which Nike would buy for sale in discount outlets." *Id.* ¶ 84. However, Flex "never produced more than 20,000 Class A sneakers per day." *Id.* Flex was required to "'eat' all of the scrap (*i.e.*, 'C' quality sneakers and excess 'B' quality sneakers not bought by Nike)." *Id.*

As to the fourth point, CW1 indicated that "the people initially hired to work on the Nike project in Guadalajara did not have the right skills or abilities." *Id.* ¶ 88. CW1 opined that "this impacted Flex's ability to operate the Guadalajara factory at full capacity or meet projections." *Id.* CW3 specifically alleged that middle management was unqualified. *Id.* CW7 "heard from her colleagues" allegations similar to CW1's allegations. *Id.* ¶ 89.

In July 2017, Defendants "partially disclosed the existence of some manufacturing issues." *Id.* ¶ 88. Despite these issues, Defendants repeatedly predicted that the Nike contract would cross into profitability by the end of March 2018. *Id.* ¶¶ 96, 103. Defendants asserted that preparation of the new Guadalajara factory was responsible for increased investment costs, but Defendants also indicated that the transition of operations into that new factory would permit the Nike contract to meet the March 2018 target for profitability. *Id.* ¶¶ 92, 93.

On October 26, 2017, Defendant McNamara announced that the transition of operations related to the Nike contract into the new Guadalajara factory was "substantially complete." *Id.* ¶ 95. For the next few months, into January 2018, Defendants continued to maintain that the end of March 2018 represented the "target" for profitability of the Nike contract. *Id.* ¶ 100. However, according to Plaintiff, "the very same manufacturing issues that plagued the Nike contract from the start of the Nike contract continued to prevent Flex from hitting the production targets required to remain on the trajectory to breakeven." *Id.* ¶ 105.

On April 26, 2018, Defendant McNamara announced that the Nike contract had not in fact

reached profitability by the end of March 2018. *Id.* ¶ 109. However, Defendant McNamara indicated that the Nike contract would become profitable in the "near future," and set the updated break-even timeframe at some point in the second half of the 2019 fiscal year. *Id.* Defendant McNamara indicated that new "design content" from Nike had been needed to achieve profitability, but that "the purported design content problem was resolved." *Id.* ¶ 114.

Shortly afterward, in August 2018, Defendant Dennison, the President of Flex's CTG segment, was hired by another company and ceased employment at Flex. *Id.* ¶ 119.

On October 25, 2018, Flex announced the winding down of operations related to the Nike contract effective December 31, 2018, because "[i]n recent weeks, [] it became clear that the Company [*i.e.*, Flex] would be unable to reach a commercially viable solution" as to the Nike contract. *Id.* ¶ 121. On that same day, Flex also announced the retirement of Defendant McNamara. *Id.* ¶ 122. Plaintiff alleges that this news caused Flex's stock price to drop 35% in one day. *Id.* ¶ 123.

### 4. The False or Misleading Statements

Plaintiff alleges that, between January 26, 2017 and July 26, 2018, Defendants made 14 false or misleading statements. The Court reproduces in the table below the specific statements that Plaintiff alleges to be false or misleading ("Statements"). *See* App'x A, ECF No. 140-1 (Plaintiff's table of Statements). The column "Former No." shows a Statement's previous identification number, as analyzed in the Court's Order granting Defendants' prior motion to dismiss. The column "Current No." shows a Statement's current identification number as alleged in the Amended Complaint.[3]

//

//

---

[3] The statements highlighted in bold and italics represent the statements that Plaintiff alleges were knowingly and materially false and misleading and/or failed to disclose material information of which Defendants were aware or were reckless in not knowing. ECF No. 140-1 ("App'x A") at 1 n.1.

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

| Current No. | Former No. | Speaker(s) / Date / Medium | Allegedly False and Misleading Statement(s) or Omissions |
|---|---|---|---|
| 1 | 5 | Collier / February 15, 2017 / Goldman Sachs Conference | When asked if he could confirm that the Company would crossover from investment to "profitability in the March calendar '18 quarter," Defendant Collier replied: "***Yes, correct. . . . [W]e anticipate and see profitability being achieved in Q4 next year and then sustaining that going forward***." And while acknowledging that there would be an incremental level of cost associated with the Nike ramp, he reiterated that Flex has "***a clear line of sight and conviction around hitting profitability and sustaining profitability from that point forward . . . .***" |
| 2 | 6 | McNamara / April 27, 2017 / Earnings Call | Defendant McNamara boasted to investors that Flex was "accelerating our investments in Nike ***on the back of early automation successes***, a strong customer collaboration and broad-based opportunities." |
| 3 | 7 | McNamara / April 27, 2017 / Earnings Call | "***We're starting to get early successes around some of the design engagements that we're having [with Nike] about reinventing how design actually occurs, some of the new technologies of the shoes, and even into the automation projects that we're seeing.***" |
| 4 | 8 | Collier / April 27, 2017 / Earnings Call | Defendant Collier reiterated that Flex was on track with the ramp of the Nike project, noting that they were "***completely aligned with the production curve . . . .***" |
| 5 | 9 (in part) | Dennison / May 10, 2017 / Investor Day | In discussing the status of the project: "[W]e've got real commits. ***We have to drive significant volume, which we're doing today.*** This has been a great solution for us, a great story for us. It continues to be a great story for us. We're going to continue to focus on this. We are committed to our numbers this year. So we're going to be at meaningful revenue in FY '18, and we will be at breakeven or better by the end of the year as we've said before." |
| 6 | 12 | Collier / September 6, 2017 / Citi Conference | When asked to confirm that the end of fiscal year 2018 is the "time line . . . for turning past loss-making to breakeven, profitable exiting at that quarter," Defendant Collier responded "***[e]xactly***." He went on to state that: "We're moving into a customized, tailor-built facility in our Q3 that's specifically designed to optimize around |

United States District Court
Northern District of California

| | | | the manufacturing requirements for our partner, and *we anticipate, as we exit this year, being at a breakeven, which allows us to see some real good accretion into EPS into fiscal '19 and beyond.*" |
|---|---|---|---|
| 7 | 13 | Kessel / November 7, 2017 / RBC Conference | When asked "how confident we remain with the goals for March breakeven," Defendant Kessel responded, "[a]dmittedly, we did have some struggles initially in terms of Q1, in terms of the initial stages of ramping up and dealing with multiple styles of shoes before we've actually put in place the factory that we've talked about that is now as of end of [] October online. *But in terms of the general trajectory, I think we still remain very confident about the fact that we're going to be improving both performance and scaling as time goes on here . . . . [W]e still look at what we said back in May has been very much intact.*" |
| 8 | 14 | Kessel / November 14, 2017 / UBS Conference | In response to a question from an analyst about the status of the Nike project, Defendant Kessel stated: "So, we had our Investor and Analyst Day back in May and we presented a timeline back then that kind of talks about how we see Nike over the next two years to three years evolving for us. And I think at this stage, *it remains very much intact.*" |
| 9 | 15 (in part) | Collier / December 4, 2017 / Raymond James Conference | When asked by an analyst whether the move into the new Guadalajara factory was directly associated with Flex's trajectory to breaking even on the Nike project, Defendant Collier stated: "We're well on our way, we're 30 days plus into the new operation. *We see multiple signs of the accelerated scaling effects.* We've been able to work with our partner to identify the right product set to be able to be manufactured inside that operation. We've been deploying further lean manufacturing principles and you're going to see a natural progression up as we scale that further with the target of exiting this year at breakeven." |
| 10 | 16 (in part) | McNamara / January 25, 2018 / Earnings Call | Defendant McNamara spoke about the impact that moving into the Guadalajara factory was having, and how it was driving the breakeven trajectory that was just a few months away now: "*This move improved efficiency and helped reduce operating losses in line with expectations.* Our objectives of moving this project |

8

United States District Court
Northern District of California

| | | | towards the breakeven level exiting our Q4 remains unchanged." |
|---|---|---|---|
| 11 | 18 | Kessel / February 14, 2018 / Goldman Sachs Conference | In response to a question from a Goldman analyst regarding the March 2018 breakeven date, Defendant Kessel reiterated that Flex would breakeven on the Nike project in just a few weeks:<br><br>"*Yes, Yes*. So we haven't made any changes to our view on Nike, and really the most important thing for us is getting that business to breakeven. That's been something we've been discussing at length this entire fiscal year. Q1, for us, was kind of the peak period of investment, if you will, the biggest period of absorbing losses. Every quarter since then we've seen improvement in terms of revenue and loss shrinking. We, obviously, just finished Q3, where again we saw a further reduction in loss, further increase in revenue, and *Q4 is where we're focusing on breaking even as we exit the year*." |
| 12 | 19 | McNamara / April 26, 2018 / Earnings Call | Rather than admit to investors that the Nike project had failed to hit breakeven because it was not on track to profitability, Defendant McNamara attributed the failure to breakeven solely on the previous lack of design content:<br><br>"The key to Nike is to have design content – shoe content that's designed to run on a highly automated line. The highly automated line that's turned on, the content has been developed, and it just needs to ramp. *So this is the key thing we need. We don't need any more optimizations of a factory. We have good factory flow. We just need the right content to run*. . . . [Y]ou have to have design content. That design content has to run on fully automated lines. We turned those fully automated lines on. They're running really well. We'll ramp up those fully automated lines over the course of the year and get to volume. *And this is what we need to get to profitability: the right shoe with the right automation system. . . .*" |

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

| 13 | 20 | McNamara / April 26, 2018 / Earnings Call | Defendant McNamara portrayed the issue as a past, not current problem. He reassured investors that because Nike had now provided design content, Flex was on track to achieve profitability going forward: "Most importantly, Nike has released a full set of products designed for our automation system, **which is now beginning to ramp in mass production**." |
| 14 | 22 | Kessel / May 16, 2018 / J.P. Morgan Conference | In response to a question regarding the profitability of the Nike project, Defendant Kessel told investors that ***"[t]he overall opportunity remains unchanged for Flex meaning that over time this should be and can be easily a $1 billion[-]plus opportunity. . . . As we go into this fiscal year, it will improve dramatically, so we talked about significant year-over-year growth, again, getting into profitability at some point in the second half of the year***." |

**B.  Procedural History**

On May 8, 2018, a group of Flex shareholders filed suit against Defendants Flex, Collier, and McNamara. ECF No. 1. On October 1, 2018, the Court then appointed Plaintiff Bristol County Retirement System ("Bristol") as lead plaintiff in the instant case. ECF No. 37. On November 8, 2018, Bristol filed an amended complaint that substantially altered the class allegations against Flex. ECF No. 42. Given the altered allegations, the Court vacated the appointment of lead plaintiff in order to re-open the appointment process. ECF No. 74. On September 26, 2019, the Court then appointed Plaintiff National Elevator ("Plaintiff") as lead plaintiff. ECF No. 111. Plaintiff filed a consolidated class action complaint on November 8, 2019. ECF No. 125.

On December 4, 2019, Defendants moved to dismiss the consolidated class action complaint, which alleged violations of (1) § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; (2) violation of § 20(a) of the Exchange Act against Defendants McNamara, Collier, Dennison, and Kessel. ECF No. 128. The Court granted the motion to dismiss without prejudice on May 29, 2020. ECF No. 137 ("prior Order" or "Order"). As relevant here, the Court's prior Order reached three key holdings. First, the Court held that Statement 5 is nonactionable corporate puffery. *See* Order at 22.

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

Second, the Court held that the CWs' statements were not indicative of the falsity of Defendants' Statements 1, 5–11, and 14. Specifically, the Court held that CW1, CW2, and CW5 plausibly described only operational difficulties, not missed profitability projections. *See* Order at 29–30 (CW1), 30 (CW2), 30–32 (CW5 and other grounds for CWs' insufficiency). As for the other CWs, the Court did not consider their statements because those CWs were unreliable under the two-part test set forth in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). *See* Order at 25 (CW6), 25–27 (CW3 and CW4).

Third, the Court held that Plaintiff failed to plead particularized facts that Statements 2–4, 12, and 13 were false. *See* Order 32–34. Specifically, as to Statements 2 through 4, Plaintiff again failed to plead more than the "mere existence of operational problems." Order at 33. As to Statement 12—Defendant McNamara's statement that Nike design content was "the key thing" Flex needed for profitability—the Statement was not false because it was "plainly distinct from saying that new design content was the only thing Flex needed to achieve profitability." Order at 34. As for Statement 13, the complaint actually *supported* the veracity of the statement that Nike products were "beginning to ramp in mass production." *Id.*

The Court thus dismissed the consolidated class action complaint. However, the Court granted leave to amend on two conditions. First and most relevant here, "[u]pon amendment, Plaintiff must provide more details and clearly tie the operational difficulties that the CWs discuss to the profitability of the Nike contract." *Id.* at 35. Specifically, "profitability projections also necessarily depended on the price that Nike paid Flex for shoes across the relevant period, which may have varied as Flex expanded production lines and produced new Nike designs, as well as the costs Flex bore for shoe production, which may have also varied as Flex changed facilities and increased scale." *Id.* at 31. Second, Plaintiff had to adequately plead scienter. *See* Order at 36–37.

On June 29, 2020, Plaintiff filed the operative complaint—the fourth in this case. Am. Consolidated Class Action Compl., ECF No. 140 ("AC" or "Amended Complaint"). On July 27, 2020, Defendants filed the instant motion to dismiss the AC, ECF No. 141 ("Mot."). On August 17, 2020, Plaintiff filed its opposition to the motion to dismiss. ECF No. 148 ("Opp'n"). On

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

1  September 2, 2020, Defendants filed their reply supporting the motion to dismiss. ECF No. 149

2  ("Reply").

3  **C. Request for Judicial Notice or Incorporation by Reference**

4  As an initial matter, Defendants offer 12 exhibits that Defendants argue are subject to the

5  Court's consideration under the doctrines of judicial notice and incorporation by reference.

6  Request for Judicial Notice, ECF No. 143 ("RJN"). Plaintiff only opposes Defendants' request to

7  the extent "Defendants offer Exhibits 1–12 for the truth of the matter asserted therein." Opp'n at 6

8  n.3.

9  The Ninth Circuit has provided guidance on the applicability of the doctrines of judicial

10  notice and incorporation by reference in securities cases at the motion to dismiss stage. In *Khoja v.*

11  *Orexigen Therapeutics*, 899 F.3d 988 (9th Cir. 2018), the Ninth Circuit "note[d] a concerning

12  pattern in securities cases like this one: exploiting [judicial notice and incorporation by reference]

13  improperly to defeat what would otherwise constitute adequately stated claims at the pleading

14  stage." *Id.* at 998. The Ninth Circuit explained that "Defendants face an alluring temptation to pile

15  on numerous documents to their motions to dismiss to undermine the complaint, and hopefully

16  dismiss the case at an early stage." *Id.* However, the risk of improper premature dismissal "is

17  especially significant in SEC fraud matters, where there is already a heightened pleading standard,

18  and the defendants possess materials to which the plaintiffs do not yet have access." *Id.*

19  Defendants request that the Court take judicial notice or apply the doctrine of incorporation

20  by reference to two categories of documents: (1) transcripts from earnings calls, investor and

21  analyst conferences, and related presentations; and (2) SEC filings such as Forms 10-K, 10-Q, and

22  8-K. The exhibits comprise public financial statements and transcripts of public earnings calls. *See*

23  Nicole M. Ryan Decl., ECF No. 142 (attaching exhibits). Defendants offer these documents "for

24  the purpose of demonstrating what Flex and/or its employees said to the market," and "for the

25  purpose of providing the Court with the full unabridged statements cited by Plaintiff and

26  accompanying context regarding these statements." RJN at 2–12.

27  All of the foregoing documents are public documents "the accuracy of which is not

28

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

reasonably subject to dispute." *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *1 (N.D. Cal. Aug. 27, 2018); *see Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (noting that SEC filings are subject to judicial notice); *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018) (granting judicial notice as to presentation that was "publicly available to reasonable investors at the time the defendant made the allegedly false statements" (internal quotation marks omitted)). Accordingly, the Court GRANTS Defendants' request for judicial notice. "The Court considers [these documents] in evaluating the motion to dismiss for the sole purpose of determining what representations [Defendants] made to the market. The Court is not taking notice of the *truth* of any of the facts asserted." *Wochos*, 2018 WL 4076437, at *2 (emphasis in original).

## II.  LEGAL STANDARD

### A.  Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to state a claim upon which relief may be granted. Because Plaintiff brought the instant claims in a federal securities fraud action, Plaintiff is not subject to the notice pleading standards under Federal Rule of Civil Procedure 8(a)(2), which require litigants to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Instead, Plaintiff must "meet the higher, [more] exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emp. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014).

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Plaintiffs must include "an account of the time, place, and specific content of the false representations" at issue. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." *Apollo Group*, 774 F.3d at 605. The "PSLRA imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts

United States District Court
Northern District of California

evidencing scienter." *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id.* (internal quotation marks and alteration omitted). In addition, in order to "adequately plead scienter under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (internal quotation marks omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

### B.  Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted). Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

United States District Court
Northern District of California

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

### III.   DISCUSSION

Plaintiff alleges two causes of action: (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and (2) violation of § 20(a) of the Exchange Act against Defendants McNamara, Collier, Dennison, and Kessel. AC ¶¶ 260–70. The Court addresses each cause of action in turn.

### A.   Plaintiff fails to adequately allege that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

"To plead a claim under section 10(b) and Rule 10b-5, Plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Apollo Group*, 774 F.3d at 603.

Here, Defendants argue that Plaintiff fails to plead a material misrepresentation or scienter. Specifically, Defendants argue that (1) many Statements are nonactionable statements of corporate puffery, *see* Mot. at 8–9; (2) all Statements are not demonstrably false under the PSLRA's heightened pleading standard and reliability requirements for confidential witnesses, *see id.* at 9–16; (3) many Statements are protected by the PSLRA's safe harbor, *see id.* at 7–8; and (4) Plaintiff fails to plead a strong inference of Defendants' deliberate recklessness (as is required for non-forward-looking statements) or actual knowledge of falsity (as is required for forward-looking statements), *see id.* at 18–23. Because Defendants' first two arguments require dismissing the Amended Complaint, the Court need not address Defendants' other arguments. The Court addresses Defendants' first two arguments in turn.

### 1.   As the Court previously held, Statement 5 is nonactionable corporate puffery.

Defendants argue that eight Statements—Statements 2–5, 9, 10, 12, and 13—are nonactionable corporate puffery. In particular, Defendants note that the Court already held that Statement 5 was nonactionable puffery. *See* Mot. at 8 (citing Order at 22–23). As for the other seven Statements, Defendants assert that the Court's prior order did not reach those Statements. *Id.* at n.5. Plaintiff responds that "[t]he Court already assessed [S]tatements 2, 3, 4, 7, 9, 10, 12, and 13 and found them actionable." Opp'n at 7. As to Statement 5, Plaintiff does not dispute that the

15

1  Court held Statement 5 to be nonactionable puffery. Plaintiff instead insists that holding was

2  wrong. *See* Opp'n at 7–8.

3       Both parties misapply the Court's prior Order. Defendants are incorrect that the Court's

4  prior Order did not reach Statements 2, 3, 4, 7, 9, 10, 12, and 13. The Court considered

5  Defendants' argument that thirteen Statements were "nonactionable puffery." Order at 20 (quoting

6  Defendant's prior motion to dismiss at 10 n.7). The Court then held that four Statements—

7  including Statement 5 (previously numbered statement 9)—"are nonactionable statements of

8  corporate optimism." Order at 22. The Court thus implicitly rejected Defendants' argument that

9  the nine other Statements were nonactionable puffery too.

10      Plaintiff misapplies the prior Order in two ways. First, Plaintiff is incorrect to ask the Court

11  to reconsider its ruling on Statement 5. The law of the case bars reconsideration. "Under the law of

12  the case doctrine, a court will generally refuse to reconsider an issue that has already been decided

13  by the same court . . . in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir.

14  2012) (en banc). Thus, nonactionable puffery "cannot be amended around . . . [and] should not be

15  part of any amended complaint." *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *19 (N.D. Cal.

16  July 21, 2020).

17      Second, Statement 5 was and still is nonactionable puffery. Statement 5 was made by

18  Defendant Dennison at Flex's May 10, 2017 Investor Day. Specifically, Defendant Dennison said

19  in prepared remarks on the Nike contract that "*[w]e have to drive significant volume, which we're

20  doing today.* This has been a great solution for us, a great story for us." App'x A at 1 (Plaintiff's

21  original emphasis on allegedly false statements). This Statement is non-actionable because

22  "[w]hen valuing corporations, . . . investors do not rely on vague statements of optimism like

23  'good,' 'well-regarded,' or other feel good monikers." Order at 21 (quoting *In re Cutera*, 610 F.3d

24  at 1111). A "great story" of "driv[ing] significant volume" is a paradigmatically vague statement of

25  optimism. *See also, e.g.*, *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *15 (N.D. Cal. Feb.

26  12, 2015) ("[G]eneralized statements of corporate optimism are not actionable even where those

27  statements concern a company's relationships with important customers.").

28

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

Accordingly, Statement 5 is nonactionable puffery, while Statements 2–4, 9, 10, 12, and 13 are not. Thus, the Court GRANTS Defendants' motion to dismiss to the extent Plaintiff's claim under section 10(b) and Rule 10b-5 challenges Statement 5. The Court now proceeds to consider Defendants' arguments concerning falsity.

### 2.  Plaintiff fails to adequately plead the falsity of any Statement.

To assert a claim under the PSLRA, the plaintiff must plead with particularity, *inter alia*, the element of falsity. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false. *Id.*; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false); *see also In re Stratosphere Corp. Sec. Litig.*, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b)"). Moreover, to be actionable, a statement must be false "at [the] time by the people who made them." *Ronconi*, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

Defendants argue that Plaintiff fails to adequately plead falsity on two grounds. First—as to Statements 1, 6–8, 11, and 14—Defendants argue that Plaintiff's confidential witnesses fail the two-part test set forth in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). *See* Mot. at 10–16. Second—as for the other Statements 2–5, 9, 10, 12, and 13— Defendants argue that Plaintiff's allegations fail to plead particularized facts that would prove falsity. *See id.* at 16–18. The Court addresses these arguments in turn.

### a.  Plaintiff fails to adequately plead that the Profitability Statements (Statements 1, 6–8, 11, and 14) are false.

Plaintiff's allegations that the challenged statements are false depend on information

United States District Court
Northern District of California

provided by seven confidential witnesses ("CWs"). Specifically, Plaintiff claims that "[a]ccording to [seven] former Company employees, . . . Flex was consistently missing the production targets that were required to breakeven." *E.g.*, AC ¶ 130.

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. "First, the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of" falsity. *Id.*

Defendants challenge the CWs under both *Zucco* prongs. First, Defendants argue that the accounts provided by four of Plaintiff's confidential witnesses (CWs 3, 4, 6, and 7) lack reliability and indicia of personal knowledge. *See* Mot. at 10–12. Second, Defendants claim that "*none* of the CW statements are indicative of falsity." Mot at 12 (emphasis in original). The Court addresses each *Zucco* prong in turn.

### i. *Zucco* Prong One: four of the CWs lack reliability and personal knowledge.

Defendants challenge CW3, CW4, CW6, and CW7 on three overlapping grounds. First, Defendants challenge many of CW3 and CW7's statements as unreliable hearsay. Second, Defendants challenge CW4 and CW7 on the ground that neither worked on the Nike project. Lastly, Defendants challenge the four CWs for failing "to provide the requisite 'specific[ity] in time, context, and details' for their statements to be considered reliable." Mot. at 11–12 (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016)). The Court addresses each ground in turn.

First, "vague hearsay [] is not enough to satisfy [the Ninth Circuit's] reliability standard." *Zucco*, 552 F.3d at 997; *see, e.g.*, *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *13 (rejecting CW who "confirmed hearing [from an unnamed source] the customers did not want [defendant]'s new product"). Here, CW3 and CW7's statements rely on vague hearsay. CW3—a Human Resources Generalist who left Flex in October 2017 (a year before the class period ended)—states that

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

unnamed "colleagues in engineering and other departments" told her "that Nike had planned to accept 5% returns but in reality Flex was generating 15–20% returns." AC ¶¶ 43, 75, 86. CW7—a former Regional Senior Finance Director located in Austin, Texas—states that she "heard from her colleagues in Guadalajara that there were continuous delays at the Guadalajara factory and that Flex was initially behind on the Nike contract, but as time passed they began telling her that the Nike project was 'a mess.'" AC ¶¶ 55, 73.

CW3 and CW7 fail to (1) specify who gave them this alleged information; (2) provide dates or details of the discussions; and (3) explain how these colleagues knew the information. The Ninth Circuit rejected CWs in *Zucco* for similar reasons. Specifically, the *Zucco* Court affirmed the dismissal of CW allegations that lacked specific dates; were based on "hearsay statements from anonymous finance personnel"; or used vague language like "improperly." *Zucco*, 552 F.3d at 996. Similarly, courts in this district reject CW allegations based on hearsay where the CWs fail to "provide[] any context surrounding when, why, or how these individuals provided [the] CW[] with information." *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1010 (N.D. Cal. 2018).

In response, Plaintiff argues that CW3 and CW7 in fact have personal knowledge of the Statements' falsity. That alleged knowledge fails to support the reliability of the CWs' specific allegations, however. CW3 attended "weekly meetings . . . that detailed the production problems with the Nike products and the number of products that were being rejected by Nike." Opp'n at 8–9 (quoting AC ¶ 43). Yet CW3 conspicuously fails to state that these meetings described missed projections. CW3's only basis for missed projections is hearsay from unnamed sources. For instance, the basis for CW3's allegation "that Nike had planned to accept 5% returns but in reality Flex was generating 15–20% returns" is "colleagues in engineering and other departments"—not the weekly meetings for which CW3 had personal knowledge. AC ¶ 75.

Similarly, CW7 merely (1) described Flex's "method of forecasting [profitability] for each of its clients"; and (2) recalled that Defendant McNamara visited Austin, Texas and gave speeches about Nike. *See* Opp'n at 9 (citing AC ¶¶ 47, 55, 68, 73). CW7 failed to link her generalized description of Flex's forecasting process to any personal knowledge about *Nike-specific* forecasts.

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

Nor does CW7 allege that she had personal knowledge of Nike *missing* forecasts. Thus, CW3 and CW7 fail *Zucco*'s first prong because their statements rely on "vague hearsay." *Zucco*, 552 F.3d at 997.

Second, CW4 and CW7 are unreliable because they never even worked on the Nike project. AC ¶¶ 44, 47. A court in this district has held—and the Ninth Circuit has affirmed—that CWs are unreliable if plaintiff fails to state that CWs "were connected to" defendant's allegedly fraudulent project. *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012), *aff'd,* 561 F. App'x 598 (9th Cir. 2014) (affirming on similar ground). Plaintiff's contrary argument is "CW4 knew about the Nike project and its importance" and "CW7 heard McNamara speak both in person and on internal videoconferences, of the Nike contract's importance." Opp'n at 10. Yet understanding that a project is important is not the same as having firsthand knowledge that Defendants made false statements. *See, e.g.*, *McGovney v. Aerohive Networks, Inc.*, No. 18-CV-00435-LHK, 2019 WL 8137143, at *14 (N.D. Cal. Aug. 7, 2019) ("CW testimony should not be based on 'secondhand information[.]'" (quoting *Zucco*, 552 F.3d at 996)).

Lastly, Defendants argue that CW3, CW4, CW6, and CW7 "lack the 'specificity in time, context, and details' that courts have frequently required as indicia of reliability." *Inchen Huang v. Higgins*, No. 17-CV-04830-JST, 2019 WL 1245136, at *7 (N.D. Cal. Mar. 18, 2019) (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016)). The Court agrees. As just detailed above, CWs 3, 4, and 7 are unreliably vague.

Similarly, CW6 lacks reliable specificity in her statements and time employed at Flex. For instance, CW6 asserts that Flex tracked "the number of shoes manufactured each day . . . *the metrics were not critical* but in mid-2017 the Company *began to see* the metrics were not being met." AC ¶ 76 (emphasis added). CW6 thus fails to allege what the "critical" metrics were and fails to quantify the missed metrics that the Company had just "began to see." *Id.* CW6 also omits whether the metrics improved. Indeed, CW6 left the company in April 2018. AC ¶ 46. CW6's departure was six months before the class period ended, about a month before Defendant Kessel made Statement 14, and shortly before or after Defendant McNamara made Statement 13. This

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

timing mismatch gives the Court "basis to question aspects of CW[6]'s claimed knowledge and h[er] effort to impute scienter to the defendants." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020).

Accordingly, CW3, CW4, CW6, and CW7 fail the first prong of the *Zucco* test for assessing CWs in securities cases. Even so, the Court proceeds to consider the second prong of the framework: whether the statements attributed to the CWs are "themselves [] indicative of" falsity. *Zucco*, 552 F.3d at 995

### ii.   *Zucco* Prong Two: the CWs' statements are not indicative of falsity.

*Zucco*'s second prong requires that "statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of" falsity. *Zucco*, 552 F.3d at 995. Previously, the Court held that the CWs' statements were not indicative of the falsity of Defendants' Statements about profitability projections (Statements 1, 6, 7, 8, 11, and 14, a.k.a. "profitability Statements"). Specifically, the Court held that CW1, CW2, and CW5 plausibly described only operational difficulties, not missed profitability projections. *See* Order at 29–30 (CW1), 30 (CW2), 30–32 (CW5 and other grounds for CWs' insufficiency). As for the other CWs, the Court did not consider their statements because those CWs failed *Zucco*'s first prong. *See id.* at 25 (CW6), 25–27 (CW3 and CW4). [4]

Thus, the Court dismissed Plaintiff's claims against the profitability Statements and instructed Plaintiff "to more clearly tie the allegations of the CWs to Flex's ability to achieve *profitability* as to the Nike contract." Order at 32 (emphasis in original). Profitability projections, the Court explained, depended on more than smooth operations. "[P]rofitability projections also

---

[4] Plaintiffs claim that "[t]he Court upheld CW1, CW2, and CW5's statements as indicative of falsity as to [*non*-profitability] statements 6, 7, 8, 19 and 20 (current misstatements 2, 3, 4, 12 and 13)." Opp'n at 11. Not so. The Court simply held that the three CWs' statements "are not 'themselves [] indicative of' falsity as to profitability projections" challenged by Plaintiffs. Order at 29. To the extent the Court also analyzed whether the three CWs' statements indicated the falsity of *non*-profitability Statements, the Court held that the CWs' statements *failed* to suggest falsity. *See* Order at 33 ("Again, Plaintiff merely relies on the alleged operational problems described by the CWs as evidence of this statement's falsity.").

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

necessarily depended on [1] the *price that Nike paid Flex* for shoes across the relevant period, which may have varied as Flex expanded production lines and produced new Nike designs, as well as [2] the *costs Flex bore* for shoe production, which may have also varied as Flex changed facilities and increased scale." Order at 31 (emphasis added). Yet "[t]he CWs and the complaint [were] utterly silent as to these other determinants of the Nike contract's profitability for Flex." *Id.*

The Amended Complaint is again silent as to other determinants of the Nike contract's profitability for Flex. Again, none of the CWs' statements are indicative of the falsity of the profitability Statements.

As to CW1, CW2, and CW5, the Court had held that their statements were not indicative of falsity. *See* Order at 28–32. Yet Plaintiff repleads those CWs' same statements without more information about or from the CWs. *See* AC ¶¶ 41, 42, 45, 71, 74, 75, 77, 82–84, 86–88, 106. Thus, CW1, CW2, and CW5 are still not indicative of falsity.

As for the four remaining CWs, their statements only describe operational difficulties, not the pricing and cost information outlined in the Court's prior order. Specifically:

- CW3 alleges that (1) Nike shoes manufactured by Flex were being returned three- to four-times more frequently than Nike expected, *see* AC ¶¶ 75, 86; and (2) Flex hired inexperienced personnel at its shoe factory. *See id.* ¶ 88.

- CW4 alleges that the Nike contract was "behind from the get-go." *Id.* ¶ 72. By "behind," CW4 alleges that "Flex was experiencing operational issues in the [shoe] factory in terms of quality and quantity output." *Id.*

- CW6 alleges that Flex tracked the number of shoes manufactured each day, and "in mid-2017 the Company began to see the metrics were not being met." *Id.* ¶ 76. "[T]he metrics were not critical." *Id.* Even so, "meetings were held with executives," including Defendants McNamara and Dennison, "to discuss and remedy this." *Id.*

- CW7 alleges that "she heard from her colleagues in Guadalajara that there were continuous delays at the Guadalajara [shoe] factory." *Id.* ¶ 73. CW7 also allegedly heard from her colleagues that "Flex had tried unsuccessfully to hire experienced personnel but the factory was predominantly staffed with individuals with no shoe manufacturing experience." *Id.* ¶ 89.

All these statements merely allege operational difficulties faced by Flex. As the Ninth Circuit has

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

explained, allegations about "serious operational problems" in a new business "do not meet the level of specificity required by the PSLRA and [Ninth Circuit] caselaw." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). The Ninth Circuit's rationale sounds in common sense: "Problems and difficulties are the daily work of business people. That they exist does not make a lie." *Id.*; *accord Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 954 (D. Ariz. 2007) (holding same and collecting cases).

Here too, the CWs describe difficulties arising from Flex's expansion into a new business: shoe manufacturing. That these difficulties exist fails to indicate that Defendants' Statements about future profitability were false at the time Defendants made them. Nor do the difficulties quantify "the price that Nike paid Flex for shoes across the relevant period" or "the costs Flex bore for shoe production" over time. Order at 31. Indeed, Plaintiff candidly concedes that "Plaintiff [has] failed to allege the price Nike paid for shoes or Flex's exact production costs, or the 'variables' that could have impacted profitability." Opp'n at 14.

Plaintiff tries to minimize the missing allegations in three ways. First, Plaintiff argues that "[t]here are an infinite number of variables that Defendants can point to that *may have* impacted Flex's profitability." *Id.* (emphasis in original). Second, Plaintiff argues that the CWs' statements show that Flex "miss[ed] badly on two critical variables . . . [1] the number of shoes sold and [2] the increased costs of scrap and materials problems." *Id.* Third, Plaintiff adds CW7, who states that as a general matter, Defendants "closely tracked profitability and breakeven on their contracts." AC ¶ 68. The implication of Defendants' profitability tracking, Plaintiff claims, is that Defendants knew that the Nike contract would be unprofitable at the time Defendants made the profitability Statements. *See* Opp'n at 12.

None of Plaintiff's arguments is persuasive. The Court addresses each in turn. First, profitability is not the function of "an infinite number of variables." Rather, profitability ultimately equals revenue minus costs. Thus, the Court instructed Plaintiff "to more clearly tie the allegations of the CWs to Flex's ability to achieve *profitability*" by pleading particular allegations about the "price that Nike paid Flex" (revenue) and "the costs Flex bore for shoe production" (costs). Order

23

United States District Court
Northern District of California

at 32 (emphasis in original). Yet Plaintiff again alleged operational problems alone. These problems are not enough to indicate falsity, because "[a] company could experience 'serious operational problems,' 'substantial difficulties,' and 'difficult problems' and still have increasing revenues" or decreasing costs. *Ronconi*, 253 F.3d at 434. Similarly, Flex could have sold fewer shoes than expected while still realizing profitability through lower costs, higher prices, or a margin of safety built into profitability projections. *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1116 (N.D. Cal. 2009) (holding that witness testimony did not show falsity because "[h]earing at a meeting that revenue forecasts will not be reached is not equivalent to knowing that [the company] misstated its revenues").

Second, Plaintiff fails to actually allege "increased costs of scrap and materials problems." Opp'n at 14. Plaintiff's opposition mischaracterizes the CWs' statements. The CWs never even use the word "costs." At most, the CWs state that shoes manufactured by Flex were being returned three- to four-times more frequently than *Nike* expected. *See, e.g.*, AC ¶ 75 ("Flex was generating 15–20% returns"); ¶ 86 ("it was not what Nike expected"). Yet when the CWs discuss *Flex*'s internal return projections, the CWs do not allege that the projections were missed. The CWs simply state that a weekly presentation "detailed . . . the number of products that were being rejected by Nike." AC ¶ 75. In other words, Flex could have projected that Nike's expectations were unrealistic but still left room for profitability.

Third, CW7's general allegation that Defendants' "closely tracked profitability and breakeven on their contracts" fails to suggest that Defendants' profitability Statements were false, let alone knowingly false. AC ¶ 68. "The fact that a prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re Verifone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993). CW7 does *not* allege the Defendants' tracking methods predicted that the Nike project would fail. Nor does CW7 allege that Defendants' made Statements that contradicted Defendants' internal tracking.

Regardless, Defendants in fact *disclosed* increased costs for the Nike project on July 27, 2017. Ryan Decl., Ex. 5, ECF No. 142-5 (transcript of earnings call for fiscal quarter ended June

24

30, 2017). This disclosure came from Defendant McNamara (Chief Executive Officer) and

Defendant Collier (Chief Financial Officer) in both prepared remarks and answers to questions

from analysts. For instance:

- In prepared remarks, Defendant Collier disclosed that during the quarter, "we saw elevated levels of costs to support our strategic partnership with Nike." *Id.* at 4.

- During Q&A with analysts, Defendant McNamara responded to a question about Nike costs and how investors should think about margin forecasts. CEO McNamara stated "We have to ramp 1 million square feet with like 8,000 people and it's – all I can say is when you put all that into one system over the course of the year, it's going to take time to move out. And I would just say it's complicated. And our ability to precisely forecast exactly those costs, it's hard." *Id.* at 13.

- During Q&A with analysts, Defendant Collier disclosed that overall net income across Flex would "be down modestly." The "big driver" of that decrease "is the investment cycle as we're absorbing the significant losses, as we ramp the Nike initiative." *Id.* at 18.

These disclosures are another reason why the CWs' statements are not indicative of the falsity of

Defendants' profitability Statements with the possible exception of Statement 1, which predated

the July 27, 2017 earnings call. *See* App'x A at 1 (quoting Statement 1, which was Defendant

Collier "anticipat[ing] and see[ing] profitability being achieved in Q4 next year . . . ."). "Plaintiff

'must demonstrate that a particular statement, when read in light of all the information then

available to the market, or a failure to disclose particular information, conveyed a false or

misleading impression.'" *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) (quoting

*In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of*

*reh'g* (Dec. 6, 1991)); *see* AC ¶¶ 250–54 (pleading fraud-on-the-market theory). Here, all the

profitability Statements except Statement 1 postdate the July 27, 2017 earnings call. Thus, as of at

least July 27, 2017, the market was already aware of rising costs, uncertainty in forecasts, and

"significant losses" in the Nike contract. *See* Ryan Decl., Ex. 5 at 4, 13, 18.

In short, the Court concludes that none of the CWs' statements are indicative of falsity as

to the profitability Statements (Statements 1, 6–8, 11, and 14). Accordingly, the CWs' statements

do not survive the PSLRA pleading standard as to the falsity of these alleged misrepresentations.

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiff points to no other allegations in the Amended Complaint that indicate the falsity of the profitability Statements. *See* Opp'n at 14–15 (discussing profitability Statements). Accordingly, the Court GRANTS Defendants' motion to dismiss to the extent Plaintiff's claim under section 10(b) and Rule 10b-5 challenges Statements 1, 6, 7, 8, 11, and 14.

**b.  Plaintiff also fails to adequately plead that the other, non-profitability Statements (Statements 2–5, 9, 10, 12, and 13) are false.**

Plaintiff also challenges Statements 2–5, 9, 10, 12, and 13 ("other Statements"). As with the profitability Statements though, Plaintiff fails to plead particularized facts that the other Statements are false. *See In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d at 877 (holding that the PSLRA "requir[es] plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter."). Instead, Plaintiff repeats many of the same allegations that the Court had held insufficient in its prior Order. The Court addresses each of the other Statements below.

Statements 2 and 3 were statements by Defendant McNamara on an April 27, 2017 earnings call. Defendant McNamara stated that Flex was "accelerating our investments in Nike *on the back of early automation successes . . . . We're starting to get early successes around some of the design engagements that we're having [with Nike] about reinventing how design actually occurs, some of the new technologies of the shoes, and even into the automation projects that we're seeing.*" App'x A at 1 (Plaintiff's original emphasis on allegedly false statements). Plaintiff argues that "[m]ultiple CW allegations, including new allegations from CWs 3, 4, 6, and 7 not previously considered by the Court, demonstrate that Flex was not experiencing 'early automation successes' or 'early successes around . . . design engagements.'" Opp'n at 16 (quoting Statements 2, 3).

Not so. The Court's prior holding on Statements 2 and 3 (formerly Statements 6 and 7) shows why. The Court dismissed Plaintiff's claims against Statements 2 and 3 and held that "the mere existence of operational problems does not mean that Defendants could not simultaneously experience any 'early successes.'" Order at 33. Here, Plaintiff again pleads "the mere existence of

operational problems," as detailed above in the Court's analysis of new allegations by CW3, CW4, CW6, and CW7. *See* Section III-A-2-a-ii, *supra*. Allegations about "serious operational problems" in a new business "do not meet the level of specificity required by the PSLRA and [Ninth Circuit] caselaw." *Ronconi*, 253 F.3d at 434.

In fact, some CW allegations support the *veracity* of Statements 2 and 3. For instance, "CW6 confirmed that in 2016 and 2017, the metrics were not critical *but in mid-2017 the Company began to see* the metrics were not being met." AC ¶ 76 (emphasis added). Similarly, "CW1 specifically recalled that by May 2017, Flex did not meet Nike's projections." *Id.* ¶ 75. CW6 and CW1 thus allege that Flex actually met its metrics until at least mid-2017. Statements 2 and 3 were made on the April 27, 2017 earnings call about the fiscal quarter that ended March 31, 2017. *See* Ryan Decl., Ex. 3, ECF No. 142-3 (call transcript). Thus, CW6 and CW1's allegations support statements that Flex had "early automation successes" and "starting to get early successes around . . . design engagements" through March 31, 2017, if not April 27, 2017. Only in "mid-2017" did Flex "beg[i]n to see" that it was missing metrics in a "not critical" way. AC ¶ 76.

On the same April 27, 2017 earnings call, Defendant Collier made Statement 4. Defendant Collier stated that, as to "the relationship with Nike," Flex was "*completely aligned with the production curve.*" App'x A at 1 (Plaintiff's original emphasis on allegedly false statements). Plaintiff's challenge to Statement 4 fails for the same reason it did before. Now, as then, "Plaintiff merely relies on the alleged operational problems described by the CWs as evidence of this [S]tatement's falsity. However, CW1 stated that Plaintiff only failed to meet Nike's projections 'by May 2017,' seemingly in the month following the delivery of [Statement 4]." Order at 33 (quoting former Compl. ¶ 150, now AC ¶ 135). Confirming CW1's timing is CW6's statement that only in "mid-2017" did Flex "beg[i]n to see" that it was missing metrics. AC ¶ 76.

Statement 5 is a non-actionable statement of corporate optimism that Plaintiff has improperly re-alleged. *See* Section III-A-1, *supra*. As recounted above, Statement 5 was Defendant Dennison's statement that "we've got real commits. We have to drive significant volume, which we're doing today. This has been a great solution for us, a great story for us." App'x A at 3.

27

Statement 9 was made by Defendant Collier on December 4, 2017 at an investor conference. An analyst asked Defendant Collier about Flex's new Guadalajara factory (which Flex had opened in October 2017, AC ¶ 21) and how the factory "tie[d] [] into the goal of reaching breakeven with the Nike relationship exiting the fiscal year." Ryan Decl., Ex. 6, ECF No. 142-6 (conference transcript). Defendant Collier responded "[w]e're well on our way, we're 30 days plus into the new operation. *We see multiple signs of the accelerated scaling effects.*" App'x A at 5 (Plaintiff's emphasis). Plaintiff claims that AC ¶¶ 105–07 show that "operational problems and inability to meet production targets continued to plague the Nike contract even after moving into the new Guadalajara manufacturing facility." Opp'n at 16. Based on these alleged operational problems, Plaintiff claims that Statement 9 was false.

The Court disagrees for two reasons. First, seeing "multiple signs of accelerated scaling effects" is not inconsistent with also seeing "manufacturing issues and problems" at a new factory. AC ¶¶ 105–07. A new factory can scale imperfectly but scale nonetheless. Second, the CWs themselves discuss "multiple signs of accelerated scaling." "Specifically, CW6 stated there were only two lines of production, but with the completion of a new building on the campus, this grew to six or seven lines." AC ¶ 106; *accord id.* ¶ 107 (stating same). Thus, Plaintiff fails to plead particularized facts that indicate the falsity of Statement 9.

Statement 10 was made by Defendant McNamara on the January 25, 2018 earnings call for the fiscal quarter ended December 31, 2017. *See* Ryan Decl., Ex. 7, ECF No. 142-7 (call transcript). In prepared remarks, Defendant McNamara discussed Flex's move to the Guadalajara factory in October 2017. Defendant McNamara stated "*[t]his move improved efficiency and helped reduce operating losses in line with expectations.*" App'x A at 6 (Plaintiff's emphasis). Plaintiff argues that Statement 10 is false "[f]or the same reason" Statements 5 and 9 are false. Specifically, Plaintiff argues Statement 10 is false because "operational issues (and the extent of the issues) persisted before and after the move into the new facility, regardless of the number of operating lines."

Plaintiff's challenge to Statement 10 falls with Plaintiff's challenge to Statements 5 and 9.

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

Statement 10, like Statements 5 and 9, was *not* that the Guadalajara factory lacked operational issues. Rather, Statement 10 was that the Guadalajara factory "improved efficiency and helped reduce operating losses in line with expectations." App'x A at 6. Nothing in the Amended Complaint suggests that the Guadalajara factory failed to improve certain metrics despite operating imperfectly. To the contrary, the Amended Complaint suggests that the Guadalajara factory *improved* efficiency by consolidating Nike manufacturing into one custom factory and increasing lines of production. *See, e.g.*, AC ¶ 105 (factory increased lines of production from one or two to six or seven).

Statements 12 and 13 were made by Defendant McNamara on the April 26, 2018 earnings call for the fiscal quarter and year ended March 31, 2018. In prepared remarks, Defendant McNamara stated that "Nike has released a full set of products designed for our automation system, *which is now beginning to ramp in mass production*." Ryan Decl., Ex. 8 at 7, ECF No. 142-8 (call transcript; Statement 13). Then an analyst asked if Flex could "be a bit more explicit about whether or not the company has identified the steps that it needs to take to get Nike to profitability." Ryan Decl., Ex. 8 at 17, ECF No. 142-8 (call transcript). Defendant McNamara stated "[t]he key to Nike is to have design content – shoe content that's designed to run on a highly automated line. The highly automated line that's turned on, the content has been developed, and it just needs to ramp. *So this is the key thing we need. We don't need any more optimizations of a factory. We have good factory flow. We just need the right content to run*." App'x A at 7 (Statement 12). Plaintiff alleges that Statements 12 and 13 were false because they "omitted the severe operational problems that caused Flex to miss its contractual production metrics." Opp'n at 16.

Yet the Court squarely rejected Plaintiff's same argument in the prior Order. The Court explained that products were truly "beginning to ramp," and that design content being "the key thing" did not exclude other pressures on profitability. The Court held:

> Defendant McNamara only said that "the key thing" Flex needed as of April 26, 2018, was new design content from Nike. This is plainly distinct from saying that new design content was the only thing Flex needed to achieve profitability as to the Nike contract. Plaintiff provides no particularized allegations to the contrary.

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

United States District Court
Northern District of California

United States District Court
Northern District of California

Moreover, Plaintiff provides no evidence that the aforementioned Nike products were not "beginning to ramp in mass production" as of April 26, 2018. On the contrary, at that time, the complaint alleges that the new Guadalajara factory had opened and Flex's lines of production for Nike allegedly increased in number.

Order at 33–34 (citing Compl. ¶ 103, now AC ¶ 106).

Underscoring the Court's prior holding are other statements by Defendant McNamara on the same earnings call. In those statements, Defendant McNamara disclosed sweeping risks to the viability of the Nike contract. Defendant McNamara stated, "the whole concept of automation is you can't do automation[.] [Y]ou have to do design for automation. So it's not something we control entirely . . . . [Shoes] was an entire new product category and we're very new to it. We always felt this would be a decade-long kind of implementation and commitment." Ryan Decl., Ex. 8 at 9. Thus, Plaintiff unsuccessfully makes the same argument against Statement 12 that Plaintiff did before.

In sum, Plaintiff fails to plead the falsity of Statements 2–5, 9, 10, 12, and 13 with sufficient particularity under the PSLRA. Accordingly, the Court GRANTS Defendants' motion to dismiss to the extent Plaintiff's claim under section 10(b) and Rule 10b-5 challenges statements 2–5, 9, 10, 12, and 13. All told, the Court concludes that Plaintiff has failed to adequately allege that any of the Statements are false or misleading under the PSLRA.

### B. Plaintiff's derivative claim under Section 20(a) of the Exchange Act falls with Plaintiff's claim under Section 10(b) of the Exchange Act and Rule 10b-5.

Congress has established liability in § 20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws. 15 U.S.C. § 78t(a). To prove a prima facie case under § 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law"; and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiff has failed to plead a primary securities law violation, Plaintiff has also failed to plead a violation of Section 20(a). *See In re Cutera*, 610 F.3d at 1113 n.6 ("Because the § 10(b) claims were properly dismissed, the § 20(a) claims were also properly dismissed."). Thus, Defendants' motion to dismiss Plaintiff's claim under Sections 20(a) is also GRANTED.

30

United States District Court
Northern District of California

1    Accordingly, the Court dismisses the Amended Complaint in its entirety. Moreover,

2  because the grounds for dismissal here were among the many deficiencies identified in the Court's

3  prior Order—and that Order had warned that "failure to cure the deficiencies addressed in this

4  Order[] will result in dismissal of Plaintiff's claims with prejudice"—the Court dismisses the

5  Amended Complaint with prejudice. Order at 37. Granting leave to amend would be futile because

6  nothing suggests that another complaint, which would be the fifth in this case, could cure all the

7  defects identified in the prior Order and this one. *See Leadsinger, Inc.*, 512 F.3d at 532; *see also,*

8  *e.g.*, *Curry v. Yelp Inc.*, 875 F.3d 1219, 1228 (9th Cir. 2017) (affirming dismissal with prejudice of

9  securities suit where the district court "pointed out deficiencies in Plaintiffs' pleadings" in a prior

10  order). Indeed, Plaintiff does not dispute Defendant's argument that the Amended Complaint, if

11  dismissed, should be dismissed with prejudice. *See* Mot. at 25 (arguing that the AC should be

12  dismissed with prejudice); Reply at 15 ("Plaintiff does not even request leave to amend,

13  acknowledging that it can do nothing further to fix the deficiencies and that amendment would be

14  futile.").

## IV.    CONCLUSION

16    For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Amended

17  Consolidated Class Action Complaint in its entirety is GRANTED with prejudice.

18  **IT IS SO ORDERED.**

19

20  Dated: December 10, 2020

21

22  LUCY H. KOH
United States District Judge

Case No. 18-CV-02706-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE